**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| ESTATE OF CARMEN E. CRESPO, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No.  1:22-cv-01514 |
| DEMOCRATIC PEOPLE'S REPUBLIC OF KOREA, | ) ) ) | |
| Defendant. | ) ) | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

<u>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR DEFAULT JUDGMENT ON LIABILITY AS TO DEFENDANT NORTH KOREA**</u>

## TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................1

II.    BACKGROUND ...............................................................................................2

III.   STANDARD FOR DEFAULT JUDGMENT AND EVIDENTIARY RECORD .............5

IV.    STATEMENT OF FACTS ...................................................................................8

    A.  The Lod Airport Massacre ......................................................................8

    B.  Operational Planning and Involvement of the Popular Front for the Liberation of Palestine ....................................................................................................12

    C.  North Korea's Material Support to the PFLP-JRA Network (1970–1972) .................14

    D.  The Critical Alliance: George Habash's September 1970 Pyongyang Speech ..........................................................19

    E.  The Causal Relationship Between North Korea's Support and the Lod Airport Attack ....................................................................................................22

    F.  The Plaintiffs .......................................................................................25

V.     JURISDICTION ...............................................................................................27

    A.  Statutory Framework.............................................................................27

    B.  North Korea's Designation as a State Sponsor of Terrorism .......................28

    C.  U.S. Nationality of Victims......................................................................35

    D.  No Arbitration Requirement ....................................................................37

    E.  Jurisdictional Predicate: Extrajudicial Killing..............................................37

    F.  Material Support or Resources .................................................................39

    G.  Proximate Causation .............................................................................44

    H.  Personal Jurisdiction .............................................................................50

VI.    NORTH KOREA IS LIABLE UNDER 28 U.S.C. § 1605A(c) ..................................51

    A.  Section 1605A(c) Establishes North Korea's Liability..................................51

    B.  North Korea's Liability Is Common to All Claims.........................................53

C. Claimant-Specific Eligibility and Damages Are Reserved for Phase Two..................54

VII.    CONCLUSION........................................................................................................54

## TABLE OF AUTHORITIES

**CASES**

*Alameda v. Sec'y of Health, Educ. & Welfare*, 622 F.2d 1044 (1st Cir. 1980) ..............................5

*Bae v. Democratic People's Republic of Korea*,
    No. 20-2260, 2025 WL 2633359 (D.D.C. Aug. 15, 2025) ..................................................34, 35

*Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685 (7th Cir. 2008) ...............................46

*Borochov v. Islamic Republic of Iran*, 94 F.4th 1053 (D.C. Cir. 2024), *cert. denied*, No. 24-277
(U.S. June 30, 2025) .........................................................................................28, 38, 45, 46

*Butler v. Democratic People's Republic of Korea*,
    No. 20-cv-02514 (ACR), 2025 WL 3078198 (D.D.C. Nov. 4, 2025) ..............................5, 7, 28

*Calderon-Cardona v. Democratic People's Republic of Korea*,
    723 F. Supp. 2d 441 (D.P.R. 2010).......................................6, 7, 17, 30, 38, 42, 44, 49

*Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258 (D.D.C. 2003) ..............................38

*Doe v. Democratic People's Republic of Korea Ministry of Foreign Affs. Jungsong-Dong*,
    414 F. Supp. 3d 109 (D.D.C. 2019)...........................................5 n.2, 7, 29, 31, 32, 33, 34, 37
*Does v. Democratic People's Republic of Korea*,
No. 23-273 (TJK), 2026 WL 1493562 (D.D.C. May 28, 2026) ...............................29, 32

*Fraenkel v. Islamic Republic of Iran*, 892 F.3d 348 (D.C. Cir. 2018).........................................51

*Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983) ................................................................46

*Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044 (D.C. Cir. 2014) .................5

*In re Islamic Republic of Iran Terrorism Litig.*,
    659 F. Supp. 2d 31 (D.D.C. 2009).......................................................................................27

*K.E.F.V. v. Islamic Republic of Iran*, 135 F.4th 988 (D.C. Cir. 2025) .............................51, 53, 54

*Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12 (D.D.C. 2019)...............................45, 48

*Karcher v. Islamic Republic of Iran*, No. 16-232 (CKK) (D.D.C. June 3, 2026).........................38

*Kilburn v. Socialist People's Libyan Arab Jamahiriya*,
    376 F.3d 1123 (D.C. Cir. 2004)................................................................................44, 45, 48

*Leibovitch v. Islamic Republic of Iran*, 697 F.3d 561 (7th Cir. 2012).........................................35

*Maalouf v. Islamic Republic of Iran*, 923 F.3d 1095 (D.C. Cir. 2019)...........................................5

*Massie v. Gov't of Democratic People's Republic of Korea*,
    592 F. Supp. 2d 57 (D.D.C. 2008) ...............................................28, 29, 31, 32, 33 n.4

*Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9 (D.C. Cir. 2015) ........................................35

*Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51 (D.D.C. 2010)......................................29

*Owens v. Republic of Sudan*, 864 F.3d 751 (D.C. Cir. 2017), *vacated and remanded on other grounds sub nom. Opati v. Republic of Sudan*, 590 U.S. 418 (2020) .....5, 6, 24, 35, 37, 44, 45, 46, 47, 48

*Rothstein v. UBS AG*, 708 F.3d 82 (2d Cir. 2013) ..............................................................45

*Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023) ...............................................................45

*Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52 (D.D.C. 2010) ......................................53

*Vera v. Republic of Cuba*, 867 F.3d 310 (2d Cir. 2017) .......................................................34, 35

*Warmbier v. Democratic People's Republic of Korea*,
    356 F. Supp. 3d 30 (D.D.C. 2018) .............................................................29, 30, 34

*Worley v. Islamic Republic of Iran*, 75 F. Supp. 3d 311 (D.D.C. 2014).........................................7

**STATUTES**

U.S. Const. amend. XIV, § 1 ....................................................................................36

8 U.S.C. § 1101(a)(22)...........................................................................................52

8 U.S.C. § 1401(a) ..............................................................................................36

8 U.S.C. § 1402..................................................................................................36

18 U.S.C. § 2339A(b)(1)..........................................................................................23, 39, 42

28 U.S.C. § 1330(b) ............................................................................................50, 51, 54

28 U.S.C. § 1350 note § 3(a) (TVPA) .............................................................................37

28 U.S.C. § 1605A.................................................................................................. *passim*

28 U.S.C. § 1608.................................................................1, 2, 3, 5, 6, 7, 8, 49, 50, 51, 54

Jones Act of 1917, Act of Mar. 2, 1917, ch. 145, § 5, 39 Stat. 951.............................................36

Countering America's Adversaries Through Sanctions Act,    Pub. L. No. 115-44, § 324, 131 Stat. 886, 954 (2017)..................................................................................................................31

P.R. Laws Ann. tit. 1, § 5212 (2006) .........................................................................................12

**RULES**

Fed. R. Civ. P. 4(j)(1) ...............................................................................................................50

Fed. R. Evid. 702–703 ...............................................................................................................6

Fed. R. Evid. 803(8)....................................................................................................................6

**OTHER AUTHORITIES**

North Korea State Sponsor of Terrorism Designation Act of 2017, H.R. 479,
     115th Cong. §§ 2(a)(4)–(5) (2017) (as passed by House) ......................................7, 30, 31, 35

North Korea State Sponsor of Terrorism Designation Act of 2017, S. 672,
115th Cong. §§ 2(a)(4)–(5) (2017) (as introduced in Senate) ..................................................30, 35

163 Cong. Rec. H2611–12, H2616–17 (daily ed. Apr. 3, 2017) ....................................................30

*International Terrorism: Hearings Before the Subcomm. on Internal Security of the S. Comm. on the Judiciary*, 94th Cong. (1975) .......................................................................................13, 14, 15

U.S. Dep't of State, *Country Reports on Terrorism 2020* (2021)...................................................33

U.S. Dep't of State, *Patterns of Global Terrorism: 1988* (1989).........................18, 32, 33, 40, 43

U.S. Dep't of State, *Patterns of Global Terrorism: 1996 (1997)* ....................................18, 41, 43

Determination Pursuant to Section 6(j) of the Export Administration Act of 1979; North Korea, 53 Fed. Reg. 3477 (Feb. 5, 1988) ........................................................................................28, 32

Rescission of Determination Regarding North Korea, 73 Fed. Reg. 63,540 (Oct. 24, 2008) .......28

Democratic People's Republic of Korea (DPRK) Designation as a State Sponsor of Terrorism, 82 Fed. Reg. 56,100 (Nov. 27, 2017)....................................................................................28, 31

**LIST OF EXHIBITS**

| Number | Exhibit Description |
|---|---|
| 1 | Expert Report of Thomas Joscelyn (with Appendix A) |
| 2 | North Korea State Sponsor of Terrorism Designation Act of 2017, H.R. 479, 115th Cong. (2017) (as passed by House); S. 672, 115th Cong. (2017) (as introduced) |
| 3 | Expert Report of Barry Rubin, Ph.D. (*Calderon-Cardona v. DPRK*, No. 08-1367 (D.P.R. 2010), ECF No. 23-5) |
| 4 | Expert Report of Bruce E. Bechtol, Jr., Ph.D. (*Calderon-Cardona*, ECF No. 23-6) |
| 5 | Expert Report of Rohan Gunaratna, Ph.D. (*Calderon-Cardona*, ECF No. 23-4) |
| 6 | 25 Die at Israeli Airport, *N.Y. Times*, May 31, 1972 |
| 7 | Cable No. 3447, U.S. Embassy Tel Aviv to Secretary of State: Terrorist Attack at Lod Airport (May 31, 1972) (declassified) |
| 8 | *San Juan Star*, June 1, 1972 |
| 9 | *San Juan Star*, June 2, 1972 |
| 10 | Cable, U.S. Dep't of State to U.S. Embassies Beirut and London: Attack at Lod Airport (May 31, 1972) (declassified) |
| 11 | Memorandum for the President: Implications of Lod Airport Attack, U.S. Dep't of State (June 2, 1972) (declassified) |
| 12 | 16 Caskets Leave Lod Airport, *Jerusalem Post*, June 6, 1972 |
| 13 | 16 frías cajas de metal, *El Nuevo Día*, June 6, 1972 (with certified translation) |
| 14 | Memorial Service Program, Cathedral Church of St. John the Divine (June 15, 1972) |
| 15 | Tree Planting Ceremony photograph and translation |
| 16 | P.R. Laws Ann. tit. 1, § 5212 (Law No. 144 of 2006) |
| 17 | P.R. S. Res. 460 (June 1, 2009) (with certified translation) |
| 18 | International Terrorism: Hearings before the Subcomm. on Internal Security, 94th Cong., 1st Sess. (1975) (excerpts, including pp. 112–115 and pp. 179–244) |
| 19 | Japanese National Police Agency, "Japanese Red Army" (compilation including Sean K. Anderson & Stephen Sloan, *Historical Dictionary of Terrorism*) |
| 20 | Bruce E. Bechtol, Jr., *North Korea and Support to Terrorism: An Evolving History*, 3 *J. Strategic Security* 45 (2010) |
| 21 | Rémi Kauffer, "Communism and Terrorism," in Stéphane Courtois et al., *The Black Book of Communism* 353 (Harvard Univ. Press 1999) (excerpts, pp. 353–59) |
| 22 | National Security Council, Economic Sanctions Against Countries Harboring Hijackers or Refusing to Return Airplanes or Passengers (Oct. 1970) (declassified) |
| 23 | U.S. Dep't of State, *Patterns of Global Terrorism: 1988* (1989) (excerpts) |
| 24 | U.S. Dep't of State, *Patterns of Global Terrorism: 1996* (1997) (excerpts) |
| 25 | Eric Pace, "Lebanon Is Said to Have Set Up Liaison Unit With Commandos," *N.Y. Times*, Sept. 23, 1972 |
| 26 | Determination Pursuant to Section 6(j) of the Export Administration Act of 1979, 53 Fed. Reg. 3477 (Feb. 5, 1988) |
| 27 | Rescission of Determination Regarding North Korea, 73 Fed. Reg. 63,540 (Oct. 24, 2008) |
| 28 | Democratic People's Republic of Korea (DPRK) Designation as a State Sponsor of Terrorism (SST), 82 Fed. Reg. 56,100 (Nov. 27, 2017) |

| 29 | U.S. Dep't of State, State Sponsors of Terrorism (current listing, accessed 2026) |
|----|-----------------------------------------------------------------------------------|
| 30 | U.S. Dep't of State, *Country Reports on Terrorism 2020: DPRK* (2021) |
| 31 | U.S. Dep't of State, Daily Press Briefing (Oct. 5, 2001) (Japanese Red Army and DPRK designation) |

**I. INTRODUCTION**

This case arises out of the May 30, 1972 terrorist attack at Lod Airport (now known as Ben-Gurion International Airport) in Israel, in which members of the Japanese Red Army ("JRA"), acting on behalf of the Popular Front for the Liberation of Palestine ("PFLP") and with material support from the Democratic People's Republic of Korea ("North Korea"), opened fire with automatic weapons and detonated grenades in a crowded civilian terminal. The attack killed twenty-six people and injured nearly eighty others, including American citizens and residents traveling with their families and churches.

This action asserts claims arising from the deaths of ten individuals killed in the attack, the physical injuries of twenty-four individuals who survived it, and the injuries alleged by the family-member plaintiffs — the victims' spouses, parents, children, and siblings. The complaint alleges that North Korea provided material support and resources for the attack, and is liable under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605A. Defendant North Korea has failed to appear or respond, despite proper service under 28 U.S.C. § 1608. Plaintiffs now seek default judgment on liability against Defendant North Korea.

By Order dated July 22, 2026, the Court bifurcated these proceedings, directing that jurisdiction and liability be determined first, followed by individualized damages proceedings. Order, ECF No. 34; Mem. Op., ECF No. 35, at 4–5. This motion accordingly seeks only the determinations common to all claims arising from the attack: that the terrorism exception of 28 U.S.C. § 1605A applies, that the Court has personal jurisdiction over North Korea, and that North Korea is liable for the deaths and injuries caused by the Lod Airport massacre. Plaintiffs seek no award of damages and no claimant-specific judgment in this phase. With respect to deceased claimants, the estates' claims will be prosecuted by duly authorized representatives upon

1

completion of the appointments, Register of Wills filings, and pleading amendments required by the Court's July 22, 2026 Order; Plaintiffs do not ask the Court in this phase to determine that any particular proposed representative is qualified or to enter claimant-specific judgment for any estate. North Korea's liability for the attack does not depend on the final number or identity of claimants.

In support of their claims, Plaintiffs rely upon the expert testimony of Thomas Joscelyn[1], whose qualifications are set forth in Section II of his Expert Report. (Ex. 1, Expert Report of Thomas Joscelyn ("Joscelyn Report") § II, at 2–3). Mr. Joscelyn's report traces the pathways by which North Korea materially enabled the attack as part of its state-sponsored terrorism strategy in the early 1970s. (Ex. 1, Joscelyn Report § I, at 1–2).

## II. BACKGROUND

Plaintiffs initiated this action against the Democratic People's Republic of Korea ("North Korea") on May 30, 2022. (ECF No. 1). A summons was issued on June 2, 2022. (ECF No. 3). Plaintiffs thereafter pursued service in the order prescribed by 28 U.S.C. § 1608(a).

No special arrangement for service exists between Plaintiffs and North Korea, making § 1608(a)(1) unavailable, and no applicable international convention governs service of judicial

---

[1] Mr. Joscelyn is a nationally recognized expert on terrorism and state sponsorship. He is currently a Non-Resident Senior Fellow at the Reiss Center on Law and Security at NYU School of Law. From 2009 to 2022, he served as a Senior Fellow at the Foundation for Defense of Democracies and as Senior Editor of *FDD's Long War Journal*, where he published hundreds of articles analyzing terrorist networks and state support. He has testified before Congress on more than 20 occasions, including before the Senate Committee on Foreign Relations and the House Armed Services Committee, on counterterrorism and the role of state sponsors. He also previously served as a trainer for the FBI's Counterterrorism Division. In 2022, Mr. Joscelyn served as a senior professional staff member on the House Select Committee to Investigate the January 6th Attack on the U.S. Capitol, where he was one of the principal authors of the Committee's 845-page final report and authored and edited the analysis of extremist groups. He is also coauthor of *Enemies Near and Far: How Jihadist Groups Strategize, Plot, and Learn* (Columbia University Press, 2022), a peer-reviewed academic book examining how terrorist organizations adapt and receive support from state actors. His work has appeared in *The New York Times*, *The Wall Street Journal*, and *Politico*, and he has appeared on CBS News, CNN, Fox News, MSNBC, and *60 Minutes* to discuss terrorism and related issues. He holds a B.A. in Economics from the University of Chicago.

documents on North Korea, making § 1608(a)(2) unavailable. At Plaintiffs' request, the Clerk

dispatched the required service documents to North Korea pursuant to § 1608(a)(3) by FedEx on

July 12, 2022. (ECF Nos. 5–7). FedEx was unable to deliver the package, which was returned on

July 20, 2022. (ECF No. 9). Plaintiffs then requested transmission through diplomatic channels

pursuant to § 1608(a)(4). (ECF Nos. 9–10). The Department of State initially advised that it could

not transmit the documents because the United States lacked a protecting power or other

arrangement for communicating with North Korea. (ECF No. 13-1).

On September 23, 2025, the Court granted Plaintiffs leave to file an Amended Complaint

While efforts to complete diplomatic service continued, the Court authorized notice by

publication. (ECF Nos. 16, 20); Min. Order (Sept. 26, 2023). Plaintiffs published the required

notice on October 6, 2023, and the Court found service by publication effective on October 12,

2023. (ECF No. 21); Min. Order (Oct. 12, 2023). The Clerk entered North Korea's default on

December 7, 2023. (ECF Nos. 22–23).

The Department of State subsequently completed service pursuant to § 1608(a)(4). Under

cover of a diplomatic note dated November 27, 2023, the Department delivered the Summons,

Complaint, Notice of Suit, and accompanying documents to the Permanent Mission of the

Democratic People's Republic of Korea to the United Nations in New York on February 12, 2024.

(ECF No. 26). North Korea did not answer or otherwise respond within the sixty-day period

prescribed by 28 U.S.C. § 1608(d), or at any time thereafter. The Court has since confirmed that

Plaintiffs effected service through diplomatic channels and that North Korea remains in default.

Mem. Op., ECF No. 35, at 1.

On September 23, 2025, the Court granted Plaintiffs leave to file an Amended Complaint

adding claims by similarly situated plaintiffs, substituting estates for deceased plaintiffs, and

making technical corrections. Min. Order (Sept. 23, 2025); Am. Compl., ECF No. 31. The Court

3

held that renewed service was not required and expressly ordered that the existing entry of default "shall remain in effect and apply to the Amended Complaint." Min. Order (Sept. 23, 2025).

On July 22, 2026, the Court bifurcated these proceedings, directing that jurisdiction and liability be determined first, followed by individualized damages proceedings. Order, ECF No. 34, at 1; Mem. Op., ECF No. 35, at 4–5. The Court explained that whether North Korea is liable for the personal injuries and deaths at the center of this case is "common to all Plaintiffs" and "does not require individualized determination for each Plaintiff." Mem. Op., ECF No. 35, at 4.

The Court separately directed that, before any Plaintiff proceeds as the representative of an estate, authenticated copies of the representative's appointment — and the decedent's will, if any — must be filed with the District of Columbia Register of Wills, and the operative complaint must allege facts sufficient to establish the representative's authority under D.C. law. Order, ECF No. 34, at 1–2; Mem. Op., ECF No. 35, at 5–8. The Court directed Plaintiffs to move for leave to file a Second Amended Complaint identifying the proper representatives and adding or removing plaintiffs, and held that renewed service on North Korea will not be required provided the amendment does not significantly alter the nature, scope, or legal theories of the action. Mem. Op., ECF No. 35, at 8–11.

The present motion therefore asks the Court to determine only the jurisdictional and liability issues common to the claims. The living Plaintiffs independently present those common issues. Proposed representatives of deceased claimants will proceed as estate representatives only upon completing the filings and pleading amendments the Court has required. Plaintiffs do not rely on any presently unqualified representative to establish North Korea's common liability, and this motion does not ask the Court to determine any estate representative's authority or any individual claimant's entitlement to damages.

4

### III. STANDARD FOR DEFAULT JUDGMENT AND EVIDENTIARY RECORD

Section 1608(e) provides that a default judgment may be entered against a foreign state only if "the claimant establishes his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e). The statute "leaves it to the court to determine precisely how much and what kinds of evidence the plaintiff must provide." *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1047 (D.C. Cir. 2014) (internal quotation marks omitted). The requirement concerns the "quantum and quality" of the evidence supporting the merits of the claim, *Maalouf v. Islamic Republic of Iran*, 923 F.3d 1095, 1113 (D.C. Cir. 2019), and although § 1608(e) protects a defaulting sovereign from unfounded judgment, "the quantum and quality of evidence that might satisfy a court can be less than that normally required." *Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017) (quoting *Alameda v. Sec'y of Health, Educ. & Welfare*, 622 F.2d 1044, 1048 (1st Cir. 1980)), *vacated and remanded on other grounds sub nom. Opati v. Republic of Sudan*, 590 U.S. 418 (2020). *See also Butler v. Democratic People's Republic of Korea*, No. 20-cv-02514 (ACR), 2025 WL 3078198, at *2 (D.D.C. Nov. 4, 2025) (citing *Han Kim*, 774 F.3d at 1045, 1050) (applying the standard to North Korea).[2]

A satisfactory showing may rest on circumstantial evidence and qualified expert opinion; direct or eyewitness evidence is not categorically required. *Han Kim*, 774 F.3d at 1048–51; *Owens*, 864 F.3d at 785, 787–88. Expert testimony may itself establish jurisdiction and liability where it supplies the connection between the foreign state's conduct and the terrorist attack. *Owens*, 864

---

[2] The ten-year limitations period of § 1605A(b) poses no bar to this action. The D.C. Circuit has held that § 1605A(b) is nonjurisdictional and constitutes an affirmative defense forfeited by a defaulting sovereign's failure to appear. *Maalouf v. Islamic Republic of Iran*, 923 F.3d 1095, 1109 (D.C. Cir. 2019); *Owens*, 864 F.3d at 801–04; *see also Butler*, 2025 WL 3078198, at *3 n.4 (applying *Maalouf* to hold that North Korea forfeited the limitations defense by failing to appear). Nor may the Court raise the limitations period on its own: courts lack "authority or discretion" to raise it sua sponte. *Maalouf*, 923 F.3d at 1114–15; *see Doe v. Democratic People's Republic of Korea Ministry of Foreign Affs. Jungsong-Dong*, 414 F. Supp. 3d 109, 122 (D.D.C. 2019) (same, as to North Korea).

F.3d at 787–88. Expert opinion must satisfy Rule 702, and a qualified expert may rely on otherwise inadmissible information of the kind reasonably relied upon by experts in the field, although the underlying information does not become independently admissible merely because the expert considered it. *Id.* at 789–90; Fed. R. Evid. 702–703. Plaintiffs accordingly ask the Court to base its findings on the experts' admissible opinions and independently admissible record evidence — including the State Department terrorism reports admissible as public records, *see Owens*, 864 F.3d at 792; Fed. R. Evid. 803(8) — with the remaining historical materials serving as bases for, and corroboration of, the expert analysis.

Under the Court's bifurcation order, the present submission must therefore establish, by evidence satisfactory to the Court: subject-matter jurisdiction under § 1605A, personal jurisdiction over North Korea, and North Korea's liability under § 1605A(c). The nature and amount of each claimant's damages — and the claimant-specific matters the Court has reserved — will be determined in the individualized second phase. *See* Order, ECF No. 34; Mem. Op., ECF No. 35, at 4–5.

The Court also has before it the decision in *Calderon-Cardona v. Democratic People's Republic of Korea*, 723 F. Supp. 2d 441 (D.P.R. 2010), in which, following a two-day evidentiary hearing, the United States District Court for the District of Puerto Rico entered default judgment against North Korea arising from this same attack. Plaintiffs do not contend that the factual findings in *Calderon-Cardona* are binding or preclusive here, and they do not ask this Court to accept those findings as proof of the facts found there. Plaintiffs cite the decision as persuasive authority and submit the underlying expert declarations and supporting materials for this Court's independent consideration under § 1608(e).

6

Formal findings adopted by the House of Representatives in 2017 expressly referenced the *Calderon-Cardona* judgment. (Ex. 2, H.R. 479, 115th Cong. § 2(a)(5) (2017) (as passed by House)). That congressional recognition is addressed in connection with the designation nexus. *See infra* Section V.B.

In *Calderon-Cardona*, the court considered expert affidavits submitted with plaintiffs' pretrial memorandum by Professors Barry Rubin, Bruce Bechtol, and Rohan Gunaratna, each an established scholar of terrorism studies, together with testimony presented at the evidentiary hearing. The court credited their opinions concerning North Korea's training, funding, and support of the PFLP and JRA and its role in the Lod Airport attack. Plaintiffs submit those reports here (Exs. 3, 4, 5) for this Court's independent assessment of the experts' qualifications, methodologies, sources, opinions, and fit with the documentary record.

This approach is consistent with decisions permitting courts in FSIA default proceedings to consider evidentiary records developed in related cases while independently determining whether the evidence presently submitted satisfies § 1608(e). A court "cannot 'simply adopt previous factual findings without scrutiny,'" but it may rely on the evidence presented in the earlier litigation and make its own independent findings from that evidence. *Doe v. Democratic People's Republic of Korea Ministry of Foreign Affs. Jungsong-Dong*, 414 F. Supp. 3d 109, 117–18 (D.D.C. 2019) (quoting *Worley v. Islamic Republic of Iran*, 75 F. Supp. 3d 311, 319 (D.D.C. 2014)); *see Butler*, 2025 WL 3078198, at *3. Plaintiffs nevertheless submit the underlying expert and documentary evidence itself, rather than relying on the existence of the earlier judgment.

Thomas Joscelyn's report, prepared for this action and executed under penalty of perjury, supplies the principal expert analysis connecting North Korea's support for the JRA and PFLP to the Lod Airport attack. (Ex. 1). His opinions rest on multiple categories of historical evidence —

declassified United States government records, contemporaneous State Department materials, congressional testimony, law-enforcement reporting, and scholarly sources. The Rubin, Bechtol, and Gunaratna declarations independently corroborate substantial portions of that analysis.

Taken together, the expert declarations and documentary exhibits provide mutually corroborating evidence of North Korea's sustained sponsorship of the JRA and PFLP, its training and harboring of JRA members, its facilitation of the PFLP-JRA relationship, and the causal connection between that support and the Lod Airport massacre. Plaintiffs respectfully submit that this combined record supplies satisfactory evidence for the jurisdictional and liability findings requested under §§ 1605A and 1608(e).

## IV. STATEMENT OF FACTS

### A. The Lod Airport Massacre

On May 30, 1972, three members of the Japanese Red Army—Kozo Okamoto, Yasuyuki Yasuda, and Tsuyoshi Okudaira—arrived at Lod Airport in Tel Aviv, Israel aboard Air France Flight 132 from Rome. (Ex. 1, Joscelyn Report § III, at 3–4, 7; Ex. 6, *N.Y. Times*, May 31, 1972, at 1; Ex. 7, Cable No. 3447, U.S. Embassy Tel Aviv to Secretary of State (May 31, 1972), at 1; Ex. 8, *San Juan Star*, June 1, 1972, at 1). Upon disembarking, the three men retrieved their checked luggage, which concealed automatic weapons and grenades. (Ex. 1, Joscelyn Report § III, at 3–4; Ex. 6, *N.Y. Times*, May 31, 1972, at 1; Ex. 7, Cable No. 3447, at 1; Ex. 8, *San Juan Star*, June 1, 1972, at 1). At approximately 10:30 p.m., they entered the baggage claim area of the arrivals terminal and began indiscriminately firing automatic weapons and throwing grenades into the crowd of travelers, many of whom were American citizens on a religious pilgrimage from Puerto Rico. (Ex. 1, Joscelyn Report § III, at 3–4; Ex. 6, *N.Y. Times*, May 31, 1972, at 1; Ex. 8, *San Juan Star*, June 1, 1972, at 1, 3; Ex. 9, *San Juan Star*, June 2, 1972, at 20, 72 (exhibit pp. 4, 8); Ex. 7,

8

Cable No. 3447, at 1). Twenty-six civilians were killed and nearly eighty more were injured. (Ex. 5, Gunaratna Report ¶ 31; Ex. 1, Joscelyn Report § III, at 4; Ex. 6, *N.Y. Times*, May 31, 1972, at 1).

The Joscelyn Report states elsewhere that "[t]wenty-eight people were killed" in the attack. (Ex. 1, Joscelyn Report § III, at 8). The two figures are readily reconciled. Twenty-six civilians were killed. (*Id.* § III, at 4). The remaining two were among the three JRA attackers: Okudaira, killed when his own grenade detonated, and Yasuda, killed by gunfire from his fellow attackers. (*Id.* § III, at 7). The third attacker, Okamoto, survived and was captured. (*Id.*). Twenty-six murdered civilians plus the two attackers who died in the assault account for the twenty-eight total deaths. Plaintiffs' claims arise solely from the twenty-six civilians killed and the civilians wounded.

Contemporaneous news reports described scenes of chaos and carnage, with victims gunned down while waiting for their luggage or attempting to flee. (Ex. 6, *N.Y. Times*, May 31, 1972, at 1–2; Ex. 8, *San Juan Star*, June 1, 1972, at 1, 3; Ex. 9, *San Juan Star*, June 2, 1972, at 20, 72 (exhibit pp. 3, 7)). American citizens, including members of a Puerto Rican Christian pilgrimage group, were among the dead and wounded. (Ex. 8, *San Juan Star*, June 1, 1972, at 3; Ex. 9, *San Juan Star*, June 2, 1972, at 1, 3 (exhibit pp. 1–2); Ex. 10, Cable No. TOSEC 229, U.S. Dep't of State to U.S. Embassies Beirut and London (May 31, 1972), at 1). One of the attackers, Okudaira, was killed when his own grenade detonated. (Ex. 1, Joscelyn Report § III, at 7; Ex. 6, *N.Y. Times*, May 31, 1972, at 1). Yasuda was killed during the attack, apparently struck by gunfire from his fellow attackers. (Ex. 1, Joscelyn Report § III, at 7; Ex. 6, *N.Y. Times*, May 31, 1972, at 1). Okamoto, the sole surviving attacker, was captured, confessed to his role, and was tried and convicted by an Israeli military court. (Ex. 3, Rubin Report ¶¶ 48–50; Ex. 5, Gunaratna Report ¶

9

32).[3] Declassified U.S. government cables confirm these facts in real time: the U.S. Embassy in Tel Aviv reported within hours that three Japanese from a "Maoist" group had arrived on an Air France plane, retrieved machine guns and grenades from their baggage, and "proceeded to shoot and throw grenades among crowd, killing about 25 and wounding some sixty more," and that the PFLP "in Beirut has claimed responsibility for attack." (Ex. 7, Cable No. 3447, U.S. Embassy Tel Aviv to Secretary of State (May 31, 1972), at 1). A State Department cable the same day relayed press reports that the "captured terrorist had stated terrorists trained in Lebanon" and documented the "killing of 14 American citizens and wounding of more than 30." (Ex. 10, Cable No. TOSEC 229, U.S. Dep't of State to U.S. Embassies Beirut and London (May 31, 1972), at 1). A State Department memorandum for the President described the massacre as "perpetrated by Japanese gunmen controlled by an extremist fedayeen organization, the PFLP." (Ex. 11, Memorandum for the President: Implications of Lod Airport Attack (June 2, 1972), at 1).

On June 4, 1972, a ceremony was held at Lod Airport as sixteen flower-covered aluminum caskets were loaded onto a U.S. Air Force C-141 Starlifter for transport to Puerto Rico. (Ex. 12, *Jerusalem Post*, June 6, 1972, at 1). U.S. Ambassador Walworth Barbour solemnly read aloud a telegram from President Nixon to Prime Minister Golda Meir condemning the "ugly violence and bloodshed inflicted upon innocent men, women and children." (*Id.*). Jose Abner Munoz, leader of the Puerto Rican pilgrims' tour, addressed the mourners: "This afternoon, we depart from a number of our friends who came with us, who came to see this beautiful country, but never got a chance to see it." (*Id.*).

---

[3] Okamoto, the last surviving perpetrator of the attack, died in Beirut on July 23, 2026, at age 78. Released from Israeli custody in a 1985 prisoner exchange, he lived thereafter in Lebanon under PFLP protection until his death. See *Kozo Okamoto, Last Surviving Participant of 1972 Lod Airport Massacre, Dies*, Japan Times (July 24, 2026), https://www.japantimes.co.jp/news/2026/07/24/japan/crime-legal/kozo-okamoto-terrorist-death/.

The coffins arrived at Isla Verde International Airport in San Juan on June 5, 1972. (Ex. 13, *El Nuevo Día*, June 6, 1972, at 3 (certified English translation, exhibit pp. 2, 5)). A companion report in the same edition described the scene as "un mar de dolientes"—a sea of mourners—as thousands gathered to receive their loved ones. (*Id.* at 3 (Spanish original, exhibit pp. 1, 4)). Families searched through handwritten cards on the metal coffins to identify their dead. "Sixteen tin-colored metal boxes. Two feet wide by seven feet long, approximately. Is it hard to have an idea of what a massacre is without having ever seen one? Not so hard after seeing a row of those metal boxes." (*Id.* at 3). The newspaper documented each coffin as it was unloaded, including plaintiff decedents: Juan Padilla, Virgen Flores, Eugenia Lopez, Consorcia Rodriguez, Carmen E. Crespo, Jose M. Otero Adorno, Enrique Martinez Rivera, Vasthi Zila Morales de Vega, Blanca Gonzalez de Perez, and Jose A. Rodriguez. (*Id.*).

On June 15, 1972, a memorial service was held at the Cathedral Church of St. John the Divine in New York City. (Ex. 14, Memorial Service Program, June 15, 1972, at 1 (certified English translation)). The program included a roll call of the dead, read by Nick Lugo, Jr., National Executive Director of the Commonwealth of Puerto Rico. (*Id.* at 4). Each victim was named and memorialized in turn — "Carmen Enid Crespo Martinez, Hatillo — May she live on! May she live on!" (*Id.*). The wounded were also remembered by name. (*Id.*).

Israel honored the Puerto Rican victims with a tree planting ceremony in memory of the victims of the Lod attack. (Ex. 15, Tree Planting Ceremony Photograph and Translation, at 2 (certified English translation)). The memorial listed the names of all sixteen Puerto Rican dead, including plaintiff decedents Carmen Enid Crespo, Enrique Martinez, Virgen Flores, Juan Padilla, Jose M. Otero, Jose A. Rodriguez, Blanca Gonzalez, Consorcia Rodriguez, Vasthi Zila Morales, and Eugenia Lopez. (*Id.*).

11

Decades later, Puerto Rico formally enshrined the memory of the attack in law. Law No. 144 of 2006 declared May 30 of each year "Lod Massacre Memorial Day." (Ex. 16, P.R. Laws Ann. tit. 1, § 5212 (2006)). On June 1, 2009, the Puerto Rico Senate passed Resolution 460, expressing "posthumous recognition . . . for the memory of the fatalities of terrorism" and honoring by name each of the sixteen Puerto Rican pilgrims killed, including plaintiff decedents: Carmen E. Crespo, Virgen Flores, Blanca Gonzalez de Perez, Eugenia Lopez, Enrique Martinez Rivera, Vasthi Zila Morales de Vega, Jose M. Otero Adorno, Juan Padilla, Consorcia Rodriguez, and Jose A. Rodriguez. (Ex. 17, P.R. S. Res. 460, 16th Legis. Assemb., 1st Sess. (June 1, 2009), at 2 (certified English translation, exhibit pp. 5, 10)). The Resolution's Statement of Intent declared that the massacre, "the first act of barbarism of the new phenomenon of transnational terrorism, established a pattern for future attacks." (*Id.* at 1 (exhibit pp. 4, 9)).

### B. Operational Planning and Involvement of the Popular Front for the Liberation of Palestine

The JRA did not act alone. The Lod Airport attack was a joint operation carried out by the PFLP and the JRA, in which the PFLP "recruited three members of the JRA to carry out the attack." (Ex. 1, Joscelyn Report § I, at 1; *id.* § III, at 4; *see also* Ex. 4, Bechtol Report ¶ 18 ("three members of the JRA acted on behalf of the PFLP")). The PFLP, which "combined Arab nationalism with a Marxist-Leninist ideology," had by 1972 established a reputation for transnational terrorist operations, including a string of high-profile airline hijackings, and had forged alliances with multiple international extremist organizations (Ex. 1, Joscelyn Report § III, at 5–6), including "the German Bader-Meinhoff gang, the Italian Red brigade," and the organization of the Latin American terrorist known as Carlos the Jackal (Ex. 5, Gunaratna Report ¶ 33). The attack was planned by Wadi Haddad, co-founder of the PFLP and leader of its external operations arm, who "planned the Lod Airport massacre and oversaw the training of the three JRA terrorists who were

12

responsible." (Ex. 1, Joscelyn Report § III, at 6). The attack was executed by Japanese nationals because the airport "was not accessible to PFLP gunmen, who, as Middle Easterners, would arouse suspicion." (Ex. 3, Rubin Report ¶ 45).

The three JRA operatives were trained at PFLP camps in Lebanon, where they were "instructed in handling explosives and machine guns." (Ex. 1, Joscelyn Report § III, at 7; Ex. 3, Rubin Report ¶ 47; Ex. 5, Gunaratna Report ¶ 32). Ilich Ramírez Sánchez, known as "Carlos the Jackal," "supplied the JRA's terrorists with the Czech-produced VZ58 machine guns and grenades used in the Lod Airport attack, and he showed the three JRA terrorists how to use them." (Ex. 1, Joscelyn Report § III, at 6). The operatives then traveled to Frankfurt, where they were equipped with false papers, and on to Rome, where "they each collected a suitcase containing Czech weapons and ammunition" before boarding their flight to Tel Aviv. (Ex. 3, Rubin Report ¶ 52 (quoting Richard Clutterbuck, *Guerrillas and Terrorists* (1977)); *see also* Ex. 1, Joscelyn Report § III, at 7–8; Ex. 18, *International Terrorism: Hearings Before the Subcomm. on Internal Security*, 94th Cong., 1st Sess. 191 (1975)).

Okamoto confirmed these facts after his capture, stating that the attack was "planned in Lebanon by Wadi'a Hadad, the operational chief of the PFLP," that the three attackers "were trained in PFLP training camps in Lebanon," and that the PFLP provided them with forged documents for the operation. (Ex. 5, Gunaratna Report ¶ 32). Okamoto also acknowledged that the JRA's alliance with the PFLP was "a means for propelling ourselves onto the world stage." (Ex. 1, Joscelyn Report § III, at 8). The Israeli military court that convicted Okamoto "found that the attack was a joint operation of the PFLP and the Japanese Red Army." (Ex. 3, Rubin Report ¶ 50). Both the PFLP and the JRA publicly claimed responsibility for the massacre. (Ex. 1, Joscelyn Report § III, at 4). These facts are independently corroborated by the historical reference record of

13

the JRA's formation, its alliances, and the Lod massacre itself (Ex. 19, Anderson & Sloan, *Historical Dictionary of Terrorism*, at 16–17 (documenting the JRA's "cooperative ties since 1971 with the North Korean regime," its long-term PFLP relationship, and "the massacre of 26 people at Israel's Lod Airport" carried out "on behalf of the PFLP")), and by Dr. Bechtol's peer-reviewed scholarship confirming that North Korea's training infrastructure and support for the JRA and PFLP were integral to the operational alliance that produced the attack (Ex. 20, Bechtol, *North Korea and Support to Terrorism: An Evolving History*, 3 *J. Strategic Security* 45, 47–48 (2010)).

### C. North Korea's Material Support to the PFLP-JRA Network (1970–1972)

By 1972, North Korea had established itself as one of the world's most prolific sponsors of international terrorism, operating an extensive network of training camps that provided military instruction, logistical support, and operational planning assistance to revolutionary organizations from across the globe. This infrastructure was not incidental to the Lod Airport massacre—it was essential. North Korea trained both the Japanese Red Army operatives who carried out the attack and members of the Popular Front for the Liberation of Palestine who planned and directed it. (Ex. 1, Joscelyn Report §§ V–VI).

### 1. The Soviet-North Korean Terror Axis

North Korea's support for international terrorism was rooted in its close alliance with the Soviet Union. As Joscelyn explains, "the Soviet bloc sponsored communist and other leftwing terrorist groups around the world, including by providing a network of training camps that attracted thousands of recruits. North Korea was a key state sponsor of terrorism in the Soviet Union's network, and its camps were part of a global network that supported groups such as the PFLP, JRA and others." (Ex. 1, Joscelyn Report § I, at 1; *see also* Ex. 18, *International Terrorism: Hearings*

14

*Before the Subcomm. on Internal Security*, 94th Cong., 1st Sess. 179–96 (1975) (testimony of Brian Crozier)).

### 2. Training Camps and Scale of Operations

The Soviet Union's training infrastructure included the Lenin Institute in Moscow, which provided courses in "armed and unarmed combat and guerilla war," "illegal operations," and "Marxist-Leninist ideology." These intensive facilities were "supplemented by extensive guerrilla [centers] in North Korea." (Ex. 1, Joscelyn Report § V, at 12 (citing Brian Crozier, Congressional testimony, 1975)). Between 1968 and 1975, approximately 2,500 foreign terrorists and guerrillas were trained in the North Korean camps, which could accommodate about 200 trainees at a time and were "controlled by the Defense Ministry in Pyongyang." (*Id.*).

Crozier testified before Congress that the Lod attackers "had been trained in North Korea. They had gone to Germany to be given money; they had gone on to Italy to be given arms; they had been trained in training camps in Syria and Lebanon, and then they had done their deed for the Popular Front for the Liberation of Palestine (PFLP)." (Ex. 18, *International Terrorism: Hearings Before the Subcomm. on Internal Security*, 94th Cong., 1st Sess. 183 (1975) (testimony of Brian Crozier)). Clutterbuck reported the same sequence: "As it was difficult to train with live ammunition in Japan, they went to North Korea for training. Here they were recruited by the P.F.L.P. and moved to a refugee camp in Lebanon for final training and briefing." (Ex. 3, Rubin Report ¶ 52 (quoting Richard Clutterbuck, *Guerrillas and Terrorists* (1977))). Joscelyn locates the attackers' operation-specific training at PFLP camps in Lebanon (Ex. 1, Joscelyn Report § III, at 7), and Rubin records that the JRA cadre "were trained either in North Korea or, in the case of Kozo Okamoto, were sent through earlier training with the PFLP arranged by North Korean

15

intelligence assets." (Ex. 3, Rubin Report ¶ 46). On any of these accounts, the attackers passed through a training network that North Korea built, funded, and helped arrange.

North Korea also sent military instructors to training camps in Libya and South Yemen, where North Korean advisors provided training to numerous terrorist and revolutionary organizations, including the PFLP and the JRA. (Ex. 1, Joscelyn Report § V, at 14 (citing Joseph S. Bermudez, Jr., *Terrorism: The North Korean Connection* (1990))).

### 3. Training the PLO and PFLP

In August 1970, a delegation from the Palestine Liberation Organization (PLO) traveled to North Korea, as well as China and North Vietnam, to formalize training arrangements. The delegation was personally greeted by Kim Il-Sung, who promised "increased assistance" for the PLO, including "the training of PLO members within" North Korea. (Ex. 1, Joscelyn Report § V, at 13). Between 1970 and 1972, more than 200 members of the PLO, of which the PFLP was a leading faction, received military training in North Korea in courses lasting approximately three to five months at camps near Pyongyang. (*Id.*). North Korea maintained six to ten training facilities, with long-term courses of twelve to twenty-four months located in the vicinity of Pyongyang and short-term overseas courses of three to six months covering "marksmanship, communication, map reading, ambush, and counter-ambush and explosives, sabotage, intelligence, propaganda and psychological warfare, kidnapping, and assassination." (Ex. 5, Gunaratna Report ¶ 19). Among the groups trained at these facilities between 1969 and 1974 were the JRA and the PFLP. (*Id.*; *see also* Ex. 3, Rubin Report ¶ 33).

### 4. Safe Haven and the Japanese Red Army

North Korea was the principal state sponsor of the Japanese Red Army from its inception. The JRA "quickly made contact with North Korean agents" who "passed instructions to their

16

cadres and brought the arms the JRA was lacking." (Ex. 21, Kauffer, "Communism and Terrorism," in *The Black Book of Communism* at 356–57; *see also* Ex. 1, Joscelyn Report § VI, at 15). This relationship deepened in March 1970, when nine JRA members hijacked Japan Airlines Flight 351 (the "Yodo-go") and forced it to fly to Pyongyang. Rather than return the hijackers to Japan, North Korea granted them asylum—a decision that led to a lasting operational partnership. (Ex. 1, Joscelyn Report § VI, at 14–16; *see also* Ex. 22, National Security Council, Economic Sanctions Against Countries Harboring Hijackers or Refusing to Return Airplanes or Passengers (Oct. 1970) (noting that North Korea "did hold the hijacker of a Japanese plane while allowing the plane and passengers to return to Japan" and identifying North Korea, alongside Cuba and North Vietnam, among states already subject to full trade embargo under the Trading with the Enemy Act)).

The record also provides a direct operational link between North Korea's shelter of the Yodo-go hijackers and the Lod operation. Kozo Okamoto recounted that he was brought into the JRA by his brother, Takashi Okamoto—one of the Yodo-go hijackers, then based in Pyongyang and close to North Korean intelligence—who sent him to Beirut in September 1971 for a seven-week PFLP military training course; at the end of that course, Kozo Okamoto was told he had been selected for the Lod operation. (Ex. 3, Rubin Report ¶¶ 40–42; *Calderon-Cardona*, 723 F. Supp. 2d at 449–50 & n.11; *see also* Ex. 1, Joscelyn Report § VI, at 16; Ex. 18 at 191).

As Professor Barry Rubin testified: "[A]lmost from the start [the JRA] was largely dependent on safe haven, financing, logistics, training, and international connections on North Korea. . . . [I]t was completely dependent on North Korean sponsorship without backing from China, the Soviet Union or any Arab state." (Ex. 3, Rubin Report ¶ 37). Rubin further concluded that "one of the most important special assets North Korea possessed was its link to the JRA, over

17

which it had exclusive patronage. Among the best things it could offer the PFLP was its own links to the JRA." (*Id.* ¶ 38).

North Korea did not merely shelter the Yodo-go hijackers. Japanese police tracked North Korean spy rings seeking to acquire Japanese passports, "some of which have been passed to the JRA in the past," enabling JRA operatives to travel internationally under false identities. (Ex. 23, U.S. Dep't of State, *Patterns of Global Terrorism: 1988*, at 49; *see also* Ex. 1, Joscelyn Report § VI, at 17–18). The JRA in turn "provided a channel through which" North Korea was "able to establish and/or maintain contacts to many terrorist groups," and the North Korean government used "JRA-initiated connections to funnel money and material support" to various terrorist organizations. (Ex. 1, Joscelyn Report § VI, at 16; *see also* Ex. 5, Gunaratna Report ¶ 24 ("North Korean intelligence services specifically utilized JRA members in North Korea to advance its interests")). As Gunaratna concluded: "North Korean state sponsorship of both the JRA and PFLP enabled both these groups to forge a partnership and mount attacks worldwide." (Ex. 5, Gunaratna Report ¶ 37).

The depth of North Korea's institutional control over the JRA became increasingly apparent over the following decades. In 1988, a JRA member named Yasuhiro Shibata was arrested in Tokyo; Japanese police believed that he had been "'run' by North Korean intelligence agents" and had adopted "the identity of a former North Korean resident of Japan who had immigrated to North Korea in 1972." (Ex. 23, U.S. Dep't of State, *Patterns of Global Terrorism: 1988*, at 49; Ex. 1, Joscelyn Report § VI, at 17). In March 1996, Yoshimi Tanaka, a senior member of the Yodo-go hijacking team, was arrested in Cambodia "while carrying a North Korean diplomatic passport and in the company of several North Korean diplomats." (Ex. 24, U.S. Dep't of State, *Patterns of Global Terrorism: 1996*, at 5 (1997); Ex. 1, Joscelyn Report § VI, at 18).

18

When the United States government requested in 2000 that North Korea stop harboring the Yodo-go hijackers and turn them over, the North Korean government refused. Its official KCNA news agency published a statement declaring: "It is the sovereign state's legitimate right recognized by international law to protect members of the Japanese 'Red Army' who sought political asylum in the DPRK, and nobody can put his nose into this issue." The State Department recognized the statement as a "serious offense." (Ex. 1, Joscelyn Report § VI, at 19). In March 2002, the ex-wife of one of the Yodo-go hijackers testified that she had targeted Japanese citizens for kidnapping operations under the orders of Takamaro Tamiya, one of the leaders of the Yodo-go hijackers then harbored by North Korea. She further testified that Tamiya was acting under the orders of North Korea's ruler, President Kim Il-Sung, who had commanded Tamiya to "realize a revolution passed down through the generations." Based on this and other evidence, Japanese police determined that the Yodo-go group "was deeply involved in the abduction of Japanese nationals under the direction of the" North Korean regime. (*Id.*; *see also* Ex. 5, Gunaratna Report ¶ 25).

**D. The Critical Alliance: George Habash's September 1970 Pyongyang Speech**

In September 1970, PFLP leader George Habash traveled to Pyongyang to meet with North Korean officials and deliver a speech that would set the stage for a new phase of international terrorism. (Ex. 1, Joscelyn Report § VII, at 21). Habash's visit set off a chain of events that "led directly to the Lod Airport massacre nearly two years later." (*Id.*). Indeed, "the nexus between North Korea, the PFLP and Japanese Red Army can be traced to Habash's visit." (*Id.*).

Habash visited North Korea from September 2 through September 14, 1970. (Ex. 5, Gunaratna Report ¶ 17). North Korea's support for Palestinian terrorist organizations was a matter of open state policy. As early as October 1969, a Joint Communiqué of North Korea and Syria,

19

published in the official organ of the North Korean government, *The Pyongyang Times*, declared that "both sides reached unanimity of views that every possible support should be given to this struggle of resistance [by the Palestinian people], so that they may play a vanguard, practical role in the struggle against the Zionist racialists and their master the U.S. imperialists." In the same edition, Kim Il-Sung stated: "We actively support the armed struggle of the Palestinian people for the restoration of their lost homeland and express firm solidarity with all the Arab peoples in their struggle for the territorial integrity and defense of the dignity of the Arab nation." (Ex. 4, Bechtol Report ¶ 20). During his visit, Habash sought to increase North Korean material support for the PFLP, and "it was reported, he was able to procure both weapons and funding." (Ex. 4, Bechtol Report ¶ 18). The North Koreans welcomed Habash even though the PFLP had already been involved in attacks on Israeli targets, including the bombing just months earlier of a Swissair plane headed to Israel that killed forty-seven passengers, and even as his own PFLP operatives hijacked four Western passenger planes and blew up three of them at the Dawson Field airstrip in Jordan during the visit itself. (Ex. 3, Rubin Report ¶ 34). During his stay in Pyongyang, Habash addressed an assembly of approximately four hundred delegates from terrorist groups around the globe. He justified terrorist attacks on innocent civilians, declaring: "There are no political or geographical boundaries or moral limits to the operations of the people's camp." He added: "In today's world no one is innocent, no one is a neutral." And he boasted: "We teach terror in our classrooms. The main thing is to have people always expecting terrorism." (Ex. 1, Joscelyn Report § VII, at 21).

Critically, during his visit, Habash was brought by the North Korean government to meet with the JRA fugitives who had hijacked a Japanese airliner to North Korea and were then living under North Korean protection. (Ex. 5, Gunaratna Report ¶ 17 ("North Korea facilitated an introductory meeting between Habash and the JRA fugitives"); Ex. 3, Rubin Report ¶ 44). Habash

20

took "a keen interest" in the JRA hijackers during his visit. (Ex. 1, Joscelyn Report § VII, at 22). As Rubin testified, "Habash arrived in North Korea with a plan: recruit JRA members to carry out attacks for the PFLP. Habash visited the JRA hijackers accompanied by North Korean officials, to make the request. This was the start of the Lod operation." (Ex. 3, Rubin Report ¶ 44).

After leaving Pyongyang, Habash continued to build the PFLP's alliance with the JRA through North Korea. He arranged for other PFLP leaders to visit North Korea, including Leila Khaled, an infamous hijacker who had taken part in some of the PFLP's earliest operations. During her meetings with the JRA in North Korea, Khaled discussed "possible joint ventures and a Japanese 'international unit' under PFLP auspices in Beirut." Habash then dispatched Khaled to Japan, where she established contact with JRA members and recruited them to the PFLP's cause. (Ex. 1, Joscelyn Report § VII, at 22). By 1972, the JRA was based in two locations: North Korea and inside the PFLP's camps in Lebanon. As journalist and counterterrorism scholar Claire Sterling assessed, "The [JRA] paid their bill in armed propaganda at Lod airport." "There was no such thing as an innocent bystander anymore, as Dr. Habash had made plain to heady applause in P'yongyang." (Ex. 1, Joscelyn Report § VII, at 22 (quoting Claire Sterling, *The Terror Network* (1981))).

Contemporaneous reporting corroborated the centrality of Habash's Pyongyang visit. Several months after the Lod Airport attack, *The New York Times* reported that North Korea's "links to the Palestinians" could "be traced back to" Habash's 1970 trip, and that the visit "led to the first contact between the Popular Front and a Japanese extremist organization known as the Red Army." (Ex. 25, Eric Pace, "Lebanon Is Said to Have Set Up Liaison Unit With Commandos," *N.Y. Times*, Sept. 23, 1972, at 10). A U.S. State Department spokesman confirmed that North Korea "had been supplying arms to the Arab commandos," and sources close to the commando

21

leadership reported that North Korea "has provided substantial financial and other aid to the commandos over the years." (*Id.*).

The Lod Airport massacre was not an isolated event. It was the first in a string of joint PFLP-JRA operations that bore the continuing imprint of North Korean sponsorship. (Ex. 1, Joscelyn Report § VII.B, at 23–25). In May 1971, the PFLP and JRA had announced their alliance in a video entitled "Declaration of World War by the Red Army and the PFLP," produced with the personal involvement of JRA leader Fusako Shigenobu. (*Id.* at 23). After the Lod massacre, joint PFLP-JRA attacks continued, including a 1973 hijacking demanding the release of Lod attacker Kozo Okamoto and a 1974 attack on a Shell Oil refinery in Singapore. (*Id.* at 23–24; *see also* Ex. 5, Gunaratna Report ¶ 28). During the Singapore incident, the PFLP-JRA terrorists sent a note explicitly requesting contact with the "Diplomatic Mission of North Korea" to facilitate their escape. Singapore's Prime Minister Lee Kuan Yew personally wrote to North Korean President Kim Il-Sung regarding the terrorists' request for North Korean assistance, and the North Korean government negotiated safe passage for the terrorists out of Singapore. (Ex. 5, Gunaratna Report ¶¶ 28–29; Ex. 1, Joscelyn Report § VII.B, at 24). As Gunaratna concluded, North Korean "direct and indirect sponsorship and its provisions of material support was paramount for the survival, sustenance and operation of the JRA globally. Thus, all the terrorist operations carried out by the JRA and PFLP during the period of North Korean sponsorship, including the Lod Airport massacre should be seen as terrorist attacks attributable to North Korea's leadership and intelligence services as well." (Ex. 5, Gunaratna Report ¶ 38).

### E. The Causal Relationship Between North Korea's Support and the Lod Airport Attack

The evidence establishes that North Korea provided material support and resources to the terrorist organizations that planned and executed the Lod Airport massacre. That support was not

22

tangential or attenuated. North Korea provided state-controlled training to members of the JRA and PFLP; sustained the JRA through safe haven and logistical assistance; and facilitated the introduction between PFLP leader George Habash and JRA members from which the two organizations' operational alliance developed. And early accounts specifically reported that the Lod attackers themselves had trained in North Korea. Taken together, this support was a substantial factor in the sequence of events that produced the attack.

The record establishes the following chronology:

1. North Korea granted asylum to the Yodo-go hijackers in March 1970, giving the JRA an operational base. (*See* Ex. 1, Joscelyn Report § VI, at 15; *id.* § VIII, at 26). Whether or not North Korea had advance knowledge of the hijacking itself, North Korea's decision to harbor the hijackers once they arrived — extending them sanctuary and refusing for decades to turn them over — independently constitutes the provision of "material support or resources" within the meaning of 28 U.S.C. § 1605A(a)(1) and 18 U.S.C. § 2339A(b)(1) (defining material support to include "safehouses"). (*See* Ex. 1, Joscelyn Report § VI, at 15–16).

2. North Korea trained PFLP and JRA operatives in terrorist tactics in the years leading up to the attack. (*See id.* § V, at 12–14; *id.* § VIII, at 25–26).

3. North Korea hosted PFLP leader George Habash's September 1970 visit to Pyongyang, which set off the chain of events leading to the formation of the PFLP-JRA alliance. (*See* Ex. 1, Joscelyn Report § VII, at 21; *id.* § VIII, at 26).

4. North Korea was the main state sponsor of the JRA from the early 1970s onward, providing its members with safe haven, arms, and training. (*See id.* §§ V–VI, at 12–16; *id.* § VIII, at 26).

5. In May 1972, JRA operatives, using training and resources provided by North Korea, executed the attack under PFLP direction. (*See* Ex. 1, Joscelyn Report § III, at 3–4; *id.* § VIII, at 26).

These connections were mutually reinforcing. North Korea's safe haven sustained the JRA and protected its members from law-enforcement interference. Its training strengthened the operational capabilities of JRA and PFLP cadres. And its facilitation of the Habash-JRA contact supplied the organizational channel through which the PFLP-JRA partnership developed. These forms of support need not each have been independently indispensable, nor must Plaintiffs trace a particular weapon, document, or payment from North Korea to the Lod operation. Together, they were a substantial factor in the sequence of events that produced the Lod Airport attack. *See Owens*, 864 F.3d at 798–99.

Thomas Joscelyn, after reviewing declassified intelligence, open-source reporting, and operational analysis of the PFLP-JRA alliance, concludes: "It is likely that if North Korea did not play this key liaison role, then the PFLP would not have recruited JRA terrorists for the Lod Airport massacre." (Ex. 1, Joscelyn Report § I, at 2).

This conclusion is independently corroborated by declassified U.S. government records documenting North Korea's harboring of the JRA hijackers (Ex. 22, National Security Council, *Economic Sanctions Against Countries Harboring Hijackers or Refusing to Return Airplanes or Passengers* (Oct. 1970)), by a contemporaneous State Department memorandum confirming that the PFLP "controlled" the Japanese gunmen who carried out the Lod attack (Ex. 11, Memorandum for the President: *Implications of Lod Airport Attack* (June 2, 1972), at 1), by the historical reference record of the PFLP-JRA alliance (Ex. 19, Anderson & Sloan, *Historical Dictionary of Terrorism*, at 16–17), and by published academic scholarship tracing the North Korea-PFLP-JRA

24

chain from North Korean safe haven through to the Lod massacre (Ex. 20, Bechtol, *North Korea and Support to Terrorism*, 3 *J. Strategic Security* at 47–48 (2010); Ex. 21, Kauffer, in *The Black Book of Communism* at 356–57 (1999)).

The expert conclusions are unanimous and grounded in the documentary record. Rubin, analyzing North Korea's exclusive patronage of the JRA and its role in brokering the PFLP alliance, concluded: "The 1972 Lod Airport massacre was the consummation of a tri-partite relationship between North Korea, the JRA, and the PFLP." (Ex. 3, Rubin Report ¶ 53). Gunaratna, reviewing the full scope of North Korean sponsorship from safe haven through operational support, concurred: "[A]ll the terrorist operations carried out by the JRA and PFLP during the period of North Korean sponsorship, including the Lod Airport massacre should be seen as terrorist attacks attributable to North Korea's leadership and intelligence services as well." (Ex. 5, Gunaratna Report ¶ 38).

### F. The Plaintiffs

This action arises from the deaths and injuries of thirty-four direct victims of the May 30, 1972 Lod Airport attack. Ten were killed in the attack; twenty-four survived it with physical injuries. The Amended Complaint also names family-member plaintiffs — including spouses, parents, children, and siblings of the direct victims. (Am. Compl., ECF No. 31, ¶¶ 6–179).

Sixteen members of the Puerto Rican religious pilgrimage were killed in the attack. (*See* Ex. 12, *Jerusalem Post*, June 6, 1972, at 1; Ex. 17, P.R. S. Res. 460, at 2 (exhibit pp. 5, 10)). Claims associated with ten of those sixteen decedents are asserted in this action.

The ten decedents whose deaths underlie the claims asserted in this action are: Carmen E. Crespo Martinez, Virgen M. Flores Suarez, Blanca R. Gonzalez Hernandez, Eugenia Lopez Hernandez, Miguel Enrique Martinez Rivera, Vasthi Z. Morales Rodriguez, Jose M. Otero

Adorno, Juan Padilla Ortiz, Consorcia Rodriguez Acosta, and Jose A. Rodriguez Zeno. (ECF No. 31 ¶¶ 7, 13, 28, 40, 42, 53, 66, 73, 83, 93).

The twenty-four direct victims who survived the attack and suffered physical injuries are: Maria del Carmen Diaz Flores, Lydia E. Martinez Villanueva, Reverend Jose M. Vega Franqui, Mercedes Alejandro Garcia, Luis Conde Maldonado, Juanita Lopez Molleno, Juan Cruz Candelaria, Antonia Acevedo Vila, Ernesto Delgado Crespo, Manuel Gonzalez Ruiz, Elba Delgado Mora, Nazira E. Hawayek Figueroa, Pedro Hernandez Rodriguez, Luz E. Lugo Quinones, Rosa E. Vazquez Lugo, Luz B. Matos Garcia, Carmen M. Matos Garcia, Angel Rivera Santiago, Claire Smith Golden, Carol Golden, Ana Sara Vega Gonzalez, Jose Abner Munoz Vega, Nilda Soler Rivera, and Nilda I. Munoz Soler. (ECF No. 31 ¶¶ 14, 43, 54, 99, 104, 110, 113, 118, 135, 139, 142, 143, 150, 151, 154, 168, 169, 170, 171, 172). Several of these direct victims have since died. Claims belonging to those deceased victims may be pursued by duly authorized legal representatives after completion of the filings required by the Court's July 22, 2026 Order. *See* Order, ECF No. 34, at 1–2.

The Amended Complaint names as plaintiffs the victims' spouses, parents, children, and siblings; the plaintiff roster will be conformed by the Second Amended Complaint contemplated by the Court's July 22, 2026 Order. (Am. Compl. ¶¶ 6–179). Some family-member plaintiffs have likewise died since the attack; the identity of the proper claimant for each deceased family-member plaintiff will be established through the representative appointments, Register of Wills filings, and pleading amendments the Court's July 22, 2026 Order requires. Order, ECF No. 34, at 1–2; Mem. Op., ECF No. 35, at 5–11.

### V. JURISDICTION

This Court has subject matter jurisdiction over Plaintiffs' claims under the terrorism exception to the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605A.

#### A. Statutory Framework

The FSIA "is the sole basis of jurisdiction over foreign states in our courts." *In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 39 (D.D.C. 2009). The terrorism exception to the FSIA's general grant of sovereign immunity provides:

> [A] foreign state shall not be immune from the jurisdiction of courts of the United States . . . in any case . . . in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency. 28 U.S.C. § 1605A(a)(1).

The statute further requires that: (1) the foreign state was designated as a state sponsor of terrorism at the time the act occurred, or was so designated as a result of such act, and remains so designated when the claim is filed; (2) the claimant or victim was a national of the United States at the time the act occurred; and (3) if the act occurred in the foreign state against which the claim has been brought, the claimant has afforded the foreign state a reasonable opportunity to arbitrate the claim. 28 U.S.C. § 1605A(a)(2).

As demonstrated below, each of these requirements is satisfied. North Korea was designated as a state sponsor of terrorism as a result of the very pattern of conduct at issue in this case and remains so designated. The victims were United States citizens. The attack occurred in Israel, not in North Korea, so no arbitration requirement applies. The attack constituted an extrajudicial killing, and North Korea's provision of material support and resources—through

27

officials and agents acting within the scope of their authority—was a proximate cause of Plaintiffs' injuries.

### B. North Korea's Designation as a State Sponsor of Terrorism

North Korea satisfies the state sponsor designation requirement. The statute requires that the foreign state "was designated as a state sponsor of terrorism at the time the act . . . occurred, or was so designated as a result of such act" and "remains so designated when the claim is filed." 28 U.S.C. § 1605A(a)(2)(A)(i)(I). Although the Lod Airport massacre occurred in 1972 and North Korea was not formally designated as a state sponsor of terrorism until 1988, the statute expressly provides jurisdiction when a foreign state "was so designated as a result of such act." *See Massie v. Gov't of Democratic People's Republic of Korea*, 592 F. Supp. 2d 57, 74 (D.D.C. 2008) (designation requirement satisfied for the 1968 Pueblo seizure, twenty years before the 1988 designation); *Butler*, 2025 WL 3078198, at *2 n.2 (discussing the designation requirements under § 1605A(a)(2)(A)(i) for North Korea); *Borochov v. Islamic Republic of Iran*, 94 F.4th 1053, 1066 (D.C. Cir. 2024), *cert. denied*, No. 24-277 (U.S. June 30, 2025) (reciting the "or was so designated as a result of such act" alternative).

The United States first designated North Korea as a state sponsor of terrorism in 1988. *See* Determination Pursuant to Section 6(j) of the Export Administration Act of 1979; North Korea, 53 Fed. Reg. 3477 (Feb. 5, 1988) (Ex. 26). That designation was rescinded in 2008. Rescission of Determination Regarding North Korea, 73 Fed. Reg. 63,540 (Oct. 24, 2008) (Ex. 27). The State Department redesignated North Korea as a state sponsor of terrorism effective November 20, 2017, with notice of the determination published in the Federal Register on November 27, 2017, and that designation has not been rescinded. *See* Democratic People's Republic of Korea (DPRK) Designation as a State Sponsor of Terrorism (SST), 82 Fed. Reg. 56,100 (Nov. 27, 2017) (Ex. 28).

28

North Korea thus "remain[ed] so designated when" Plaintiffs filed their claims. 28 U.S.C. § 1605A(a)(2)(A)(i)(I); Ex. 29, U.S. Dep't of State, State Sponsors of Terrorism (current listing, accessed 2026) (listing North Korea with designation date of November 20, 2017).

As to the "designated as a result of such act" requirement, courts have consistently held that the nexus between the predicate act and the designation need not be exclusive: the requirement is satisfied where the designation resulted, wholly or in part, from the act at issue or from the foreign state's support for that act. *See Does v. Democratic People's Republic of Korea*, No. 23-273 (TJK), 2026 WL 1493562, at *8 (D.D.C. May 28, 2026) ("'as a result of' means 'wholly or in part' in the FSIA context"); *Warmbier v. Democratic People's Republic of Korea*, 356 F. Supp. 3d 30, 44–45 (D.D.C. 2018) (designation satisfied where state was designated "in part, 'as a result of' its barbaric treatment" of the victim); *Massie*, 592 F. Supp. 2d at 74 ("North Korea has been designated a state sponsor of terrorism, in part due to its unlawful seizure of the Pueblo," the act upon which the FSIA claim was based); *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 65 (D.D.C. 2010) (designation satisfied where Iran was designated "in partial response to the Beirut bombing," the act giving rise to the FSIA claim).

The 2017 redesignation resulted, at least in part, from North Korea's provision of material support to the JRA in furtherance of the Lod Airport attack. Three mutually reinforcing categories of evidence establish that nexus: formal findings adopted by the House of Representatives in the legislative effort urging redesignation, which identify the Lod Airport attack by name; the designation-era State Department record connecting North Korea to the JRA; and the executive branch's own account of the designation in its subsequent reporting. *Doe*, discussed below, proceeded in exactly that cumulative fashion, 414 F. Supp. 3d at 124, and noted that another court

29

in this district had "considered evidence connected to the 1988 designation in ascertaining the basis for the 2017 re-designation," *id.* at 124 n.7 (citing *Warmbier*, 356 F. Supp. 3d at 44–45).

*Warmbier* illustrates the type of official, act-specific evidence sufficient to establish the nexus. There, Chief Judge Howell held the nexus established where (1) the victim's family recounted his story to government officials "in support of re-adding North Korea to the list of state sponsors of terrorism," (2) sixteen Congressmen wrote a letter to the Secretary of State specifically referencing the victim's case in urging redesignation, and (3) the President specifically mentioned the victim when announcing the redesignation. 356 F. Supp. 3d at 45. The court concluded this "plainly establishes" the nexus. *Id.*

The record here supplies a sufficient nexus through official, act-specific, predesignation evidence expressly directed toward whether North Korea should be redesignated. Members of both chambers introduced the "North Korea State Sponsor of Terrorism Designation Act," calling for a determination whether North Korea should be redesignated. H.R. 479, 115th Cong. (2017); S. 672, 115th Cong. (2017). The House adopted H.R. 479 by a vote of 394 to 1. 163 Cong. Rec. H2616–17 (daily ed. Apr. 3, 2017) (Roll No. 210); *see id.* at H2611–12 (text of adopted findings). Among the House-adopted findings: "[t]he Government of North Korea has harbored members of the Japanese Red Army since a 1970 hijacking and continues to harbor the surviving hijackers to this day," Ex. 2, H.R. 479 § 2(a)(4), and "[o]n July 16, 2010, in the case of Calderon-Cardona v. Democratic People's Republic of Korea (case number 08–01367), the United States District Court for the District of Puerto Rico found that the Government of North Korea provided material support to the Japanese Red Army . . . in furtherance of a 1972 terrorist attack at Lod Airport, Israel that killed 26 people, including 17 Americans," *id.* § 2(a)(5). S. 672, the companion bill introduced in the Senate, contained the same findings. S. 672 §§ 2(a)(4)–(5). Those consecutive

30

findings described connected conduct, not unrelated historical examples: the Yodo-go safe haven identified in § 2(a)(4) was operationally linked, through Takashi Okamoto, to his brother Kozo Okamoto's recruitment and selection for the Lod operation identified in § 2(a)(5). *See supra* Section IV.C.4. Although neither measure was enacted, and Plaintiffs do not offer them as enacted law or as binding on the Secretary, that does not deprive the House-adopted findings of probative force: § 1605A asks whether the designation resulted, wholly or in part, from the predicate act, *see Massie*, 592 F. Supp. 2d at 74; it does not require that Congress have enacted legislation identifying that act. Congress did, however, subsequently enact legislation requiring the Secretary of State to determine whether North Korea met the criteria for designation as a state sponsor of terrorism. Countering America's Adversaries Through Sanctions Act, Pub. L. No. 115-44, § 324, 131 Stat. 886, 954 (2017). Although § 324 did not repeat H.R. 479's predicate-specific findings, it separately required the same designation inquiry addressed by the House-adopted measure. Against that legislative sequence — House adoption of express Lod and JRA findings, followed by Congress's enactment of a mandatory designation determination — the Secretary of State redesignated North Korea. 82 Fed. Reg. 56,100 (Nov. 27, 2017) (Ex. 28); *see* Ex. 29 (listing a designation date of November 20, 2017).

Courts in this district have recognized that a historical act may satisfy the 2017 designation nexus when the predesignation record specifically connects that act to the redesignation inquiry. In *Doe*, the court held that the 2017 redesignation satisfied the designation nexus for claims arising from the 1968 capture of the USS Pueblo — an act that predated the redesignation by nearly fifty years. 414 F. Supp. 3d at 123–24. Just two weeks before the redesignation, President Trump cited the "capture and torture of the brave American soldiers of the USS Pueblo" as among the most significant of North Korea's terrorist actions. *Id.* at 124 & n.6 (citing Remarks by President Trump

31

to the National Assembly of the Republic of Korea (Nov. 7, 2017)). Those remarks, "coupled with the evidence cited in *Massie* that the Pueblo attack also partly motivated the 1988 designation," satisfied the plaintiffs' burden of production, and the court construed "as a result of" to mean "wholly or in part as a result." *Id. Doe* therefore assessed the designation nexus cumulatively, combining designation-era remarks with historical evidence rather than demanding a single dispositive source. *Id.* at 124 & n.7. Plaintiffs' proof follows that same model.

Most recently, a second action arising from the Pueblo seizure applied the same framework. *Does v. Democratic People's Republic of Korea*, No. 23-273 (TJK), 2026 WL 1493562, at *8–9 (D.D.C. May 28, 2026). Because North Korea "was not so designated at the time of the Pueblo incident," the court held that "any current designation must have been made 'as a result of'" that incident. *Id.* at *8. Applying the "wholly or in part" standard and relying on the President's designation-era remarks and prior decisions — including *Massie* — the court concluded that "the 2017 designation was made, at least in part, as a result of the Pueblo incident." *Id.* at *8–9. That recent application confirms the framework used here: because Lod preceded North Korea's designation, Plaintiffs must — and do — connect North Korea's support for Lod to the 2017 redesignation.

The designation-era record supplies historical corroboration. The 1988 designation rested on the Secretary's determination that North Korea had "repeatedly provided support for acts of international terrorism." 53 Fed. Reg. at 3477 (Ex. 26). Although the designation notice did not enumerate the underlying acts, *Massie* relied on the surrounding record to find that the Pueblo seizure partly motivated North Korea's designation. 592 F. Supp. 2d at 74. State Department reporting from the period surrounding the designation connected North Korea to the JRA: in its *Patterns of Global Terrorism: 1988*, the Department reported that "[d]uring 1988, the JRA

32

maintained its worldwide operations, including sustaining links to Libya and North Korea," Ex. 23, U.S. Dep't of State, *Patterns of Global Terrorism: 1988*, at 37 (1989), and that "North Korea supported at least some members of the JRA," a faction of which was "based in P'yongyang," Ex. 23, at 49. The same report's profile of the JRA records that the group's attacks included "the massacre of passengers at Lod Airport in Israel (1972)" and that the JRA was "[b]ased in Lebanon with six members in North Korea (since 1970)." Ex. 23, at 79–80. The Department's later reporting reflects the same continuing relationship. Ex. 24, at 2 (exhibit PDF pagination) (North Korea "continues to provide sanctuary to Japanese Red Army members"); Ex. 30, U.S. Dep't of State, *Country Reports on Terrorism 2020* (2021). Plaintiffs' expert and documentary evidence connects that sponsorship relationship to the PFLP-JRA collaboration that produced the Lod Airport attack. *See* Ex. 1, Joscelyn Report § I, at 2; Ex. 3, Rubin Report ¶ 53; Ex. 5, Gunaratna Report ¶ 38; Ex. 4, Bechtol Report ¶¶ 15–20, 26. This designation-era evidence bears directly on the 2017 nexus. *See Doe*, 414 F. Supp. 3d at 124 n.7.[4]

In its *Country Reports on Terrorism 2020*, the State Department explained that in 2017 the Secretary of State determined that North Korea had "repeatedly provided support for acts of international terrorism" since the 2008 rescission; that "[t]he DPRK also has failed to take action to address historical support for acts of international terrorism"; and that "[f]our Japanese Red Army members wanted by the Japanese government for participating in a 1970 Japan Airlines

---

[4] Indeed, the specific connection between North Korea and the Lod Airport attack was placed before Congress more than a decade before the 1988 designation. In 1975, the Senate Subcommittee on Internal Security received testimony from terrorism expert Brian Crozier that the Lod attackers "had been trained in North Korea" before receiving money in Germany, arms in Italy, and further training in camps in Syria and Lebanon. Ex. 18 at 183. This predesignation congressional record demonstrates that North Korea's reported training of the Lod attackers was specifically placed before Congress well before the formal designation in 1988. The Department's later reporting attributes the 1988 designation "primarily" to the November 1987 bombing of Korean Air Flight 858 (Ex. 30); a designation's primary basis does not exclude additional bases, for § 1605A requires only that the designation have resulted wholly or in part from the conduct at issue. *See Massie*, 592 F. Supp. 2d at 74.

hijacking continue to shelter in the DPRK." Ex. 30. That the report also identifies other conduct as a basis for the determination does not narrow the nexus: § 1605A requires only that the designation have resulted "wholly or in part" from the conduct at issue, not that the conduct be its sole or primary basis. *Doe*, 414 F. Supp. 3d at 124. Long before the redesignation, the Department expressly treated North Korea's continuing shelter of the JRA hijackers as relevant to its state-sponsor status: in October 2001, explaining that the JRA's removal from the foreign-terrorist-organization list "doesn't change the status of North Korea," the Department's spokesman stated that the 1970 hijacking "remains a criminal act," that the hijackers' "continued presence in North Korea constitutes a safe haven from judicial accountability," and that this "would be a key consideration on US law regarding the designation of state sponsors of terrorists." Ex. 31, U.S. Dep't of State, Daily Press Briefing (Oct. 5, 2001). Taken together, that official record supports the conclusion that the 2017 redesignation resulted at least in part from North Korea's continuing JRA sponsorship, including the material support for Lod identified in the House's contemporaneous designation findings.

This case is readily distinguished from *Bae v. Democratic People's Republic of Korea*, No. 20-2260, 2025 WL 2633359 (D.D.C. Aug. 15, 2025),[5] in which the court held that the plaintiffs failed to establish the designation nexus where their only evidence was family affidavits about lobbying efforts directed at securing the victim's return—not at redesignation—and the victim's detention was never referenced in any official redesignation materials. *Id.* at *3 (distinguishing *Warmbier* because "there is not enough evidence to conclude that [the redesignation] resulted from Mr. Bae's detention"). *See also Vera v. Republic of Cuba*, 867 F.3d 310, 318 (2d Cir. 2017)

---

[5] *Bae* is currently on appeal. *Bae v. Democratic People's Republic of Korea*, No. 25-7132 (D.C. Cir. filed Sept. 12, 2025).

(general expert opinion that designation was "based, at least in part, on extrajudicial killings and tortures" insufficient without specific link to plaintiff's injury).

Unlike *Bae*, the official predesignation legislative record here expressly connected North Korea's material support for the Lod Airport attack and its continuing harboring of JRA members to the redesignation inquiry. Ex. 2, H.R. 479 §§ 2(a)(4)–(5); S. 672 §§ 2(a)(4)–(5). And unlike the generalized expert opinion rejected in *Vera*, this evidence identifies the specific predicate act and North Korea's support for it. The State Department's reporting provides executive-branch corroboration of the continuing JRA relationship and its relevance to North Korea's designation status. Taken together, this sequence supplies satisfactory evidence from which the Court may find that the 2017 redesignation resulted, at least in part, from the conduct at issue here.

This act-specific official record carries Plaintiffs' "initial burden of production" on the jurisdictional facts. *Owens*, 864 F.3d at 784. North Korea has never appeared or offered any evidence in rebuttal — and "if a plaintiff satisfies his burden of production and the defendant fails to present any evidence in rebuttal, then jurisdiction attaches." *Id.* The designation requirement of § 1605A(a)(2)(A)(i) is satisfied.

### C. U.S. Nationality of Victims

Section 1605A(a)(2)(A)(ii) requires that "the claimant or the victim" have been "a national of the United States" at the time the act occurred. 28 U.S.C. § 1605A(a)(2)(A)(ii). The requirement is disjunctive: jurisdiction exists where either the claimant or the direct victim possessed the required status when the act occurred. *See Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 14–15 (D.C. Cir. 2015); *accord Leibovitch v. Islamic Republic of Iran*, 697 F.3d 561, 570 (7th Cir. 2012) ("[t]he claimant and victim need not both be American citizens"). Here, the nationality of

the direct victims supplies the jurisdictional nexus for all claims arising from their deaths and injuries.

The direct victims were United States nationals on May 30, 1972. The ten individuals killed in the attack were U.S. citizens, and the twenty-four individuals directly injured were U.S. citizens at the time. (Am. Compl. ¶¶ 7, 13–14, 28, 40, 42–43, 53–54, 66, 73, 83, 93, 99, 104, 110, 113, 118, 135, 139, 142–43, 150–51, 154, 168–72). The victims were predominantly Puerto Rican pilgrims. (Ex. 8, *San Juan Star*, June 1, 1972, at 1; Ex. 12, *Jerusalem Post*, June 6, 1972, at 1; Ex. 17, P.R. S. Res. 460, at 2 (exhibit pp. 5, 10) (naming each of the sixteen Puerto Rican pilgrims killed)). Persons born in Puerto Rico on or after January 13, 1941, and subject to the jurisdiction of the United States, are citizens of the United States at birth. 8 U.S.C. § 1402. Section 1402 also declared qualifying persons born in Puerto Rico between April 11, 1899 and January 13, 1941 to be citizens no later than January 13, 1941. *Id.* Most members of that earlier-born cohort had acquired citizenship even sooner under the Jones Act, which conferred United States citizenship on the citizens of Puerto Rico in 1917. *See* Act of Mar. 2, 1917, ch. 145, § 5, 39 Stat. 951, 953. The two remaining direct victims, Claire Smith Golden and Carol Golden, were born United States citizens and remained so at the time of the attack. (Am. Compl. ¶ 6); *see* U.S. Const. amend. XIV, § 1; 8 U.S.C. § 1401(a). The Amended Complaint's allegation that the named plaintiffs "were born and have remained, or at the time of their deaths did remain, U.S. citizens" stands uncontroverted and is corroborated by the contemporaneous and official record described above. (Am. Compl. ¶ 6).

Because the direct victims were United States nationals when the massacre occurred, § 1605A(a)(2)(A)(ii) does not require that every family-member claimant also have possessed United States nationality in 1972. Section 1605A(c) separately requires each person invoking the federal cause of action to be a United States national, a member of another enumerated class, or

36

the duly authorized legal representative of such a person. 28 U.S.C. § 1605A(c), (h)(5); *see infra* Section VI; *see also Doe*, 414 F. Supp. 3d at 125 (§ 1605A(c) "omit[s]" the time-of-act nationality requirement that § 1605A(a)(2)(A)(ii) imposes (citing *Owens*, 864 F.3d at 809)). Each claimant's eligibility under § 1605A(c) — including the authority of representatives of deceased claimants — will be resolved after the common liability determination and before entry of any individual judgment, as appropriate. That claimant-specific inquiry does not alter the Phase One conclusion that the victims' nationality satisfies § 1605A(a)(2)(A)(ii).

The nationality requirement of § 1605A(a)(2)(A)(ii) is thus satisfied.

### D. No Arbitration Requirement

The attack occurred in Israel, not in North Korea. The arbitration requirement of § 1605A(a)(2)(A)(iii) applies only when "the act occurred in the foreign state against which the claim has been brought." 28 U.S.C. § 1605A(a)(2)(A)(iii). Because the Lod Airport attack occurred in Israel, the arbitration requirement is inapplicable.

### E. Jurisdictional Predicate: Extrajudicial Killing

The Lod Airport massacre killed twenty-six civilians. Ten of the decedent-plaintiffs in this action were among those killed, and twenty-four plaintiffs were physically injured in the attack. The attack constitutes extrajudicial killing within the meaning of 28 U.S.C. § 1605A(h)(7), which incorporates the definition set forth in the Torture Victim Protection Act, 28 U.S.C. § 1350 note § 3(a).

Under the TVPA, extrajudicial killing means "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples." 28 U.S.C. § 1350 note § 3(a). The indiscriminate grenade and machine gun attack on civilians in an airport terminal by armed

37

terrorists unquestionably constitutes extrajudicial killing. *Calderon-Cardona*, 723 F. Supp. 2d at 459 (holding Lod Airport attack constituted an "act of extrajudicial killing" under § 1605A, and that injured survivors may recover for personal injury caused by such act). Importantly, the *Calderon-Cardona* court held that § 1605A(a)(1) "does not require that the injury to a plaintiff result from the actual 'extrajudicial killing,' but rather from an 'act of extrajudicial killing,'" and that "[a] deadly terrorist attack, taken as a whole, clearly constitutes an 'act' of extrajudicial killing." *Id.* (citing *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 270 (D.D.C. 2003)).

*Borochov* confirms rather than undermines jurisdiction over the injured plaintiffs. *Borochov* holds that FSIA jurisdiction premised on "extrajudicial killing" requires a completed killing; where an attack produces no qualifying killing, the extrajudicial-killing predicate is not met. 94 F.4th at 1061–62. That requirement is satisfied here many times over: the Lod Airport massacre killed twenty-six people. And the statute confers jurisdiction over claims "for personal injury or death that was caused by an act of . . . extrajudicial killing," 28 U.S.C. § 1605A(a)(1) — language that reaches the personal injuries of those who survived an act that killed others. *See Campuzano*, 281 F. Supp. 2d at 270; *Calderon-Cardona*, 723 F. Supp. 2d at 459 (arising from this very attack). Once an attack qualifies as a completed act of extrajudicial killing, those injured by that same act may recover. The twenty-four surviving plaintiffs were injured by an act of extrajudicial killing, and jurisdiction over their claims is secure. This Court recently applied *Borochov* in the same way: where "each of the . . . attacks involved an extrajudicial killing," the extrajudicial-killing conclusion "applies not only to the . . . victims who were killed in action but also to the . . . victims . . . who were wounded in action." *Karcher v. Islamic Republic of Iran*, No. 16-232 (CKK), slip op. at 42–43 (D.D.C. June 3, 2026).

38

Accordingly, the Lod Airport massacre constituted a completed act of extrajudicial killing, satisfying the jurisdictional predicate for all claims arising from the deaths and the physical injuries the attack caused.

### F. Material Support or Resources

Jurisdiction under § 1605A(a)(1) exists not only for acts of extrajudicial killing committed directly by the foreign state, but also for the foreign state's provision of material support or resources for such acts. 28 U.S.C. § 1605A(a)(1). "Material support or resources" is defined by reference to 18 U.S.C. § 2339A(b)(1), which includes: "any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel . . . and transportation, except medicine or religious materials." 18 U.S.C. § 2339A(b)(1).

As set forth in Section IV, *supra*, North Korea provided extensive material support and resources to the Japanese Red Army and the Popular Front for the Liberation of Palestine, including:

(1) *Training*—North Korea operated between six and ten training camps that accommodated approximately 200 trainees at a time and were "controlled by the Defense Ministry in Pyongyang." (Ex. 3, Rubin Report ¶ 33; Ex. 5, Gunaratna Report ¶ 19 (camp count); Ex. 1, Joscelyn Report § V, at 12 (citing Crozier congressional testimony) (capacity and Defense Ministry control)). Between 1968 and 1975, approximately 2,500 terrorists and guerrillas were trained in the North Korean camps. (Ex. 1, Joscelyn Report § V, at 12 (citing Crozier congressional testimony)). Other estimates place the number between 3,000 and 4,000, "a large proportion Palestinian." (Ex. 3, Rubin Report ¶ 33; Ex. 5, Gunaratna Report ¶ 16). The courses included

bomb-making, kidnapping, assassination, propaganda, and guerrilla warfare. (Ex. 3, Rubin Report ¶ 34). North Korea also sent military instructors to training camps in Libya and South Yemen, where both the PFLP and JRA received training. (Ex. 1, Joscelyn Report § V, at 14 (citing Bermudez)). Early accounts specifically connected the Lod attackers themselves to this training network: "As it was difficult to train with live ammunition in Japan, they went to North Korea for training. Here they were recruited by the P.F.L.P. and moved to a refugee camp in Lebanon for final training and briefing." (Ex. 3, Rubin Report ¶ 52 (quoting Clutterbuck)); *see also id.* ¶ 46 (the JRA cadre "were trained either in North Korea or, in the case of Kozo Okamoto, were sent through earlier training with the PFLP arranged by North Korean intelligence assets").

(2) *Safe haven*—The North Korean government granted asylum to the Yodo-go hijackers beginning in March 1970, providing JRA members a secure operational base free from law enforcement interference. (Ex. 1, Joscelyn Report § VI, at 14–16). North Korea harbored the hijackers for decades, openly defending its decision to do so through its official KCNA news agency. (*Id.* at 19). The JRA established a presence in both North Korea and Lebanon, and, operating out of these two safe havens, benefitted from its state sponsors. (Ex. 5, Gunaratna Report ¶ 13; *see also id.* ¶ 38 (North Korean sponsorship "was paramount for the survival, sustenance and operation of the JRA globally")). North Korea "consistently provided material support for the JRA and PFLP, harbored JRA terrorist fugitives, trained the terrorists, and gave them financial support." (Ex. 3, Rubin Report ¶ 54; *see also* Ex. 4, Bechtol Report ¶ 26).

(3) *False documentation*—Intelligence evidence from the years after the attack corroborates North Korea's state-level documentation support for the JRA: Japanese police tracked attempts by North Korean spy rings to acquire Japanese passports, "some of which have been passed to the JRA in the past." (Ex. 23, U.S. Dep't of State, *Patterns of Global Terrorism: 1988*,

40

at 49; *see also* Ex. 1, Joscelyn Report § VI, at 17–18). In March 1996, Yoshimi Tanaka, a senior member of the Yodo-go hijacking team, was arrested in Cambodia "while carrying a North Korean diplomatic passport and in the company of several North Korean diplomats." (Ex. 24, U.S. Dep't of State, *Patterns of Global Terrorism: 1996*, at 5 (1997) (exhibit PDF pagination); Ex. 1, Joscelyn Report § VI, at 18).

(4) *Logistical support and brokering of the PFLP-JRA alliance*—North Korea facilitated the formation of the PFLP-JRA partnership that carried out the Lod Airport attack. (Ex. 1, Joscelyn Report § VII, at 21). In September 1970, North Korea hosted PFLP leader George Habash in Pyongyang, where North Korean officials facilitated an introductory meeting between Habash and the Yodo-go hijackers. (Ex. 5, Gunaratna Report ¶ 17; Ex. 3, Rubin Report ¶ 44; Ex. 1, Joscelyn Report § VII, at 22). Other PFLP leaders followed, including Leila Khaled, who met with the JRA in North Korea to discuss "possible joint ventures and a Japanese 'international unit' under PFLP auspices in Beirut." (Ex. 1, Joscelyn Report § VII, at 22 (quoting Sterling)). North Korea's diplomatic support for the alliance continued even after the Lod massacre. When a PFLP-JRA team attacked a Shell Oil refinery in Singapore in January 1974, the terrorists specifically requested contact with the "Diplomatic Mission of North Korea" to facilitate their escape, and the Singapore government held meetings with the North Korean Consul General on their behalf. (Ex. 5, Gunaratna Report ¶¶ 28–29; Ex. 1, Joscelyn Report § VII.B, at 24 (citing Bermudez)).

(5) *Arms*—Although the weapons used at Lod itself were supplied through PFLP operative Ilich Ramírez Sánchez, "Carlos the Jackal" (*see supra* Section IV; Ex. 1, Joscelyn Report § III, at 6), North Korea supplied arms to the organizations as part of the same support relationship: North Korea "supplied Palestinian groups with a wide variety of arms." (Ex. 3, Rubin Report ¶ 34). During Habash's 1970 visit, he was able to procure "weapons and funding" from North Korea.

41

(Ex. 4, Bechtol Report ¶ 18). North Korea provided weapons to both the JRA and PFLP as a matter of official state policy. (Ex. 4, Bechtol Report ¶ 26). A contemporaneous *New York Times* report confirmed that a State Department spokesman had acknowledged North Korea had been "supplying arms to the Arab commandos," and sources close to the commando leadership reported that North Korea "has provided substantial financial and other aid to the commandos over the years." (Ex. 25, Pace, *N.Y. Times*, Sept. 23, 1972, at 10; *see also* Ex. 1, Joscelyn Report § VII, at 23; Ex. 3, Rubin Report ¶ 51).

This material support satisfies the requirements of § 1605A(a)(1). As demonstrated above, North Korea's support to the JRA and PFLP encompassed multiple categories of "material support or resources" defined in 18 U.S.C. § 2339A(b)(1): training, safehouses, false documentation, weapons, and the personnel and logistical support that brokered the PFLP-JRA alliance. The record further reflects financial support. Rubin concluded that the JRA was "largely dependent on safe haven, financing, logistics, training, and international connections on North Korea" (Ex. 3, Rubin Report ¶ 37), and that North Korea "harbored JRA terrorist fugitives, trained the terrorists, and gave them financial support" (*id.* ¶ 54), and Bechtol found that Habash secured "both weapons and funding" during his September 1970 Pyongyang visit (Ex. 4, Bechtol Report ¶ 18). A contemporaneous *New York Times* report likewise quoted sources close to the commando leadership that North Korea "has provided substantial financial and other aid to the commandos over the years." (Ex. 25, Pace, *N.Y. Times*, Sept. 23, 1972, at 10). In the prior Lod Airport litigation, the court found that "North Korea provided both terrorist groups with material support, resources, training, weapons, and refuge" and "financed, armed and trained the groups that perpetrated the Lod Airport Attack, while providing sanctuary to the leadership of the JRA." *Calderon-Cardona*, 723 F. Supp. 2d at 450–51.

42

North Korea's provision of material support was carried out by officials, employees, and agents of the North Korean state acting within the scope of their authority. The training camps in North Korea were "controlled by the Defense Ministry in Pyongyang." (Ex. 1, Joscelyn Report § V, at 12 (quoting Crozier congressional testimony); Ex. 5, Gunaratna Report ¶ 16). The grant of asylum to the Yodo-go hijackers was a decision of the North Korean government, which openly defended that decision through its official KCNA news agency, declaring it "the sovereign state's legitimate right." (Ex. 1, Joscelyn Report § VI, at 19). The PLO delegation that visited Pyongyang in August 1970 was personally greeted by Kim Il-Sung, North Korea's head of state, and the North Korean government promised "increased assistance" including training. (Ex. 1, Joscelyn Report § V, at 13 (citing Bermudez)). The provision of passports required the resources of state intelligence agencies—Japanese police tracked attempts by North Korean spy rings to acquire Japanese passports, "some of which have been passed to the JRA in the past." (Ex. 23, U.S. Dep't of State, *Patterns of Global Terrorism: 1988*, at 49; *see also* Ex. 1, Joscelyn Report § VI, at 17–18). A JRA member arrested in Tokyo in 1988 was believed by Japanese police to have been "'run' by North Korean intelligence agents" and was using the identity of a former North Korean resident of Japan who had immigrated to North Korea in 1972. (Ex. 23, U.S. Dep't of State, *Patterns of Global Terrorism: 1988*, at 49; Ex. 1, Joscelyn Report § VI, at 17). And Yoshimi Tanaka was arrested carrying a North Korean diplomatic passport "in the company of several North Korean diplomats." (Ex. 24, U.S. Dep't of State, *Patterns of Global Terrorism: 1996*, at 5 (1997); Ex. 1, Joscelyn Report § VI, at 18). Japanese police determined that the Yodo-go hijackers were deeply involved in the abduction of Japanese nationals under the direction of the North Korean regime. (Ex. 1, Joscelyn Report § VI, at 19). The ex-wife of one of the hijackers testified that Kim Il-Sung had commanded the group's leader, Tamiya, to "realize a revolution passed down through the

43

generations." (*Id.*). As Bechtol concluded, "North Korea as a matter of its official policy did provide material support, training, resources, weapons and safe haven to the [JRA] and PFLP." (Ex. 4, Bechtol Report ¶ 26). Gunaratna concurred that the Lod Airport massacre "should be seen as [a] terrorist attack[ ] attributable to North Korea's leadership and intelligence services as well." (Ex. 5, Gunaratna Report ¶ 38). The *Calderon-Cardona* court reached the same conclusion, finding that "through their officials, employees and agents, who were acting pursuant to defendants' official policies and therefore within the scope of their office, employment and agency, the defendants provided material support and resources to the JRA, PFLP and their operatives, within the meaning [of] section 1605A, for the specific purpose of carrying out acts of extrajudicial killing such as the Lod Airport Attack." 723 F. Supp. 2d at 459. The requirement that the provision of material support be "engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency," 28 U.S.C. § 1605A(a)(1), is therefore satisfied.

### G. Proximate Causation

As explained above, the Lod Airport massacre constituted a completed act of extrajudicial killing. *See supra* Section V.E. The remaining question is whether North Korea's material support proximately caused that act. Section 1605A(a)(1) requires that the plaintiff's personal injury or death be "caused by" an act of extrajudicial killing or the provision of material support for such an act. The D.C. Circuit has interpreted this language to require proximate cause. *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1128 (D.C. Cir. 2004). Because § 1605A(a) "restates" the predicate acts of former § 1605(a)(7), "it stands to reason that proximate cause remains the jurisdictional standard." *Owens*, 864 F.3d at 794. Neither "specific intent" nor "direct traceability" is required, because material support "is fungible" and "terrorist organizations can

44

hardly be counted on to keep careful bookkeeping records." *Id.* at 799 (quoting *Kilburn*, 376 F.3d at 1130).

Proximate cause has two elements. *Id.* at 798. First, the defendant's material support must be a "substantial factor in the sequence of responsible causation" that led to the terrorist act. *Id.* (quoting *Rothstein v. UBS AG*, 708 F.3d 82, 91 (2d Cir. 2013)). Second, the terrorist act must have been "reasonably foreseeable or anticipated as a natural consequence" of the defendant's material support. *Id.* It is enough to show that the material support went to the terrorist organization that perpetrated the attack and that the support was a proximate cause of the terrorist act. *Kilburn*, 376 F.3d at 1128–30; *Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12, 55 (D.D.C. 2019).

Importantly, the word "for" in the statutory phrase "provision of material support . . . for such an act" does not require specific intent to cause the particular attack. *Owens*, 864 F.3d at 798–99. As the D.C. Circuit recognized, applying a restrictive causation standard to joint tortfeasors "could absolve them all," and requiring that a state sponsor's financial assistance be directly traceable to a particular terrorist act "would likely render § 1605(a)(7)'s material support provision ineffectual." *Kilburn*, 376 F.3d at 1129–30. In *Kilburn*, the D.C. Circuit confirmed that a state's provision of general material support to a terrorist organization can strip it of immunity even though the state did not itself carry out or directly orchestrate the attack; proximate cause does not require direct traceability. 376 F.3d at 1128–30. This framework applies directly here, where North Korea provided the general support infrastructure—training, safe haven, and the brokered alliance—while the PFLP directed the specific Lod Airport operation.

*Borochov* itself confirms this framework. In holding that the material-support clause requires a completed predicate act, the D.C. Circuit analogized the clause to common-law aiding and abetting. 94 F.4th at 1063–64 (citing *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023);

45

*Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983)). That requirement is satisfied here twenty-six times over. *See supra* Section V.E. And once the predicate act is completed, "district courts need only determine whether a foreign government's material support was a proximate cause of a completed killing." *Borochov*, 94 F.4th at 1066 (citing *Owens*, 864 F.3d at 799). Requiring proof of a state's subjective intent in providing support "is a step our cases have repeatedly eschewed": conditioning jurisdiction on the intent behind a particular payment, shipment, or transfer "would as a practical matter eliminate . . . liability except in cases in which the [defendant] was foolish enough to admit [its] true intent" or "specifically tie its support to a single pre-planned terrorist act." *Id.* at 1065–66 (quoting *Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 698–99 (7th Cir. 2008)). Knowing assistance is, in any event, on the face of this record: North Korea welcomed Habash months after the PFLP's Swissair bombing and while his operatives were hijacking Western airliners to Dawson Field, and it granted the Yodo-go hijackers asylum when they arrived having just seized a civilian airliner at gunpoint. *See supra* Section IV.

Both elements are satisfied here.

1. *Substantial Factor.* As demonstrated in Section IV, *supra*, North Korea's material support was a substantial factor in the Lod Airport massacre. North Korea trained both JRA and PFLP operatives at camps controlled by its Defense Ministry. (Ex. 1, Joscelyn Report § V, at 12–14; Ex. 3, Rubin Report ¶¶ 33–34; Ex. 5, Gunaratna Report ¶¶ 16, 19). Two early accounts specifically connected the Lod attackers to North Korean training. In 1975, Brian Crozier testified before the Senate Subcommittee on Internal Security that "[t]hese people had been trained in North Korea." (Ex. 18 at 183). Maj.-Gen. Richard Clutterbuck subsequently reported that the attackers went to North Korea for training before being recruited by the PFLP and moved to Lebanon for final training and briefing. (Ex. 3, Rubin Report ¶ 52 (quoting Clutterbuck)). Whatever the site of

the operatives' final, operation-specific preparation — which Joscelyn locates at PFLP camps in Lebanon (Ex. 1, Joscelyn Report § III, at 7) — the record establishes that North Korea trained JRA members and brokered the PFLP-JRA alliance that produced the attack. The Court need not resolve where each operative received which increment of training: North Korea's training of the JRA and its facilitation of the alliance were substantial factors in the massacre. North Korea granted asylum to the Yodo-go hijackers, giving the JRA an operational base free from law enforcement interference. (Ex. 1, Joscelyn Report § VI, at 14–16). And critically, North Korea brokered the PFLP-JRA alliance that produced the attack by hosting George Habash's September 1970 visit to Pyongyang, during which—accompanied by North Korean officials—he recruited JRA members to carry out attacks for the PFLP. (Ex. 3, Rubin Report ¶ 44).

Each of these forms of support was a substantial factor in bringing about the attack. *See Owens*, 864 F.3d at 794, 798–99 (applying the substantial-factor and reasonable-foreseeability test). North Korea's safe haven gave the JRA an operational base; its training equipped JRA cadres; and its brokering of the PFLP-JRA alliance brought the two organizations together. As Joscelyn concludes, "[i]t is likely that if North Korea did not play this key liaison role, then the PFLP would not have recruited JRA terrorists for the Lod Airport massacre." (Ex. 1, Joscelyn Report § VIII, at 25–26). On this record, North Korea's material support was a substantial factor in, and the massacre was a reasonably foreseeable consequence of, that support. Rubin concurred: "The 1972 Lod Airport massacre was the consummation of a tri-partite relationship between North Korea, the JRA, and the PFLP." (Ex. 3, Rubin Report ¶ 53). North Korea's material support was unquestionably a "substantial factor in the sequence of responsible causation" that led to the Lod Airport attack. *Owens*, 864 F.3d at 798.

47

*Owens* confirms that general material support may remain a substantial factor even when the state sponsor did not plan the particular attack and some of its support preceded the attack by years. There, the D.C. Circuit held that Sudan's material support for al-Qaeda during the 1990s— including safe haven, logistical assistance, and intelligence support—was a proximate cause of the 1998 embassy bombings, even though Sudan expelled bin Laden two years before the attacks; the expulsion "did not undo the support Sudan provided in the previous years." 864 F.3d at 794–98. The record here likewise connects North Korea's training, safe haven, and alliance-facilitation to the organizations and the operational relationship that produced the Lod massacre — support that was ongoing through the period of the attack itself and never severed. (Ex. 3, Rubin Report ¶ 54; Ex. 1, Joscelyn Report §§ V–VI). The existence of later, operation-specific preparation in Lebanon does not negate the causal significance of North Korea's earlier and continuing support.

2. *Foreseeability. Owens* illustrates that foreseeability does not require advance knowledge of the particular target. On the record there, Sudan "could not help but foresee" that al-Qaeda "would attack American interests wherever it could find them." 864 F.3d at 798. The court reached that conclusion even though Sudan's invitation to bin Laden predated al-Qaeda's major attacks and the United States had not yet designated al-Qaeda as a terrorist organization at the time of Sudan's support. *Id.* at 797–98. *Owens* therefore supports foreseeability here, where North Korea knowingly supported organizations with established records of violence against civilian, Israeli, and Western targets. Courts have consistently held that a reasonably foreseeable consequence of supporting a terrorist organization is terrorism. *See Kilburn*, 376 F.3d at 1128–30 (holding that a state sponsor's material support need not be directly traceable to a specific terrorist act); *Karcher*, 396 F. Supp. 3d at 55.

48

North Korea did not merely have general awareness of the terrorist aims of the JRA and PFLP—it was intimately involved in advancing those aims. North Korea knew the PFLP was a terrorist organization when it welcomed Habash to Pyongyang; the PFLP had already bombed a Swiss airplane headed to Israel, killing forty-seven passengers, and hijacked four Western airliners during Habash's visit itself. (Ex. 3, Rubin Report ¶ 34). North Korea knew the JRA's violent aims when it granted asylum to the Yodo-go hijackers, who had just seized a civilian airliner at gunpoint. (Ex. 1, Joscelyn Report § VI, at 14–16). North Korea facilitated Habash's recruitment of JRA members specifically to carry out attacks for the PFLP. (Ex. 3, Rubin Report ¶ 44). And North Korea's official media openly declared its support for revolutionary violence against Israel and its allies. (Ex. 4, Bechtol Report ¶ 20). North Korea could not help but foresee that the JRA and PFLP would carry out attacks against civilian, Israeli, and Western targets.

The Lod Airport massacre was a natural and reasonably foreseeable consequence of North Korea's training, safe haven, arms, and organizational support, even if North Korea did not select the target or participate in the operation's final planning.

On materially similar evidence, the *Calderon-Cardona* court found that the JRA "could not have infiltrated Lod Airport nor otherwise perpetrated the Lod Airport Attack without the material logistical, financial, training and ideological support and resources provided by defendants." 723 F. Supp. 2d at 451–52. That finding is persuasive rather than dispositive: this Court makes its own findings under § 1608(e), and Plaintiffs have submitted the underlying expert evidence, together with the additional Joscelyn report, to enable the Court to do so.

Consistent with the Court's bifurcation order, the question presented at this phase is whether North Korea provided material support for the completed extrajudicial killings at Lod Airport and whether that support proximately caused the attack — determinations common to the

49

claims arising from the attack. *See* Mem. Op., ECF No. 35, at 4–5. On this record, proximate causation is satisfied. Claimant-specific issues — each estate representative's authority, and each plaintiff's individual injuries and damages — are reserved for the second phase.

### H. Personal Jurisdiction

Federal statute grants district courts personal jurisdiction over foreign states wherever "service has been made under section 1608 of [Title 28]." 28 U.S.C. § 1330(b); *see also* Fed. R. Civ. P. 4(j)(1). Plaintiffs followed § 1608(a)'s hierarchy in sequence. No special arrangement for service exists between Plaintiffs and North Korea, precluding service under § 1608(a)(1), and no applicable international convention on service of judicial documents provides a means of service on North Korea, precluding service under § 1608(a)(2). Plaintiffs attempted service by mail under § 1608(a)(3), which could not be completed. ECF Nos. 7, 9. Plaintiffs accordingly requested service through the Secretary of State under § 1608(a)(4). ECF No. 10. While that request remained pending, the Court authorized service by publication, Min. Order (Sept. 26, 2023); publication was effected on October 6, 2023, ECF No. 21; the Court found service effective, Min. Order (Oct. 12, 2023); and the Clerk entered default, ECF Nos. 22, 23. The Department of State thereafter completed statutory service through diplomatic channels, transmitting a diplomatic note, dated November 27, 2023, to North Korea's Permanent Mission to the United Nations, with delivery on February 12, 2024, as reflected in the Department's certification. ECF No. 26; *see* 28 U.S.C. § 1608(c)(1) (service by diplomatic channels is deemed made "as of the date of transmittal indicated in the certified copy of the diplomatic note"). Plaintiffs rely on that completed diplomatic service for purposes of personal jurisdiction and default. North Korea failed to appear or respond within the sixty days prescribed by § 1608(d), or at any time thereafter, and the Court has recognized that "the DPRK is in default." Mem. Op., ECF No. 35, at 1. Whichever date controls under § 1608(c)(1)

50

— the note's date or its delivery — the sixty-day period has long since expired without any response from North Korea, and the sequence of the December 2023 entry of default is therefore immaterial to the relief sought. Because the requirements of § 1605A are met and service has been effected under § 1608(a)(4), the Court has personal jurisdiction over North Korea. 28 U.S.C. § 1330(b).

### VI. NORTH KOREA IS LIABLE UNDER 28 U.S.C. § 1605A(c)

### A. Section 1605A(c) Establishes North Korea's Liability

Section 1605A(c) creates a federal cause of action directly against a foreign state. *K.E.F.V. v. Islamic Republic of Iran*, 135 F.4th 988, 991 (D.C. Cir. 2025). Under that provision, a foreign state that is or was designated a state sponsor of terrorism "shall be liable" to the claimants the statute enumerates "for personal injury or death caused by" the acts described in § 1605A(a)(1) — including extrajudicial killing and the provision of material support or resources for such an act. 28 U.S.C. § 1605A(c), (a)(1). Once those statutory elements are established, liability rests on the statutory text itself; an eligible claimant need not establish an independent state-law cause of action. *K.E.F.V.*, 135 F.4th at 991 & n.4, 992 & n.5. The statute makes available "economic damages, solatium, pain and suffering, and punitive damages." *Id.* at 991 (quoting 28 U.S.C. § 1605A(c)). Where the statute does not answer whether or to what extent a particular remedy is available, courts consult well-established state tort law — including common-law and statutory analogues — as guideposts. *Id.* at 992–95; *Fraenkel v. Islamic Republic of Iran*, 892 F.3d 348, 353 (D.C. Cir. 2018).

Sections IV and V establish each element of the statutory cause of action. North Korea was designated a state sponsor of terrorism as a result, at least in part, of the conduct at issue, and it remains so designated. *Supra* Section V.B. The direct victims whose deaths and injuries underlie

the claims asserted here were United States nationals at the time of the attack. *Supra* Section V.C. The Lod Airport massacre constituted a completed act of extrajudicial killing. *Supra* Section V.E. North Korea, through officials, employees, and agents acting within the scope of their authority, provided material support and resources — including training, safe haven, and the personnel and logistical support that brokered the PFLP-JRA alliance — to the organizations that carried out the attack. *Supra* Section V.F. And that support was a substantial factor in the sequence of events that produced the massacre, whose resulting deaths and injuries were reasonably foreseeable consequences of the support. *Supra* Section V.G. North Korea is therefore liable under § 1605A(c) for the personal injuries and deaths caused by its material support for the attack.

Section 1605A(c) extends this private right of action to four enumerated classes of claimants: "(1) a national of the United States, (2) a member of the armed forces, (3) an employee of the Government of the United States, or of an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment, or (4) the legal representative of a person described in paragraph (1), (2), or (3)." 28 U.S.C. § 1605A(c). For purposes of the statute, a "national of the United States" carries the meaning given in section 101(a)(22) of the Immigration and Nationality Act, 8 U.S.C. § 1101(a)(22). *Id.* § 1605A(h)(5). The living Plaintiffs who are United States nationals fall within § 1605A(c)(1). *See supra* Section V.C. Claims belonging to deceased United States nationals — the ten victims killed in the attack and any family-member plaintiff who has died since — may be pursued under § 1605A(c)(4) by their duly authorized legal representatives. Consistent with the Court's July 22, 2026 Order and Memorandum Opinion, the identity and authority of each estate representative, and any claimant-specific question of survivability, will be resolved through the filings the Order prescribes, after the common liability determination and before entry of any individual judgment, as appropriate.

52

*See* Order, ECF No. 34; Mem. Op., ECF No. 35, at 4–5 (bifurcating proceedings "with jurisdiction and liability to be determined first, followed by individualized damages proceedings," and reserving for the second phase each estate's "authority to litigate on behalf of deceased claimants"). The requested Phase One determination does not depend on final resolution of which duly authorized representative will prosecute each estate's surviving claims; those determinations do not affect whether North Korea is liable for the conduct common to all claims.

### B. North Korea's Liability Is Common to All Claims

Each of the six counts of the Amended Complaint arises under § 1605A(c). (Am. Compl., Counts I–VI). The determination that North Korea is liable under the statute therefore resolves the common liability core of every claim in this action — precisely the adjudication the Court's bifurcation order contemplates for this phase, in which "jurisdiction and liability [are] to be determined first, followed by individualized damages proceedings." Order, ECF No. 34; *see* Mem. Op., ECF No. 35, at 4–5. The six counts use traditional tort labels to organize the injuries and remedies alleged; those tort analogues do not impose an additional source-of-liability requirement beyond § 1605A(c), although they may remain relevant in the individualized proceedings to the availability and measure of particular remedies. Solatium, in particular, is a remedy expressly authorized by § 1605A(c), not an independent tort. *See K.E.F.V.*, 135 F.4th at 992–95.

Consistent with *K.E.F.V.*, decisions in this District have used traditional tort analogues — including wrongful death, assault, battery, and intentional infliction of emotional distress — to evaluate the kinds of injuries and remedies cognizable under § 1605A(c). *See, e.g., Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 76–80 (D.D.C. 2010). Those authorities remain useful in the individualized second phase where the statute does not itself resolve the availability

53

or measure of a particular remedy, but they do not supply a separate substantive cause of action that Plaintiffs must establish in addition to § 1605A(c). *See K.E.F.V.*, 135 F.4th at 992 & n.5.

### C. Claimant-Specific Eligibility and Damages Are Reserved for Phase Two

Each claimant's entitlement to recovery under § 1605A(c), and the amount of any recoverable damages, will be resolved after the common liability determination and before entry of any individual judgment. Those determinations include each estate representative's authority to sue and any claimant-specific question of survivability; the nature and extent of each direct victim's physical and emotional injuries; each family-member claimant's qualifying relationship and resulting injury; and the availability and amount of economic damages, pain and suffering, solatium, and punitive damages. Nothing in the ruling requested here would award damages to, or finally adjudicate the individual entitlement of, any particular claimant.

### VII. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court enter default judgment on liability against the Democratic People's Republic of Korea, determining that:

1. This Court has subject matter jurisdiction under 28 U.S.C. § 1605A over claims against North Korea for its material support of the May 30, 1972 Lod Airport massacre;

2. The Court has personal jurisdiction over North Korea under 28 U.S.C. § 1330(b), North Korea having been served in accordance with 28 U.S.C. § 1608 and having failed to appear or otherwise defend;

3. North Korean officials, employees, and agents, acting within the scope of their authority, provided material support and resources for a completed act of extrajudicial killing — the Lod Airport massacre — and that support was a substantial factor in, and the resulting deaths and injuries a reasonably foreseeable consequence of, the attack;

4. North Korea is liable under 28 U.S.C. § 1605A(c) for the personal injuries and deaths proximately caused by its material support for the Lod Airport massacre; and

5. Claimant-specific entitlement to recovery, representative authority, survivability, qualifying injuries and relationships, and the availability and amount of damages — including economic damages, pain and suffering, solatium, and punitive damages — are reserved for subsequent proceedings consistent with the Court's July 22, 2026 Order and Memorandum Opinion.

Plaintiffs will submit individualized damages evidence in phases in accordance with the Court's orders following entry of judgment on liability.


Dated: August 14, 2026

Respectfully submitted,

/s/ Joshua M. Ambush
Joshua M. Ambush
Bar No. MD27025
Law Offices of Joshua M. Ambush, LLC
106 Old Court Road, Suite 303
Baltimore, Maryland 21208
Phone: (410) 484-2070
Facsimile: (410) 484-9330
joshua@ambushlaw.com
Attorney for Plaintiffs

55