# EXHIBIT 18

# TERRORISTIC ACTIVITY
## International Terrorism

# HEARINGS
BEFORE THE

## SUBCOMMITTEE TO INVESTIGATE THE ADMINISTRATION OF THE INTERNAL SECURITY ACT AND OTHER INTERNAL SECURITY LAWS
OF THE

## COMMITTEE ON THE JUDICIARY
## UNITED STATES SENATE
NINETY-FOURTH CONGRESS

FIRST SESSION

PART 4

MAY 14, 1975

Printed for the use of the Committee on the Judiciary



U.S. GOVERNMENT PRINTING OFFICE
WASHINGTON : 1975

ale by the Superintendent of Documents, U.S. Government Printing Office
Washington, D.C. 20402 - Price $1.20



## COMMITTEE ON THE JUDICIARY

JAMES O. EASTLAND, Mississippi, *Chairman*

JOHN L. McCLELLAN, Arkansas
PHILIP A. HART, Michigan
EDWARD M. KENNEDY, Massachusetts
BIRCH BAYH, Indiana
QUENTIN N. BURDICK, North Dakota
ROBERT C. BYRD, West Virginia
JOHN V. TUNNEY, California
JAMES ABOUREZK, South Dakota

ROMAN L. HRUSKA, Nebraska
HIRAM L. FONG, Hawaii
HUGH SCOTT, Pennsylvania
STROM THURMOND, South Carolina
CHARLES McC. MATHIAS, Jr., Maryland
WILLIAM L. SCOTT, Virginia

---

SUBCOMMITTEE TO INVESTIGATE THE ADMINISTRATION OF THE INTERNAL
SECURITY ACT AND OTHER INTERNAL SECURITY LAWS

JAMES O. EASTLAND, Mississippi, *Chairman*

JOHN L. McCLELLAN, Arkansas
BIRCH BAYH, Indiana

STROM THURMOND, South Carolina
WILLIAM L. SCOTT, Virginia

J. G. SOURWINE, *Chief Counsel*
ALFONSO L. TARABOCHIA, *Chief Investigator*
MARY E. DOOLEY, *Research Director*

(II)

# CONTENTS

Testimony of:

Mr. Brian Crozier, director of the Institute for the Study of Conflict, London, England — Page 179

Hon. Robert A. Fearey, Special Assistant to the Secretary of State, Coordinator for Combatting Terrorism, Department of State, accompanied by Mr. Louis Fields and Mr. John N. Gatch, Deputy — 212

Appendix — 253

(III)

# TERRORISTIC ACTIVITY—INTERNATIONAL TERRORISM

---

### WEDNESDAY, MAY 14, 1975

U.S. SENATE,
SUBCOMMITTEE TO INVESTIGATE THE
ADMINISTRATION OF THE INTERNAL SECURITY ACT
AND OTHER INTERNAL SECURITY LAWS
OF THE COMMITTEE ON THE JUDICIARY,
*Washington, D.C.*

The subcommittee met, pursuant to notice, at 9:35 a.m. in room 155 Russell Senate Office Building, Senator Strom Thurmond presiding.

Also present: J. G. Sourwine, chief counsel; Gary Clary, minority counsel; R. J. Short, senior investigator; David Martin, senior analyst; and A. L. Tarabochia, chief investigator.

Senator THURMOND. The subcommittee will come to order.

This is the first of a series of hearings the Senate Internal Security Subcommittee plans to hold on the the general subject of political terrorism, international and domestic.

Today's hearing will focus on the problem of international political terrorism. During the first part of June, it is planned, highly knowledgeable testimony will be given before the subcommittee about political terrorism in the United States. Shortly thereafter, the subcommittee plans further hearings dealing with special ramifications of terrorism or blackmail by terrorist groups.

Political terrorism is an ancient phenomenon. For example, during the last century, opponents of the czarist regime in Russia would target czarist administrators whom they considered particularly cruel or obnoxious, assassinate them, and then claim public credit for the assassination.

No civilized person can condone a theory of action in which a so-called revolutionary elite presumes to act as prosecutors, judges, and hangmen of those with whom they disagree politically. But compared with the political terrorists of the last several decades, the anticzarist terrorists almost begin to look like discriminating and civilized people.

The anticzarist terrorists at least sought to single out those individuals whom they considered guilty of certain crimes. On the other hand, the political terrorists of today, in pursuit of their political objectives, do not hesitate to abduct or murder completely innocent victims—men, women, and children—who are guilty of no crime other than the fact that they are Americans or Englishmen or Israelis or that they hold some position in a government or in a corporation that the terrorists for one reason or another do not like.

(177)

The story of modern terrorism is bloody and ruthless. Palestinian terrorists in 1970 sabotaged a Swissair plane en route to Tel Aviv, killing all 47 people aboard. IRA terrorists have repeatedly exploded large bombs in pubs and department stores and other crowded areas, killing and maiming hundreds of people.

Arab terrorists again were guilty of the massacre of 31 Americans and a number of other passengers in a Pan Am plane at the Rome airport in December of 1973. In May of 1972, the Baader-Meinhof gang in Germany blew up an American officers' club—and it was only by a miracle that casualties were limited to two people killed.

American diplomatic personnel have been prime targets of the terrorists. In September of 1969 terrorists kidnapped U.S. Ambassador to Brazil Burke Elbrick. In July of 1970 they kidnapped and killed Daniel Mitrione, U.S. Public Service adviser to Uruguay.

In January of 1971 Uruguayan terrorists kidnapped Ambassador Jackson and held him for 8 months, until 106 Tupamaro prisoners against whose release he was being held hostage, managed to "escape." In March of 1974, U.S. Vice Consul John Patterson was kidnapped in Hermosillo, Mexico, and was subsequently found murdered. In August of 1974, Cypriot terrorists murdered U.S. Ambassador of Cyprus Davis and a local embassy employee.

This is only a small part of a much longer list of kidnappings, disappearances, and murders, involving American businessmen as well as diplomatic representatives. Countless citizens of other countries have also been the victims of the same kind of indiscriminate terror and killing.

The absolute ruthlessness of our modern terrorists is starkly revealed in two incidents where their planned actions failed to come off because we had advance intelligence.

In the first instance, in 1973, several Arab terrorists were seized with two Russian SA-7 heat-seeking missiles—which they had intended to use against an Israeli airliner. In another incident about the same time in New York City, authorities seized three cars laden with explosives, in a densely populated area.

Unfortunately, there exists in this country certain individuals and certain political tendencies that are inclined to regard the political terrorists as patriots and progressives—even when their activities cost the lives of scores of innocent men, women, and children.

Sometimes they preface their moral support for the terrorists by saying that they themselves do not believe in terrorism. But, nevertheless, the terrorists are fighting against the same imperialist enemies and they therefore have to be defended. Thus, we find American lawyers sharing quarters and cooperating with the lawyers for the Bader-Meinhof terrorist group in Germany.

It is our hope that today's hearing will throw some light on the problem of international terrorism and on the interlocking links between the various international terrorist groups. Despite Communist disclaimers, we also intend to look into the possibility of interlocks between the major international terrorist organizations and Moscow, Peking, Prague, and Havana.

I might say that only here last week, in Washington, a number of people were assaulted and injured at this so-called Kindness Day. We read in the paper about one man having his eye put out. Many others were assaulted and robbed and injured.

Now today our first witness is Mr. Brian Crozier, Director of the Institute for the Study of Conflict in London, who has a deserved reputation as one of the free world's foremost experts on international terrorism.

Our second witness will be Mr. Robert Fearey, who is the State Department representative and coordinator of the Working Group of the Special Cabinet Committee on International Terrorism.

We are pleased to have these gentlemen with us, and we will now hear from Mr. Crozier.

Mr. MARTIN. If I may, Mr. Chairman, I would like to put into the record a brief statement about Mr. Crozier's special qualifications to testify on the subject of today's hearings.

Mr. Crozier has been a student of the use of violence for political purposes, and of security problems, for more than 20 years now. As a newspaperman he covered violent situations in Indonesia, Indochina, Algeria, Cyprus, the former Congo, and Latin America. And, among the news organizations he wrote for were the New York Times, Time magazine, Reuters, and the London Economist, and the Sunday Times of London.

In 1960—that is, 15 years ago—he wrote a book called "The Rebels" which was a comparative study, pioneering in its field, of revolutionary methods all over the world. And it is my understanding that this study formed the basis for the first counterinsurgency course at Ft. Bragg, Mr. Chairman, and that it is required reading in military and defense colleges in many countries.

Mr. Crozier was the founder of the Institute for the Study of Conflict in London. It was set up in 1970 with the collaboration of Prof. Leonard Schapiro and Sir Robert Thompson, and a number of other distinguished Britons who have had experience, or possess expertise in this special area.

He is the author of a recent book, "A Theory of Conflict" which was published by Scribners in March of this year. This book sums up, attempts to bring together, his findings from more than 20 years of study of the joint problems of the political use of violence and the problems of security which arise from the use of violence.

Mr. CROZIER. Mr. Chairman, it is a great honor to be here today.

Senator THURMOND. We are glad to have you with us, and you may proceed, Mr. Crozier.

## TESTIMONY OF BRIAN CROZIER, DIRECTOR OF THE INSTITUTE FOR THE STUDY OF CONFLICT, LONDON, ENGLAND

Mr. CROZIER. I do not know whether I am as famous as the last speaker suggests, but I did bask very briefly in a certain notoriety when I was inadvertently included in a list of terrorist members of the Weather Underground.

However, I gather that this has now been rectified, and I just wanted to make it clear that although I am a student of terrorism I am not myself a terrorist.

I am going to begin with definitions, for I believe that it is important that we should know what we are talking about. You will notice that I use the term "transnational terrorism", rather than "international terrorism." The distinction between the two may seem pedantic to some people, but to my mind it is a real one. "International terrorism"

180

might imply the existence of a "terrorist international" in the sense of an international body coordinating the activities of terrorists in different countries. There is really no such thing, although a number of terrorist groups are affiliated to the Trotskyist Fourth International with its headquarters in Brussels. However, a striking aspect of the new wave of terrorism that faces us today is that the great majority of the proliferating terrorist groups receive help of one kind or another across international boundaries, either from other terrorist groups or from governments that support what they are doing or the objectives which they claim to be furthering. With these few preliminary remarks, I propose the following brief glossary:

Terrorism: Motivated violence for political ends (a definition that distinguishes terrorism from both vandalism and nonpolitical crime).

Terror: Measures of extreme repression, including torture, used by states to oppress the population or to repress political dissenters (the converse of terrorism).

Extremist: Prepared to break the law, with particular reference to political violence.

Subversive centers: Countries that provide assistance, whether with money, training, arms or various facilities, to extremist movements engaged in challenges to the security of other states.

Guerrillas (urban or rural): Groups or individuals practicing guerrilla warfare. The term "urban guerrillas" is often a misnomer for "urban terrorists."

Revolutionary war: A form of warfare in which the ultimate objective is the total destruction of the society in which the conflict is occurring, and of the government and administration of the area.

Subversion: A systematic attempt to undermine a society with the ultimate objects of bringing about a total collapse of the State by bringing a regime into disrepute, causing a loss of confidence on the part of the ruling establishment, institutions and government, and provoking a breakdown of law and order.

### SUBVERSION AND TERRORISM

It is very important to understand that terrorism, which is our main concern today, may or may not be a phase in a subversive campaign or in a revolutionary war. The relationship between subversion and terrorism is the same as that between the whole and the part. A revolutionary war, essentially based on the pattern developed by Mao Tse-tung in China and by Truong Chinh and Vo Nguyen Giap in Vietnam, and later practised in Algeria and other countries, usually goes through various phases. It will begin with the creation of a subversive apparatus; the second phase will consist of terrorism; there will be a third phase of guerrilla war; and a final phase of full-scale war leading (if the revolutionaries are successful) to the "revolutionary final offensive"—of which we have just witnessed a tragically successful example in Vietnam.

Now the point I want to make is this, that terrorism is, in the final analysis, much more grave and important if it is a phase in a process of subversion or revolutionary war than if it is practiced for its own sake as an isolated phenomenon. It is a very important element in the counteraction to terrorism to be certain in diagnosis of the challenge. If the terrorists have ultimate revolutionary objectives, they must be prevented from reaching phase 3 and at all costs phase 4.

181

One of the most striking and curious aspects of the contemporary wave of terrorism, however, is that in a number of cases there appears to be no discernible ultimate political objective. Terrorism becomes a way of life. I am not making the mistake of suggesting that such forms of apparently unmotivated terrorism are unimportant. On the contrary, they contribute to the erosion of liberties and of the fabric of society. They must not be allowed to go on, but it must be borne in mind that the ultimate beneficiaries—if any—of such terrorism are unlikely to be those that actually practice it.

### THE OBJECTS OF TERRORISM

I think it is fair to say that there is no absolute unanimity among specialists on the aims or objects of terrorism. I myself have always distinguished between two main categories of terrorism: disruptive and coercive.

The aims of disruptive terrorism are: self-publicity; to build up the movement's morale and prestige; to discredit and demoralize the authorities; to provoke the authorities into taking excessively harsh repressive measures, likely to alienate the population and force a rising spiral of official expenditure in arms, lives and money, resulting in public clamor for the abandonment of counteraction.

The aims of coercive terrorism are: to demoralize the civil population, weaken its confidence in central authority, and instill fear of the terrorist movement; to make an example of selected victims, by torture and/or death to force obedience to the leadership of the movement.

There is an important observation to be made at this point: terrorism is a weapon of the weak. This, at any rate, was the normal experience in the recent past. Usually, terrorists graduated to guerrilla war and then to outright war, when and if they felt strong enough. If they abandoned guerrilla war to return to terrorism, this could normally be taken as a sign of returning weakness. It must be stressed, however, that the contemporary wave of terrorism provides many examples that do not conform to this facile rule; and it may well be that the readiness of terrorists to stick to terrorism even when they are visibly growing in strength, may help the security forces to determine whether the prevailing terrorist situation represents an end in itself or is a phase in a wider revolutionary action. There are many examples, but the ones that have struck me most forcibly are those of the Red Army group (the Baader-Meinhof gang) in the Federal Republic of Germany; and the prolonged terrorist activities of the Ejército Revolucionario del Pueblo (ERP) and the Montoneros in Argentina.

Two more observations are called for at this point. One is that terrorism is a barometer of success or failure, and a fairly precise indicator of public support or its absence. Whenever terrorists find it necessary to kill more people on their own side than on the enemy side, it must be presumed either that their cause is widely opposed, or that at least it leaves the population indifferent. In many situations I have studied, the terrorists normally killed more of their presumed supporters than of the supposed enemy. The other observation is that terrorism, in general, appears to be a useful auxiliary weapon rather than a decisive one. It may even be counterproductive, by alienating the population.

182

### THE MAIN STRANDS OF TERRORISM TODAY:

Any classification of terrorist groups is bound to be arbitrary, in that overlapping is inevitable. In recent study groups and conferences of the Institute for the Study of Conflict, we have been in broad agreement on the following classification of the main categories of terrorist groups. We had Western Europe primarily in mind, but these categories are operative all over the world, including the Western Hemisphere:

1. *Ethnic, religious or nationalist groups.*—In general, these are minority groups which feel themselves different from the majority of the population, on ethnic, religious, linguistic, or cultural grounds. They include the Provisional wing of the Irish Republican Army (IRA), the Palestinian group Al Fatah with its extreme terrorist wing, Black September, and on this side of the Atlantic, the Front de Libération du Québec (FLQ). At different times, of course, you have had black extremist groups in this country as well. You will note that these ethnic or religious groups may be either rightwing or leftwing. Initially, both the Provisional IRA and Al Fatah were to the right rather than to the left. On the other hand, the FLQ and the Official wing of the IRA, which is Marxist, are of course leftwing.

2. *Marxist-Leninist groups.*—I should like to emphasize the important point that although a number of revolutionary groups of the extreme left, such as the Trotskyists, are often at loggerheads with each other and usually violently opposed to the Moscow-line Communist parties, they are all nevertheless branches from the same mother tree, in that they are all Marxist-Leninist. The same obviously applies to the so-called Maoist groups, which may or may not be affiliated to the Chinese People's Republic. The Guevarists and Castroites must also be considered in this group. The Official wing of the IRA certainly belongs in this group as well as in group 1; along with the Portuguese Maoist Reorganization Movement of the Party of the Proletariat (MRPP), the Basque ETA (VI Assembly) and the Maoist Brigate Rosse in Italy. It should be remembered that most of the orthodox Communist parties are more or less responsive to the current Soviet line in favor of a "constitutional path to power." Nevertheless, there are a number of striking examples of Communist parties that have latterly been involved in violent action. These include the Portuguese Communist Party—for about 2 years until May 1973, through the terrorist ARA; the North Vietnamese (Lao Dong); the North Korean and the Cuban parties. Nor should it be overlooked that Moscow, while in general advocating "constitutional" methods is nevertheless engaged in clandestine assistance for a number of terrorist groups, not limited to those of Marxist persuasion.

3. *Anarchist groups.*—The Anarchists are not necessarily followers of the 19th century revolutionary leader Bakunin, but owe much to his ideas. They do not appear to have a very precise theory about their final objectives.

The Anarchist groups are neither as numerous nor as important as the groups in our second category, but anarchism may now be on the increase. In Spain, which has a strong Anarchist tradition, the Movimiento Ibérico Libertario has emerged recently in Catalonia. The German security authorities classify the Baader-Meinhof gang as Anarchist, but this is arguable. The ideology of the gang is confused

183

and eclectic. To the extent that it possessed an ideology at all, the Angry Brigade in the United Kingdom could be classified as Anarchist.

4. *Pathological groups or individuals.*—Where group violence appears to be a way of life, in that the political objectives are never clearly spelled out, it may be helpful to regard such groups as pathological rather than political. Some experts would hold that such American groups as the Weathermen or the Symbionese Liberation Army, are organizations that may be considered analagous to the group responsible for the Manson killings. The motivation may have more to do with personal inadequacy, hatred of family, or a specifically white-middle-class guilt feeling than with an acquired ideology.

5. *Neo-Fascist and extreme rightwing groups.*—Then you have other groups, the extreme rightwing which is not, in fact, as important as the extreme left in the current phase of history. There are neo-Fascist groups particularly in Italy where you have groups such as Ordine Nero, that order, and Rosa Dei Venti, which have been very active over the last 18 months or 2 years.

In Latin America in recent years, a number of groups that may be regarded loosely as rightwing and that appear to have enjoyed the tacit support of the authorities, have sprung up in reaction to leftwing terrorism. Examples include the Eye for an Eye (Ojo por Ojo) in Guatemala and the Death Squad (Escuadrão da Morte) in Brazil. There has in fact been very little true rightwing terrorism in most Western countries, with the important exception of Italy, during the past 2 years or so.

6. *Ideological mercenaries.*—This is a true transnational phenomenon. Traditionally, mercenaries sold their military talents for money; the ideological mercenaries are ready to cross international borders in pursuit of an ideological cause.

An interesting example was the Japanese United Red Army, the Rengo Segikun, which as most of you are aware, I am sure, was involved in the massacre at Lod Airport in May 1972. These people had been trained in North Korea. They had gone to Germany to be given money; they had gone on to Italy to be given arms; they had been trained in training camps in Syria and Lebanon, and then they had done their deed for the Popular Front for the Liberation of Palestine (PFLP).

### THE SUBVERSIVE CENTERS

Relatively few terrorist movements are entirely homegrown and self-sufficient, although it is equally true to say that unless a group has roots in its home territory, it is unlikely to flourish, regardless of foreign support. The point, however, is that foreign support does enable such groups in many cases to increase their effectiveness and pursue their efforts until final victory. Recent history has brought dramatic examples of this proposition. For instance, the victory achieved by the North Vietnamese forces and the Vietcong would not have been possible without massive supplies of sophisticated armaments from the Soviet Union. This was equally true, incidentally, of the Vietnamese Communist victory over the French forces at Dien Bien Phu in 1954. Again, the anti-Portuguese terrorists and guerrillas in Mozambique and elsewhere would probably not have achieved their final political victory without substantial support in money, arms, and training from the Soviet Union, China, and certain Western countries, among them Sweden.

184

As my earlier glossary puts it, countries which provide much assistance for movements in other countries must be regarded as subversive centers. By far the greatest subversive center in the world is the U.S.S.R., which is actively supported by Eastern Europe, especially by East Germany, Czechoslovakia, and Bulgaria. The Chinese People's Republic is also involved as a subversive center in support of groups in South and East Asia, in the Middle East, and in Africa. North Vietnam is similarly involved, in Laos, Cambodia, and Thailand. North Korea's involvement in subversive support has had a bizarre geographical spread, including Mexico and Chile. Cuba under Fidel Castro has likewise exported subversion and terrorism to most other countries in Latin America, on a very minor scale in the United States, and in certain African countries, and even in the Middle East.

The U.S.S.R. spends enormous, but obviously incalcuable sums, on subversion all over the world. It is often thought—I just want to correct an impression here—it is often thought that all of the subversion is controlled by the KGB, and certainly the KGB plays an important autonomous role in it, but really the powerhouse is the International Department of the Central Committee of the Communist Party of the Soviet Union.

The International Department is the direct descendant of Lenin's Comintern and the present head of it is Boris Ponomarev, who was in fact a member of the Executive Committee of the Comintern, so that the line of descent is perfectly clear.

Now the Soviet Union is involved in terrorism in many ways. It is thought—popularly, but quite incorrectly—that they abandoned political violence in 1956 at the time of the 20th Congress of the Soviet Communist Party. They did not.

What they said was that under certain circumstances, it is possible to "reach power" by constitutional means. But they did not support abandonment of political violence.

And I will give you some examples of it, but first I want to make it clear that the Russians have systematically trained terrorists. I am not talking now about "agitators" "propagandists". They train "terrorists" in two quite distinct streams. One stream is the stream of members of orthodox, Moscow-line parties who go through the Lenin Institute in Moscow, which is also known as the Institute of Social Studies and uses other names as well. These are all the same organizations which are directly controlled by the Central Committee of the CPSU.

Now, at any time there will be 300 to 600—men; mostly—but also members of some Communist parties from Latin America, from North America, from Western Europe, from Africa, from the Middle East, from East Asia, and from Australia, undergoing training courses at the Lenin Institute.

Then there is the other stream, which is the so-called national liberation stream, or freedom fighters stream of people from the Third World who are processed through the Patrice Lumumba University in Moscow. They are then sent to specialized training courses for sabotage, terrorism, assassination, and other kinds of clandestine and violent warfare in training camps in Simferopol, in Baku, in Tashkent, and in Odessa. So you have two entirely separate streams.

185

Now, in addition, the Soviet Union either directly or through certain satellite Communist countries in Eastern Europe—and this particularly applies to East Germany, Czechoslovakia, and Bulgaria—is involved in clandestine support for terrorist movements in various countries.

Now I should explain that the activities of these countries are very widespread, indeed. There are many examples that can be given, but to give one or two examples.

In the Western Hemisphere about 3 years ago, there was an interesting case involving a group called the MAR in Mexico in which the candidates were recruited by the Russians, taken to Moscow, then transferred to North Korea for training in terrorism and sabotage, and then sent back to Mexico where they were rounded up. One of the results was that the Soviet Ambassador and four or five members of his staff were expelled.

There are examples elsewhere. In Colombia, for example, the FARC is under Moscow's control. It is active from time to time when it suits the Russians that it should be active. And then, of course, one must not forget the very important fact that a few years ago the Soviet KGB brought the Cuban DGI, the Directorio General de Inteligencia, under its direct control and thereby gained control of certain terrorist actions that originated in Havana. That is an important point.

But you get examples even in Western Europe. There was, for example, the provision of arms for the non-Marxist wing of the IRA (Provisionals) a few years ago. A case came up in September or October 1971, when a very large consignment of arms was seized at Schiphol Airport in Holland. Now these arms were of Czech origin and had been handled by a Czechoslovak agency called Omnipol. Of course it is inconceivable that this deal could have been made without the approval, and indeed without the directive, of the KGB.

Another example, which I think is a particularly interesting one at this time, is Portugal. The Portuguese Communist Party, of all parties in the world outside of the Communist bloc, is the one that has been most undeviatingly faithful to the Moscow line.

The leader of the Portuguese Communist Party, Alvaro Cunhal, emerged from 30 years of clandestine activity the last few years of which were spent mainly in Prague, and established a very powerful position in Portuguese politics, although as we have seen recently, his electoral support is very small.

But the important point I want to make is this. For a period of about 2 years from 1971 to precisely May 1973, the Portuguese Communist Party controlled a terrorist organization called ARA, Acção Revolucionaria Armada, and it indulged in the usual terrorist actions, bomb explosions in various cities, and so forth.

In May 1973 the Portuguese Communist Party announced that it was abandoning direct action in favor of political action. I put it to you, gentlemen, that this is a remarkable piece of political foresight, for this was 11 months before the coup d'état which overthrew the Salazar regime.

Another interesting point is that——

Senator THURMOND. Stop just a minute there, if you do not mind? [Discussion off the record.]

Senator THURMOND. That is all right, now. Go ahead.

186

Mr. CROZIER. In February of 1974, which was 2 months before the military coup d'état, Cunhal was in Moscow where he received from the hands of Mr. Brezhnev the Order of the October Revolution which, as I understand, is not lightly awarded. For example, I am unlikely ever to be a recipient, but Mr. Cunhal was.

To give examples of the loyalty of the Portuguese Communist Party, even at such traumatic moments as the Nazi-Soviet Pact, the Soviet invasion of Finland, the occupation of Hungary, the occupation of Czechoslovakia, no word of criticism came from the Portuguese Communist Party.

So, in the strictest sense of the word, the Russians have their man in the government in Portugal. And a third——

Senator THURMOND. Excuse me? I did not hear you. The other man what?

Mr. CROZIER. In the government.

[Pause.]

Senator THURMOND. You may proceed now.

Mr. CROZIER. Another fact that I want to mention, in connection with the events in Portugal concerns Mozambique, where the movement known as FRELIMO, the Front for the Liberation of Mozambique, is now in power. And, for something like 12 years the Russians trained at the rate of at least 200 at a time, terrorists and guerrillas from FRELIMO in the training camps that I mentioned.

So, at a very conservative estimate, there must be at least 2,000 Russian-trained people in the new government in Mozambique. I mention these examples as I think they are relevant to our problem.

It should not be supposed that the subversive activities of the Communist countries are necessarily coordinated. On the contrary, they are often conducted in rivalry with one another, and I have termed this phenomenon "competitive subversion". There has been competitive subversion between China and Russia, especially in Africa and the Middle East. But it would be a mistake to suppose that these rivalries are entirely to the benefit of threatened countries. The Russians and Chinese may currently be pursuing policies of mutual hostility, but all Communist states that are involved in subversion are aiming at the same objectives—the elimination of "colonialism", "neocolonialism", "imperialism", and "capitalism". The proliferation of revolutionary groups, regardless of their allegiance or the degree of their autonomy merely complicates the job of security forces and intelligence services in the target countries.

Apart from the Communist countries, a number of other countries, mostly of left-wing or revolutionary tendencies, have also been involved in the export of subversion and terrorism in recent years. These include, or have included, Algeria, Tanzania, Zambia, the Republic of the Congo (Brazzaville) and Zaire; the Popular Democratic Republic of Yemen (PDRY), Iraq, Syria and Lebanon (the latter probably involuntarily). An important newcomer in the field has been Libya under the Ghadaffi regime, which has involved itself in terrorism in many places, including Northern Ireland, Chad, and even the Philippines.

I am now going to tread on more controversial ground. The terrorists of yesterday quite often turn into the respected citizens of today. This is clearly happening in Mozambique, and in Guinea-Bissau, and will

187

shortly happen in Angola. It is a curious fact, nevertheless, that during the period when such movements as FRELIMO were involved in terrorist activities against the Portuguese authorities, a number of private organizations—most prominently, the World Council of Churches—and various Western governments provided financial assistance to the terrorists. These included Sweden, Denmark, Holland, Norway and Finland. In all cases, the aid provided was said to be "humanitarian" in character (that is, destined for medical supplies, schools, etc.) and not military. To the extent that such assistance relieved the budgets of FRELIMO and other organizations, they were enabled to increase their purchases of military material.

I end this section with some further remarks about Soviet bloc involvement in support for terrorist movements. The year 1968 was a turning point. In that year, three major events focused the attention of Soviet ideologists and policymakers on political violence and in particular on the so-called New Left. These events were: The Prague Spring in Czechoslovakia, which in a sense brought a New Left government to power, forcing the Soviet Armed Forces to occupy the country; the Tet offensive in Vietnam and President Johnson's decision not to seek reelection, which could be attributed at least in part to the protest movement; and the disorders in Paris in May and June, which almost brought down the government of General de Gaulle. A new policy and attitude toward the extreme left originated in Moscow at that time. It was a very sophisticated policy, which amounted to this: That the orthodox parties everywhere could denounce the extremism of the left and advance their own credentials as the alternative government and the party of order; whereas Soviet assistance to terrorist groups, including some ideologically incompatible with the Moscow line, could continue on a clandestine basis. A striking example of this came to light with the seizure at Schiphol airport in Holland in the autumn of 1971, of a large shipment of Czech arms destined for the provisional (that is, non-Marxist) wing of the IRA. The Russians have also been involved in support of terrorist activities in Portugal, in Mexico, in Colombia and in Chile, among other places.

The Portuguese example is particularly relevant. I have already mentioned the Portuguese Communist Party's involvement in violence through the ARA. The point is that the PCP has always been entirely responsive to Soviet directives. It has never questioned Soviet policy even on such traumatic issues as the Nazi-Soviet pact, the invasion of Finland, the occupation of Hungary or the occupation of Czechoslovakia. The Soviet Union was also involved for many years in the training of terrorists and guerrillas from African countries, including the Portuguese territories.

In addition, Soviet weapons have reached the Palestinian groups and the Turkish People's Liberation Army some years ago. In fact, the U.S.S.R. offers courses in terrorism, sabotage and guerrilla warfare in two distinct streams, according to whether the candidates are members of a Moscow-line Communist Party or of a "national liberation movement". The Communists attend courses run by the Lenin Institute, otherwise known as the Institute of Social Sciences, the Institute of Social Studies and the International School of Marxism-Leninism—the terms being interchangeable and all referring to the same organization controlled by the Central Committee of the Soviet Communist

188

Party. Each course lasts about 6 months and at any given time between 300 and 600 men and some women are enrolled. The largest group is from Latin America; next come the Arabs, but Europeans, Asians and Africans are present in smaller numbers.

The second stream—national liberation movements—is channelled through the Patrice Lumumba University in Moscow, and eventually finds its way to training camps at Tashkent, Odessa, Baku and Simferopol.

I should add in fairness that the Russians hold ambiguous views on terrorism. They are on record as opposing the hijacking of international airliners, for instance—not least because this kind of action has happened in the U.S.S.R. itself. But they are in the terrorist business on a large scale, and this fact should be remembered at a time when "détente" is supposed to be the order of the day.

### THE RESPONSE TO TERRORISM

Now, let us turn, if you like, to the problem of how to counter terrorism. First, I think that there is a fairly wide consensus that terrorism must be resisted. Earlier, Mr. Chairman, you mentioned the fact that in this country, for example, and certainly in other western countries, some misguided people appear to believe that the terrorists are accomplishing a useful thing, and are fighting for noble objectives and therefore deserve to be supported.

But, in the long run, terrorism—irrespective of terrorism itself—must be resisted because if it is not resisted then the effect is that the terrorists emerge as the legitimate spokesman for certain interests or for certain points of view, and this is undesirable for the overwhelming majority of the population.

Now it is fair to observe that in some cases terrorists do espouse objectives which are, in themselves, valid, and there may be real grievances to be removed and there may be real objectives to be attained.

The intelligent response must always involve some attempt to deal with these grievances, where they are real, and to remove them if at all possible. But in some cases, the objectives pursued may simply not be attainable.

This seems to be the case in Northern Ireland where two entirely opposed objectives are pursued, on the Protestant or loyalist side by people who want Northern Ireland to remain part of the United Kingdom; and on the side of the Irish Republican Army by those who want to incorporate Northern Ireland into the Republic of Ireland.

Now these are incompatible objectives and it is impossible for a government situated in London to provide satisfaction to both sides.

Inevitably, the terrorist has the initiative, since they can attack places of their own choosing and in their own time. It is essential, therefore, to penetrate the terrorist organization or acquire reliable intelligence about its plans. The terrorists must be isolated, by being denied the essential aids they need, such as food, money, medical treatment and safe houses.

A successful counteraction must be coordinated. The brunt of it will fall on the national police force and on the internal security and external intelligence services. But paramilitary organizations of the state, and other state organizations—such as immigration control,

189

frontier and coastal guards, and any official information services that may exist—will also be involved. In the last resort, the armed services may also have a part to play, when the incidence of terrorism has escalated to a level that is beyond the competence of the police to deal with. In terms of organization, the various ministries and agencies involved must be brought under a single authority, who may be the Prime Minister or the President or head of state.

The role of intelligence is absolutely crucial. All intelligence gathered by separate agencies must be pooled, computerized if necessary and centrally assessed. In any antiterrorist campaign, it is desirable to set up a national task force drawn from the various agencies involved, and dedicated to research, investigation and the coordination of countermeasures. One of the most successful examples of antiterrorist action in recent times was the incident in Holland on October 31, 1974. Fifteen hostages held by armed criminals in Scheveningen jail were released by a commando assault by a Dutch counterterrorist squad. The psychological methods included noise, flares, smoke bombs and sirens, and skilled marksmanship played its part.

A particularly important aspect of a countercampaign is information and publicity. Especially in an open society and a representative democracy, the public must be fully informed about the need for counteraction and—as far as is consistent with security—the need for certain measures. Media publicity tends, very often, to favor the terrorist side because of the drama that they represent. And also—and I apologize to the professional people here present who may not agree with me—but it is in the nature of television as a medium that it tends to favor the revolutionary side. This is not a reflection on the people who are involved in television. It is the character of the medium itself.

In any situation of revolutionary war or political violence, all acts of force, legitimate or otherwise, on the side of the authorities are duly recorded, and the television cameras tend to be present when a demonstration or incident is planned, because very often they have been tipped off to be present.

But, the atrocities on the other side are not recorded. This happened in Vietnam and it is happening in Ireland. For example, I am unaware that the Vietcong invited a CBS, let us say, into the villages to witness the inhabitants being publicly disembowled. Similarly, I am not aware that the IRA has invited British television teams to witness the tarring and feathering or the knee-capping of recalcitrant elements on the IRA side. One learns about these things, but one does not see them recorded on the television screens.

If society is to be protected from terrorism, it is incumbent on the authorities to make the extra effort needed to enlist the cooperation of media personnel—not to present a distorted view in favor of official action, but merely a fair presentation of the need for countermeasures in the common interest.

Much remains to be done in preventing terrorists from gaining access to explosive materials and to weapons. I realize that in the United States you have a special problem because of the wide availability of guns. But the availability of explosive materials can be limited. Companies entitled to stockpile such materials should be required to guard their supplies.

190

As regards such crimes as the hijacking of passenger aircraft, very inadequate progress has been made in international law. The use of new technology and the rigorous enforcement of security measures, especially in the United States, has drastically reduced the incidence of hijacking on internal flights. On international flights, no real progress will be made until countries offering a safe refuge for hijackers are suitably penalized.

And, finally—and this really is my last word until I am interrogated—I think that international action, as well as national action, is required. I do not think we have gone anything like far enough in that direction. I look forward to hearing what Mr. Fearey may have to say, but until it is possible to penalize countries harboring highjackers of international airliners, in some way or another, and to achieve some kind of unanimity in the treatment of transnational terrorists, then we shall be very far from our objectives.

This statement does not, of course, pretend to be exhaustive. I have sought to analyze the problem in its principal aspects. It is a problem that is still growing in scope and danger. And it is a problem that cannot be solved in one country alone: International as well as national action is required.

Thank you.

Senator THURMOND. Thank you, very much.

Mr. SOURWINE. Mr. Chairman, I think we should offer for the record three items. One is from "Transnational Terrorism" a subhead of "Annual of Power and Conflict 1972 and 1973" written by Mr. Crozier. I offer several ending on page 7—I beg your pardon, ending on page 8.

Senator THURMOND. Without objection, it is so ordered.

[The material referred to follows:]

[From Annual of Power and Conflict 1972–73 (ISC, London)]

TRANSNATIONAL TERRORISM

(By Brian Crozier)

The most striking development in 1972, in the field of special interest to this Annual, was the increasingly international character of terrorism. It has become fashionable in some quarters to speak of a "terrorist international". The phrase is picturesque but lacks substance in that, as far as is known, there is no organisation that really qualifies for a such a designation, although a number of individual terrorist groups are affiliated to the Trotskyist *Fourth International*, with headquarters in Brussels. It would be more accurate to call the current phenomenon "transnational terrorism".

Nor is transnational terrorism, strictly speaking, an entirely new phenomenon, in the sense that it did not appear for the first time in 1972: what was new was its rapid growth. In January 1966, for instance, a Tricontinental body (the *Afro-Asian-Latin American People's Solidarity Organisation*—AALAPSO) was set up in Havana with terms of reference that justified the description of it coined by a Western diplomat: the "guerrillas' international". In practice, as it happens, the Tricontinental has had remarkably little influence in guerrilla movements outside Latin America, although it has been of service to Fidel Castro in the export of subversion in that area.

It is true also that the systematic organisation of training and the provision of arms or money for left-wing guerrilla groups in Communist countries is of long standing. The North Vietnamese have been training Laotian and Cambodian "liberation forces" for at least 20 years; the Russians and Chinese have been training African terrorists and guerrillas since the early 1960s; the Cubans have been similarly engaged since the early days of Castro's regime. Nor have such training schemes been a monopoly of strictly Communist regimes, for revolu-

191

tionary governments that are not truly Communist, or even that owe nothing to Marxism-Leninism, are similarly involved. Among the former, for example, are Algeria, Congo-Brazzaville and Tanzania; and among the latter, the Khaddafi regime in Libya.

In each of the examples given above, there has been at least one "subversive centre" [1] in the sense of a government disposed, for ideological or other reasons, to assist terrorist groups operating in other countries. This situation continues. What is relatively new is a form of co-operation between different terrorist groups, operating in some instances in countries that tolerate or encourage their presence, and in others in countries in which their activities are illegal and liable to suppression if discovered. The tendency first came to public notice in the widespread student riots of 1968, when it was seen that a small and international nucleus of ringleaders appeared in Paris, London, New York and other cities to organise demonstrations.

This trend has continued; the violence of the terrorists has intensified; the methods used have become progressively more daring and sophisticated. While the years 1968 to 1971 provided many examples, the cases of 1972 were perhaps more spectacular even, and more shocking to public opinion than previous ones. The year brought, for instance, the following events:

MURDER OF TECHNICIANS. On 30 March, a group of terrorists belonging to the Turkish People's Liberation Army (TPLA); murdered three foreign radar technicians (two British and one Canadian) whom they had kidnapped as hostages to try to force the Turkish authorities to release fellow-terrorists under sentence of death. The killings took place shortly before a gun battle between Turkish security forces and the terrorists, who had been surrounded in a farmhouse in a mountain village.

THE LYDDA AIRPORT MASSACRE. On 30 May, three young Japanese who had landed at Lydda airport, Israel, from Rome, flung hand-grenades and opened fire with automatic weapons at passengers in the arrival hall, killing 25 and wounding 78. It was subsequently established that the Japanese were members of an extreme left-wing terrorist organisation named the United Red Army (Rengo Segikun).

THE MUNICH MASSACRE. Arab terrorists, later identified as members of the Black September group, murdered 11 Israeli athletes during the XXth Olympic Games at Munich on 5 September. Five of the terrorists were shot dead by German police in a gun battle, and one German policeman also lost his life. On 29 October, Arab hi-jackers forced the German authorities to hand over the three Palestinian terrorists still alive and in their hands. The hi-jackers forced the pilot of a Lufthansa airliner to fly from Zagreb to Tripoli (Libya), where the Munich terrorists were greeted as heroes and the passengers and crew, who were being held as hostages, were released.

LETTER-BOMBS. On 19 September, a letter-bomb delivered to the Israeli embassy in London killed Dr. Ami Shachori, the Counsellor. Many similar devices were later posted to Israeli diplomats and Jewish businessmen—not Israeli citizens—in London and elsewhere.

These examples—a few among innumerable ones during the year—illustrate the nature of the loose network of links between terrorist groups across national boundaries. For example, the brother of one of the Japanese terrorists at Lydda airport was one of a United Red Army group who had hi-jacked a Japanese airliner to North Korea in May 1970. The Lydda operation was planned by the Popular Front for the Liberation of Palestine (PFLP), which trained the Japanese for action in camps in Lebanon. Moreover, the gunmen had collected passports at Frankfurt and weapons in Rome.

Similarly, the Turkish People's Liberation Army has used Palestinian training camp facilities in Syria, has probably received Soviet arms shipments from Bulgaria and has had support channelled through the North Korean embassy in East Berlin. Then again, West Germany's Red Army Group (RAG)—better known as the Baader-Meinhof gang, kept in close contact with the terrorist group organised by the late Italian publisher, Giangiacomo Feltrinelli, and there were certainly contacts between the Red Army Group and the Arab Black September group responsible for the Munich outrage.

Such links between terrorist groups across the frontiers are in no sense surprising in view of the ideological similarities between them. The contacts between them are facilitated by the speed and frequency of jet travel; while the enormous expansion of airport traffic has stimulated the new terrorist industry of hi-jacking, not all of which, of course, is politically motivated, while adding intolerably to the strain on, and cost of security controls.

[1] See "Annual of Power and Conflict," 1971 (London, 1972).

192

Propinquity, television and self-dialling international telephonic communications have also contributed, in a way not possible in earlier days, to the elaboration and imitation of new terrorist techniques. Hi-jacking is one of these and another, characteristic of the past few years, has been the kidnapping and occasional murder of diplomats and other public figures. The letter-bombs, made possible by the miniaturisation of detonating devices, are a further contribution to revolutionary technology.

### THREE PROBLEMS

One of the main purposes of this Annual is to provide a yearly guide through the kaleidoscopic maze of extremist groups and the links between them. Some guiding lines may therefore be appropriate in this introductory article, as well as some precise definition of the subject under review in Part I.

There are really three distinct problems involved in the unsatisfactory but fashionable phrase, "low-level political violence". At the lowest level of all, political violence is scarcely distinguishable from violent crime, with which the Institute for the Study of Conflict is not normally concerned. Indeed violent crime facilitates political violence in that the iteration of images of violence, on the screen, on television and in the press creates a tolerance of violence, or at any rate an apathetic indifference to it, which encourages the terrorist and assassin and reduces the risks of the game. Some terrorist groups, of which Black September is the most notorious recent example, resort to common law crimes, including drug-running and murder on contract for fund-raising purposes; while hold-ups and bank robberies for the same purpose are commonplace for instance in Uruguay during the years when the Tupamaros were building up their power base.

Where such terrorism remains within given national boundaries, it may constitute a problem for that country alone. Increasingly, however, both national and transnational violence has involved not only innocent bystanders but the nationals of countries other than that of the terrorists concerned. For example, the murder of the German ambassador in Guatemala in April 1970 and the kidnapping of the British ambassador in Uruguay in January 1971 automatically involved the interests of powers that were not parties to the quarrels between the terrorists and their own governments. Yet these and similar cases were in the context of national, not transnational, terrorism.

In the Lydda massacre, however—a transnational example—many innocent travellers were murdered for no better reason than that they happened to be there when the terrorists decided to open fire.

When such procedures are used, then, terrorism ceases to be of parochial interest and becomes a matter for international concern, irrespective of the aims, and motivation of the terrorists and of the merits, if any, of their cause. At this stage, the issue is the maintenance of agreed standards of conduct that are a condition sine qua non of civilised international intercourse. The immunity of diplomats is one such standard; and, in the last resort, it is of equal concern to governments that call themselves revolutionary, such as Algeria's, Cuba's or Libya's, and to totalitarian governments that aid terrorist movements, such as those of the USSR and the Chinese People's Republic. The same applies to the hi-jacking of international airliners, and the dangers of air piracy to innocent (or guilty) travellers and to air crews and ground staff is not reduced if the motivation of the hi-jackers is declared to be political.

There is yet another level at which terrorism is of concern to the Institute for the Study of Conflict—that of the exploitation of, assistance to, or initiation of, terrorism by governments. As those governments include those of the major Communist powers (and some minor ones), it is arguable that this aspect of transnational terrorism—which is largely clandestine and the evidence for which is therefore elusive and fragmentary—is in the last analysis the most important of all, since the successful exploitation of terrorism by interested powers has obvious strategic implications.[3]

For various reasons political terrorism cannot be treated as a social phenomenon, although, as I have suggested, the social climate may be a factor in the degree of its prevalence. As a writer on the subject once put it, it takes a rebel to rebel. Similarly, for terrorism to flourish on any but a sporadic scale, organized groups are required. Organization implies the creation of secret cells or units, the provision of arms and ammunition, medical supplies, training facilities and a network of informants and auxiliaries. And all these in turn presuppose a supply of funds. These matters are basic to the work of the ISC and therefore of its Annual.

[3] See "The Peacetime Strategy of the Soviet Union," an ISC Special Report, 1973.

---

193

What groups, then, are involved in transnational terrorism? The answers, which are many and complex, will in numerous cases be found within these covers. Some observations, however, may help the reader to get the most out of this book. The extremist groups considered in Part I fall, broadly, into the following categories:

1. Ethnic, religious or nationalist. Most of these groups, though not all, may be labelled, without straining accuracy too far, "right-wing." These include, for instance, the Provisional wing of the Irish Republican Army (IRA) and the Palestinian group Al Fatah, with its extreme terrorist wing, Black September. But there are a few ethnic or nationalist groups of the extreme Left, the most notorious in recent times being the Front de Liberation du Québec (FLQ). The Regular wing of the IRA, which is Marxist-inclined, also falls into this category.

2. The revolutionary Left. This in turn may be subdivided into four main groups: the Trotskyists (by far the most important because of their discipline and international organisation); the Anarchists (of which the Red Army Group in West Germany and the Angry Brigade in Britain are examples); and the Maoists (whose label, usually self-conferred, is often misleading since it may imply simply a devotion to revolutionary violence and a hatred of Soviet "bureaucratism", and not necessarily any understanding, let alone espousal, of the creed or techniques of Mao Tse-tung); and the "Guevarists" who owe their inspiration to the late Che Guevara. To these should be added a profusion of groups or movements whose ideology is confused or whose tactics are incoherent, and whom this Annual therefore terms "left-wing eclectic".

3. The orthodox Communist Parties, more or less loyal to Moscow and more or less responsive to the current Soviet line, which advocates a "constitutional path to power" for Communists in general, while not excluding more or less clandestine assistance to non-Communist extremists. Among the true Communist Parties, however, are a number—the most important being the North Vietnamese, the North Korean and the Cuban—that are actively engaged in revolutionary violence or assistance to terrorists.

4. The ideological extreme Right. At this time, groups that can be labelled "fascist" or "neo-fascist", except with pejorative intent only, are few and relatively unimportant.

Despite the appearance of new techniques, such as the abduction of diplomats and the hi-jacking of airliners, there has been no basic change in the purposes of terrorism. As always, and allowing for some overlapping, they may be divided into two groups: disruptive and coercive. The aims of disruptive terrorism include: to gain publicity for the movement, and arouse admiration and emulation; to secure funds and build up the movement's morale and prestige; to discredit and demoralise the authorities; and to provoke the authorities into taking excessively harsh repressive measures, likely to alienate the population and force a rising spiral of official expenditure in arms, lives and money, resulting in public clamour for the abandonment of counteraction. Coercive terrorism complements the disruptive kind, by demoralising the civil population, weakening its confidence in the central authority, and instilling fear of the revolutionary movement; it is used also to make an example of selected victims, by torture and/or death, to force obedience to the leadership of the movement.

Examples of both kinds of terrorism, and of various purposes, were numerous in 1972. The murder of the Israeli athletes brought world publicity to the Black September group and to the issue of Palestine; and, although it provoked widespread horror and revulsion, it also aroused admiration for its daring and self-sacrificial courage. The letter-bombs, dispatched at minimal risk to the senders, aroused less or no admiration, but possibly served the end of demoralising non-Israeli Jewish supporters of Israel. The tarring and feathering of young Catholics by the IRA Provisionals, and the beating up of young women, served obvious coercive ends. The murder of the NATO technicians by Turkish extremists, although the original kidnapping did not secure its stated objective of obtaining the release of gaoled terrorists, undoubtedly contributed to increasing the severity of repressive measures in Turkey. That this is, at a given stage, an objective of the terrorists does not necessarily ensure that the further aim of alienation of the population as a whole will also be secured.

Mr. SOURWINE. Then, from the same work, I offer an excerpt called "Soviet Involvement" beginning on page 5 and ending on page 9 of another section of the work. And finally, I offer an extract from "New Dimensions of Security in Europe" which is a forthcoming

194

special report of the Institute for the Study of Conflict, London, which will be published later this month, I understand, and this consists of 20 typewritten pages, Mr. Chairman.

Finally, I ask that there be included in the record the segment entitled "Who's Who of the Most Active Organizations" from "International Terrorism: A Chronology, 1968–74" prepared for the Department of State and Defense advanced research project, an agency of the United States, by the Rand Corp.

[The material referred to follows:]

[From Annual of Power and Conflict 1973–74 (ISC, London) Extr. Aid for Terrorism]

### SOVIET INVOLVEMENT

Although the year brought no spectacular disclosures of Soviet involvement in terrorism, there were enough minor indications to show that the Russians continue to aid terrorist and guerrilla groups in many countries. The occasional denunciations of political violence emanating from Moscow should be seen against this reality. Nor is Moscow's aid to terrorists confined, as has been widely supposed, to members of extremists groups that are not, in the official (that is, Moscow-line) sense, Communist. Indeed, the year brought important evidence that Communists from Western and Third World countries are being trained in terrorism, sabotage and guerrilla war at a secret school in Moscow.

This training is part of a systematic course in revolutionary techniques which has been on offer to carefully selected Communists since 1967 but the existence of which was revealed only in 1973. The courses are run by the Lenin Institute, otherwise known as the Institute of Social Science, the Institute of Social Studies and the International School of Marxism-Leninism (the terms are interchangeable and all refer to the same organisation, which is controlled by the Central Committee of the Soviet Communist Party). The Rector of the Institute is F. D. Ryshenko, and the courses are supervised by his deputy, G. P. Chernikov; another deputy, V. G. Pribytkov, is responsible for liaison with the Central Committee. The teaching staff consists entirely of members of the party or of the Komsomol youth organisation.

Each course lasts about six months, at any given time, some 300 to 600 men and some women are enrolled. The largest group comes from Latin America; next come the Arabs, but Europeans, Asians and Africans are present in smaller numbers. Apart from armed and unarmed combat and guerrilla war, students are instructed in illegal operations, social psychology, open and clandestine Communist Party journalism, the subversive use of posters, radio, television and other information media, public speaking, and Marxist-Leninist ideology.

By no means all the students are young, some being well into middle age. The equipment at the Institute is sophisticated and includes a film studio, closed circuit television, a radio transmitter-receiver, printing machines, photographic facilities and a large gymnasium. Course instructions are simultaneously interpreted into several languages.

Although under constant KGB surveillance, the students are given "élite" privileges, including a special identity card which enables them, for instance, to go to the top of the queue at "full" Moscow restaurants. If a student tangles with the police he shows his card and is immediately released, though not necessarily unpunished: discipline is enforced within the closed world of the Institute.

These intensive training facilities, and others for non-Communist students at Tashkent, Odessa and Moscow, are supplemented by extensive guerrilla centres in North Korea. That such centres exist has been known, of course, for the past few years; but the year brought the additional information that East Berlin is the transit point for young extremists from many countries. Communists go to the Lenin Institute; many of the others are sent to North Korea. During the past seven years it may be estimated that some 2,500 terrorists and guerrillas have been trained in the North Korean camps, which accommodate about 200 at a time and are controlled by the Defence Ministry in Pyongyang. (The Guardian of Liberty, Munich, 31 January 1973; Der Bund, Bern, 25 April; Berner Tagblatt, 30 October.)

It is a fair assumption that after the collapse of the Allende experiment in the "constitutional road to power" in Chile (see Conflict trends below), more "employment" will be found for the graduates from the Lenin Institute and the North Korean training camps.

195

The following items illustrate the range of Soviet and satellite activities:

Guinea-Bissau (Portuguese Guinea). A technological escalation of Soviet aid to the PAIGC guerrillas occurred during the year, with the training of pilots and the provision of heat-seeking SA–7 ground-to-air missiles. (See Portuguese Guinea [Bissau] in Non-Arab Africa section of the Annual.)

Columbia. Three men alleged to be members of the Revolutionary Armed Forces of Colombia (FARC) were arrested on disembarking from a ship at El-dorado. They were returning to Colombia after a two-year stay in Russia. Travel arrangements for all three had been made through the Cosmos travel agency, run by Cecilia Quijano, wife of the secretary-general of the Communist Party of Colombia, Gilberto Vieira. (Bogota Radio, quoting El Siglo, 16 March 1973.) At about the same time, a cache of arms, including some of Soviet manufacture, was found. The FARC is known to have received Soviet support for some years, but it is only intermittently active. It is thought in some quarters to exist merely as an occasional demonstration that Moscow does indeed support revolutionary guerrillas in Latin America, although discouraging similar Cuban-sponsored groups.

South Africa. At a trial of six men by the Supreme Court it was disclosed that the four Africans among them had been trained in the Soviet Union for guerrilla war. The two others were an Australian and an Irishman. They were alleged to have sailed, possibly from Mogadishu (Somalia) and landed secretly on the South African coast. (Morning Star, 15 March 1973.) It is worth noting that Sechaba, the organ of the African National Congress (ANC), is published in East Germany.

Rhodesia. A captured African terrorist said he had been trained in Russia under English-speaking instructors. (Salisbury Radio, 12 April 1973.)

Organisation of African Unity (OAU). Soviet donations totalling 41,000 Ethiopian dollars were acknowledged. (Addis Ababa Radio, 16 May 1973.) A few days earlier, Mohammed Sahnoun, deputy Secretary-General of the OAU, publicly welcomed Soviet support. (Tass, 10 May.)

Palestinians. Under an agreement signed in August, East Germany pledged itself to increase its aid to the Palestine guerrillas. The leader of Al Fatah, Yasser Arafat, opened an office in East Berlin. (West German Radio, 14 August 1973, quoting the Arab Information Agency.)

Ulster. A case for more support for the IRA, either with arms or morally, was argued in Literaturnaya Gazeta. (Tass, 3 April 1973.) In a radio talk in English for the British Isles on 16 November, however, a Soviet commentator argued against terrorist activities in Northern Ireland—another instance of the dilemma currently facing the Soviet Union of professing détente in Europe while supporting "contradictions" in the western alliance.

### CONFLICT TRENDS

By far the most important event of 1973, in the field of revolutionary conflict, was the overthrow of the Chilean government of President Allende on 11 September by a coup in which the Army, Navy, Air Force and National Police were all involved. It is hard to overstate the revolutionary importance of the Allende régime, which expressed itself on several levels: as a new and major subversive centre; as a field for competing Marxist experiments; and as a symbol and possible model for the Marxists of other countries to adopt and adapt.

A subversive centre.—The advent of a left-wing government in the Presidential elections of 1970 enabled Fidel Castro of Cuba to transfer the headquarters of his own subversive efforts throughout Latin America from the embassy in Paris to the new embassy in Santiago. From Uruguay, Brazil, Bolivia and other countries revolutionaries by the hundred flocked to the Chilean capital in 1971. Later on, in 1972 and 1973, when the security forces of target countries began to get the upper hand, the terrorists and guerrillas took refuge in Chile, where they knew they could count on a safe haven. By mid-1972 the Soviet KGB was financing a training scheme for Chilean leftists ostensibly run by the pro-Soviet Cuban intelligence service (DGI); while Castro's rival and anti-Soviet National Liberation Directorate (DLN) ran a competing course with North Korean help.[4]

_Competing Marxist experiments._—The main elements in Allende's ruling Popular Unity coalition were his own Socialist Party (a good deal more extreme than the Communists) and the well-disciplined, Moscow-line Communist Party. The Movement of the Revolutionary Left (MIR) was not directly represented in the

[4] See "Soviet Pressures in the Caribbean: the Satellisation of Cuba" (Conflict Studies No. 35, ISC, May 1973).

196

government; nevertheless, Allende gave the Miristas a fairly free hand with "land reform", which meant, especially in the south, the illegal grabbing of land, supplementing a rapid expropriation of private estates. The Communists, however, were not in favour of these rough methods, and prepared to gain and consolidate central control over the economy through the party's command of the ministries of Finance, Economics, Public Works and Labour. Either by participation or by tolerance, the Socialists were involved in all aspects of the competitive revolutionary process.

*The Santiago Model.*—Many European social democrats looked to Chile as the key to the introduction of Marxism in freedom; while in the eyes of both the Soviet ideologists and the major European Communist Parties (especially in France and Italy), the Chilean experiment was to be, if successful, a model for the so-called "constitutional road to power". It is already clear that the collapse of the experiment has caused the European Communists, at all events, to ponder the consequences of too close an association with the "adventurist" Left.

Apart from individual revolutionary groups, by far the biggest losers in the overthrow of Allende were the Cubans. It is well authenticated that the Cubans had poured arms into Chile, evidently with the object of forcing the pace of revolutionary change should Allende's programme show signs of not succeeding within the allotted presidential span. At a Havana rally on 28 September Castro promised Cuba's support for the Chilean people who, he said, now knew that there was no alternative to revolutionary struggle. (See *Latin America* entry in Part I and article by Ernst Halperin in Part II.)

The techniques of crisis-management, elaborated between the two superpowers since the Caribbean confrontation of 1962 were tested—and indeed placed under severe strain—during the Arab-Israeli war of 1973 (6 October-11 November). In the interests of the developing bilateral *détente*, the Russians abandoned their plan to send substantial forces to the Middle East, in the face of an American nuclear alert (see contributions by R. M. Burrell and David Rees in Part II). In the event, crisis-management worked in the Middle East, but at the cost of some consequences for relations between the United States and its European allies within NATO.

In the Hispanic world, the trend towards authoritarian governments continued, or was reaffirmed. This was true, for instance, in Uruguay, Brazil and Chile. In these countries it was clear that terrorists would now face, or continue to be faced with, restrictions on activities once freely indulged in. In Argentina, however, there was no immediate break in terrorism after the return of President Perón from his long Spanish exile. In Spain, the assassination of the Prime Minister, Admiral Carrero Blanco, on 20 December, was followed by the appointment of a former Director of Security, Sr. Arias Navarro, to the vacant premiership.

As in recent years, Chinese support for insurgencies was ambivalent. Since 1971, the CPR has followed a fairly consistent line—that where State-to-State relations are sought indigenous guerrilla movements are sacrificed. This was true in Bangladesh in 1971 and in Ethiopia in 1972; and in 1973 there were signs that PFLOAG in Oman would get the same treatment in deference to Chinese-Iranian relations.

During the year, the Arab world displayed continuing signs of a trend that first began in 1970, i.e. increasing national control over the Palestine Liberation Organisation (PLO). This in turn produced another trend—the emergence and proliferation of extremist splinter groups as national restrictions were extended. Soviet and Chinese influence in the PLO remained a factor but it was not sufficient to alter significantly the regional balance of power.

The year was also remarkable for the growing evidence of Libyan financial support for subversive activities in many countries.[a] The spin-offs from the Middle East War assisted the Libyan policy of attempting to destroy a settlement; but conservative Arab States found themselves threatened by Libya's activities, and there were signs that if Libyan support for uncoordinated terrorists seriously threatened the prospects for peace other Arab governments might begin to scheme for the removal of Colonel Khadaffi, who in fact stepped down from some of his functions in April 1974.

In some major sub-Saharan African States there were signs that economic development, or at least an improving financial position, was making a contribution to the prospects for stability. This was true of Ghana, Nigeria and Zaire.

[a] For full details, see *Libya's Foreign Adventures* (Conflict Studies No. 41, ISC, December 1973).

197

during 1973. In Angola and Mozambique, the guerrilla alternatives appeared less attractive in the light of agricultural improvements and the future energy resources of the Cabora Bassa dam and the Cunene river scheme.

In the *Portuguese territories* the wars dragged on inconclusively yet with the balance of military success broadly in favour of the Portuguese forces. But as this book went to press the future of Portugal's overseas territories and, indeed of metropolitan Portugal itself was thrown into the melting pot by a lightning military *coup* on 25th April, 1974, which sent President Tomás and Prime minister Caetano into exile and ended decades of authoritarian rule. The *coup* was led by General Spinola, who two months earlier had published a book advocating a new political approach to the wars. The book brought about his dismissal as Deputy Chief of Staff, but eventually provided the spark for the revolt that toppled the Caetano government. In *Indo-China*—especially *Cambodia* and *South Vietnam*— the cease-fire agreements signed at the beginning of the year proved no more than a momentary diversion in Hanoi's continuing effort to bring the whole of France's former Far Eastern empire under Vietnamese Communist control.

[Extract from New Dimensions of Security in Europe—a forthcoming Special Report of the Institute for the Study of Conflict, London, to be published late May 1975.]

### PART IV—TERRORISM

The growth of political violence has kept pace with the other developing threats to the internal cohesion and stability of Western European societies. The three countries in Western Europe that are most directly threatened by political terrorism are the United Kingdom, Italy and Spain. Two of them are NATO countries, while Spain is a strategically important ally of the United States.

But it has been amply demonstrated that no Western country is immune from political terrorism. The range of targets for "transnational terrorism" has been steadily increased by the extension of indiscriminate acts of political violence to countries which played no part in the original dispute.

The vulnerability of public utilities in the modern state has not yet been exploited by West European terrorist groups, which have, either, like the Baader-Meinhof group attacked representatives of the establishment, or like the Provisional wing of the Irish Republican Army (Provisional IRA) relied on indiscriminate bombings and shootings. More spectacular means of sowing mass terror have been widely canvassed in "underground" publications. Such possibilities include:

An attack on a nuclear station.
The theft of nuclear, chemical warfare or biological warfare materials.
The poisoning of the water-supply of a major city.
The sabotage of communications centres and railway installations.
The destruction of oil refineries or off-shore oil rigs.
The hijacking of oil tankers or large passenger liners.

Contingency plans no doubt exist for most of these but others may be needed. Although an attack on any "high-risk" target requires technical expertise and inside knowledge that few terrorist groups currently appear to possess, this could be supplied by foreign backers at a later stage—for example, if the Soviet bloc decided to embark on a programme of economic sabotage disguised as the work of non-Communist groupuscules.

Political terrorism is used in Europe to win publicity, to raise funds, to recruit through fear, to punish for defection or deviation, to win labour or social concessions and to demoralise the legally established authorities. The long term goal may be to win regional autonomy or independence as in the case of the secessionist groups, or to overthrow the State for ideological reasons by force of arms, or a combination of both. The object of revolutionary terrorism is therefore to erode confidence in government and the morale of those responsible for keeping order, in the hope that the government under attack will finally be driven to resort to a policy of repression that will turn middle-of-the-road opinion against it—thus creating, in theory, a "pre-revolutionary" situation in which politics will be polarised between the right and the left. Against a background of uncurbed inflation, industrial unrest, and left-wing subversion in the universities and the media, political violence can be a major factor in the collapse of the social consensus that is the precondition for liberal democracy.

Terrorist organisations are often small in numbers. It is estimated that in West Germany the Baader-Meinhof gang has no more than 50 hard-core activists, with about 150 supporters and sympathisers. Yet these men and women have caused great damage. The point is that although by their own efforts they cannot bring about the changes in society and government which are their declared aims, they can contribute to a general process or erosion. By bank raids, hijacking and kidnapping they acquire money, and by the publicity given them—often with dangerous irresponsibility—by the media, they attract recruits. With money and men such small movements may grow alarmingly unless checked. Money is particularly important, because it can be used for purchasing sophisticated weapons as well as marksmen's rifles, bazookas and other hand-held rocket launchers, such as the SA-7, which can be used against aircraft in flight. Money can also be used to hire experts. In any European country safe-blowers, industrial saboteurs and well-trained mercenaries can be bought for the tasks which the terrorists are unable to carry out themselves. It is well known that criminals have been attracted by the high fees which subversive movements are prepared to pay for terrorist action.

Such groups, therefore, represent more than a nuisance; they contribute to the erosion of confidence, the stretching of the security forces and the slowing-up of national progress, and thus indirectly provide a climate which the major subversive movements, such as the Communists, are able to exploit.

### CLASSIFICATION OF TERRORIST GROUPS

Terrorist groups in Western Europe can be classified in six general categories (not necessarily mutually exclusive):

(i) *Minority Nationalist Groups.*—Here the support-base will depend on the sympathy of ethnic, religious or linguistic minorities at odds with the majority community. This category includes: the Official and Provisional IRA in Ulster, the Basque Euzkadi ta Azkatasuna or Freedom for the Basque Homeland (ETA, V Assembly) and the Front d'Alliberament Català in Spain, the Front de Libération de la Bretagne in Brittany, the Corsican separatist groups, the Jura liberation movement in Switzerland and a wide variety of Black Power or migrant workers' groups that have not as yet, outside the United States, been involved in terrorist operations.

(ii) *Marxist Revolutionary Groups.*—Here the terrorist movement is characterised by its possession of a coherent Marxist ideology (which may be Moscow-line Communist, Trotskyist, Maoist or some fashionable mélange of all three) and of a long-term strategy for bringing about "socialist" revolution. Such groups include the Official wing of the IRA, the Portuguese Maoist Reorganisation Movement of the Party of the Proletariat (MRPP), the ETA (VI Assembly) linked since December 1973 with the Trotskyist Fourth International movement in Brussels, and the Maoist Brigate Rosse in Italy.

(iii) *Anarchist Groups.*—The anarchist tradition has traditional roots in southern Europe, particularly in Spain, where the Movimiento Ibérico Libertario (MIL) has recently emerged. In West Germany members of the Baader-Meinhof gang look to the New Left rather than to traditional anarchist texts for an ideological justification for their actions. To the extent that it possessed an ideology at all, the Angry Brigade in UK might have been classified as "anarchist".

(iv) *Pathological Groups or Individuals.*—Pathological violence appears to be a phenomenon of individuals rather than groups; although, in the case of American groups like the Weathermen or the Symbionese Liberation Army, it seems to have become a way of life for some people—whose organisations are perhaps analogous to the group responsible for the Manson killings rather than to a political movement, and whose motivation has more to do with personal inadequacy, hatred of family, or a specifically white middle-class guilt-feeling than with acquired ideology.

(v) *Neo-fascist and Extreme Right-wing Groups.*—The threat from this quarter is at present minimal in most Western countries, with the exception of Italy, where such groups as the Avanguardia Nazionale, Ordine Nuovo and Rosa dei Venti have been implicated in a series of rather dramatic terrorist attacks, including the bombing of the Italicus express late in 1974 and the Milan bank bombings in 1969. The possibility of right-wing terrorism in Portugal and its former African colonies cannot, however, be ruled out in the event of a continued lurch to the left and an explosion of settler discontent (on the model of the Algerian OAS) as the decolonisation process continues to gather steam. Spain and Greece are also potential targets for extreme right-wing terrorism.

(vi) *Ideological Mercenaries.*—In addition to these home-grown movements, every Western society is now exposed to the menace of the ideological mercenaries: men who for the sake of a shared ideology and a common faith in world-wide revolution (rather than money) are ready to cross national frontiers to pursue their cause. The Japanese United Red Army (Rengo Segikun) pioneered these modern transnational movements.

### Italy

Only in Italy has there been a significant reaction to the "new left" revolutionary violence which came to a head in the late 1960s in France, West Germany and Italy. Following the bomb explosion in Milan's Piazza Fontana in December 1969, the right wing increasingly took to the streets and imitated the left by training in para-military camps in the countryside, seventeen of which were discovered in 1972, eight belonging to right-wing groups. For a time violence came equally from the left and right. It consisted mainly of thuggery on the streets, attacks upon rival party premises and clashes between demonstrators and counter-demonstrators. By 1973 it appeared that the neo-fascists were responsible for much of the political violence. It was generally agreed that the grenade thrown on 12 April that year into the middle of a demonstration in Milan was the work of agitators on the right, and that on 28 May 1974 they planted the Brescia bomb which killed eight people and injured 95 at an anti-fascist gathering. Neo-fascists were also blamed for the bomb which exploded on the Italicus express, killing 12 people on 5 August.

Although measures such as the banning of the neo-fascist Ordine Nuovo in November 1973 were taken to meet President Leone's call on 26 April 1973 to strengthen democracy, rumours and fears of a right-wing coup persisted. These fears arose from the allegedly tolerant attitude of the security forces towards right-wing activism, and were to some extent confirmed by the arrest in December 1974 of General Ugo Ricci on charges of subversion. The plot uncovered on that occasion provided for the assassination of a group of leading politicians and trade union leaders and, possibly, the poisoning of the water supply.

The chances of a successful right-wing coup in Italy are, however, limited by the division of responsibility for state security between the Army (four-fifths of which are conscripts, many of them left-inclined), the Carabinieri, the Pubblica Sicurezza, the Guardia di Finanza and the municipal and traffic police.

Although right-wing violence has spread, it has by no means superseded violence both from the many groups of the extreme left and, increasingly, from criminal gangs. There has been an extraordinary rise in abductions for ransom, both to swell revolutionary funds and to line the pockets of common malefactors. Murders and armed robberies have also increased dramatically. Nor has judicial counteraction always been pressed as energetically as possible. Where determined action has been taken (e.g. against senior officers allegedly involved in Prince Valerio Borchese's abortive coup attempt in 1970), the motivation appears to have been related to the political ambitions of Christian Democrat leaders or of left-wing magistrates. One of the key judges involved in the investigation of the Borchese affair, for example, was himself a member of the extreme left-wing Avanguardia Operaia group.

The spread of lawlessness has served to underline the apparent impotence of the shifting political coalitions that have ruled Italy since the war, and to lend credence to the claims of the Italian Communist Party (PCI) as the party of order and efficiency. To the extent that political violence has come from the extreme right, the Communists have strengthened their alternative credentials as a democratic party opposed to the resurgence of fascism. Conversely, the neo-fascist Movimento Sociale Italiano has shown itself, in the eyes of most observers, to be unable or unwilling to contain extremist groups on its fringe; to that extent, its parallel claim to be a democratic party opposed to totalitarian communism has been undermined, thus ensuring its continued isolation in parliament and the country. (Although the MSI leadership was not directly implicated in any terrorist acts, some of its lesser members—such as the ex-paratroop lieutenant Sacucci—turned out to be involved in extremist plots.)

### Spain

Although neither a member of NATO nor a democracy in the sense of the Preamble to the North Atlantic Treaty, Spain is an ally of the United States, belongs to the Western economic system and is a consistent opponent of the Soviet Union. Its future political orientation and its ability to withstand subversive or terrorist pressures are of strategic importance to the rest of Western Europe.

200

General Franco was 82 when this Report went to press and the long period of internal peace associated with his regime may have been drawing to an end. Certainly the existing order was being increasingly challenged, and it was clear that a peaceful succession was going to prove difficult.

In this situation, both Basque and Catalan separatists—those traditional threats to Spanish unity—have turned to terrorism. The most effective of the terrorist groups is the Basque ETA (V Assembly) which, in its separatist goals and its relationship to the rival Marxist wing of the same movement, bears some resemblance to the Provisional IRA. The ETA provided its professional competence by venturing outside its home territory to organize the murder of Admiral Carrero Blanco, the Prime Minister, in Madrid on 20 December 1973—an operation that involved full-time preparations by an advance group in the capital for about a year.

While principally organized within the Basque country, using French territory as a haven among compatriots, the ETA has set up contacts with Basque students all over Spain. It also has contacts further afield, for example with the most successful Latin American terrorist group, the Ejército Revolucionario del Pueblo (People's Revolutionary Army or ERP), from which it may have borrowed sophisticated techniques.

In Catalonia, the challenges to security come both from the Front d'Alliberament Català (FAC), which is devoted to armed struggle, and from the Anarchist movement, which has enjoyed a revival in recent years. Unlike the FAC, the Anarchists can rely upon arms smuggled in by a European network—the Grupos de Acción Revolucionaria Internacionalista (GARI), which in 1974 attacked Spanish airline offices and consulates in Belgium, Holland and France, and sabotaged high tension cables in the Pyrenees.

Last year for the first time Basque and Catalan terrorists operated on each other's territory, though it is not known whether this implied joint planning. Their activities accounted for the deaths of six members of the Guardia Civil during the year.

The threat of terrorism transcends separatism, however. A new wave of violence could provide the extreme right with arguments to persuade General Franco to clamp down on reformist and conciliatory (aperturista) elements within the regime, leaving it increasingly isolated and vulnerable. Should violence come after his departure, it would provoke an Army coup and wreck the chances of a peaceful transfer of power to his designated heir, Prince Juan Carlos.

The main Spanish Communist Party (PCE) under the independentminded Santiago Carrillo denounces the terrorist groups for "left-wing adventurism" and continues to rely on the patient infiltration of existing structures, the recruitment of Spanish workers abroad, the organisation of the clandestine trade unions (comisiones obreras), and the cultivation of contacts with sympathetic elements in the armed forces—in the hope of repeating the Portuguese coup of 25 April 1974. Only a violent confrontation could show what degree of success the Communists have achieved.

*United Kingdom*

(a) *Northern Ireland.*—The main threat to the unity of the United Kingdom comes from the Provisional Irish Republican Army (IRA), a Catholic terrorist organisation seeking the detachment of Northern Ireland from the UK and its integration into the Irish Republic. A parallel but secondary current threat comes from the Irish Republican Socialist Party (IRSP), recently formed by Seamus Costello with militants who broke away from the Official IRA at the end of 1974.

The Official IRA is a complicating factor. It has largely adhered to a cease-fire it declared in May 1972. However, because of its Marxist ideology and its success in infiltrating local organisations, it may prove even more dangerous than the Provisional in the long run. A further complication arises from the presence of militantly loyalist Protestant groups (the Ulster Defence Association or UDA, the Ulster Volunteer Force or UVF, the Ulster Freedom Fighters or UFF and the Young Citizens' Army or YCA). These loyalist groups are determined to maintain Northern Ireland's status as a province of the United Kingdom and therefore do not threaten national unity as do the Republicans. Having resorted to terrorism and sectarian murders since 1972, however, the loyalist groups further complicate the problems facing the British Security Forces. Between 1969 and February 1975, communal violence and terrorism in the province caused 1,168 deaths.

201

It has been established that Irish-related terrorism cannot be confined to Ireland. The export of terrorism to England and Scotland by the Provisionals not only induced the British government to rush through emergency legislation in December 1974, but could well spark off imitative violence by English sympathisers and separatist groups in Scotland and Wales. It is fallacious, therefore, to view IRA terrorism as a purely "Irish" problem.

It is true, however, that the key to dealing with IRA terrorism lies in Ulster. The breakdown of the Northern Ireland political system (based on a semi-autonomous local parliament) and increasing violence in the province caused the British government to assume direct rule in March 1972. Following negotiations in which the government of the Irish Republic also participated, political proposals for power-sharing between Catholics and Protestants were implemented in January 1974. But the opposition of some loyalist politicans and trades union leaders rendered the arrangement unworkable; and following the collapse of the new assembly the British government again had to resume direct rule in June 1974. Further attempts to create a political consensus are expected to follow elections to a constitutional convention in April 1975.

To any objective observer, however, the chances of any successful new initiative appeared to be rather poor. The balance sheet of previous initiatives—apart from a novel degree of cooperation from the government in Dublin—had been fairly dismal. The two "truces" announced by the Provisional IRA, in the context of secret negotiations with British civil servants, were no more than a breathing space—and one of doubtful value since the IRA's underlying aim was clearly a "deal" involving the release of detainees, the revival of the notorious "no-go" areas (districts of Belfast and Londonderry controlled by the Provisionals and out of bounds—for political reasons—to the British Security Forces until "Operation Motorman" in August 1971); and (probably most important of all) its own elevation to the status of a legitimate negotiating partner.

This left Britain with three options, none of them attractive:

(i) A holding operation on the present lines, to be continued indefinitely with little or no prospect of a political breakthrough and an increasing prospect of a situation in which the Army, subjected to successive budgetary cutbacks, might find itself seriously overstretched.

(ii) Withdrawal from Northern Ireland, which would probably turn the island of Ireland into the Congo of Western Europe. The most likely outcome of a British withdrawal would indeed be a prolonged and bloody civil war sucking in the Dublin government and its (notoriously weak and ill-equipped) Army, resulting almost certainly in the creation of a strong right-wing Protestant government in the north with, less certainly, an extreme Republican or socialist regime in the south.

Whatever the outcome, it should be noted, it would probably involve continued Irish-related terrorism in Britain—much of it springing from disillusioned Protestant militants who would feel that their loyalty to Britain had been betrayed.

(iii) A more ruthless counter-insurgency programme, involving the full use of existing powers of detention and interrogation and possibly involving the appointment of a military governor with sweeping powers to rule the province.

There was no indication, when this Report went to press, that the government was thinking on lines of such severity. Hampered by the fact that the existing police force, the Royal Ulster Constabulary (RUC), which is 80 per cent Protestant, is unacceptable to the majority of the Catholic community, the British government was concerned to sustain an increasingly precarious cease-fire, to revive and maintain political activity, to modify the police force in a manner which will reconcile Catholics while not impairing its effectiveness, and to assist economic rehabilitation in a province where terrorism has accelerated emigration and deterred investment.

(b) *Great Britain.*—Since 1969 the principal terrorist threat in Great Britain has been the armed violence—bombings and shootings—of Irish terrorists, mainly Republican but also loyalist, against mainland targets. Other threats are latent; they include the possibility of Scottish and Welsh nationalist violence, left-wing militancy and a populist backlash.

(i) *Irish terrorism.*—Since March 1972 there have been IRA bomb attacks against civilians, shops, railway stations, exhibition centres and military establishments in Great Britain. During 1972–1974 there were more than 100 bomb attacks and nearly 50 people died. Initially, both the Provisional and the Official wings were involved; latterly, only the Provisionals. Spokesmen for both wings

202

declared that the export of terrorism was designed to force British withdrawal from Northern Ireland. Loyalist terrorism has been more fitful and the principal extremist organisation, the Ulster Defence Association (UDA), has mainly been concerned to form mainland-based support groups for its propaganda and arms supplies. Cease-fires declared by the Provisional IRA in December 1974 and February 1975 applied to Great Britain as well as to Northern Ireland. For its part the Marxist Official IRA has adhered in Great Britain to its cease-fire of May 1972.

Government response to exported terrorism was manifest in November 1974, when, following Provisional IRA bomb attacks in Birmingham, they introduced the Prevention of Terrorism Act.

(ii) *Scottish and Welsh nationalism*.—The Scottish Nationalist Party (SNP) is a legal party which is represented in the British Parliament. It has not resorted to violent tactics. There have been bomb attacks against oil and gas pipelines in Scotland in 1973 and 1974, by a group calling itself the "Tartan Army" whose membership and organisation is unknown. The SNP has condemned the activities of the "Tartan Army" and at present the group is not considered to be a serious regional or national threat.

Plaid Cymru (the Welsh Nationalist Party) is also a legitimate political party with parliamentary representation. Welsh nationalism largely focuses on cultural matters and, since 1962, a splinter movement, Cymdeithas yr Iaith Cymraeg (Welsh Language Society) has been active in sit-ins, look-outs, vandalism and street demonstrations, but there is no evidence that it has been involved in terrorism or intimidation. Individuals hostile to English influence have however been responsible for three bomb attacks since the Second World War.

(iii) *Left-wing militancy*.—The Communist Party of Great Britain (aligned on Moscow on most issues) makes no secret of its strategy to influence, and in time, control, the Labour Party through its domination of certain trade unions. To this end, it has practised militancy in industry, but deprecated violence. Other left-wing extremists, however, have advocated and practised more violent methods, not only in industry but also in universities and polytechnics. These have included physical assaults on public speakers at universities as well as the organisation of flying pickets during strikes, the victimisation of and beating up of colleagues, industrial sabotage and other damage to property.

Two Trotskyist organisations—the International Socialists and the International Marxist Group (IMG)—while disclaiming any direct connection with terrorist operations, have lent moral support to the IRA's campaign. The IMG organ Red Weekly declared in an editorial in December 1974, for example, that the people killed in the Birmingham bombings were the victims of "British imperialism" rather than of the IRA. In an earlier issue, the paper argued that militants in the British working class must understand that armed actions against imperialism are essential when part of an overall strategy to mobilise mass forces. Red Weekly does not think that the recent bombings in Britain are part of such a strategy, whoever is actually responsible. But this is merely a tactical issue. Both the IS and the IMG support the idea of armed workers' militias to further the cause of socialist revolution in Britain.

(iv) *Right-wing militancy*.—The extreme right in Britain is small and poorly organised. The National Front has been involved in violent clashes with Trotskyist groups, but only when physically challenged by the latter.[1] Some concern has been expressed, mainly on the left, about the potential danger to law and order implicit in the creation by former Army officers, in the summer of 1974, of groups of vigilantes for the purpose of providing civil assistance in the event of national paralysis caused by politically motivated strikes. There was no evidence of violent intent among such groups, however, or even of political motivation, except in the negative form of resistance to revolutionary action from the extreme left. Indeed the groups concerned made it plain that they would act only if invited to do so by the elected government of the day. The prospect of a "right-wing backlash" could not, however, be entirely excluded should the trend towards polarisation continue.

*Eastern Mediterranean*

The continuing conflict in Cyprus—exacerbated by the proclamation of a provisional Turkish republic in the northern part of the island in February 1975—has had a disastrous effect on NATO's position in the Eastern Mediterranean and may well mean a continued terrorist campaign. The main group involved is Eoka-B, which supports the idea of enosis with Greece.

[1] Lord Justice Scarman, "The Red Lion Square Disorders of 15 June 1974." CMD 5919 (HMSO, London 1975).

203

### THE PROSPECT OF SOVIET BLOC INVOLVEMENT

It is popularly supposed that the late Khrushchev discarded violent revolution as the road to power for Communist Parties in his speeches at the Twentieth Congress of the Soviet Communist Party (CPSU) in 1956. He did not. What he did say was that in certain circumstances, the transition to socialism might be achieved by parliamentary means. Violence was not discarded, but held in reserve. Overtly or covertly, the Russians have gone on supporting Communist Parties (such as the Workers' Party of North Vietnam) or non-Communist "national liberation" movements, engaged in a violent struggle for power, by means of money, arms, training and propaganda. Indeed, for many years, they have been providing specialised courses in sabotage and guerrilla war, both for non-ruling Communist Parties (including West European ones) at the Lenin Institute in Moscow; and for noncommunist groups in various training camps at Odessa, Simferopol, Tashkent and other places.

In most European countries, the Soviet-inclined Communist Parties are encouraged to pursue the parliamentary or constitutional path to power, and such evidence of involvement in political violence as has come to light suggests that there is very little of it, and that what there is tends to be clandestine, or through intermediaries (whereas in areas where is it considered that it is politically advantageous to be seen to be supporting political violence, as in southern Africa, the Russians make no secret of their material support). For about 2½ years from October 1970, the then illegal Portuguese Communist Party (PCP), which was entirely responsive to Soviet directives, conducted a programme of armed action through an organisation styled Acção Revolucionaria Armada (ARA)—disbanded in May 1973 in preparation for the political action which the party rightly decided would soon become possible. In October 1971, Dutch police at Schiphol airport seized a large consignment of arms destined for the Provisional (non-Marxist) wing of the IRA. These arms were being supplied under an agreement negotiated by the Czechoslovak state agency Omnipol; but all such agencies in that country and other countries of the Soviet bloc are known to be under the control of the central committee of the CPSU and it must be assumed that the arms were sent on instructions, or with the approval of the Soviet party.

In addition, Soviet weapons have reached the Palestinian groups and (since the Schiphol affair) both wings of the IRA, which has received Soviet RPG-7 hand-held launchers, and, most recently, the Soviet AK-47 and SKS carbines. It is still not clear who the direct suppliers of these weapons were.

But is has clearly not been in the interests of the Russians or the Moscow-line Communist Parties to give any kind of open support to terrorist groups in the West, so long as it was clear that such groups had little chance of destroying the system while Communist backing for them would merely undermine their chances of coming to power by democratic means in countries like France and Italy. The question now, given Moscow's reactions to recent developments in Chile and Portugal, and its overall view of a deepening crisis of capitalism, is whether its attitudes will change. The fundamental point to bear in mind is that the Soviet attitude is essentially tactical: the strategic aim remains constant, and any methods that will help to weaken the other side in the strategic balance are going to be seriously contemplated.

Since the Chilean coup, the Russians have been engaged in a detailed postmortem on the reasons why Allende failed; their conclusions, combined with a series of statements by Boris Ponomarev on "the qualitative shift in the crisis of capitalism" make illuminating, and disturbing, reading. (It is worth noting also that the more dramatic of these statements have not been quoted in the Italian Communist organs, no doubt because they might place a question mark over the democratic professions of the PCI.) The Soviet commentators have been stressing the need to move fast in a situation that favours the left, to consolidate its power before the "counter-revolutionists" have time to mobilise. Ponomarev argued in an article in the World Marxist Review last June, that a future Allende could only hold power by employing the "boldest" means of struggle, he was suitably vague about just what that phrase meant, but other recent Soviet statements provide some clues.

The two points that the Russians have been hammering are: (i) the need to make an all-out attempt to convert or subvert the armed forces, and (ii) the need, simultaneously, to build up the extra-parliamentary pressure groups, such as workers' councils and (although this is never explicitly stated) armed workers' militias in order to provide the means of effective resistance against a right-wing takeover bid.

204

Although support for the terrorist groups that are currently active seems to have no place in the new Soviet strategy, it is clear that Soviet hopes for a collapse of political systems of Western Europe have increased dramatically in step with the oil crisis and the overthrow of the Caetano regime in Portugal. The apparent Soviet belief that new revolutionary possibilities in Western Europe are opening up may lead the men in Moscow once again to consider seriously the technique of armed insurrection that the Comintern experimented with in the late 1920s. The Russians, however, being the supreme realists, understand perfectly that the overthrow of the modern state is bound to involve the participation of at least a powerful section of the armed forces—as in Portugal.

### THE RESPONSE TO TERRORISM

#### General principles

Political violence has to be viewed as part of a continuum: as the sharp cutting edge of the broader processes of subversion and alienation that are eroding the foundations of Western society. This means that terrorism (when it goes beyond isolated kamikaze gestures) is not merely a problem for the police or the army, but for society as a whole. The questions that the authorities must always ask themselves are: What has led to political violence? Will political or social reforms serve to isolate the terrorists from their popular base, or merely serve to show that the government is weak? Are the terrorists managing to create sympathy for their cause through the media and, if so, has the case for counter-measures been argued forcefully and imaginatively enough?

It does not follow that a serious terrorist campaign is the product of genuine social grievances that can only be dealt with by far-reaching social reforms. It is true that terrorists seek to exploit the real or imagined social injustices of an inevitably imperfect society; this does not mean that society can afford to treat the gunman or the bomb-thrower as spokesmen for legitimate pressure groups. The first concern for the authorities in a society that allows for peaceful change must be to enforce the rule of law against those who make war on it. To do otherwise would lend credibility to the terrorists' claim to be a legitimate political force.

There is another danger to be avoided. If the authorities fail to respond effectively during the opening phase of a terrorist campaign, they may have to contend with the emergence of private vigilante groups prepared to take the law into their own hands. Once the State is seen to have lost its monopoly of force, it will prove increasingly difficult to prevent successive groups intruding on it. The government challenged by terrorism must (i) be *seen* to act, in order to restore confidence and head off a private response; and (ii) mount an imaginative education campaign to persuade the public of the need for the selected counter-measures—which may not be obvious to everyone at the onset of a campaign that may later disrupt the life of major cities.

#### A. INTERNAL ACTION

While the pressures exerted by a subversive movement can be seen in operation and to some extent anticipated, terrorist attacks are usually made without prior warning, and on targets chosen at will and sometimes at random. It is impossible to protect every bank from a terrorist raid, or every prominent personality from assassination or kidnapping, and no-one can save the lives of innocent citizens when a bomb explodes in a crowded shopping centre. Only the terrorists themselves know when and where the next attack will be made (unless and until their organisation has been penetrated by agents of the security forces).

The aims of counter-action must therefore be:

—To penetrate the terrorist organisation or in other ways secure intelligence about its plans.

—To prevent terrorism by discovering and isolating the centres of terrorist action, denying essential aids (e.g. food, shelter, money and medical treatment) and forcing the terrorists into the open.

—To eliminate the leaders, by capture and detention. Lesser operatives, when identified, may be left in circulation if they can provide leads to those at the top. Without leaders, small organisations tend to wither or lapse into internal squabbles, to the benefit of the security forces.

(i) *Coordinated planning.*—The brunt of counter-action will be borne by the national police force and by the internal (security) and external intelligence services (where the latter exists). But many other government agencies will be involved. These include provincial police forces and gendarmerie, immigration

205

control, frontier and coastal guards, and the official information services. The problem is that these bodies are responsible to different ministers. In some countries—Spain and Italy, for example—the internal or counter-espionage services as well as those operating abroad, work under the control of the Interior or Home Ministries and not, as in some other countries, under the Interior or Home Ministries. In any anti-terrorist campaign, it is highly desirable that there should be a single authority, responsible to one minister, or to the Prime Minister or Head of State, which has the power to impose an agreed strategy on all the agencies concerned. If this is politically or constitutionally impossible, at least there should be a common agreed strategy.

(ii) *Intelligence.*—Most European countries have several intelligence-gathering services: foreign intelligence, internal security, police (special branch), armed services. Intelligence gathered by these separate organizations should be pooled and centrally assessed.

Three separate processes are involved in intelligence-gathering; (a) establishing detailed background dossiers on active and potential terrorists and those who might lend them support and compiling organisation charts to show the command structures of underground organisation; (b) creating an efficient retrieval system so that this information can be passed on swiftly to the men in the field as they need it; and (c) developing "strategic intelligence" into "operational-intelligence" through local contacts that will make it possible to lay hands on the right man at the right time. The development of computer science has opened up almost limitless possibilities for the accumulation and rapid retrieval of file material on the greater part of the population; the problem for the authorities in a liberal democracy is to determine at what point the computerisation of information represents an intolerable intrusion on personal liberties. But there is no doubt that the centralisation of relevent information—and the facilities for "plugging in" the men in the field—will vastly simplify the work of the security forces in confronting an urban terrorist campaign.

(iii) *The police.*—The police (with the intelligence services) will inevitably find themselves thrust into the front-line. The number of police available in a given country is nearly always less significant than their preparedness to deal with political violence, which is bound to involve special training—in an intellectual as well as a technical sense. In Britain, for example, the ratio of police to the total population is higher than in the United States and some Western European countries, and yet until recently the police had received almost no conditioning for counter-terrorist operations. This was partly the legacy of their founder, Sir Robert Peel, who had promised that no "officer class" would be allowed to emerge in the British police; even today, there is a total of less than 500 graduates in a total police force of just under 100,000 in England and Wales. The British police response has also been constricted by the decentralised organisation that still prevails; it seems quite extraordinary to many outsiders that there is still no Special Branch for the country as a whole, let alone a central executive for all the regional police forces.

(iv) *Task forces.*—In any anti-terrorist campaign, it is desirable (and ought to be possible) to set up a national task force, drawn from the agencies involved (see above) and dedicated to research, investigation and the coordination of counter-measures, for which the existing forces can be used in their respective capacities. It is vital that there should be no delay or confusion in the coordinating body's access to records of all kinds or in its demands for executive action. In addition, the task force should be able to co-opt specialists, such as psychologists, linguists, locksmiths, clergymen, political analysts, media people, etc.

Indeed, most Western European countries have already opted for the formation of task forces—that is, "fire brigade" police paramilitary units equipped to intervene both in serious riots and in urban guerrilla confrontations. The usefulness of a specialised counter-terrorist unit was amply demonstrated by the events in the Netherlands on 31 October 1974. The 15 hostages being held by armed criminals in Scheveningen jail were released as a result of a commando assault by a Dutch counter-terrorist squad. The Dutch force employed a variety of talents: diversionary action (involving tremendous noise, flares, smoke bombs and sirens), the use of a thermal lance to slice through a steel door in six seconds, rapid movement, skilled marksmanship, and well-processed background intelligence on the Arab terrorist who had organised the kidnap and the criminals inside the jail.

Britain has been one of the few European countries traditionally opposed to the idea of a "third force". The argument in Britain has usually revolved around

206

the claim that an armed counter-terrorist squad would undermine the pattern of cordial relations between the neighbourhood "bobby" and the public, based (allegedly) on the longstanding tradition of an unarmed police. But it now seems clear that more than an ad hoc police unit (like the national anti-IRA unit set up in Britain in November 1974) is required to muster the specialist skills needed to defeat terrorism.

Under the present system, Britain is in a position where the Army would need to be brought in at the first sign of serious trouble. Of course, there is a strong argument in favour of perpetuating this system: the Army combines the range of skills and the practical experience of Northern Ireland and is clearly the most competent force available to deal with terrorism inside Britain itself. For this reason, the British solution may be to second Army experts to form the backbone of a new joint police/army "fire brigade" squad.

Counter-terrorist units should also have on call an advisory team of psychologists who have studied the problems of negotiating with political extremists. This is already the pattern in the Netherlands and West Germany, and in many urban police departments in the United States.

(v) *Information and publicity.*—Public unease in a democratic state must be allayed by proper publicity on the need for counter-measures, so that the psychological means and tactics employed by the terrorists, and their aim of sapping the government's civilian support, can be thoroughly understood. This is especially important when and if it becomes necessary to call in military aid, which may be essential in view of the advanced weaponry (see below) available to contemporary terrorists.

The terrorist side has often used the media to great advantage. Television interviewers have been known to present terrorists in a sympathetic light and one-sided presentation of the news may damage the official case. Nothing serves the cause of terrorists better than a glamourised "clandestine" interview with hooded men, filmed expressly for television. It is the duty of those seeking to protect the public against the gunman and the bomb-thrower to seek to enlist the cooperation of media personnel with a view to a fair presentation of the need for counter-measures in the common interest. West German and British television services provide programmes on criminal events, in which the public are invited to cooperate with the police. This has proved a successful concept, and it could be extended to include cooperation against terrorism. Terrorists should not be allowed to get away with the pretence that they are spokesmen for legitimate pressure groups.

(vi) *Psychological warfare.*—The battle against terrorism (like the attempt to counter subversion) is primarily a battle for minds. There is a considerable literature providing a theoretical justification for political terrorism, shading over into direct incitement to violence in the case of the "underground" press. Far more effective, however, are the propaganda efforts to discredit the security forces in a situation like Northern Ireland, through allegations of "torture", brutality in the conduct of searches and the killing of innocent civilians.

The most effective response to this kind of propaganda attack is (a) to educate the public in the constant risks and stresses of a soldier's (or a policeman's) life in a situation of endemic violence; and (b) to provide similar education in the techniques employed by the terrorists themselves. British newspaper exposés of the misappropriation of "commandeered" property by IRA chiefs in Northern Ireland, for example, were highly effective. So are any authenticated news items about coercive terrorism—such as the IRA's "kneecapping" of those who disobey the organisation's orders, by driving an electric drill through the victim's knee.

Psychological warfare techniques always have to be chosen for the intended audience. Arguments about the immorality of violence that will be readily accepted by the bulk of (say) the British or West German public may have no effect on the recruitment pool for terrorists operating in a Catholic ghetto like the Ardoyne in Belfast or a community of migrant Arab workers in Frankfurt. At this level, the authorities will have to be more resourceful: they will need, for instance, to expose rivalries and corruption in the terrorist leadership.

(vii) *Control of explosives.*—A good deal more can be done to prevent terrorists gaining access to the routine sources of explosives: supplies of nitric acid, sodium chlorate and ammonium nitrate that are simply sold over the counter or available as ingredients in common fertilisers; thefts of detonators, detonator wiring and other explosive materials from construction firms, quarries, etc. Companies entitled to stockpile explosive materials should clearly be required to guard their supplies properly. Detonators should be properly identified—perhaps through the use of radioactive isotopes in labelling—to enable the police to determine the source if they are used in a terrorist incident.

207

(viii) *Legal powers.*—The question of how far the government is entitled to go in lifting normal legal safeguards in response to a terrorist campaign is probably the thorniest problem of all. The short answer is that terrorists should be tried in a normal way on criminal charges wherever possible. The situation may arise, however, where an entrenched terrorist movement is able to intimidate witnesses, juries and even magistrates, making a normal trial impossible. In this situation, the security forces must have the power to take known gunmen off the streets for a limited period. If emergency powers are sought, however, it should be made clear that they are temporary and will be dropped as soon as conditions permit.

There is also the question of when it is justifiable, and expedient, to ban a particular organisation. It astonished many outsiders that the IRA was not pronounced an illegal organisation in Britain until November 1974—several years after the campaign in Northern Ireland commenced. During that period, it was perfectly legal to display IRA banners and propaganda (though not to parade in paramilitary uniform) and to raise finance for a movement at war with the British government.

There was always a very simple and compelling reason for banning the IRA in Britain: that its appearance as a legal political group on the other side of the water placed the Army in Ulster in an extraordinary moral dilemma and could only help to undermine morale. But in other situations, the strong case for banning an extremist group that openly espouses armed revolution and engages in (or supports) a terrorist campaign will have to be weighed against the practical advantage of having such a group out in the open where it is easy for the security forces to keep it under surveillance. It is the old choice between punishing the crime or the conspiracy, and the choice will have to be based on what is likely to prove most effective in a particular situation.

(ix) *Penalties.*—Penalties for political violence are another source of unending debate. Current discussion tends to revolve around the question of capital punishment. Members of the Study Group were divided on this question. The main arguments against the use of the death penalty for terrorists appear to be: (a) the judicial problems, especially in a situation where emergency legislation is in force; (b) the possibility of erroneous conviction (which also applies to ordinary criminals); (c) the prospect of terrorist retaliation and the creation of false martyrs; and (d) the risk of losing a useful future source of information—assuming that the captive can be "turned". The two most powerful arguments in favour of the death penalty are: (a) its possible deterrent effect on younger terrorists and accessories if not on the hard-core leadership; and (b) its moral impact, as evidence that society under attack is ready to react strongly in its own defence.

Wherever possible (i.e. when they have been charged under normal criminal laws) terrorists should be treated as normal criminals in captivity. Particular care must be taken to avoid the establishment of "schools for terrorism" inside jails as the number of prisoners grows.

(x) *Weaponry and technical aids.*—Advanced weapons now available to terrorists include hand-held rocket-launchers, bombs equipped with anti-detection devices and similar weapons. Such weaponry cannot normally be countered by conventional police forces. That is why military assistance is sometimes needed, and is in itself a strong reason for creating a special task force. Such task forces' need to match terrorist technology with devices of their own, such as radio monitoring, "bugging" devices, advanced audio and visual aids to detection; trace elements for detecting the misuse of materials; helicopters and other aircraft for spotting, surveillance and the rapid transporting of personnel to target areas; and not least, dogs trained for tracking and the discovery of explosives.

(xi) *Rehabilitation.*—The work of the authorities does not end with the defeat of the terrorists. Many of them will be in jail or under detention. As far as possible, and with deliberate speed, an effort should be made to rehabilitate and reconcile them with society, especially the young. In this essential task, the social services have a major role to play.

#### B. INTERNATIONAL ACTION

(i) *Coordination.*—The need for it is clear. Before the Lod airport massacre in May 1972, the Japanese terrorists working on contract for the Popular Front for the Liberation of Palestine (PFLP) collected forged identity documents in Frankfurt and weapons in Rome. International coordination has so far been insufficient, however, largely because not all countries are equally affected by terrorism; in addition, differences between political, military and legal systems sometimes hamper international responses.

208

(ii) *Intelligence.*—Although crimes are still crimes even if politically motivated, the coordination of police efforts for politically motivated crimes requires new machinery. Interpol cannot be used if only because of the membership of Arab states. Each country's police accumulates a mass of data, including statistics on terrorism. Much of it can be computerised. All European countries should compile profiles of terrorist groups and individuals. This information should be pooled or at all events made readily available to other police forces needing information.

(iii) *Sanctuaries.*—Multilateral conventions on hijacking have proved inadequate. Some countries, expecially in the Arab world, have found it politically impossible to deny sanctuary to terrorists, and therefore to sign conventions to this end. In the case of hijacking, in particular, there is a pressing need for general agreement that no asylum shall be granted to air pirates, backed if possible by sanctions against countries refusing to comply. A step in the right direction is the negotiating of bilateral agreements, such as that between the United States and Cuba. Existing extradition treaties antedate the current wave of terrorism. They need to be revised and extended specifically to cover hijackers seeking sanctuary.

(iv) *Funds.*—All governments should be pressed to discourage or, preferably, to prohibit fund-raising for foreign terrorists. Irish-American individuals or societies are believed to have contributed between $1 million and $2 million to the IRA. In recent months, intensive counter-propaganda by the governments of the UK and the Irish Republic have drastically reduced these contributions.

(v) *Explosives.*—Since 1961, the distribution and delivery of explosive materials (fuses, detonators and explosive substances) by road or rail in Europe have been controlled under pan-European agreements to which East as well as West European governments subscribe. Currently, wider international controls are being considered by the Economic Commission for Europe (ECE), a United Nations agency. This kind of agreement has had a major effect in Northern Ireland, where terrorists have been forced to improvise highly unstable bombs.

(vi) *Population Controls.*—It has been too easy for terrorists to move around Western Europe; the most egregious example has of course been the procession of IRA men travelling to and fro between Britain and Eire. Controls at ports and airports will have to be tightened up generally. This is a further argument in favour of a system of identity cards throughout the EEC area—however repugnant that seems to those who, like the British, are unaccustomed to it. Some form of identification for people moving between Britain, Northern Ireland and Eire has become essential. A speedy means of self-identification would also assist the police with the spot checks that are becoming inescapable in the context of widespread bombings and bomb scares. (It may be objected that mass production will be expensive and that forgery is always possible, but there are technical means for making that more difficult.)

---

## II. Who's Who of the Most Active Organizations

The numerous groups that have employed terrorist tactics surface in news reports under a bewildering array of acronyms. The following "Who's Who" may lessen confusion about their identities. For a more complete list of terrorist groups and extremist movements, see Brian Crozier, ed., "Annual of Power and Conflict 1973–74," London: Institute for the Study of Conflict, 1974.

### LATIN AMERICA

*Argentina.*—The urban guerrilla groups that represent the revolutionary left wing of the Peronist movement in Argentina became active in the late 1960s, exerting increasing pressure on successive military governments to allow Juan Perón to return to the country and participate in presidential elections:

ERP—Ejército Revolucionario del Pueblo (People's Revolutionary Army). An imaginative, and still the most active group in Argentina, the ERP is the combat wing of the Argentine Trotskyist Party. It has specialized in kidnapping local and foreign businessmen. ERP-August 22 is a splinter group of the ERP which included in its name the date in 1972 when 16 revolutionaries reportedly were killed in prison.

FAL—Frente Argentino de Liberacion (Argentine Liberation Front). A pro-Cuban group.

FAP—Fuerzas Armadas Peronistas (Peronist Armed Forces).

209

FAR—Fuerzas Armadas Revolucionarias (Revolutionary Armed Forces). A pro-Cuban group. (Not to be confused with the FAR of Guatemala.)

Montoneros—an ultra-left Catholic group.

*Brazil.*—Brazil surpassed all other countries in the sheer number of urban guerrilla organizations. Most of the groups became active in the lat 1960s and operated mainly in the cities of Rio de Janeiro and São Paulo. Sometimes cooperating with each other on specific operations—kidnapping a diplomat, for example—they also occasionally betrayed each other. Subject to increasing government pressure, the organizations declined in number and effectiveness and are now, for the most part, out of action. The groups involved in international terrorism included:

Ala or Red Wing, a group composed of militants who broke with the pro-Peking Communist Party of Brazil, PC do B—Partido Communista do Brasil—in 1966 and engaged in armed struggle. Ala itself did not carry out any actions with international consequences, and was smashed by the police in 1969, but its survivors joined the ALN, VAR-Palmares, or VPR (see below).

ALN—Ação Libertadora Nacional (Action for National Liberation), the group formed by the famous urban guerrilla theorist, Carlos Marighela, kidnapped the U.S. ambassador in 1969 and the Swiss ambassador in 1970.

MR-8—Movimento Revolucionario-8 (Revolutionary Movement of the Eighth), a dissident faction of the Brazilian Communist Party, dedicated to armed struggle. It participated in the kidnapping of the U.S. ambassador in 1969.

VAR-Palmares—Vanguarda Armada Revolucionaria-Palmares (Armed Revolutionary Vanguard-Palmares), named after the seventeenth century slave republic of Palmares. VAR-Palmares was the short-lived product of a merger between elements of VPR, mentioned below, and COLINA—Comando da Libertação Nacional (National Liberation Commando). It soon split into at least two factions, one retaining the name VAR, the other going back to its original name, the VPR.

VPR—Vanguarda Popular Revolucionaria (Popular Revolutionary Vanguard). The VPR kidnapped the Japanese consul in São Paulo in March 1970 and participated in the kidnapping of the West German ambassador in June 1970.

*Guatemala.*—An unsuccessful military coup attempted by young Guatemalan army officers on November 13, 1960 evolved into a persistent leftist guerrilla movement originally called MR-13—Movimiento Revolucionario-13 (Revolutionary Movement of the Thirteenth)—to commemorate the date of the coup attempt. The movement came under the influence of Trotskyists, which led to an internal split and the creation of new guerrilla forces, as follows:

FAR—Fuerzas Armadas Rebeldes (Rebel Armed Forces)—was considered more reliable than MR-13 by the regular Guatemalan Communist Party (called PGT for Partido Guatemalteco de Trabajo, or Guatemalan Workers Party), but subsequent conflict between FAR and PGT led to another split and the creation of a new combat wing also called FAR.

The new FAR—Fuerzas Armadas Revolucionarias (Revolutionary Armed Forces)—which was under PGT control, was intentionally given a name with the same acronym as the original FAR.

*Uruguay.*—By far the most famous urban guerrilla group in Latin America is the MLN—Movimiento de Liberación Nacional (National Liberation Movement)—better known as the Tupamaros after Tupac Amaru, an Inca chief who rebelled against the Spaniards.

The Tupamaros, an ultraleft Marxist group, began operations in the early 1960s as rural guerrillas, but soon changed their theater of operations to Montevideo. They kidnapped several U.S. officials and the British ambassador, whom they held for eight months in 1971. Subjected to military crackdowns in 1972, the Tupamaros are now inactive in Uruguay. A number of their members escaped to Argentina where they cooperate with Argentine terrorists.

Recently it was reported that the Tupamaros and three other urban guerrilla groups in South America, the ERP of Argentina, the ELN—Ejército de Liberación Nacional (National Liberation Army) of Bolivia—and MIR—Movimiento Izquierdista Revolucionario (Revolutionary Leftist Movement) of Chile—have created a "junta for revolutionary coordination" in order to "internationalize" their armed struggle.

A little known group called OPR-33—Organization of the Popular Revolution-33—for 33 heroes of the 19th century independence movement, was active in Uruguay in the early 1970s.

210

### NORTH AMERICA

*Canada.*—Terrorism in Canada has generally been the work of either French-speaking separatists in Quebec or Croatian emigrés. The FLQ—Front de Liberation du Québec (Quebec Liberation Front)—was founded in 1963 in an effort to establish a guerrilla organization on the pattern of Algeria. The effort failed and the new FLQ that emerged in 1965 adopted terrorist tactics, including bombings and political kidnapping. The FLQ has been quiet for the past two years.

*United States.*—Terrorism in the United States has for the most part been the product of the Weatherman faction of the radical Students for a Democratic Society (SDS), the Black Liberation Army (an offshoot of the Black Panthers), the Jewish Defense League (JDL), the short-lived Symbionese Liberation Army (SLA), and various groups of emigres and political exiles, primarily Croatian and Cuban. Of these, only the Jewish Defense League and the emigré groups have been involved in international incidents.

The Weatherman faction has thus far carried out no acts of international consequence, but the organization is reported to have contacts with two Palestinian groups, Al Fatah and PFLP, and with the Irish Republican Army.

The JDL began as a vigilante group formed to patrol and protect Jewish neighborhoods in New York, but later it expanded its activities to harassing Soviet and Arab diplomats. Police believe the JDL is responsible, for sniping attacks on the the one mentioned most frequently early in the chronology is El Poder Cubano Soviet mission to the United Nations.

Of the several Cuban exile groups that have been active in the United States, the one mentioned most frequently early in the chronology is *El Poder Cubano* (Cuban Power), which has often attacked the offices of countries and private firms doing business with the Castro government.

### EUROPE

*Northern Ireland.*—The IRA—Irish Republican Army (Provisional Wing)—split off from the old Irish Republican Army, which had turned to Marxism and peaceful protest, in 1970. The "Provisionals" are more conservative politically but more inclined to violence than their parent organization. Most of their attacks are directed against British authority in Northern Ireland, but they have occasionally carried their bombing campaigns to other parts of the United Kingdom and the Republic of Ireland, and they have mailed letter-bombs to British officials overseas. The "Provisionals" reportedly have contacts with the ETA, a Spanish Basque separatist movement, and with guerrilla groups in the Middle East.

*Germany.*—One of the most active terrorist groups on the continent has been the Red Army Group, nicknamed the Baader-Meinhof Gang for its two leaders, Andreas Baader and Ulrike Meinhof. It was responsible for several bombings at U.S. Army bases in Germany.

*Spain.*—The ETA—Euzkadi Ta Azkatasuna (Basque Nation and Liberty)—is a Basque nationalist party dedicated to achieving independence for the Basque provinces in northern Spain; it has links with Basque groups in southern France. The ETA has carried out kidnappings of foreign diplomats in Spain.

*Yugoslavia.*—Tight security discourages terrorism in Yugoslavia, but Croatian nationalist emigrés have been active worldwide, particularly in Australia and Canada. They are responsible for several airliner hijackings and bombings. The international problem is complicated by the efforts of Yugoslav intelligence agencies to neutralize, by assassination if necessary, the activities of the emigré groups.

### THE MIDDLE EAST

*Palestinian Organizations.*—Palestinian Arabs have fielded a number of guerrilla groups and terrorist groups that operate against targets in Israel and against Israeli nationals and Jews throughout the world. Egypt, Algeria, Libya, and Syria provide these groups with arms and training bases; Saudi Arabia and other Persian Gulf states are said to provide them with financial support. Well-financed, well-equipped, and well-trained, they are the most truly international terrorists, having struck targets in the Middle East, Europe, North America, and Asia.

The PLO—Palestine Liberation Organization—acts as a parliament for the fedayeen groups. Its military arm is the PLA—Palestine Liberation Army—which in turn has a commando wing called the PLF—Popular Liberation Forces. The PLF, for the most part, confines its activities to targets inside Israel and the occupied territories. Under the PLO are Al Fatah, which was founded under Egyptian sponsorship, Al Saiqa, PDFLP, PFLP, PFLP-General Command, and ALF.

211

Like the PLF, Al Fatah has limited its attacks to targets inside Israel and the occupied territories, but it is reported to be the parent of the BSO—Black September Organization—a terrorist group named for September 1970, the month in which bitter fighting erupted between the Jordanian Army and Palestinian guerrillas. Black September killed Israeli athletes at the Olympics in Munich, seized Israel's embassy in Bangkok, and later seized the Saudi Arabian embassy in Khartoum, where members killed the American ambassador and deputy chief of mission as well as the Belgian chargé. Al Fatah is also believed to control RASD, a counterintelligence organization devoted to the assassination of Israeli intelligence agents.

Al Saiqa is connected to and financed by the Syrian Baath Party; it is reported by Israeli intelligence to be the terrorist arm of the regular Syrian Army. It operates primarily against targets in Israel.

PDFLP—Popular Democratic Front for the Liberation of Palestine—is Marxist and pro-Peking. It split with the PFLP in 1969.

PFLP—Popular Front for the Liberation of Palestine—founded in 1967, is also Marxist, and claims credit for 18 attacks on airliners or airports since 1968.

PFLP-General Command—the Popular Front for the Liberation of Palestine-General Command—is a separate organization from the PFLP with which it split for doctrinal reasons in 1968. It claims credit for the blowing up in air of a Swissair flight in 1970 and the mailing of letter-bombs to Jewish leaders. It was responsible for the attack at Qiryat Shemona in April 1974.

ALF—Arab Liberation Front—is a terrorist group said to have been formed by the Iraqi government in 1968 to counter the influence of other pro-Egyptian and pro-Syrian terrorist groups. It conducts its campaigns primarily in Israel and Israeli-occupied territories.

There are several other groups, including the AOLP—Action Organization for the Liberation of Palestine—which claimed credit for the attack on Israeli passengers at the Munich airport on February 10, 1970.

The above description is probably out of date because the Palestinian organizations are constantly changing; new alliances are created and new factions break off. For example, the seizure of hostages at the Saudi Arabian embassy in Paris on September 5, 1973 was carried out by a group calling itself the "Punishment Squad." All other Palestinian organizations disclaimed knowledge of the group.

Israeli attacks against civilian targets in Lebanon and on suspected terrorist leaders in the Middle East and Europe are carried out either by commandos from the regular armed forces or by counterintelligence agents.

*Ethiopia.*—The ELF—Eritrean Liberation Front—is mentioned several times in the chronology in connection with airliner hijackings. It takes its name from Eritrea, the former Italian colony that is now part of Ethiopia. The group allegedly receives support and training from Palestinian organizations.

*Turkey.*—Turkey has two groups engaged in terrorist activities. The Dev-Genc, a shortened form of Devrimci Gencler (Revolutionary Youth) is an offshoot of the Maoist faction of the Turkish Communist Party. It is a loosely knit group, composed primarily of students. Some of its members have allegedly received training with Palestinian guerrillas in Syria. The TPLA—Turkish People's Liberation Army (which occasionally appears as THKO: Turkiye Halk Kurtulus Ordusu)—is an offshoot of the Dev-Genc, and more inclined than the Dev-Genc to armed action. The membership of the two organizations may overlap. The TPLA also maintains contacts with guerrilla groups in Arab countries.

### ASIA

*Japan.*—The Asian organization most frequently mentioned in connection with international terrorism is Japan's United Red Army (Rengo Sekigun), which began in 1969 as an urban guerrilla group. It is an offshoot of the Zengakuren, a militantly leftwing student movement. The United Red Army has carried its activities beyond Japan, most notably to the Middle East where it is allied with the PFLP; it provided the three recruits who machine-gunned passengers at Tel Aviv's Lod Airport on May 31, 1972.

Mr. SOURWINE. I have no questions, Mr. Chairman. I think Mr. Crozier has covered his subject adequately; and under the time limitations this morning, if we start asking him to expand on every point, we will finish next week.

Mr. MARTIN. I have two brief questions that I think we can cover in about 2 minutes' time. In the case of the Japanese Red Army

212

Terrorist Group responsible for the Lod massacre, you said they had traveled to East Germany, where they were provided with money?

Mr. CROZIER. West Germany.

Mr. MARTIN. West Germany. And then they had traveled to Italy where they were provided with arms. Were they provided with the money and arms by their own agents? Or by cooperating organizations?

Mr. CROZIER. By cooperating organizations.

Mr. MARTIN. Communist Party organizations? Or purely terrorist organizations?

Mr. CROZIER. No; terrorist organizations.

Mr. MARTIN. Thank you.

And one other question. You spoke about the interlocks that exist between the major international terrorist organizations. Do you know of any interlocks between American terrorist organizations and other major international terrorist organizations?

Mr. CROZIER. Well, there are certainly links with Cuba, in some cases, and there have been links with the Palestinian terrorist organizations.

Mr. MARTIN. Thank you; that is all.

Senator THURMOND. Mr. Crozier, I want to thank you very much. You presented a very enlightening testimony here which I am sure will be very helpful, and these articles by you which will be placed in the record, too, will be most helpful.

We appreciate your presence, and again we thank you.

Our next witness is Mr. Robert A. Fearey, Special Assistant to the Secretary and Coordinator for Combating Terrorism, Department of State.

Mr. Fearey, we are pleased to have you with us, and we will be glad to hear from you.

## TESTIMONY OF HON. ROBERT A. FEAREY, SPECIAL ASSISTANT TO THE SECRETARY OF STATE, COORDINATOR FOR COMBATING TERRORISM, DEPARTMENT OF STATE, ACCOMPANIED BY LOUIS FIELD, COUNSEL, AND JOHN N. GATCH, DEPUTY

Mr. FEAREY. Thank you, Mr. Chairman.

It is a privilege to meet with this committee. I am particularly happy to be included in the same hearing with our distinguished visitor from abroad, Brian Crozier. His name is well known to me and the fact that he is appearing today spurred me to reacquaint myself with his excellent writings.

I believe this is the first time that my office has been represented before this committee, and a brief description of my functions may be in order.

I wear two hats. As Special Assistant to the Secretary of State, I am coordinator for combating terrorism as it may affect our Department of State activity and responsibilities in foreign affairs throughout the world.

My other capacity is as Chairman of the Working Group under the Cabinet Committee for Combating Terrorism. In both these capacities, I am essentially a coordinator.

213

I am accompanied by my Deputy, Mr. John N. Gatch. Mr. Gatch is a Foreign Service Officer with extensive experience in the Middle East.

Senator THURMOND. Would you point him out, if you would?

Mr. FEAREY. Yes; he is right here.

His most recent assignments abroad were as deputy chief of mission in Kuwait from 1964 to 1968 and as charge d'affaires of our Embassy in Manama, Bahrain, from 1971 to 1973. He joined our office shortly after it was established and worked with my two distinguished predecessors, whom you may know, Ambassador Armin Meyer and Ambassador Lewis Hoffacker.

I too am a Foreign Service officer with varied service abroad, most recently in the Far East where I had two Presidential appointments—one as political adviser to the Commander-in-Chief, Pacific, and the other as civil administrator of the Ryukyu Islands, or Okinawa. My immediately preceding assignment was as Chairman of the Department of International Relations and Area Studies at the National War College here in Washington. May I interject here that I have been in the position that I now hold for about 6 weeks and therefore, if it is agreeable to you, in the question period I would hope to be able to call on the assistance of Mr. Gatch who has been in this office, that I just joined, for over 2 years.

First a word about the formal structure of our interagency activity to combat terrorism. This structure was established in September 1972, when the President asked the Secretary of State to chair a Cabinet Committee to consider, in the President's words, "the most effective means to prevent terrorism here and abroad."

The President took this action following the tragedy at the Munich Olympics, a tragedy which illustrated dramatically that international terrorism had reached the point where innocent people anywhere can be victimized. This incident and others throughout the world bear witness to the terrible potential of a disturbed or determined person or group to terrorize the international community.

This capability to disrupt society has expanded with the increasing technological and economic complexity of our society and with the added incentive of wide and rapid publicity.

The Cabinet Committee does not meet on a regular basis, only as the situation may demand. The Working Group, composed of senior representatives of the department or agency heads, is in constant contact as issues arise and incidents occur and meets on a biweekly basis.

Over the past 2 years and 8 months, this interagency effort has been extremely active. It has, I believe, made us as a government more effective in responding to the continuing threat from a variety of organizations and individuals seeking to strike at us at home and abroad.

This is not to say that we have solved all the problems facing us. But we are using Government-wide resources to better advantage. We have at least reduced the risk to our people and to our foreign guests.

The Cabinet Committee/Working Group has, as a matter of practice, concentrated on protection of Americans abroad and of foreigners, particularly internationally protected persons, in this country. For

214

Americans at home, there are the customary agencies, local and Federal, which continue with their traditional responsibilities.

Since the terrorism which concerns our Government-wide antiterrorism structure is of international scope, threatening to strike within our borders, the FBI is invaluable in keeping the Cabinet Committee/Working Group appraised of international potentialities or implications arising in domestic situations.

Here again, the Cabinet Committee/Working Group is a useful instrument to surveil the global terrorist picture, to insure effective collaboration among agencies and departments having domestic and foreign responsibilities, and to recommend countermeasures to close gaps in the security screen around individuals whom we protect.

For example, we monitor the implementation of Public Law 92–539, which confers Federal jurisdiction in the protection of foreign officials and official guests. If in the light of experience, there is room for improvement in the dovetailing of local and Federal protection in this regard, modification of practice or legislation would be a matter of concern to the Cabinet Committee/Working Group.

Our official personnel abroad have been frequent targets for a wide variety of terrorists, but we are mindful that our mandate covers all Americans. American businessmen have been particular targets in Latin America and have therefore received our special attention.

There have been so many requests for advice from companies with overseas interests that the Department of State prepared a brochure containing general security tips for such businessmen. This brochure is not for general distribution, for obvious security reasons, but I am pleased to supply copies for the use of the committee, if it desires.

When briefing American businessmen on dangers they may face abroad, we emphasize the importance of continuing contact with our embassy or consulate in the area of assignment. The full resources of the U.S. Government, including information, official contacts with the host Government, and our expertise in counterterrorism, are at the disposal of American businessmen or other nonofficials abroad.

Mr. SOURWINE. Mr. Chairman, if I could ask one question, you talked about the advice to American businessmen, and said it was available to the committee. But do I understand that you do not want to include it in the hearing record?

Mr. FEAREY. I think it would be our preference that it not be made completely public.

Mr. SOURWINE. That is a classified document?

Mr. FEAREY. It is not exactly classified, but we have some concern that if it were published it might be read by those who had hostile intentions toward our people and that it might be of some benefit to them. In this light, we believe this should not become a public paper.

Mr. SOURWINE. Mr. Chairman, may it be received by the committee with the reservation of judgment as to whether it is, or any part of it is to be actually included in the record for the purpose of publication?

Senator THURMOND. Is that all right with you?

Mr. FEAREY. Yes; that is all right.

Senator THURMOND. All right, it will be received on that basis.

[The document referred to may be found in the files of the subcommittee.]

215

Mr. FEAREY. While the foreign Government has the primary responsibility for protection of foreigners within its territory, the U.S. Government complements that protection in such matters as the protection of our official establishments.

We may not always agree with the company or individual concerned on tactics, such as the advisability of paying ransom. But it is important that we stick together in tight situations such as, for example, Argentina where despite the efforts of the Argentine Government terrorists have kidnapped a number of American businessmen in Argentina for very high ransoms.

We conscientiously emphasize the preventive aspect of our mandate. Therefore, our main efforts are in the field of improving procedures in this country and abroad to detect and deter terrorists.

We have been in the forefront of those who have sought tightened international air security. We continue to press for additional ratifications of three important multilateral conventions dealing with hijacking: The Tokyo 1963 Convention, which in effect requires countries to return the hijacked plane, passengers and crew; the 1970 Hague Convention, which requires countries either to extradite or prosecute skyjackers; and the 1971 Montreal Convention, which proscribes any kind of sabotage of aviation, including destruction of aircraft on the ground, and requires prosecution or extradition of the offenders.

At Rome in September of 1973 we were unsuccessful in our efforts to develop an international consensus to put enforcement teeth in these conventions. Nevertheless, we are encouraged by continued, admittedly slow, progress elsewhere in the ICAO forum, including adoption of a security annex by the ICAO Council to further improve security of airports abroad.

At the U.N. in 1972, we sought to prohibit the export of violence to innocent persons who are many countries—sometimes continents—removed from the scene of a conflict. This approach became bogged down in debate over so-called justifiable as opposed to illegal violence.

We accordingly narrowed our proposals to more specific categories of offenses which, because of their grave and inhuman effect on innocent individuals, or because of their serious interference with the vital machinery of international life, should be condemned by States of every ideology and alinement.

Under this narrowed approach we supported in the 1973 General Assembly a convention for the protection of diplomats. The Assembly agreed to this measure, which requires that persons who attack or kidnap diplomats of foreign governments or international organizations be extradited or prosecuted.

In Interpol, in the Organization of American States, and in other appropriate forums, we achieve what is feasible in the way of multilateral discouragement of international terrorists.

Simultaneously, we maintain quiet liaison with individual governments which share our abhorrence of terrorism. We are pleased, for example, to assist others when they suffer hijackings, by providing communications and other services even though the affected plane may not be over or in our own country.

When, in spite of all our efforts, an act of terrorism occurs, we are prepared to deal with it swiftly and effectively. Within the Depart-

216

ment of State, task forces can be assembled on short notice to manage critical events.

Such task forces are composed of selected specialists who can call on the full resources of the U.S. Government to rescue, or at least to monitor, the beleaguered parties. With the advice and concurrence of the Working Group, our office has prepared detailed operating procedures for handling terrorist incidents involving Americans abroad and involving foreign officials in this country.

These documents are, of course, classified, but I would be pleased to discuss, generally, their contents with this committee.

Senator THURMOND. Did you want to discuss those in closed session, or in open session?

Mr. FEAREY. I think it would be possible to discuss them in our existing open session. If there is something sensitive that comes up, I will so indicate.

Senator THURMOND. OK.

Mr. FEAREY. Tactics vary in each crisis situation, but one consistent factor should be understood by all parties concerned: The U.S. Government will not pay ransom to kidnapers, nor will it release prisoners to satisfy blackmail demands.

We advise other governments, individuals, and companies to adopt similar positions because we believe to do otherwise would multiply terrorist attacks. But I hasten to underline the importance which we attach to human life.

We do not glibly sacrifice hostages for the sake of this firm policy. We believe that firmness, if applied with the best diplomacy we can muster, can save lives in the long run and probably in the short run as well.

The Foreign Service has had more than a few terrorist experiences in the past 10 years: sixty-one of our officials abroad were subjected to terrorist attacks during that period, including 28 who were kidnaped. Fifteen of these individuals were murdered. We have learned to take reasonable precautions, but we do not want our embassies and consulates to be fortresses or armed camps.

We use ingenuity to reduce risks. Very importantly, we remind the host government of its special responsibility to protect diplomatic and consular personnel, and of its general duty to protect all foreigners in its territory.

Sometimes, however, that foreign protection must be reinforced. The State Department's Office of Security is responsible for insuring that our Foreign Service posts are doing their best, with necessary equipment, to supplement such local protection as may be available.

After the tragic murder of our diplomats and a Belgian colleague in Khartoum in March of 1973, we concluded that this effort should be strengthened. The Congress was requested to provide supplemental funds and all of us in the Foreign Service are most grateful for the $19.6 million which was made available.

The Office of Security is managing the disbursement of these funds, based on highest priority needs of our posts throughout the world.

The United States has attempted to show leadership in stimulating global attention to the apparently growing international terrorist threat. We have not achieved all we sought in internationl cooperation. But our multilateral, bilateral, and unilateral efforts must and will continue with all possible drive and persuasiveness.

217

There seems to be increased collaboration among terrorist groups of different nationalities. Such groups seem to be moving farther and farther afield, including toward North America. There is evidence of ample financial sources for some terrorist groups, not only from ransoms collected but also from governments which, for one reason or another, are sympathetic toward certain groups.

And, last but not least, there seems to be no shortage of political-economic-social frustrations to spawn terrorists on all continents. The global terrorist epidemic threatens the very fabric of international order.

Mr. SOURWINE. May I ask one question at this point?

You do not mean to imply that it requires a political-economic frustration to spawn terrorism?

Mr. FEAREY. No; I think a substantial portion of them derive, in major degree, from such frustrations, but there are other motivations.

Mr. SOURWINE. Thank you, sir.

Mr. FEAREY. Many terrorist incidents involve a combination of the political, criminal, and psychotic.

Mr. SOURWINE. And sometimes, subversive?

Mr. FEAREY. Yes, sir.

I would like to conclude this statement with, first, a very brief assessment of trends in international terrorism over the past year, and then with a broad look at what the future may hold.

As for the recent trends in terrorism, these have been mixed. On the favorable side, the relatively moderate, propeaceful settlement members of the Palestine Liberation Organization leadership, supported by key Arab governments, have brought about a significant reduction in Arab terrorism against non-Israeli targets.

Arab governments have one after the other closed their airports to hijackers and other terrorists seeking safe haven after attacks against non-Israeli targets. Even the Popular Front for the Liberation of Palestine, which conducted so many of the dramatic hijacking, massacre, and barricade/hostage incidents of the 1970–73 period, appears to have at least temporarily abandoned these tactics. There has been a worldwide trend of nations no longer being willing to provide safe haven to known terrorists or otherwise openly support terrorist activities.

On the negative side, however, there has been no diminution of terrorist violence against Israel, and there has been no reduction of such violence in most countries that have domestic terrorism problems—such as Argentina, Nicaragua, Northern Ireland, Mexico, Spain, and Germany.

Some of the more sensational incidents have been by the Baader-Meinhof gang in Germany, in pursuit of its anarchist, antiestablishment objectives and the release of imprisoned comrades.

You will recall the recent Lorenz kidnaping in Berlin and the subsequent seizure of the German Embassy in Stockholm. The Japanese Red Army, with objectives similar to those of the Baader-Meinhof gang plus a world revolution theme, has been active, initiating incidents abroad on its own as well as in collaboration with the PFLP.

Cooperation among terrorist groups has strengthened, particularly the PFLP with the Japanese Red Army, the Baader-Meinhof group and the IRA.

218

What of the future? Brian Jenkins of the Rand Corp. recently wrote a provocative article which will be reflected in my effort to respond to this important question.

Up to now the toll of terrorism in dead, wounded, and property damage has been relatively small—notwithstanding all I have said about terrorism's political impact and importance. This is true of all forms of terrorism compared with the casualties and property losses of even the most limited conventional wars.

But it is particularly true of international terrorism. Only a little over 500 people were killed, including terrorists, and some 800 injured in all international terrorist incidents from 1968 through 1974. This is less than the homicide rate of a single major American city.

In the years ahead this may change. New weapons are constantly enlarging terrorists' destructive capabilities. Particularly rapid advances are being made in individual weapons development. With the benefit of miniaturization, a new range of small, portable, easy to operate, highly accurate, and highly destructive weapons are coming into existence.

Such weapons, if they should become available to terrorists, could be employed as effectively against civil aircraft, supertankers, motorcades, and speakers' podiums as against military targets. The Soviet SA-7 heat-seeking, man-portable missile, the equivalent of our Redeye, has already been found in the hands of terrorists, fortunately before it could be used.

And of course there are even more serious hazards. As nuclear power facilities proliferate, the quantity and geographical dispersion of plutonium and other fissionable materials in the world will increase greatly.

The possibility of plausible nuclear terrorist threats based on illicitly constructed atomic bombs, stolen nuclear weapons or sabotage of nuclear power installations can be expected to grow. Even more plausible will be threats based on more readily and economically produced chemical and biological materials, such as nerve gas and germ concentrates.

Would terrorists actually use such weapons? Probably not. They could already have contaminated water supplies, killing thousands, but they have not done so. There are practical arguments against mass murder, which would not necessarily promote the terrorist's objectives and could provoke a damaging backlash. But the possibility of plausible nuclear, CW, and BW threats is real. And though the chances of such threats being carried out are small, the risk will be there and will have to be met.

There is a further danger. Conventional war is becoming increasingly impractical. It is too destructive, it is too expensive, and it usually requires big-power backers which, fearing direct involvement, tend to force a quick cease-fire, before the attacker's purposes can be fully achieved. To avoid these disadvantages, a nation could employ terrorist groups in surrogate warfare against another nation. A government could subsidize an existing terrorist group, or create one of its own, to disrupt, alarm, and subvert a target country. Only a small investment of men and material would be required, far less than for a conventional attack; the venture would be deniable; and the results achieved in the target state might be fully as effective as through a military action.

219

We are in an era in which people are increasingly unwilling to accept authority, and increasingly willing to challenge authority. The atmosphere is similar to the period from 1775 to the mid-Nineteenth century. That era too was marked by widespread revolution in Europe and the Americas directed against existing political and social institutions. Like the last two decades, it saw the dissolution of several empires and the creation of many new states.

But there are important differences between that period and the one on which we now seem to be embarking. One such difference, just noted and most welcome, is the reduced prospect of open warfare, with its high casualties. But another is a prospect of a high level of internal insecurity and political violence by dissatisfied groups using, or threatening to use, against our vulnerable modern societies, the frightening small, or even more frightening mass effect, weapons that I have described. A world of many Ulsters, plus threatened nuclear, chemical or biological terrorist attacks, could be statistically safer for the average man than the world of 150 years ago or, particularly, the world of repeated major conflicts of the past 60 years. But it seems likely also to be a more nerve-wracking and unsettled world of continuing low level violence and threatened mass weapons terrorist attack.

In conclusion, modern terrorism obviously presents complex and serious problems. There are no easy answers. If there is a Middle East settlement the aspects of the problem originating there may diminish. But in various forms not now clear terrorism seems likely to be a growing problem for the world and for the United States. It could become an extremely frightening problem with radiological, biological, and chemical weapons in the hands of international terrorists convinced that the highest morality is the advancement of their cause and quite prepared to die for that cause. A broad international consensus on the seriousness of the problem, and on the necessity for effective action in such matters as the safeguarding of fissionable materials, is essential. We do not want such effective international action to come as a result of some terrible shocks. Our Government is pursuing its efforts, with all the energy and imagination it can muster, both to combat the existing terrorist threat and to avert worse dangers that may lie ahead.

Thank you.

Senator THURMOND. Thank you very much. Do you have any questions?

Mr. SOURWINE. Mr. Chairman, I do have questions, but I am aware of the fact that we have a commitment to be out of the room in 40 minutes. I promise to end the questioning before that time. We will go as far as we can and I will ask now if I may have it from a ruling from the Chair that if there remain unfinished questions, they may be laid into the record and answered when the witness corrects his testimony.

Senator THURMOND. Without objection, that will be done, or else if you wish to take them with you, you may continue that.

Mr. SOURWINE. Well, most of the questions we seek to introduce are of public interest and if we may go as far as we can, it will leave less to go over until we publish the transcript.

I would ask that at this point in the record, sir, that when you correct your testimony you outline the present composition of the

220

Working Group of which you are the head. And at this point, Mr. Chairman, I would like to ask that two chronologies with respect to terrorist activities, one selected events in the barricade-hostage type, and the other being of hijackings being included in the record. They were supplied by the witness.

Senator THURMOND. Without objection, it will be done.

[The composition of the Cabinet Committee To Combat Terrorism follows:]

MEMBERSHIP OF THE WORKING GROUP OF THE CABINET COMMITTEE TO COMBAT TERRORISM

Department of State (Chairmanship).
Department of Treasury.
Department of Defense.
Department of Justice.
Department of Transportation.
Central Intelligence Agency.
Federal Bureau of Investigation.
National Security Council Staff.
Domestic Affairs Council Staff.
US Mission to the United Nations.
Arms Control and Disarmament Agency.
Energy Research and Development Administration.
Federal Protective Service (GSA).
Immigration and Naturalization Service.
Law Enforcement Assistance Administration.
D.C. Metropolitan Police Department.
Nuclear Regulatory Commission.
National Security Agency.
Office of Management and Budget.
United States Information Agency.
Secret Service.

(The first ten departments and agencies listed are the original members of the Working Group.)

Mr. FEAREY. Could I ask permission to refine these chronologies a little? The latter portions were put together a bit hastily and I would like to make them more accurate.

Mr. SOURWINE. Mr. Chairman, I intended to offer at a later time—and maybe I should do it now—the witness' request of other similar data with respect to terrorist activities which the committee has from acceptable sources. I would ask that all of this material be inserted in the record and that there be inserted also a combination and justification of all of this information which could be prepared by the committee staff and I will add the request that the staff consult with the Department of State or Mr. Fearey himself at his election with respect to this before it be finalized.

Senator THURMOND. Without objection, that will be done.

[Subsequently, Mr. Fearey furnished the following revised and updated chronologies of terroristic incidents:]

CHRONOLOGY OF SIGNIFICANT TERRORIST INCIDENTS INVOLVING U.S. DIPLOMATIC/OFFICIAL PERSONNEL

November 1963—Caracas, Venezuela: U.S. military officer kidnapped. The Deputy Chief of the U.S. Military Mission in Caracas was kidnapped by the FALN. He was released six days later.

October 1964—Caracas, Venezuela: U.S. military officer kidnapped. The Deputy Chief of the U.S. Air Mission in Caracas was kidnapped by FALN terrorists. He was released three days later.

221

June 1965—Argentina: U.S. Consul Temple Wanamaker was shot and seriously wounded by unknown assailant.

January 1968—Guatemala: Two U.S. military attachés were killed and two were wounded by terrorists of the Rebel Armed Forces (FAR).

August 1968—Guatemala: U.S. Ambassador John Gordon Mein killed during kidnap attempt.

October 1968—Brazil: U.S. Army Attaché Captain Charles Chandler was killed by terrorists of the Popular Revolutionary Vanguard (VPR).

July 1969—Japan: Secretary Rogers and Ambassador Meyer were attacked at Tokyo International Airport by knife-wielding assailant. Neither were injured.

September 1969—Brazil: U.S. Ambassador C. Burke Elbrick was kidnapped and exchanged for fifteen "political" prisoners.

September 1969—Ethiopia: Consul General Murray E. Jackson was held several hours by Eritrean Liberation Front.

January 1970—Ethiopia: An American soldier stationed in Ethiopia was shot and killed by unknown gunmen. The Eritrean Liberation Front (ELF) was suspected of the shooting.

March 1970—Guatemala: U.S. Labor Attaché Sean Holley was kidnapped by FAR and exchanged for four "political" prisoners.

March 1970—Dominican Republic: U.S. Attaché Lt. Colonel Crowley kidnapped by MPD and ransomed for twenty "political" prisoners who were then flown to Mexico.

April 1970—Brazil: U.S. Consul Curtis C. Cutter was wounded in an unsuccessful kidnapping attempt by VPR terrorists.

April 1970—Ethiopia: Jack Fry, Peace Corps, kidnapped from train. Released five days later.

June 1970—Jordan: Fedayeen terorists entered the homes of U.S. personnel in Aman, searched, looted and raped two U.S. wives.

June 1970—Jordan: Captain Robert Potts, U.S. military attaché, and his wife were slightly wounded by gunfire after their car was stopped by a commando roadblock in Aman.

June 1970—Jordan: Morris Draper, Chief, Political Section was held 22 hours, by PFLP. His release was negotiated by Jordanian Government.

June 1970—Jordan: Seven Americans, including one Foreign Service Officer, were held hostage in two hotels, seized by Fedayeen. They were later released.

July 1970—Uruguay: Tupamaros attempted to kidnap Michael Gordon Jones, Second Secretary to the U.S. Embassy. and Nathan Rosenfeld, the Cultural Attache. Jones was struck on the head with a pistol, wrapped in a blanket, tied and thrown on the back of a pickup truck. Jones managed to escape by throwing himself from the truck while being driven through Montevideo.

July 1970—Uruguay: U.S. Public Safety Adviser Dan Mitrione was kidnapped by Tupamaros. He was murdered on August 10, 1970.

August 1970—Uruguay: Public Safety Officer Spann held by Tupamaros while his car was used in bank robbery. He was later released unharmed.

August 1970—Uruguay: USAID official Dr. Claude Fly was kidnapped by Tupamaros. He was released on March 2, 1971.

September 1970—Jordan: Jon Stewart, Cultural Affairs Officer, and Sgt. Graham, USADAO, were kidnapped by PLA, interrogated and held for 1 day and 8 days respectively and then released.

November 1970—Iran: Ambassador MacArthur evaded kidnap attempt. No injuries, although at least one shot was fired at Ambassador and a hand axe was hurled through the rear window of the limousine.

February 1971—Turkey: An unarmed USAF Security Policeman patrolling the Ankara Air Station was kidnapped by the Turkish People's Liberation Army. He was released after being held for 17 hours.

March 1971—Turkey: Four U.S. Air Force airmen kidnapped by members of the Turkish People's Liberation Army. They were released five days later.

September 1971—Cambodia: Bicycle bomb was directed to car in which Ambassador Swank was traveling to Embassy. Bomb did not detonate.

September 1971—Cambodia: Two Embassy members were killed and ten others wounded when explosive devices were thrown into softball field by terrorists.

May 1972—Frankfurt, West Germany: A bomb at the U.S. Army Headquarters killed one U.S. colonel and injured 13 others. The bomb was placed by the Baader-Meinhof gang.

222

May 1972—Heidelberg, West Germany: Bombs exploded at U.S. Army facility. Two bombs placed in cars exploded at the U.S. Army's European Headquarters. One soldier was killed and two were wounded. The Baader-Meinhof gang was believed to be responsible.

September 1972—Cambodia: Charge Thomas Enders, while traveling by car to the Embassy, was subjected to bomb attack. Enders and party in his car were unhurt.

January 1973—Haiti: Ambassador Knox was kidnapped on road to his residence, taken to the residence and held approximately 18 hours with Ward Christensen, for release of Haitian political prisoners. Knox and Christensen were released unharmed after demands were met and terrorists flew to Mexico.

March 1973—Sudan: Ambassador Noel and DCM Moore were captured and killed at the Saudi Arabian Embassy by Black September Organization terrorists.

May 1973—Mexico: Consul General Terrance Leonhardy was kidnapped on road to his residence in Guadalajara by FRAP guerrilas. He was released after five days when the Mexican Government submitted to demands for the release of 30 prisoners and $80,000 ransom.

June 1973—Iran: A U.S. adviser assigned to the U.S. Army Military Aid and Assistance Group in Tehran was shot to death by two gunmen believed to be members of a radical leftist guerrilla group.

March 1974—Mexico: Vice Consul John Patterson kidnapped from Consulate in Hermosillo. Even though attempt were made to comply with the kidnapper's demands by the family his body found 107 days later near Hermosillo.

April 1974—Argentina: USIA Officer Alfred Laun wounded while being kidnapped by ERP terrorists in Cordoba, Argentina. He was released the same day.

August 1974—Cyprus: Ambassador Roger Davies assassinated during an anti-U.S. demonstration at the Embassy in Nicosia.

September 1974—Dominican Republic: USIA Officer Barbara Hutchison kidnapped as she left her office by dissidents seeking the release of imprisoned comrades. She was released twelve days later after her kidnappers were given asylum in Panama.

February 1975—Argentina: Consular Agent John Egan kidnapped from his home and later found murdered after demands were not met.

May 1975—Iran: Two U.S. Air Force MAAG officers were gunned down on their way to work in Tehran.

### CHRONOLOGIES OF HIJACKINGS—1968 THROUGH 1975

March 5, 1968: Three members of ELN hijacked Colombian airlines plane and ordered it flown to Cuba.

March 21, 1968: Venezuelan airliner hijacked to Cuba.

July 23, 1968: El Al airliner attacked and hijacked to Algeria. Two Palestinians and 1 Syrian released.

October 6, 1968: Mexican airliner hijacked to Cuba by a woman.

November 8, 1968: Olympic airliner jet en route from Paris to Athens hijacked by two Italians to publicize opposition to the military junta in Greece.

November 18, 1968: Mexican airliner hijacked to Cuba by two armed men.

1969: Eduardo Martinez hijacked Avianca jetliner in Colombia to Cuba.

January 7, 1969: An unidentified hijacker seized Colombian airliner on a domestic flight and diverted it to Santiago, Chile.

January 12, 1969: A lone hijacker seized a Peruvian airliner en route from Buenos Aires to Miami and diverted it to Havana, Cuba.

January 10, 1969: Four men armed with guns and dynamite seized Ecuadorean airliner en route from Quito to Miami and diverted it to Havana.

February 5, 1969: Colombian airliner on domestic flight was seized by one person and diverted to Havana.

February 6, 1969: Seven men hijacked Venezuelan airliner to Havana.

February 18, 1969: El Al airliner attacked at Zurich airport. One of the assailants killed; four others sentenced to jail but later released. Four Israeli crewmembers and three passengers wounded. Israeli security guard also tried but acquitted and four Arab PFLP members initially given 12 years hard labor before released.

March 16, 1969: Lone gunman seized Colombian airliner and diverted it to Cuba.

March 17, 1969: Six armed men with guns hijacked Peruvian plane to Havana.

223

April 11, 1969: Three armed men with machine guns hijacked Ecuadorean airliner to Havana.

April 14, 1969: Colombian airliner commandeered in Cartagena, Colombia by three men armed with knives and diverted to Havana.

May 20, 1969: Four armed men seized a Colombian airliner in Bogota and hijacked it to Havana.

June 8, 1969: Two Africans dressed in Portuguese Army uniforms and armed with machine guns and grenades hijacked Portuguese airliner in Angola and diverted it to Point Noire, Congo Republic.

July 26, 1969: Mexican airliner was seized while on a domestic flight by one hijacker and diverted to Havana.

August 12, 1969: Seven Ethiopian students, members of ELF, hijacked an Ethiopian airliner to Khartoum, Sudan.

August 23, 1969: Colombian airliner hijacked to Santiago, Chile by two armed men.

August 29, 1969: TWA airliner hijacked to Damascus by PFLP. Two Palestinians involved never brought to trial. Plane destroyed in Syria who released all but two Israeli passengers who were held for three months by Syrian government.

September 6, 1969: Twelve men and one woman armed with machine guns hijacked Ecuadorean Air Force transport plane to Havana; co-pilot killed and one crew member wounded.

September 13, 1969: Three armed members of ELF hijacked an Ethiopian airliner to Aden, South Yemen.

September 14, 1969: One person seized Honduras airliner on a domestic flight and diverted it to San Salvador, El Salvador.

September 16, 1969: 27 year old Turkish law student hijacked a Turkish airliner to Sofia, Bulgaria.

October 8, 1969: Unidentified hijacker seized a Brazilian airliner while on a domestic flight and diverted it to Havana, Cuba.

October 8, 1969: Aerolinas Argentina airliner was hijacked by a lone terrorist to Havana, Cuba.

Otober 19, 1969: Two East Germans, 24 and 19 years old, hijacked a Polish airliner en route from Warsaw to East Berlin and diverted it to West Berlin.

November 4, 1969: Two armed men seized Nicaraguan airliner en route from Miami to Mexico and diverted it to Havana, Cuba.

Noverber 4, 1969: Brazilian airliner en route from Buenos Aires to Santiago, Chile, was commandeered to Havana, Cuba by a lone hijacker.

January 2, 1970: VAR-Palmares hijack Uruguayan plane to Cuba. Eight Brazilian terrorists involved.

January 9, 1970: TWA Boeing 707 going from Paris to Rome with 20 persons on board was hijacked by one Frenchman, Christian Belon, who said he was protesting US policy in the M.E. In Lebanon, he was arrested and tried—given 9 months in jail; released since he had spent 9 months waiting for trial.

January 25, 1970: Netherlands Antilles plane hijacked. Flown to Cuba.

February 16, 1970: Eastern Airlines plane was hijacked to Cuba.

March 11, 1970: Colombian airliner hijacked to Cuba.

March 11, 1970: United Airlines jet was hijacked to Cuba.

March 12, 1970: Brazilian Varig airliner jet hijacked to Cuba when en route from Santiago, Chile to Buenos Aires.

March 24, 1970: An Argentine airliner hijacked to Cuba.

March 31, 1970: Nine members of Sekigun-ha (Red Army) hijacked JAL to Pyong-yang, North Korea.

April 26, 1970: Brazilian airliner hijacked and ordered flown to Cuba. 37 passengers allowed to disembark at Guyana.

May 1, 1970: British West Indian airliner hijacked by two Americans who demanded to be flown to Senegal after landing in Havana. British and Cubans talked them out of scheme.

May 5, 1970: Czechoslovakian plane hijacked to Austria.

May 13, 1970: Dutch Antilles Airways plane hijacked by eight armed Dominicans and flown to Cuba.

May 21, 1970: Colombian plane hijacked to Cuba.

May 24, 1970: Mexican airliner hijacked to Cuba.

May 31, 1970: Colombian plane hijacked to Cuba.

June 5, 1970: Polish airliner hijacked to Denmark by persons seeking political asylum.

224

June 8, 1970: Czech airliner hijacked to West Germany by persons seeking political asylum.

June 21, 1970: Iranian plane hijacked to Baghdad by three persons seeking asylum.

June 22, 1970: US Pan Am jet bound from Beirut to NY was hijacked by US citizen with an Albanian passport and ordered flown to Cairo.

July 1, 1970: National airlines jet was hijacked to Cuba.

July 12, 1970: Saudi Arabian airliner hijacked to Syria by an individual seeking political asylum.

July 22, 1970: Six Arab guerrillas hijacked Olympic Airways 727 over Rhodes after it had taken off at Beirut; it was flown to Cairo where hijackers demanded release of seven Arabs being held in Greece for 1968 attack on El Al plane, for 1969 attempted hijacking of TWA plane, and for a 1969 attack on El Al office in Athens.

July 25, 1970: Mexican airliner hijacked to Cuba.

July 25, 1970: Three armed Dominicans hijacked to Cuba a Mexican airliner.

August 2, 1970: Pan Am plane—Boeing 707—hijacked to Cuba.

August 19, 1970: Trans-Caribbean Airways jet hijacked to Cuba.

August 20, 1970: Delta airliner jet hijacked to Cuba.

August 24, 1970: TWA jet hijacked to Cuba.

August 31, 1970: Three armed Algerians hijacked an Algerian plane to Albania where Albanian authorities refused to let the plane land. Plane flew to Yugoslavia. Hijackers seeking political asylum.

September 6, 1970: Attempt to hijack El Al airliner from Amsterdam to London to New York. Woman (Leila Khalid—she had earlier participated in TWA plane hijacking to Syria on 8/2-/69) released when plane returned to Great Britain because attack occurred outside British jurisdiction. Male companion (Patrick Arguella, Sandinist Liberation member), killed. PFLP claimed credit.

September 6, 1970: Pan Am, Swissair, and TWA planes hijacked; Pan Am plane flown to Cairo where after passengers released, it was blown up. Other two planes flown to Dawson Field (Revolution Airport) in Jordan where hijackers demanded release of Arab guerillas in Switzerland, UK and West Germany.

September 8, 1970: Two members of ELF attempted a hijacking of an Ethiopian airliner in Athens, Greece but foiled by security guards.

October 9, 1970: Iranian airliner hijacked to Baghdad by Iranian terrorists seeking the release of 21 prisoners held in Iran.

October 15, 1970: Two Lithuanians hijacked a Soviet Aeroflot plane to Turkey where Turkish court judged their crime to be political and ordered them released.

October 22, 1970: Costa Rican airliner hijacked to Cuba; hijackers demanded release of four Nicaraguan guerrillas, members of FSLN, who were being held in Costa Rica. Four released and flown to Cuba, with hijackers.

October 27, 1970: Aeroflot plane hijacked to Turkey by two Soviet students seeking asylum.

October 30, 1970: National Airliner jet hijacked to Cuba.

November 1, 1970: United Airlines hijacked to Cuba.

November 13, 1970: Eastern Airlines hijacked to Cuba.

January 3, 1971: National Airlines plane hijacked to Cuba.

January 21, 1971: Four armed men hijacked Ethiopian airliner to Libya. ELF denied responsibility.

January 22, 1971: Northwest Airliner jet hijacked to Cuba.

January 23, 1971: South Korean attempted to hijack plane to North Korea; but, plane forced to make emergency landing when hijacker forced his way into cockpit by exploding two hand grenades.

February 2, 1971: Two armed Kashmiri nationalists hijacked Indian airlines plane to Pakistan where they demanded release of 36 prisoners held in Kashmir by Indian government. GOI refused; hijackers after clearing the plane proceeded to blow it up.

February 4, 1971: Delta airlines jet hijacked to Cuba.

March 30, 1971: Six members of Philipine leftist organization hijacked a domestic flight to China.

March 31, 1971: Eastern Airlines jet hijacked to Cuba.

May 27, 1971: Rumanian National airlines plane was hijacked to Vienna, Austria, by six armed men who were seeking political asylum.

July 2, 1971: American citizen, Robert Lee Jackson, and Guatemalan, Ligia Lucrecia Sanchez Arcilla, hijacked a Braniff plane in Mexico. In Monteray, they received $100,000 from Braniff official in exchange for release of passengers.

225

Plane with crew and hijackers then flew onto Lima, Peru and Rio de Janiero where police tried to arrest hijackers but failed. Plane finally flew to Buenos Aires where GOA refused to negotiate with hijackers and surrounded the plane with 300 policemen. Hijackers finally gave in after 16 hours.

July 24, 1971: National Airlines jet was hijacked to Cuba.

September 8, 1971: Attempted hijacking of ALIA to Bengazi by one Fatah member.

October 4, 1971: Attempted hijacking of ALIA to Beirut by one Fatah member who was killed.

October 25, 1971: American airlines 747 hijacked to Cuba.

November 27, 1971: Three armed men claiming to be members of the "Republic of New Africa" hijacked a TWA jet to Cuba.

December 26, 1971: Air Canada jet hijacked to Cuba.

February 22, 1972: Hijacking of Lufthansa plane to South Yemen by PFLP; hijackers set free in Aden after $5 million paid for the release of the plane; W. German government paid this money for passengers release.

April 18, 1972: 2 Czech miners hijacked a Czech airliner to Nurenburg, Germany.

May 3, 1972: 4 Turkish students claiming to be members of TPLA hijacked a Turkish airliner to Bulgaria.

May 8, 1972: Sabena airlines en route from Vienna to Tel Aviv hijacked by 4 BSO members who forced plane to be flown to Lod Airport in Israel. Hijackers demanded release of 317 Palestinians being held by Israelis. Israel negotiated with hijackers; but, meanwhile, Israeli paratroopers came aboard disguised as mechanics. They burst through doors and killed 2 of the hijackers and wounded a third. 5 passengers wounded in fight with one dying later.

May 24, 1972: 2 Lebanese hijacked a South African plane. They attempted to extort money from a mining company, but after forcing the plane to Blantyre, hijackers were over-powered there. In Milawi, they were given 11 years in jail.

June 3, 1972: One hijacker claiming to be a member of the Black Panther Party seized a Western Airlines jet and ordered it to be flown to Algiers after collecting $500,000 ransom. Algeria later returned the ransom money.

June 8, 1972: Czech airliner hijacked by a group of persons to W. Germany where they requested asylum.

July 2, 1972: Pan Am airliner was hijacked by a S. Vietnamese student shortly after takeoff from Saigon. Hijacker wanted a plane flown to Hanoi. He was killed by another passenger.

July 31, 1972: Hijackers claiming to be sympathizers of the Black Panthers took over a Delta Airlines jet over Florida, directing plane to Algeria after collecting $1 million. Upon arrival, the Algerian authorities impounded the ransom money and took hijackers into custody. Hijackers released on 8/4. Ransom later returned to Delta.

August 15, 1972: 6 ERP escape jail and hijack plane to Chile were given political asylum and allowed to go to Cuba. Another 16 of the escapees recaptured and killed in alleged escape attempt.

August 22, 1972: Southern Yemeni DC-6 airplane en route from Beirut to Cairo hijacked by three armed men who said they were members of a group called the "Eagles of National Unity." Plane flew to Benghazi, Libya where the hijackers requested asylum.

September 15, 1972: 3 Croatians hijacked plane and demanded release of 6 Croatians who were serving life sentences for murdering Yugoslav Ambassador in 1972 in Sweden. Demands met—all flown to Spain where 6 terrorists released after Swedish attempts at extradition failed. 6 presently in Asuncion, Paraguay, and free. 3 hijackers still in Spain awaiting disposition of their case by Spanish government.

October 29, 1972: Hijacking of Lufthansa plane en route from Beirut to Ankara by members of BSO and ordered to be flown to Munich. Hijackers threatened to blow up plane unless W. German government agreed to release 3 BSO members held for Munich attack. Plane kept flying until prisoners released and landed at Zagreb, Yugoslavia where hijackers then landed and picked up 3 terrorists. All flew to Tripoli, Libya where they were released.

November 8, 1972: 4 members of the "Armed Communist League," a small guerrilla group hijacked a Mexican airliner. They demanded 5 imprisoned guerrillas, government promise to drop charges against 2 fugitives who joined them, and $330,000 in ransom. The GOM complied and plane flew to Cuba, where 11 guerrillas granted asylum by Government of Cuba.

December 8, 1972: 7 Ethiopian students attempted to hijack Ethiopian plane shortly after take-off from Addis Ababa.

226

January 26, 1973: Heavily armed man shot to death after seizing 5 hostages in an abortive attempt to hijack plane at Calri Airport in Corsica. Man reportedly a French Legionnaire.

April 23, 1973: Attempt made to hijack Aeroflot flight bound from Leningrad to Moscow. Hijacker exploded device which killed him and the pilot (co), but the airplane returned safely to Leningrad.

May 18, 1973: 4 members of the "People's Revolutionary Army (Zero Point) a leftist organization hijacked a Venezuelan airlines plane and ordered it flown to Curacao, Panama City, Merida in Mexico, and then Mexico City. Hijackers then demanded the release of 79 prisoners held in Venezuela, but the GOV rejected it. Hijackers accepted the offer of safe passage and flew to Havana where they were taken into custody.

May 30, 1973: Colombian airliner hijacked by 2 men who ordered the plane flown first to Aruba, then to Ecuador, and then to Peru, Argentina, finally Paraguay. Hijackers demanded the release of 47 imprisoned guerrillas and $200,000; the government of Colombia refused both demands. Hijackers accepted $50,000 instead and escaped.

June 10, 1973: Royal Nepal Airlines plane was hijacked while on a domestic flight by 3 armed men one of whom was identified as a leader of a Nepalese student organization connected with the Nepalese Communist Party. The plane was carrying a bank shipment of approximately $4,000,000 which the hijackers seized. Plane flown to India where the hijackers escaped.

July 4, 1973: Man claiming to be member of ERP hijacked Argentine plane and ordered it flown to Santiago, Chile, then Cuba. He demanded $200,000 be paid to charitable organizations—these demands were refused, and hijacker was offered asylum in Cuba.

July 20, 1973: JAL Boeing 747 hijacked from Amsterdam to Dubai by 1 Japanese and 3 Arabs demanding release of Lod terrorist Kozo Okamoto and $5 million. Demands denied and plane flew on to Benghazi where passengers were released and plane destroyed.

August 16, 1973: Libyan Mohammed Ahmed Altoumi hijacked Lebanese plane to Israel where he was imprisoned and sentenced to unknown term.

October 11, 1973: 3 Filipinos hijacked a plane in the Philippines and flew it to Hong Kong with the President of the airlines Benigno Toda as hostage. Hijackers surrendered their arms and returned to the Philippines in exchange for amnesty.

October 18, 1973: Danielle Francoise Cravenne Nee Batisse attempted to hijack plane in Marseille but was killed by a security officer.

October 20, 1973: Argentine Airlines 737 jet bound from Buenos Aires to Salta was hijacked by 4 armed terrorists who claimed to be Tupamaros. Plane eventually ended up in small Bolivian border town of Yacuiba and after 2 days of negotiations, hijackers surrendered to GOB after accepting offer of safe conduct to Cuba in exchange for hostages.

November 25, 1973: 4 Palestinians, belonging to the Arab National Youth for the Liberation of Palestine, hijacked a Royal Dutch KLM jumbo jet which they flew first to Damascus and then to Nicosia, Tripoli and Malta. All 247 passengers and 17 crew members were released unharmed on November 27, 1973 after hijackers were offered safe passage guarantee to Dubai.

March 3, 1974: 2 guerrillas—Adman Ahmad Nuri and Sami Hussin Taiman, were sentenced to 5 years in prison for hijacking a British VC-10 on its way from Bombay to London. Guerrillas planted explosives and ordered plane to land at Amsterdam's Schipol Airport where they freed 92 passengers and 10 crew members before blowing up the plane and being taken prisoner by Dutch security forces.

March 15, 1974: Police arrested 6 Arabs after they attempted to smuggle arms and explosives aboard a Dutch KLM jumbo jet at Beirut International Airport. One of the suspects was Lebanese employee of KLM. His 5 alleged accomplices carried Jordanian, Egyptian and Yemeni passports. FOLLOW UP: PFLP responsible. 2 of those involved are suspected repeaters—Mahmud Subhi Albal'US, Palestinian refugee from S. Lebanon, and Husayn Nasvi Al-Kebir, (Abu Mu'tarzz), Palestinian refugee from Syria—they may have been involved in November 26, 1973 KLM hijacking. Leader of group, Fawzi Darwish is Fedayeen also.

March 20, 1974: East African airplane hijacked en route to Mombasa from Nairobi landed in Entebbe, Uganda where passengers released and Amin negotiated with hijacker. Hijacker appeared to be Arab who was armed with gun and threatened to blow up plane if demand to go to Libya via Khartoum not met. He subsequently surrendered in Entebbe. Uncertain whether 2 were arrested or not.

227

July 19, 1974: Akira Iwakoshi, JRA, hijacked a JAL airliner en route from Osaka to Tokyo. Negotiations at Osaka were unsuccessful as the hijacker forced the plane to take off; however, it had to refuel in Najoya where the passengers managed to escape. Hijacker then tried to commit suicide, but was captured and arrested.

July 22, 1974: Pleasure boat named Spook hijacked by Clifford Thomas and his wife Patrice Ann McRary with their two children. Captain of boat Captain Earl Werner Widner—and one crew member—Molly Christine de Witt—forced to take seajackers to Havana after leaving Key West, Florida. Captain and one crew members allowed to return and 4 seajackers to be turned over to competent course to be tried in accordance with Cuban law for most severely penalized offense in accordance with the acts they had committed.

July 24, 1974: A couple and an infant (female carrying gun) hijacked a Colombian plane and upon landing, hijacker was overpowered, shot and killed. Female accomplice Mercedes Forero de Suarez currently serving prison term in Colombia.

Septemper 4, 1974: 20-year old black man attempted to hijack an Eastern Airlines shuttle from New York after landing at Boston with a nail spike and a razor. Demanded $10,000 to be paid to the people of the Roxbury ghetto and a transport to La Guardia field. After approximately 3 hours, the young man surrendered to police and FBI. Marshall Collins III of Providence arrested and charged with air piracy.

September 14, 1974: Le Duc Tan, a Major in the South Vietnamese Army attempted to hijack a 727 South Vietnamese airliner enroute to Saigon from Da Nang to Hanoi, but when the pilot attempted a landing at Phan Rang, the 34 year old terrorist detonated 2 hand grenades thereby exploding the aircraft which then crashed killing all 68 persons on board, including the skyjacker. One or possibly two Americans are believed to have been on board.

January 7, 1975: An armed man in an Arab headdress commandeered a British Airway jetliner as it landed at Heathrow Airport, London, and said he would blow it up with himself and five crew members unless he could take off for Paris with $230,000 and a parachute. Before plane took off he was overpowered by security guards and is currently on trial.

February 23, 1975: A Yemeni Airways DC-3, while on a routine domestic flight, was hijacked by a Yemeni passenger who held the pilot at gunpoint and forced him to fly north. The pilot requested permission to land at Qizan, Saudi Arabia, for refueling. Saudi security officials were able to arrest the hijacker during the refueling. They accompanied the hijacker and crew, in the hijacked plane, to San'a international airport and turned him over to Yemeni authorities. He was sentenced to life imprisonment in March 1975.

March 1, 1975: 3 armed men, all apparently Kurdish sympathizers, hijacked an Iraqi Airways plane on a domestic flight and diverted it to Tehran. A passenger was shot to death and 10 persons, including one hijacker, wounded in the gun battle between the hijackers and Iraqi security officers aboard the plane. The hijackers surrendered to Iranian authorities after forcing the pilot to land in Tehran, and were executed on March 20, 1975.

Mr. SOURWINE. Mr. Fearey, it has been said, not here today, that the Cabinet Committee to Combat Terrorism considers terrorism as violent attacks or threats by politically motivated or mentally disturbed individuals or groups against innocent bystanders who fall under our particular responsibility.

Would you concur with that definition?

Mr. FEAREY. Yes, I think broadly that does describe the situation.

Mr. SOURWINE. Does it go far enough? Is it not a little bit limited? Does the violent act have to be performed either by a politically motivated group or by mentally disturbed individuals in order to be terrorism?

Mr. FEAREY. As I mentioned earlier, I think frequently in the terrorist you have a combination of the political, the criminal and the mentally disturbed.

Mr. SOURWINE. And it is questionable whether the word "political" is broad enough, is it not? You could have in theory terrorist ac-

228

tivities by a group of strikers, terrorist activities by a religious group, and so on.

Mr. FEAREY. That is right. Yes, sir. The important point, in the Cabinet Committee's working definition of terrorism which you have cited, is that the terrorist act occur and that it affect, say one of our Foreign Service people abroad. Whether it occurred from a political motivation or whatever, we would be concerned at once.

Mr. SOURWINE. And of course this definition embraces the particular interst of the Government, but actually terrorism does not have to be against an innocent bystander, does it?

Mr. FEAREY. No; though it typically is. I would regard an Ambassador serving at his post, for example, as an innocent object of a terrorist attack, though not completely a bystander.

Mr. SOURWINE. Nor does it have to be against a person who falls under your group's protective responsibility in order to be terrorism.

Mr. FEAREY. No.

Mr. SOURWINE. Can you tell us who or what organization or organizations provides intelligence for the campaign against terrorism?

Mr. FEAREY. We have represented on our working group a number of agencies that are concerned with this activity, notably, of course, the CIA, the State Department itself, the NSA, and the FBI. of course, would be a very important one.

Mr. SOURWINE. Would you say that all of the intelligence gathering agencies of the Government, including those which only occasionally come into the possession of intelligence are available to you insofar as they have produced or can produce intelligence that would be useful to your effort?

Mr. FEAREY. Yes. The original directive from President Nixon called for cooperation by all arms of the Government in order to further the objectives of the Cabinet Committee.

Mr. SOURWINE. I want to clear up one small point. Who is the present terrorism coordinator of the Department of State?

Mr. FEAREY. I am, sir.

Mr. SOURWINE. So, as you said, you wear two hats and in that capacity do you have, for instance, authority over the Executive Protection Service?

Mr. FEAREY. No, sir. My role is coordinating.

Mr. SOURWINE. You have no rule over the Secret Service?

Mr. FEAREY. No, sir.

Mr. SOURWINE. But there is within your working group as a representative of the Cabinet Committee a person under whom these various smaller organization come so that your coordination can be pretty effective, can it not?

Mr. FEAREY. Yes. All of these organizations to the extent their work relates to terrorism, are enjoined by the original letter setting up the structure to work in and through this committee on this topic.

Mr. SOURWINE. I guess what I am trying to get at is whether within the working group you have complete cooperation or whether there is some pulling and hauling between or among agencies.

Mr. FEAREY. No, sir. Of course I am quite new to the activity but my impression is that there has been very good cooperation in the committee.

229

Mr. SOURWINE. In respect to intelligence, of course that is extremely important, that is a sine qua non of any effective action in this area, is it not?

Mr. FEAREY. Yes, sir.

Mr. SOURWINE. Can you tell us if Interpol is taking any special steps with respect to terrorism?

Mr. FEAREY. Not special steps, to my knowledge. The scope of its information role includes people charged with terrorism.

Mr. SOURWINE. Is Interpol a law enforcement agency?

Mr. FEAREY. My understanding is that it is an agency for the interchange of information about international criminals.

Mr. SOURWINE. It is neither a law enforcement agency nor an investigating agency, is it?

Mr. FEAREY. That is my understanding. Yes, sir.

Mr. SOURWINE. Is it possible to combat terrorism without the keeping of substantial files and the correlation and coordination of those files, as the previous witness spoke of?

Mr. FEAREY. Files are very important. There have by now been many hundreds, indeed thousands, of terrorist incidents, the greatest number being bombings. And so to keep track of the incidents, the individuals, and the groups involved, the files are very important.

Mr. SOURWINE. You have to have intelligence, and adequate intelligence, about existing terrorist groups, do you not?

Mr. FEAREY. Yes, we do.

Mr. SOURWINE. And their activities?

Mr. FEAREY. Yes, we do.

Mr. SOURWINE. And about terrorist individuals?

Mr. FEAREY. Yes, we do.

Mr. SOURWINE. And about methods of operations, past, present, and future and about the past activities of certain groups and individuals?

Mr. FEAREY. Yes.

Mr. SOURWINE. And about the contacts between and among groups and individuals?

Mr. FEAREY. That is important.

Mr. SOURWINE. And about the plans and objectives of terrorist groups and terrorist leaders and sometimes terrorist individuals?

Mr. FEAREY. To the extent that we can learn them.

Mr. SOURWINE. Do you seek police cooperation in the gathering of this intelligence?

Mr. FEAREY. One of the members, in addition, of course, to the FBI member, of our working group is Deputy Chief Rabe of the D.C. Metropolitan Police Department. We have close cooperation there.

Mr. SOURWINE. Well, perhaps I did not phrase it correctly. It would seem obvious that if you had a particular terrorist incident, you must have police cooperation in the area of the incident, but I mean do you seek to establish and maintain a degree of liaison which would make available to you police intelligence in this whole area all of the time?

Mr. FEAREY. May I ask Mr. Gatch to comment on that?

Mr. SOURWINE. Certainly, if you wish you can reserve the question and answer.

230

Mr. GATCH. No, we do have police intelligence available to us, through the FBI which, as Mr. Fearey said, is a member of our working group.

Mr. SOURWINE. You do not do it directly but you maintain it through the Bureau?

Mr. GATCH. Yes, sir.

Mr. SOURWINE. Is there anything secretive, or classified secret or confidential, with respect to U.S. policy in dealing with terrorism?

Mr. FEAREY. Our policy is basically quite open.

Mr. SOURWINE. You touched on that in your statement. Is there a definitive policy paper in this area which could be furnished to the committee and made a part of our record?

Mr. FEAREY. The paper as a whole is classified confidential, but, as I indicated, we would be glad to respond to questions.

Mr. SOURWINE. If it would not be out of order, sir, would you be willing to look into the prospect of sanitizing that so that you can give us a summary or something that we could use to represent that policy in the record, and with the permission of the Chair, we will include it.

Senator THURMOND. So ordered.

Mr. FEAREY. Yes, we will be glad to study that.

Mr. SOURWINE. Has consideration been given to the various kinds of demands that terrorists are likely to make?

Mr. FEAREY. Yes. This, of course, is a very important part of our whole effort to deal with the problem. As you know, demands often include release of comrades in jail, other terrorists.

Mr. SOURWINE. You mentioned these. I assumed the answer would be yes but I was laying the foundation for another question.

Mr. FEAREY. Right.

Mr. SOURWINE. Have you set specific guidelines on how respective kinds of demands are to be answered?

Mr. FEAREY. Yes. We recognize that each terrorist incident is unique and must be dealt with as a unique, special situation. There is no guideline that can apply automatically. But we do have guidelines which assist our efforts to deal with each incident as it comes up.

Mr. SOURWINE. Can those guidelines be supplied to the committee for this record?

Mr. FEAREY. They are part of this document that I mentioned which is confidential but we will be studying to see if this can be done.

Mr. SOURWINE. There would not be anything confidential about those guidelines themselves, considered as separate from the classified document?

Mr. FEAREY. I would want to study them, sir, to make sure.

Mr. SOURWINE. You will do the best you can?

Mr. FEAREY. Yes, sir.

[The material referred to follows:]

U.S. GOVERNMENT POLICY GUIDELINES FOR DEALING WITH TERRORISM IN THE UNITED STATES HAVING INTERNATIONAL ASPECTS OR IMPLICATIONS

1. The US Government seeks to maintain firm, effective and consistent anti-terrorist policies at home and abroad.

2. We seek to exert leadership, by example and by diplomacy, in attempting to find collective solutions to this international problem.

231

3. The US Government is committed to pursue legal remedies in dealing with terrorists and endeavors to influence other governments to do likewise.

4. Under principles of customary international law, the host government of a country where an act of terrorism occurs is responsible for providing protection to foreign nationals within its territory, including securing their safe release from captors.

5. Accordingly, in an incident in the US involving foreign nationals, the US Government undertakes negotiations to secure the release of hostages. The FBI, under guidance from the Attorney General, has clear responsibilities in this effort, in collaboration with other law enforcement agencies. The Department of State exercises responsibilities in any aspects touching on relations with other governments.

6. The US Government does not pay ransom, release prisoners or otherwise yield to blackmail by terrorists groups.

7. We establish effective communication with terrorists whose hostages are under US protective responsibilities, avoiding hard and fast positions, except as noted above, while seeking to reduce, or ideally to terminate, danger to hostages.

8. The US Government generally opposes but cannot prevent foreign governments, private individuals, or companies from meeting terrorists' demands, including payment of ransom.

9. The US Government adheres to the principle that a terrorist should be prosecuted for criminally defined acts of terrorism within the country of commission or be extradited to a country having appropriate jurisdiction to try the offender.

10. While political motivations such as the achievement of self-determination or independence are cited by some individuals or groups to justify terrorism, the US rejects terrorism in any circumstances. Political objectives should be addressed in appropriate forums rather than by resort to violence against innocent bystanders.

11. The US Government seeks the reduction or elimination of the causes of terrorism at home and abroad, including legitimate grievances which might motivate potential terrorists.

U.S. GOVERNMENT POLICY GUIDELINES FOR DEALING WITH TERRORISM INVOLVING AMERICAN CITIZENS ABROAD

1. The US Government is concerned with the security of American citizens no matter where they may be, even though primary legal responsibility for their protection rests with the country in which they are located. The US Government, as employer, has an additional protective responsibility for its employees caught in terrorist situations. If terrorists seize Americans abroad, our Government reminds the host government of its primary responsibility to cope with such terrorists and to effect the safe release of the American hostages, whether they enjoy diplomatic status or otherwise. Early agreement is sought with the host government on that objective: the safe return of the hostages by whatever means may be appropriate and if possible without providing an incentive for future terrorism.

2. The US Government establishes close contact with the host government and supports it with appropriate resources to help achieve that objective. We look to the host government to conduct negotiations with the terrorists but reserve the right to counsel that government on all aspects of the rescue operation. If demands are made on the US Government, it will normally respond through the negotiating host government.

3. Should the matter of a monetary ransom arise, the US Government would make known to the host government that, as a matter of policy, it does not pay such money. While we believe that other governments, companies, and individuals should follow suit, the US Government has no legal means to restrain such parties if they choose to do otherwise.

4. The wishes and rights of the hostage's family or employer are borne in mind by the US Government, which seeks to harmonize them with those of the host government within the context of established policy considerations.

5. During and following an incident, the US Government uses every appropriate influence to induce governments to adhere to the principle of arrest or extradition of terrorists. The full resources of our Government are used to pursue such terrorists and to see that they are brought to justice. The broadest multilateral cooperation is sought toward these ends in the UN, ICAO, and other appropriate forums. The US Government seeks to ensure that bilateral agreements, such as the US-Cuba accord of February, 1973, and traditional extradition treaties, include effective legal deterrents to terrorism.

232

6. The US Government seeks to identify the causes of international terrorism and to remove them. When such causes are within the domain of other governments, our influence is restrained by the principle of non-interference in the internal affairs of another country, and by other interests which the US Government may be obliged to protect in those countries. At the same time, we reserve the right to criticize other governments if they show irresponsibility in transferring international terrorists to the international community in cases which do not involve probable further bloodshed.

7. The US Government wishes to share its counter-terrorism techniques with other governments. It also seeks, for anti-terrorist and other reasons, to encourage the development of societies striving for social-political-economic justice, thereby reducing legitimate grievances and the potential for terrorism.

Mr. SOURWINE. Does the U.S. policy ever permit the United States to release prisoners in response to the demands of terrorist groups? It may be that you answered that in your general statement, but I think this is a little tighter question.

Mr. FEAREY. Our position is one of clear opposition and unwillingness to release alleged political prisoners. Actually, of course, we have very few such people in the United States.

Mr. SOURWINE. Depending upon who describes the prisoners. Certain groups will describe all prisoners who ever were or are members of their bodies, or even associates or collaborators with them, as political prisoners.

Mr. FEAREY. I would not attempt to estimate how many we have. One of course that has been cited is Sirhan Sirhan, and his release was one of the original demands of the terrorists that kidnaped our people in Khartoum, but then that demand was dropped.

[Pause.]

Mr. FEAREY. Mr. Fields has made one point, and could I insert in the record that I am also accompanied by Mr. Louis Fields, who is the counsel for the working group. A member of the Department of State, he is Assistant Legal Adviser for Special Functional Problems in the Department.

He reminds me, and I said I would mention, that we have no political prisoners convicted as such in this country.

Mr. SOURWINE. That is true. That is why I said that depends on who classifies them. You get a man like Sirhan Sirhan. He is called by terrorist groups a political prisoner.

Mr. FEAREY. Right.

Mr. SOURWINE. We are very grateful to have your counsel with us and we are very grateful for any light he sheds.

Mr. FEAREY. He has just proved his value.

Mr. SOURWINE. This advice to businessmen that we talked about earlier, I suppose you keep it up to date or revise it periodically?

Mr. FEAREY. Yes, we do.

Mr. SOURWINE. Well, if you are able to give us a copy, get us the latest copy, will you?

Mr. FEAREY. Yes, sir.

Mr. SOURWINE. Mr. Fearey, as a result of the murder of a U.S. diplomat—as a matter of fact plural, U.S. diplomats—in the Sudan, Congress appropriated nearly $20 million to improve security at U.S. diplomatic and consular establishments. You spoke of that. How much of this money has been spent and what did we get for it? And perhaps you would not want to answer that question off the cuff but would like to prepare an answer.

233

Mr. FEAREY. For a full and detailed answer I would like to reply subsequently for the record.

Mr. SOURWINE. Well, this is not an appropriations committee and we do not require a complete accounting, but we would like to have an answer which in the State Department's judgment is adequate.

Mr. FEAREY. The Office of Security is basically responsible there and we will take that up with them.

Senator THURMOND. It will be included in the record when received.

DISTRIBUTION OF TERRORISM SECURITY FUNDS APPROPRIATED TO THE DEPARTMENT OF STATE FISCAL YEARS 1974 AND 1975

The attached schedule shows the distribution of Terrorism funds by function and geographic area for both FY 1974 and 1975. These funds have been used to recruit, train, and assign the personnel authorized by the FY 1974 Supplemental for Terrorism, and to pay their continuing costs. The Terrorism Supplemental provided for the following staffing:

Washington:
Security_____ 75
Communications_____ 14

    Subtotal_____ 89

Overseas Americans:
Regional security officers_____ 38
Technical security officers_____ 17
Clerical personnel_____ 27
Communications_____ 14

    Subtotal_____ 96

    Total Americans_____ 185
Locals_____ 16
This staff has been assigned as follows:

|      | Americans | Locals |
|------|-----------|--------|
| AF   | 18        |        |
| ARA  | 14        |        |
| EA   | 17        |        |
| EUR  | 22        |        |
| NEA  | 25        | 16     |
| SY   | 75        |        |
| OC   | 14        |        |
| Total | 185      | 16     |

The budget also provided for 432 Marine Security Guards; 210 for new complements, 172 for increasing existing complements and 50 for special body guard details; an additional 30 Seabees, 6 armored vehicles, 20 follow cars and 45 carryalls. In addition, funds authorized under this program have been used to reimburse the Secret Service for protecting the Secretary of State.

234

ANALYSIS OF TERRORISM BY FUNCTION, FISCAL YEAR 1974 AND 1975

| | AF | ARA | EA | EUR | NEA | OC | S | SY | OPR | Am. sal. int. travel | USIA | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Marine guards: | | | | | | | | | | | | |
| 1974 | 426,250 | 317,440 | 99,100 | 67,600 | 302,800 | | | 81,400 | | | | 1,324,590 |
| 1975 | 320,700 | 103,588 | 160,200 | 111,400 | 401,000 | | | 62,000 | | | | 1,158,888 |
| Local guards: | | | | | | | | | | | | |
| 1974 | 524,000 | 433,977 | 191,300 | 455,100 | 149,000 | | | | | | | 1,764,377 |
| 1975 | 646,200 | 914,119 | 533,000 | 772,830 | 260,000 | | | | | | | 3,186,119 |
| Protection vehicles: | | | | | | | | | | | | |
| 1974 | 4,942 | 11,229 | | 7,200 | 4,003 | | | | | | | 1,182,310 |
| 1975 | | 14,241 | | | | | | | | | | 513,541 |
| Building security: | | | | | | | | | | | | |
| 1974 | 1,034,480 | 108,103 | 286,400 | 30,500 | 408,502 | | | 128,774 | 1,037,365 | | | 1,862,983 |
| 1975 | 218,303 | 3,490 | 10,000 | 35,200 | 42,000 | | | 142,500 | 395,600 | | | 453,700 |
| Terrorism staff: | | | | | | | | | | | | |
| 1974 | 627,500 | 59,035 | 117,820 | 83,830 | 385,603 | 2,934,274 | | 25,000 | | 997,990 | | 3,590,314 |
| 1975 | 411,700 | 165,020 | 122,600 | 200,030 | 502,003 | 852,630 | | 146,800 | | 3,294,100 | | 4,972,020 |
| Communications: | | | | | | | | | | | | |
| 1974 | 95,330 | 4,570 | 67,700 | 5,730 | 32,703 | | | 1,318,679 | | | | 3,140,274 |
| 1975 | 56,600 | | 47,600 | 400 | 32,003 | | | 276,600 | | | | 939,200 |
| Special protection: | | | | | | | | | | | | |
| 1974 | | | 19,020 | 1,705 | | | 930,846 | 457,785 | | | | 1,457,631 |
| 1975 | | | 13,500 | | | 92,726 | 1,000,000 | 544,400 | | | | 1,559,600 |
| Physical security and other: | | | | | | | | | | | | |
| 1974 | | 83,927 | 37,500 | 119,322 | 85,500 | | | 3,938,284 | | | | 4,400,237 |
| 1975 | | 19,652 | 46,830 | 10,003 | | 24,100 | | 823,000 | | | | 925,532 |
| USIA: | | | | | | | | | | | | |
| 1974 | | | | | | | | | | | 957,284 | 957,284 |
| 1975 | | | | | | | | | | | 979,000 | 979,000 |
| Total: | | | | | | | | | | | | |
| 1974 | 2,682,502 | 1,654,281 | 854,870 | 773,030 | 1,355,100 | 3,027,000 | 930,846 | 5,949,922 | 1,037,365 | 957,900 | 957,284 | 19,700,000 |
| 1975 | 1,653,500 | 1,220,000 | 933,700 | 1,138,763 | 1,239,000 | 876,703 | 1,000,000 | 1,937,350 | 345,600 | 3,294,100 | 979,000 | 14,737,600 |

235

Mr. SOURWINE. The U.S. Ambassador and his deputy in Khartoum were killed by terrorists. Have those terrorists been brought to justice?

Mr. FEAREY. They were tried in the Sudan and subsequently released to the PLO and they are presently incarcerated in Egypt.

Mr. SOURWINE. Are we satisfied with the situation?

Mr. FEAREY. No, we are not.

Mr. SOURWINE. Are we doing anything about it?

Mr. FEAREY. We have done all we could, I think, in terms of expressing our great disappointment over the disposition of these people. To the Sudanese Government we have made it very clear, I believe, that these people should serve their full sentences and not be released under any circumstances until the sentences are complete.

Mr. SOURWINE. Is there any prospect they will serve their sentences?

Mr. FEAREY. I hope a good prospect. We had an incident on which my associates here can provide more details, where there was a demand for the release of the Khartoum murderers in connection with a highjacking in Tunis, and it was rejected by the Egyptian Government.

Mr. FIELDS. That is correct, last August.

Mr. FEAREY. They insisted on holding them.

Mr. SOURWINE. Is terrorism growing in Latin America?

Mr. FEAREY. Terrorism is at high levels in certain portions of Latin America, notably Argentina.

Mr. SOURWINE. You mean higher than more recently?

Mr. FEAREY. I would hate to characterize it as higher or lower than in the past. I would just like to characterize it as being high.

Mr. SOURWINE. Well, you did use the word "high," and I wondered what you meant, higher than it was or higher than it could be?

Mr. FEAREY. I was referring to, say, 2 or 3 years ago.

Mr. SOURWINE. I was asking about the trend, not the present high point, but the trend. Is it upward? Is terrorism increasing?

Mr. FEAREY. If you look at a number of countries, the ones that have been particularly subject to terrorism, including Brazil, Uraguay, as well as Argentina, I would say that it is down overall because in Uraguay and Brazil, notably, they have been very effective in smashing terrorist organizations.

Mr. SOURWINE. Are U.S. citizens and especially U.S. diplomats popular targets for Latin American terrorists?

Mr. FEAREY. In Argentina part of the position of terrorists is that the Americans should be driven out of Argentina.

Mr. SOURWINE. Are there some other feelings elsewhere, to your knowledge?

Mr. FEAREY. Anti-Americanism is an important part of the terrorist creed and position in several areas.

Mr. SOURWINE. If you want to expand your testimony when you correct your testimony, please do so. I do not press these questions because we are working to a time limit.

Mr. FEAREY. Right, sir.

Mr. SOURWINE. Are Customs procedures all they should be to protect against terrorism insofar as they can have a hand in it?

Mr. FEAREY. One of the areas through which we have attempted to deal with the terrorist problems is Customs, yes, sir.

236

Mr. SOURWINE. Do you feel that you have been entirely successful in the Customs area?

Mr. FEAREY. I think that we have been quite successful.

Mr. SOURWINE. How about visa procedures?

Mr. FEAREY. Visa procedures also have been utilized in the effort to counter terrorism.

Mr. SOURWINE. There are some shortcomings in the visa procedures; are there not?

Mr. FEAREY. We can never hope to have perfect results, sir.

Mr. SOURWINE. How about immigration?

Mr. FEAREY. Yes; this has been an important focus of the attention in the working group.

Mr. SOURWINE. And there is much to be desired; is there not?

Mr. FEAREY. I would again turn to Mr. Gatch.

Mr. SOURWINE. I am not trying to get you to criticize somebody else; but insofar as we discuss this overall view of responsibility, I do not think you can be criticized for answering the question.

Mr. FEAREY. My own knowledge, because of my brief tenure, does not go into detail as to how well this has gone, but my impression is that we have set up effective procedures in all of these areas which are basically working but can never be perfect.

Mr. SOURWINE. Well, how many Cubans did we bring in?

Mr. FEAREY. I would like to submit that figure subsequently, if I can.

Mr. SOURWINE. I can answer it but I would rather have you answer it for the record.

Did we have adequate security screening in all cases?

Mr. FEAREY. Again, I would like to look into that.

Mr. SOURWINE. As a matter of fact, are there not some thousands of Cubans in this country now who are part of the Castro network which will become terrorist if the Communists so desire?

Mr. FEAREY. There is a Cuban organization, the FLNC, which is violently anti-Castro.

Mr. SOURWINE. That is a different subject entirely. I asked you about Castro organizations, about an organization controlled by the Cuban DGI, which in turn is controlled, as Mr. Crozier told us, by the KGB. Are you aware there is such an apparatus in the country?

Mr. FEAREY. I will turn it over to Mr. Gatch. It is beyond my limited experience.

Mr. GATCH. It has not come to the attention of our working group.

Mr. SOURWINE. Well, sir, perhaps I am out of line but I will suggest that you can push the Department for an answer to that question. Give us what information you have on such an organization as well as on the anti-Castro terrorists you spoke of, and if it turns out the Department of State is not aware of such an organization, then we would await the event when the committee takes further testimony.

Can you name a country or countries where visa procedures are in particular need of being tightened up?

With your permission, I will not waste time on these questions. Let me ask four questions, leave them in the record, and you answer them at your pleasure.

Does the United States have a uniform policy with respect to terrorist demands and with regard to specific demands in hostage situations?

237

Does a hostage situation involve the need for the specially trained negotiators you spoke of using? That might take a little expansion.

Should all hostage situations be handled by professionals?

Should all terrorist situations be handled by professionals?

Does the rank or prominence of an individual involved as a hostage make any difference in the treatment of the hostage situation?

Mr. FEAREY. Terrorists undoubtedly hope that they will be more successful in achieving their demands by kidnaping, say, an ambassador than a junior officer, but the attention and the effort and the concern by the Government to recover and free the hostage would be identical for any rank of officer or individual.

Mr. SOURWINE. Thank you, sir.

What is the United Nations doing about the international importation of violence?

Mr. FEAREY. Well, we have quite a record of efforts to achieve the adoption of effective international agreements which would stop the export of terrorist violence.

Mr. SOURWINE. Has the United Nations General Assembly done anything in this field since 1973?

Mr. FEAREY. As you are aware, one achievement of importance that we did accomplish there was the convention regarding the protection of diplomats.

Mr. SOURWINE. Regarding the prevention and punishment of crimes against internationally protected persons adopted in December 1973.

Mr. FEAREY. Right, sir.

Mr. SOURWINE. But as you indicated that has no teeth in it. It is a pious hope.

Mr. FEAREY. There is continuing activity in the air safety field in Montreal.

Mr. SOURWINE. Are they United Nations organizations now?

Mr. FEAREY. It is a subsidiary.

Mr. SOURWINE. What countries have been most effective in blocking international cooperation against terrorists?

Mr. FEAREY. Well, I think from different points of view a great many. One group of countries certainly has been the Arab countries, which have been sympathetic to the PLO cause. Beyond them there are a larger group of countries that might loosely be referred to as the third world, which have had very much in mind the validity and importance of liberation movements. Their feeling that terrorism is a valid tactic in such movements, their reluctance to see any convention adopted which might even indirectly cut across the wars of national liberation and the self-determination principles to which they attach so much importance, has tended to block international cooperation against terrorism. And there are of course major countries such as the Soviet Union which have close relations with these groups I have just mentioned. These major countries prize their relationships with Arab and third world countries and, as has been pointed out by Mr. Crozier, are reluctant to pursue antiterrorist policies which might offend those countries.

Mr. SOURWINE. When you get to correcting your testimony if you can give us any kind of a list of countries in further response to that question, I hope you will do it.

You use the phrase "wars of national liberation." In the Communist lexicon, all wars are either wars of national liberation or

52-954—75—pt. 4——5

counterrevolutionary wars or imperialist aggressive wars; are they not?

Mr. FEAREY. There certainly is a great use of those phrases.

Mr. SOURWINE. If it is a Communist or pro-Communist group that is seeking to come into power, it is in Communist eyes a war of national liberation. If it is an anti-Communist group, it is considered by Communists to be either imperialist revolution or imperialist aggression or counterrevolution; is it not?

Mr. FEAREY. Yes, sir.

Mr. SOURWINE. Are there powers in the Middle East which seek to prevent the pacification of terrorism in the Arab-Israeli conflict?

Mr. FEAREY. Yes. These Arab countries I mentioned oppose bitterly any effort to prevent terrorism which they regard as a valid use of force by groups which operate from weakness.

Mr. SOURWINE. These are national efforts that you are talking about?

Mr. FEAREY. Yes; that is what I am talking about.

Mr. SOURWINE. Do you see any indication that governments are tending to adopt terrorism as a strategy or a tactic in lieu of or in aid of conventional warfare?

Mr. FEAREY. I would say that there is thus far a continuing reliance on what I will call wars of national liberation, which will very frequently include terrorism but they are not turning to terrorism thus far as a principal means of conducting such wars.

Mr. SOURWINE. Well, I was not asking about the principal means. Let me ask you a question in the same area.

Is it not true that since the days of Lenin terrorism has been doctrinally a part of the struggle in the sense that the Communists use the word?

Mr. FEAREY. Well, my understanding is that the main emphasis of Soviet ideology and theory is that revolution should come by well disciplined leadership of mass movements and that terrorism is a somewhat divisive and not particularly effective means of advancing the revolution in those terms.

Mr. SOURWINE. There is no question, sir, that this is the position publicly taken by the U.S.S.R., but are you not aware of the support that is given to terrorist groups all over the world by the U.S.S.R.?

Mr. FEAREY. Yes; and we heard a very clear position on this from Mr. Crozier.

Mr. SOURWINE. Do you agree with it?

Mr. FEAREY. I am not enough of an expert to comment on it in detail. Certainly, as he said, the University of Patrice Lumumba exists in Moscow. But my overall impression is that the Soviet Union does all it can to assist wars of national liberation, which they recognize in many cases, as say in Vietnam, will involve terrorism. But the assistance is to that war rather than to terrorism itself as a major technique for the achievement of revolution.

Mr. SOURWINE. Have you heard of the Soviet phrase "armed propaganda"?

Mr. FEAREY. Armed propaganda? I probably should have.

Mr. SOURWINE. Are you aware that it is a euphemism which embraces terrorist activities?

Mr. FEAREY. No, sir, I had not been aware of that.

Mr. SOURWINE. Is there any country in the world which officially on the record regards terrorism as justified?

Mr. FEAREY. I would say no.

Mr. SOURWINE. Well, you spoke of certain Arab countries feeling that terrorist groups were patriotic. Can you give us any countries which formally, officially regard terrorists as patriots?

Mr. FEAREY. When I said no a moment ago, I meant that a great number of countries feel that terrorism, reluctantly feel, as they put it, that terrorism is necessary. I would say that even the Soviet Union feels this, where the ruling groups in a particular country have proven themselves very stubborn and incapable of being pushed aside.

But my overall feeling is, as I mentioned before, that the push of the major Communist countries is in support of what they call wars of national liberation.

Mr. SOURWINE. Actually, does it make any difference whether the members of a terrorist group believe sincerely in the rightness of their cause? I mean from the standpoint of whether the terrorism must be resisted and put down?

Mr. FEAREY. No. I believe the main importance of terrorists believing in the rightness of their causes is that it gives the terrorist group a lot more impetus and effectiveness and a great many of them seem to have this impetus and effectiveness. Certainly we have to deal with terrorists on the basis of what they do, not the strength or weakness of their beliefs.

Mr. SOURWINE. If we could conceive of and define a terrorist activity or course of activity in support of a completely right cause, that still would not justify the terrorist activity; would it?

Mr. FEAREY. Certainly not, sir.

Mr. SOURWINE. Can you tell us whether, in general, terrorist groups are crusaders or cynics?

Mr. FEAREY. That is a hard question to answer.

Mr. SOURWINE. Well, let's leave it.

Sir, I promised that I would be finished with my examination by 11:30 a.m. and it is almost 11:25.

With the Chair's permission, I ask that my remaining questions, as I will have them prepared, may be laid into the record and the answers supplied by you or your people as you have time when you correct it.

Mr. FEAREY. Certainly, sir.

[Questions and answers as supplied by Mr. Fearey follow:]

RESPONSES TO QUESTIONS

*Question 1.* You have told us police files are available through the FBI. Specifically, what cooperation is being sought directly from regional and local police organizations?

Answer. The New York City police have trained a few State Department employees in barricade and hostage situation negotiations. A representative of the Washington Metropolitan Police sits on the Working Group. These are exceptions to a general rule that contacts with regional or local police organizations are conducted through the FBI. We rely on the FBI to supply information that may be relevant from its files or, through FBI channels, from local or state police files. We find this a more efficient method than seeking direct contact with other law enforcement agencies.

*Question 2.* You have indicated police files with respect to local terrorist groups and associations are valuable in counter-terrorist activity. Do you have any direct access? Any feed-in?

240

Answer. We do not have a direct feed-in to any law enforcement agency other than the FBI. The Working Group does not function as an operational unit except when there are terrorist events abroad involving American citizens, or terrorist events in this country involving foreign officials. When such events occur we establish a Task Force in the State Department Operations Center. If the incident is a domestic one the FBI has primary responsibility for dealing with it, with the State Department handling any international aspects.

Question 3. Does the FBI secure and compile intelligence for you from police sources?

Answer. Yes.

Question 4. Have there been any studies to determine what chance a terrorist group has of getting away with a political kidnapping? Any different odds in case of an attack on a public installation?

Answer. Research in this area has focused chiefly on political kidnappings abroad. A recent Rand Corporation study commissioned by the Advanced Research Projects Agency (DOD) and the State Department revealed that of 63 major diplomatic kidnappings abroad, involving a variety of nationalities, over the last eight years, a kidnapper had the following chances of success and risk:

87 percent chance of successfully seizing hostages;

79 percent chance that all members of the kidnapping team would escape punishment or death, whether or not they successfully seized hostages;

40 percent chance that all or some demands would be met in operations where something more than just safe passage or exit permission was demanded;

29 percent chance of full compliance with such demands;

83 percent chance of success where safe passage or exit, for themselves or others, was the sole demand;

67 percent chance that, if concessions to the principal demands were rejected, all or virtually all of the kidnappers could still escape alive, by going underground, accepting safe passage, or surrendering to a sympathetic government; and

Virtually a 100 percent probability of gaining major publicity whenever that is one of the terrorist goals.

We do not have such statistics in the case of public installations but estimate that they would be comparable since it is normally easier to bomb a building than to successfully kidnap a diplomat.

Question 5. What lists have you made of various kinds of international terroristic activity? Air hijacking? Hostage situations? Kidnappings? Other?

Answer. Attached are up-to-date chronologies of significant terrorist incidents involving U.S. diplomatic/official personnel (1963–1975) and commerical air carrier hijackings (1968–1975). (See pp. 220–227.)

Question 6. Is the United States today giving adequate protection to foreign officials in this country?

Answer. Protection is generally adequate, although available resources are often stretched thin. The responsibility is divided. The Secret Service protects visiting dignitaries of the rank of Chief of State or Prime Minister plus such others as the President may designate. The Department of State protects other visiting dignitaries as necessary. The continuing protection of foreign officials residing in this country is the responsibility of local law enforcement agencies. The physical protection of diplomatic establishments in Washington is the responsibility of the Executive Protective Service (EPS) under Secret Service control. The EPS may extend its protection elsewhere at the President's direction, e.g. to New York City.

The overall record has been good, but, again, there is no reason for complacency.

Question 7. Have you a complete list of terrorist bombings? In U.S.?

Answer. The FBI will answer during their appearance.

Question 8. Can you give statistics on letter bombs discovered? Those exploded?

Answer. The FBI will answer during their appearance.

Question 9. Does the Postal Service have adequate surveillance against letter bombs?

Answer. In view of the magnitude of the problem, the Postal Service does an excellent job in this field.

Question 10. What do you know about terrorist threats to water supplies in this country?

Answer. This is a possibility, but we have not as yet had evidence of any credible threats to water supplies in the U.S.

241

Question 11. Are security measures and procedures in this country adequate to guard against terrorist forays against stored nuclear weapons or materials.

Answer. The Energy Research and Development Administration (ERDA) has provided the following response:

"Physical protection at nuclear weapon storage facilities under ERDA control is considered adequate, with programmed upgrading which provides for additional security measures and procedures required for perceived increases in threat levels. This upgraded system is designed to allow defense against an assault by a group of well-armed and trained men. The adequacy of the system is under continual review to assure prompt recognition and correction of deficiencies due to system component failure or threat change.

"Physical protection at ERDA facilities for storage of nuclear materials is considered adequate for threats currently perceived. The protection system is designed to be effective against an assault by a few armed men. In anticipation of an increased terrorist threat environment, upgrading actions are currently underway."

Question 12. Is there a difference in this regard with respect to military storage and civilian storage?

Answer. ERDA has provided the following response:

"The storage of nuclear weapons in the ERDA program is generally comparable with the storage in the DOD program, except that civilian guards are used as opposed to military. A continuing review of the status of protection afforded in both areas is made through the ERDA–DOD Physical Security Review Board, a task group for exchange of nuclear weapon security information. Nuclear materials are afforded essentially the same security measures as weapons in those areas where strategic amounts of materials are stored."

Question 13. Is adequate protection given today to nuclear materials in plants? In transit?

Answer. ERDA has provided the following response:

"The physical protection given to nuclear materials in ERDA plants and in transit is considered adequate for currently perceived threats involving a few men. In anticipation of an increased terrorist threat environment, upgrading actions are underway.

"As a minimum, transportation of strategic quantities of special nuclear material is carried out under protection of armed ERDA couriers having two-way communications capability with a central control station. To counter possible future increases in the terrorist threat, equipment upgrading is underway, and by October 1976 all ERDA highway shipments of strategic quantities of special nuclear material will be made in vehicles specifically designed to impede forced access to the cargo or movement of the vehicle pending arrival of response forces. Weapons assembly shipments are transported by such vehicles at the present time."

Question 14. Do you consider it possible to ship an atom bomb into the United States? The materials for one? How about shipments from here to other countries?

Answer. ERDA has provided the following response:

"The clandestine import or export of nuclear weapons or special nuclear materials for nuclear weapons are the specific kinds of activities that the recently-strengthened Atomic Energy Rewards Act was designed to deter. Moreover, nuclear weapons stockpiles of all the states possessing them are under rigorous military security systems which provide a high degree of protection against theft.

"The question of clandestine import or export relates primarily to individuals or groups including terrorists. Their acquisition of special nuclear material would require theft. The United States has an aggressive program for achieving world-wide physical protection systems to prevent special nuclear material theft. This will complement nuclear materials accountability systems in all countries which by virtue of their peaceful nuclear programs possess or have the potential for possessing special nuclear material. Additionally, the United States has achieved success in encouraging the IAEA to press for uniform highly effective physical protection systems in all countries. The United States is pursuing cooperation with foreign countries to exchange with them technical information on physical protection, hardware, and systems application. The results to date have been encouraging in that countries contacted are evidencing high interest in the same objectives."

Question 15. What is being done to prevent such shipments, either way?

Answer. See the answer to question 14.

242

*Question 16.* How many international conventions have been adopted dealing with arrest or extradition of airplane hijackers?

Answer. There have been three conventions adopted to date dealing with the air piracy problem. They are the Tokyo, Hague and Montreal Conventions.

*Question 17.* What do they provide?

Answer. *Tokyo Convention.*—(Convention on Offences and Certain Other Acts Committed on Board Aircraft, signed at Tokyo on 9/14/63). Basic purpose is to promote safety through establishment of continuity of jurisdiction among contracting States over criminal acts occurring on board aircraft. Article 11 deals with hijacking and provides: (a) a positive obligation on each contracting State to take every appropriate measure to restore control to, or preserve control in, the lawful commander of an aircraft; and (b) an obligation on contracting States to permit the passengers and crew of a hijacked aircraft to continue their journey as soon as practicable, and to return the aircraft and its cargo to the persons lawfully entitled to possession. The U.S. ratified the Tokyo Convention on September 5, 1969, being the 12th nation to do so. The treaty came into force on December 4, 1969. Seventy-six countries are contracting parties.

*Hague Convention.*—(Convention for the Suppression of the Unlawful Seizure of Aircraft, signed at The Hague on December 16, 1970). This treaty obliges the contracting parties to: (a) establish jurisdiction over hijackers; (b) make the offense punishable by severe penalties; and (c) submit any offenders found in their territories to the competent authorities for prosecution, or extradite them. The U.S. ratified the Hague Convention on September 14, 1971, and was the 19th nation to do so. The treaty came into force on October 14, 1971. Seventy-two countries are contracting parties.

*Montreal Convention.*—(Convention for the Suppression of Unlawful Acts Against the Safety of Civil Aviation, signed at Montreal on September 23, 1971). This treaty deals with sabotage and armed attacks against international civil aviation facilities and creates the same obligations with respect to these offenses as the Hague Convention creates with respect to hijacking. The treaty came into force on January 26, 1973. The U.S. ratified the treaty on November 1, 1972. Sixty-one countries have ratified the document.

*Question 18.* Are they adequate? Are they being observed?

Answer. The Federal Aviation Administration (FAA) has provided the following response:

"The conventions are essentially adequate and they are apparently being observed generally. The obvious deficiency in this area is the fact that the conventions have not been approved and ratified by all states. The ratification and compliance by all states would contribute significantly to improvement of worldwide aviation security."

*Question 19.* What sanctions, if any, are being applied against countries which do not cooperate in arrest or extradition of air hijackers?

Answer. The Federal Aviation Administration (FAA) has provided the following response:

"None. However, Public Law 93–366 (Air Transportation and Anti-Hijacking Acts of 1974), which was enacted on August 5, 1974, does provide for sanctions to be applied against those countries which permit the use of territory under its jurisdiction as a base of operation or training, or as a sanctuary for, or in any way arms, aids, or abets any terrorist organization which knowingly uses the illegal seizure of aircraft or the threat thereof, as an instrument of policy. The sanction authorizes the President to suspend (1) the right of any air carrier to engage in foreign air transportation, and the right of any person to operate aircraft in foreign air commerce, to and from that foreign nation, and (2) the right of any foreign air carrier to engage in foreign air transportation, and the right of any foreign person to operate aircraft in foreign air commerce, between the United States and any foreign nation which maintains air service between itself and that foreign nation."

*Question 20.* Do foreign airports meet the same high security standards as airports on the U.S.?

Answer. The FAA provided the following response:

"Generally, the foreign airports do not have the same security standards as U.S. airports. There are some exceptions, but very few. The FAA, in recognition of this, regularly provides technical assistance and guidance to foreign nations upon request. This assistance consists of (1) providing detailed briefings to foreign officials here in the U.S., (2) providing training for foreign officials at the Aviation Security Course which is conducted by the Department of Transportation Safety

243

Institute at Oklahoma City, and (3) sending aviation security technical teams to foreign nations for the purpose of assisting foreign governments in developing and establishing aviation security programs. More than 20 foreign nations have sent students to the school in Oklahoma City and numerous governments have been provided the other assistance indicated. Although the U.S. airports are not "fortresses," basic security programs are in effect at all. This would enable all airport operators in the U.S. to tighten the security at their facilities to the extent necessary to meet almost any threat within a few hours."

*Question 21.* What percentage (foreign airports) gives adequate screening?

Answer. The FAA has provided the following answer:

"Passenger and baggage screening at foreign airports vary greatly from one location to another. U.S. air carriers are requested to conduct passenger screening at all airports where they operate whether that be domestic or foreign. The screening at some foreign locations is performed by the foreign governments. In others it is accomplished by U.S. air carriers themselves. Screening, however, at foreign airports is frequently inconsistent and inadequate. Most of the major countries, however, have incorporated passenger and baggage screening to some extent at most of their major airports."

*Question 22.* What percentage of foreign airlines gives adequate screening?

Answer. The Federal Aviation Administration provided the following response:

"The screening by foreign air carriers generally varies from airport to airport and often includes only selected flights. Airlines of a number of other countries are more consistent and do apply screening to all flights. Most foreign governments and foreign air carriers recognize the need for effective passenger and baggage screening and are in the process of establishing programs similar to that of the U.S. carriers."

*Question 23.* Can you give examples?

Answer. The Ministry of Transport of Canada adopted screening measures which are very similar to those of the U.S., but confines their application to flights of Canadian airlines. The British have similar procedures, as do France and Germany. In most European countries passenger screening procedures and airport security measures are of varying intensities. Many countries in the Middle East, Africa and South America are also currently providing adequate screenings.

*Question 24.* Can foreign airlines be required to screen their passengers adequately?

Answer. The FAA has provided the following response:

"Public Law 93–366 requested that the Administrator of the Federal Aviation Administration issue rules requiring foreign air carriers to conduct passenger and baggage screening on all flights operating to, within, and from the U.S. The FAA plans to amend Part 129 of the Federal Aviation Regulations in the near future to request such screening by the foreign carriers."

*Question 25.* Do Federal Aviation Administration Security regulations presently control foreign airlines well as U.S. airlines?

Answer. The FAA has provided the following response:

"No. However, the amendment indicated above will probably be issued in the very near future and will become effective within 90 days of issuance."

*Question 26.* How many men does it take to hijack an airplane?

Answer. The FAA has provided the following response:

"Many aircraft have been hijacked by one person. It would be more difficult today, however, for a single hijacker to successfully hijack a U.S. aircraft in view of the present security procedures and training provided the air carrier crewmembers. It would not be impossible but the chances of an individual actually committing a hijacking and getting away with it is much less today than it was prior to 1973."

*Question 27.* Is the instantaneous and widespread publicity of TV a factor in the modern growth of terrorism?

Answer. Publicity for its cause is often one of the primary aims of a terrorist group. As the above-cited Rand study results note, widespread publicity for a terrorist action is virtually guaranteed. It is logical to assume that this is an encouragement to acts of terrorism, but the matter has not been studied sufficiently to warrant definitive answers.

*Question 28.* Is consideration being given to eliminating or minimizing this factor?

Answer. Freedom of expression, within judicially defined limits, is a cherished American right. In their media contacts U.S. officials have stressed the theme that terrorists are not heroes or patriots but criminals. No matter how deeply felt and legitimate a grievance may be, terrorism and the taking of innocent lives is not

244

an acceptable means of redress. We encourage balanced media treatment which reflects these facts.

Question 29. Does the LEAA have authority to give funding to efforts to combat terrorism in foreign countries?

Answer. The Law Enforcement Assistance Administration (LEAA) provided the following response:

"The legislative history of Sec. 515(c) of the Crime Control Act of 1973 makes it clear that LEAA has the authority to fund technical assistance projects to combat terrorism, including international terrorism. It would be necessary that any such projects conducted in foreign countries bear a reasonable relationship to the security interests of the United States or its citizens. This authority does not include assistance to foreign police that could result in the suppression of the civil rights of the citizens of the country involved."

Question 30. How about LEAA participation in funding 1) the recent FBI symposium on international terrorism; and 2) the FAA's Air Security School in Oklahoma City?

Answer. LEAA has provided the following response:

"LEAA has funded two recent symposia on possible terrorist activities during the Bicentennial. LEAA provided $11,175.54 for the National Symposium on Possible Terrorist/Extremist Activities during the Bicentennial, held at the FBI Academy, in Quantico, Virginia, from December 9 through December 12, 1974. LEAA funds were used to finance travel, room and board expenses for the 100 participating state and local Command and Intelligence level law enforcement officers from across the country. LEAA provided an estimated $8,000.00 to the Northeast Regional Conference on Possible Terrorist Activity during the Bicentennial, held in Albany, New York, April 15 through April 18, 1975. LEAA funds were used to finance travel, room and board expenses for the participating state and local law enforcement officers from the northeast region and Canada.

"LEAA has provided funding for state and local law enforcement officers to attend the FAA Air Security School. $400,000 will have been expended from January 1973 through October 1975 to provide training for 739 state and local law enforcement officials. Proposals are pending in LEAA to expand the course and continue it for three more years at a cost of $600,000."

Question 31. How many foreigners have attended or are attending the FAA School in Oklahoma City? From what countries?

Answer. LEAA has provided the following response:

"LEAA provided an additional $25,000 on March 10, 1975 to train up to 30 foreign nationals where the training received in maintaining air security is in the interests of the United States. All participating foreign nationals were selected by the FAA. LEAA has not yet received a report on participation in this program per se. LEAA does, however, have a report from FAA that 96 foreign nationals have received training financed by funds from their own respective governments. A country-by-country breakdown of foreign participation in the FAA Air Security School appears as follows:

| | |
|---|---|
| Canada—35 | Turkey—2 |
| West Germany—17 | Portugal—2 |
| Ireland—4 | Republic of China—2 |
| Philippines—4 | Denmark—1 |
| Spain—3 | South Vietnam—1 |
| Liberia—3 | Netherlands—1 |
| Panama—3 | Guam—1 |
| Sudan—3 | Singapore—1 |
| Saudi Arabia—2 | Switzerland—1 |
| Jordan—2 | Egypt—1 |
| Algeria—2 | Ecuador—1 |
| Oman—2 | Cambodia—2 |

Question 32. Are you aware of the growing cooperation and multiplying liaisons between terrorist groups in different countries?

Answer. We have seen evidence of growing collaboration among terrorist groups in Latin America. Additionally there are indications of increasing cooperation among the Baader-Meinhof gang in West Germany, the so-called Japanese Red Army, and Palestinian terrorist groups, particularly the Popular Front for the Liberation of Palestine (PFLP).

Question 33. Do any foreign terrorist groups have liaison of any kind with groups in the United States? Please go into detail.

Answer. The FBI will answer during their appearance.

245

Question 34. Do you know of any terrorist groups which receive extra-national financing?

Answer. The Arab terrorist groups are the most prominent groups that receive extra-national financing. A number of other terrorist groups around the world receive modest amounts of extra-national financing from governments and from other terrorist groups.

Question 35. Do you know of any foreign financing for any terrorist or violent groups in the United States?

Answer. The FBI will answer during their appearance.

Question 36. Can you cite any cases illustrating the possibility of operational collaboration between domestic and foreign terrorist groups?

Answer. The FBI will answer during their appearance.

Question 37. Do you know of any connection between the IRA and Communism?

Answer. One of the two wings of the IRA, the Officials, are avowed Marxists. There are no indications that there are explicit connections (i.e. arms transfers, training, financial support, etc.) between either wing of the IRA and Communist governments.

Question 38. Between the PLO and Puerto Rican terrorists?

Answer. The FBI will answer during their appearance.

Question 39. Between Philippine terrorists and either Cuban terrorists, or the Cuban government?

Answer. There has been no connection that we know of between Philippine "terrorist" groups and Cuban terrorists or the Cuban Government.

Question 40. Please cite any similar connections of which you have knowledge?

Answer. The guerrillas of the Maoist "New Peoples' Army" in the Philippines have been in contact with the Chinese Peoples' Republic and there has apparently been contact between various Muslim rebel groups in the southern Philippines and the Government of Libya.

Question 41. You have mentioned both a Castro apparatus in the United States and anti-Castro groups in the United States. In each case, what supporters does the group have? What liaison does it maintain with other subversive or terrorist groups?

Answer. The FBI will answer in their appearance.

Question 42. Has any study been made of the potential of the Palestinian terrorists?

Answer. This subject is under continuing study within the Government. Palestinian commando activities can conceivably have influence within the paramilitary, terrorist and political dimensions. Paramilitary activities, such as those by the Palestine Liberation Army (PLA), are not particularly significant. The PLA, which has units in Jordan, Syria, and Egypt, is essentially controlled by the government upon whose territory it operates. Terrorist activity, while sometimes reaching serious proportions, is not sufficient in and of itself to disrupt negotiations unless a key Arab leader should be assassinated. The Palestinians' greatest potential is in the political realm. The commandos have been recognized by the Arab League, the Communist states, and most nonaligned countries as the representatives of the Palestinian people. As the spokesmen of Palestinian nationalism, the commandos have to be considered in the Arab-Israeli settlement equation.

Question 43. Can you tell us what forces today support the PLO (Palestine Liberation Organization)?

Answer. Supporting the PLO as the representative of the Palestinian people are a large number of states and international organizations. The Islamic, nonaligned, and Rabat Summit meetings of 1974 concluded with recognition of the PLO as the sole legitimate representative of the Palestinian people, and this set the stage for last November's grant of observer status to the PLO by the UN General Assembly. Most international support for the Palestinians goes to the PLO, which is the umbrella organization of several commando groups. Specific states, however, support commando groups with views closest to their own. Saudi Arabia and the Persian Gulf Sheikhdoms, for example, support Fatah, the largest commando organization. The Soviet Union supports the Popular Democratic Front for the Liberation of Palestine, in addition to Fatah and the PLO. Syria supports Saiqa, while Iraq supports the Arab Liberation Front (ALF). Supporting the "Rejection Front," opposed to a peaceful settlement of the Arab-Israel conflict, are Libya and Iraq. The Rejection Front is composed of the Popular Front for the Liberation of Palestine, the Popular Front for the Liberation of Palestine-General Command, and the ALF.

246

*Question 44.* Does the PLO have any contact with organizations in the United States? Please give details.

Answer. The FBI will answer during their appearance.

*Question 45.* There seems to have been a shift toward acceptance of the PLO as a legitimate and non-terrorist organization. Can you explain this any more than you already have?

Answer. The shift toward viewing the PLO as a legitimate rather than terrorist organization came in the aftermath of the summit meetings cited above and the granting of observer status by the General Assembly. Approximately fifty states have allowed the PLO to open offices in their capitals, and several international agencies affiliated with the UN (ILO, WHO, UPU, ITU, and UNESCO) have granted the PLO observer status. A desire to further moderate the PLO by involving it in the settlement process has contributed to this increased acceptance of the PLO.

*Question 46.* What do you know about the suppliers of weapons to terrorist groups, anywhere?

Answer. Most terrorist groups arm themselves with weapons they acquire within the country they are in. The major exceptions to this general rule are the Arab fedayeen organizations, which receive primarily Soviet weapons from Arab nations, and the Provisional wing of the IRA, which acquires most of its weapons from outside of Northern Ireland through private smugglers. To a lesser degree, the Libyans are suspected of supplying arms to Philippine "terrorists" and to the IRA. There are other less significant suppliers of weapons to terrorist organizations around the world, both governmental and private.

*Question 47.* Do any terrorist groups have completely modern weaponry? 2) Aircraft? 3) Bazookas? 4) Ground-to-air missiles? (Such a missile was used in the attack on civilian airline, Rome, Winter 1973).

Answer. Arab terrorist groups have access to modern weaponry, including Soviet made AK-47 assault rifles, RPG-2 and RPG-7 grenade launchers, and SA-7 heat seeking rockets. No Arab terrorist groups possess aircraft.

Arab terrorists attempted to use SA-7 rockets at Rome airport in 1973 and Soviet made grenades were fired on two separate occasions at Orly airport in 1975. The fact that Arab terrorist groups have had access to these advanced weapons has not necessarily meant that they are used for terrorist attacks. The SA-7 rockets have been used primarily for the protection of Arab refugee camps from Israeli air strikes.

There are no other terrorist groups that have access to the range of sophisticated weaponry that is available to Arab terrorist groups. A number of terrorist groups, such as the ERP in Argentina, have access to the same weaponry that is available to the local security forces, like submachine guns and high explosives.

*Question 48.* How widespread is the use of plastic explosives by terrorists?

Answer. Plastic explosives are widely used by terrorist groups around the world.

*Question 49.* Can you tell us about any substantial successes in forestalling planned terrorist activity in the United States?

Answer. The FBI will answer during their appearance.

*Question 50.* How many individuals have been killed or injured by terrorist activity in recent years? Do you foresee the incidence of such deaths and injuries rising or decreasing?

Answer. It is often difficult to determine whether a death was the result of terrorist action or was motivated in whole or in part by other considerations, notably criminal activity. It is impossible therefore to give precise figures on the number of terrorist casualties. We estimate, however, that in clear cases of terrorist activity approximately 500 people have been killed and 600-800 wounded or injured since 1968. Since 1968 16 official representatives of the United States have been killed by terrorist attacks and 32 wounded.

It is difficult to predict whether there will be an increase or decrease in the number of deaths and injuries due to terrorist attacks. Political developments in some countries could greatly affect the increase or decrease of terrorism in those countries. Another factor, of course, is possible employment of weapons of mass destruction by terrorists. Factors affecting the future course of terrorism were, of course, discussed in the concluding portion of Mr. Fearey's presentation before the Subcommittee.

*Question 51.* Can you tell us, in each case, (1) where and (2) the nationality of (A) the victim and (B) the terrorists?

Answer. See the attached chronologies. (See pp. 220-227 and pp. 256-280.)

*Question 52.* Have you studied the growth trends, the developmental trends, of international terrorism?

247

Answer. We are continually examining the international terrorism phenomenon for trends of all types that may affect the security of American citizens or U.S. interests abroad and in this country. Growth and developmental trends are a part of this overall continuing concern.

*Question 53.* Can you foresee the development of international terrorism to a point where terrorist groups are using all the "fright weapons"—lasers, chemical warfare, biologicals, radiation poisoning, and so on?

Answer. The technology necessary for the manufacture and dissemination of biological or chemical agents has been public knowledge for a number of years. Terrorist acquisition of lasers or radioactive materials would depend on whether they can obtain them from governments or steal them.

Small, radical groups are not likely to have the expertise to obtain and use mass destruction terrorism weapons, and are less likely than larger, more sophisticated groups to have the backing of a government in connection with such weapons. Larger terrorist organizations on the other hand, are more vulnerable to retaliation and are likely to be deterred by what would be an extremely severe response by the world community to threats or attacks involving mass, indiscriminate casualties.

While there is, therefore, a clear possibility that terrorists will use "fright weapons" to threaten or destroy, such use is not inevitable.

Mr. SOURWINE. I would like to ask, subject to the offer of the Chair, for inclusion in this record of the text of the speech made by your predecessor, Ambassador Hoffacker, in February 1974, before the Mayors Advisory Committee on International Relations and Trade and the Foreign Relations Association in New Orleans, La.

(The material referred to follows.)

THE U.S. GOVERNMENT RESPONSE TO TERRORISM: A GLOBAL APPROACH

(By Ambassador Lewis Hoffacker, Special Assistant to the Secretary of State)

The world has lived with violence and terror since the beginning of time. But we now are experiencing new forms of international terrorism which have reached the point where innocent people anywhere can be victimized. Nothing has more dramatically underscored this fact than the cruel tragedies at the Munich Olympics of 1972, the virtual epidemic of kidnappings in Latin America, and the wanton murder of two of our diplomats and a Belgian official in the Sudan.

These and other incidents bear witness to the terrible potential of a disturbed or determined person or group to terrorize the international community. Moreover, this capability for traumatic disruption of society appears to expand with the increasing technological and economic complexity of our society and with the added incentive of wide and rapid publicity.

What is terrorism? Last summer a UN group failed to agree on a definition of the term and became diverted by an inconclusive discussion of the causes and motives of terrorists. Such disagreement, however, should not deter us from getting on with the business at hand, which we, for our working purposes, regard as defense against violent attacks, by politically or ideologically motivated parties, on innocent bystanders who fall under our protective responsibility. I am talking primarily of Americans abroad and foreign officials and their families in this country. At the same time, we follow terrorism throughout the world, even though our people may not be directly involved, since this is a global phenomenon requiring global attention.

The US government has responded forthrightly to this serious challenge in fulfillment of its traditional responsibilities to protect its citizens and its foreign guests. In September of 1972 President Nixon established a Cabinet Committee to Combat Terrorism to consider, in his words, "the most effective means to prevent terrorism here and abroad." The Secretary of State chairs this Committee, which includes also the Secretaries of the Treasury, Defense, and Transportation, the Attorney General, our Ambassador to the UN, the Director of the FBI, and the President's Assistants on National Security and Domestic Affairs. This body is directed to coordinate interagency activity for the prevention of terrorism and, should acts of terrorism occur, to devise procedures for reacting swiftly and effectively.

Under the Cabinet Committee, a Working Group composed of personally designated senior representatives of the members of the Cabinet Committee meets

248

regularly. It is this Group which I chair and which is in daily contact as issues arise and incidents occur. While we would prefer to be a policy planning body dealing in preventive measures, we are geared to respond to emergencies. Over the past year and a half this inter-agency group has dealt with a wide variety of matters and in my view has made us as a government more effective in responding to the continuing threat from a variety of organizations or individuals seeking to strike at us at home and abroad. This is not to say that we have solved all the problems facing us. But we are using government-wide resources to better advantage and have at least reduced the risk to our people and our foreign guests. We must face the reality that there is no such thing as 100% security. But we are doing our job if we reduce risks to a practical minimum.

I would like to make clear at the outset that individual departments and agencies continue to manage programs dealing with terrorism under their respective mandates. The important difference is that these efforts, which deserve commendation, are now fully coordinated and consequently are greater deterrents to potential terrorists.

Intelligence is one of our more valuable resources in this self-defense endeavor. All security agencies have improved the quality of their intelligence relating to terrorism, and the Working Group ensures that this product is fully shared and coordinated throughout the government.

Abroad, security at our embassies and consulates has been steadily improved. Last summer the President submitted to the Congress a request for $21 million for personnel and materials to better our overseas security and hopefully reduce the risk which our official personnel suffer throughout the world. These funds are now being disbursed, based on highest priority needs at our posts abroad.

We are mindful that our mandate also covers unofficial Americans. For example we are pleased to advise American businessmen with overseas interests. Our embassies and consulates are in constant touch with American businesses abroad, especially in such places as Argentina where they are particularly vulnerable. We are prepared to share with them security techniques and experiences. Although we may not agree on tactics such as the advisability of paying ransom, it is important that we stick together in tight situations such as Buenos Aires, where terrorists have taken advantage of serious internal security deficiencies to kidnap businessmen for increasingly higher ransoms. We were, e.g., concerned with the Bank of America case in Beirut, where a representative of Douglas Aircraft was murdered by bank robbers posing unconvincingly as fedayeen.

Visa, immigration, and customs procedures have been tightened. The regulation allowing a foreigner to transit the U.S. without a visa has been suspended except for passengers with immediate onward reservations to a point outside the U.S. This suspension applies to every traveller on a non-discriminatory basis and closes a loophole through which 600,000 visitors per year formerly passed.

In several categories of visa applicants who have been particularly susceptible to terrorist penetration, deeper screening of applications has shown some useful results.

In the fall of 1972 Congress approved a public law aimed at increasing protection for foreign officials and their immediate families in this country through the creation of federal criminal offenses for various acts directed at them and at other official guests. Under this legislation the FBI has investigative jurisdiction concurrent with that already held by local law enforcement authorities. This expanded legal coverage of our foreign guests will hopefully add a further deterrent to those who might be tempted to molest them. There has been one conviction under this law, and several other cases are now before federal courts or are expected to be submitted soon.

For some time the Postal Service has alerted post offices and other likely targets of letter bomb activity. Many hundreds of such devices have been circulating internationally. Some have been intercepted in this country by alert customs and postal employees with one injury sustained by a postal clerk in the process. Unfortunately a letter bomb exploded in the British Embassy last September, maiming a secretary and illustrating dramatically that international terrorists have probably penetrated our security screen.

Hijacking within the US has fallen off significantly since the beginning of last year. This happy trend is not just a stroke of luck. Aside from the rigorous airport security program now underway, a principal factor in this favorable evolution is the bilateral agreement with Cuba whereby hijackers are denied asylum in that country. Other countries, with or without our encouragement, have taken similar steps to close their doors to individuals who look for refuge from prosecution after

249

a hijacking. Let us recall, at the same time, that the domestic variety of hijacker in the US is usually different from those who operate abroad, with special ruthlessness, under the control of terrorist organizations.

The US has been busy internationally. We have been in the forefront of those who have sought tightened international air security. We have pressed for three important multilateral conventions dealing with hijacking: the 1963 Tokyo Convention, which in effect requires countries to return a plane and passengers if it has been hijacked; the 1970 Hague Convention, which says that countries should either extradite or prosecute the skyjackers; and the 1971 Montreal Convention, requiring that any kind of sabotage of aviation such as blowing up planes on the ground be dealt with by prosecution or extradition of the offenders. We had modest expectations as we sent a delegation to two joint air security conferences in Rome last summer in the hope that the international community would advance a step forward in tightening controls on skyjackers and aerial saboteurs. Despite our disappointment over the meager results in Rome, we are confident that there remains a sufficient sense of international responsibility to make possible other steps to discourage those who would threaten international air travellers. For one thing, we are seeing a steady stream of accessions to the aforementioned conventions by countries representing all ideologies. This, in itself, should have a good, deterrent effect.

In INTERPOL, in the Organization of American States, and in other appropriate forums, we achieve what is feasible in the way of multilateral discouragement of the international terrorist. Simultaneously we maintain quiet liaison with individual governments which share our abhorrence of terrorism. We are pleased, e.g., to assist others when they suffer hijackings by providing communications and other services even though the affected plane may not be over or in our country.

At the UN in 1972 we sought to prohibit the export of violence to innocent persons who are many countries, sometimes continents, removed from the scene of a conflict. This approach became bogged down in debate over so-called justifiable, as opposed to illegal, violence. Accordingly, we narrowed our objectives to more specific categories of offenses which because of grave and inhuman effect on innocent individuals or because of their serious interference with the vital machinery of international life, should be condemned by states of every ideology and alignment. We therefore supported in the last General Assembly a convention for protection of diplomats. The Assembly agreed in December to this measure, which requires that persons who attack or kidnap diplomats or officials of foreign governments or international organizations be extradited or prosecuted.

If in spite of all our efforts, an act of terrorism should occur, we are prepared to deal with it swiftly and effectively. Within the State Department, task forces can be assembled on short notice to manage such critical events as the Southern Airways hijacking, the seizure of American diplomats in Haiti, the kidnapping of two of our officers in the Sudan, the kidnapping of our Consul General in Guadalajara, the hijacking last summer of the Japanese airliner out of Amsterdam, the attack on emigrant Jews in Austria last fall, various incidents at Rome and Athens airports, and the recent terrorism in Karachi and Singapore harbors and in Kuwait. Such task forces are composed of selected specialists who can call on the full resources of the US government to rescue, or at least to monitor, the beleaguered parties. The State Department Operations Center, which is the site of such task forces, is in instant contact with the White House, Pentagon, CIA, and other agencies concerned, as well as foreign governments and overseas posts. By swift and intelligent action in such circumstances, we hopefully can overcome the terrorists by one means or another.

Tactics vary in each crisis situation, but one consistent factor should be understood by all parties concerned: the US government will not pay ransom to kidnappers. We urge other governments and individuals to adopt the same position, to resist other forms of blackmail, and to apprehend the criminal attackers.

I hasten to underline the importance which we attach to human life. We do not glibly sacrifice hostages for the sake of this admittedly firm policy. We believe that firmness, if applied with the best diplomacy we can muster, can save lives in the long run and probably in the short run as well.

We have had more terrorist experiences than we had anticipated in the past five years, during which period 25 of our officials abroad, who normally enjoy diplomatic protection, were kidnapped. Fifteen of these kidnapping attempts succeeded with 10 individuals murdered and 12 wounded. When we Foreign Service people elected to follow this career, we appreciated that there were risks different in type and intensity from those to which we are exposed in this country.

250

Abroad we experience increased threats of subversion, kidnapping, blackmail, civil disturbances, and politically motivated violence, including assassination. In my 23 years Foreign Service experience, mostly abroad in the Middle East and Africa, I have not seen any of our people flinch in a dangerous situation. We have learned to take reasonable precautions. We do not want to live in fortresses or armed camps. We use ingenuity to reduce risks. Most importantly, we must remind the host government of its undoubted responsibility for protecting foreigners within its territory. I recall, e.g., when I was once put under house arrest by an angry Minister, I reminded him and his government that that government continued to be responsible for my personal security and would face dire consequences if anything happened to me. I am glad to report that my consular colleagues rallied round me and after a week I was able to resume my normal movements.

It would be unfair to assign labels to countries as to their hawklike or dovelike qualities in facing up to the terrorist challenge. Each country naturally performs in the light of its own interests. Some are more cautious than others to avoid provoking militants who engage in terrorism. Even countries friendly to us are selfish about their sovereign right to decide what is best in a terrorist confrontation; whether or not, e.g., to yield to demands for ransom, release of prisoners, etc. Moreover, we in the US have not found ourselves in excruciating circumstances such as some countries like Haiti or Mexico have undergone with foreign diplomats held in their territory under terrorists' guns.

The US approach to counter-terrorism is based on the principle derived from our liberal heritage, as well as from the UN Declaration of Human Rights, which affirms that every human being has a right to life, liberty, and "security of person." Yet the violence of international terrorism violates that principle. The issue is not war. The issue is not the strivings of people to achieve self-determination and independence. Rather the issue is—and here I quote from former Secretary of State Rogers before the UN General Assembly—"The issue is whether millions of air travelers can continue to fly in safety each year. It is whether a person who received a letter can open it without fear of being blown up. It is whether diplomats can safely carry out their duties. It is whether international meetings—like Olympic games—can proceed without the everpresent threat of violence. In short, the issue is whether the vulnerable lines of international communication—the airways and the mails, diplomatic discourse and international meetings—can continue, without disruption, to bring nations and peoples together. All who have a stake in this have a stake in decisive action to suppress these demented acts of terrorism. We are aware that, aside from the psychotic and the purely felonious, many criminal acts of terrorism derive from political origins. We all recognize these issues such as self-determination must continue to be addressed seriously by the international community. But political passion, however deeply held, cannot be justification for criminal violence against innocent persons."

The US has attempted to show leadership in stimulating a global preoccupation with this apparently growing international threat. We have not achieved all that we have sought in international cooperation. Our multilateral, bilateral, and unilateral efforts must, however, continue because the outlook is not as promising as it might be. There seems to be increased collaboration among terrorist groups of different nationalities. Such groups seem to be moving farther and farther afield, including toward North America. There is moreover evidence of ample financial sources for some terrorist groups not only from ransoms collected but also from governments which, for one reason or another, are sympathetic toward certain terrorist groups. And, last but not least, there seems to be no shortage of politico-economic-social frustrations to spawn terrorists on all continents.

Accordingly, we must increase our vigilance, our expertise, and our determination in the face of what may be an expanding threat to our personnel and other interests abroad, as well as on the home front. In fact, this global epidemic still threatens the very fabric of international order.

We as a government must be cool and tough—and I might add, sensitive—in responding to these vicious attacks against our citizens and other interests. As we seek to defend ourselves against this viciousness, we are not unmindful of the motivation inspiring the frustrated political terrorist, who feels he has no other way to fulfill his particular mission in life. As ways are found to convince him to reason otherwise, he must be made to understand *now* that it is unprofitable for him to attack innocent bystanders. In the meantime also, we as a government have a continuing obligation to safeguard the most fundamental right of all—the right of life. There is no reason why protection of this right and of our citizens need necessarily conflict with other human rights such as self-determination and individual liberty.

251

Mr. SOURWINE. And I have been asked by the Chair to express the great appreciation of the committee to you and to your staff people for coming down here today and for your obviously very full cooperation. What you are doing is very vitally important.

Mr. FEAREY. Thank you very much. We have been very happy to be here.

Mr. SOURWINE. I do not think the people know enough about that, the people of the country.

By direction of the Chair, with 11:30 approaching, this committee will stand in recess subject to the call of the Chair.

[Whereupon, at 11:25 a.m., the subcommittee adjourned, to reconvene subject to the call of the Chair.]

# APPENDIX

Library of Congress

Congressional Research Service

INTERNATIONAL TERRORISM—ISSUE BRIEF No. IB74042

(By Vita Bite, Foreign Affairs Division)

### ISSUE DEFINITION

International terrorism may be defined as politically and socially motivated violence conducted outside the territories of parties to a conflict or directed against the citizens or property of a third party. It is effective because of the fear it generates and thrives on publicity. Forms of terrorism include aircraft hijackings, attacks on airplane passengers, kidnapings, seizure of hostages for ransom, assassinations, and bombings. The victims of these attacks are usually civilians.

### BACKGROUND AND POLICY ANALYSIS

The issues affecting the United States are the safety of American travelers, businessmen, and diplomats abroad, as well as U.S. internal security particularly with respect to the protection of foreign diplomats, tourists, and others in this country. The pattern of international terrorism has become increasingly diversified and widened in scope. Terrorist movements are using new methods of violence for new purposes, their activities are more geographically widespread, and cooperation among different terrorist groups is growing.

Hijacking is decreasing. Whereas 140 airline passengers and crew were killed by terrorists in 1972, and in December 1973, 32 people were killed in a Palestinian attack on a Pan American airliner at the Rome airport. During 1974 few international hijackings were attempted. An important factor in the reduction of hijackings has been the decrease in the number of counteris willing to grant sanctuary to hijackers. The four Palestinians who hijacked a British airliner in Dubai on November 21, 1974, for instance, were refused sanctuary by the whole Arab world. The Tunisian Government, to whom they finally surrendered, turned them over to the Palestine Liberation Organization (PLO), which is quite hostile to this splinter group of Palestinian guerrillas.

Following a pattern of increased terrorism accompanying significant developments toward peace in the Middle East, Palestinian terrorist attacks on Israeli villages bordering Lebanon coincided with Secretary of State Kissinger's apparent progress in negotiating an Arab-Israeli settlement. In April 1974, 18 Israelis were killed in an attack by the Popular Front for the Liberation of Palestine (PFLP)-General Command on the village of Kiriyat Shmoneh. In May, at least 25 were killed and 70 wounded, the majority high school students, when a terrorist commando group, reportedly affiliated with the Popular Democratic Front for the Liberation of Palestine (PDFLP) attacked Maalot and seized 90 children as hostages. In both of these cases the terrorists were killed by the Israeli army. After each incident Israel retaliated by bombing Palestinian refugee camps in Lebanon. A more recent example of such retaliation and counter-retaliation for terrorist attacks occurred in early December. On December 11, 1974, two persons were killed and 54 injured by a grenade explosion in a Tel Aviv theatre; a Palestinian organization claimed responsibility for the act, carried out to retaliate for attacks against PLO facilities in Beirut on the previous day. This was followed on December 12 by Israeli planes bombing Palestinian refugee camps inside Beirut for the previous day's PLO attack in Tel Aviv. The United States has almost entirely halted the hijacking of airliners from U.S. territory, but the kidnapping of Patricia Hearst by the subsequently doomed "Symbionese Liberation Army" raises the question of U.S. vulnerability to the importation of this form of terrorism or its imitation by criminal elements. The U.S. Atomic Energy Commission

254

released a study citing the danger of theft of nuclear materials by terrorist organizations. The House Committee on Internal Security held public hearings on terrorism. In addition to domestic implications, the prevention of terrorism against U.S. citizens, officials, and property abroad is a major foreign policy objective. On June 11, 18, 19, and 24, 1974 the House Foreign Affairs Committee's Subcommittee on Near East and South Asia held hearings on international terrorism and counter-terrorism.

All nations are vulnerable to terrorist attacks, which are a serious danger to international transportation, communication, commerce, and even to diplomatic relations. Both preventive measures and punishment of the terrorists themselves are complicated when attacks occur under the jurisdiction of third states, and/or when the terrorists are granted asylum by sympathetic states. There appear to be two basic approaches to the problem:

(1) Unilateral improvement of internal security.

(2) Collective international action to punish terrorists as a deterrent to future violence.

The United States has been a leader in anti-terrorist policy. In September 1972, the President established a Cabinet Committee to Combat Terrorism. Visa, immigration, and customs procedures were tightened. The Federal Aviation Administration (FAA) ordered strict airport security measures. Federal protection of foreign officials was increased as a result of the signing into law of P.L. 92-539 (Oct. 24, 1972).

The United States has taken steps to improve security at U.S. installations abroad in order to protect American diplomats. The State Department advises American businessmen on security measures. U.S. policy is to resist giving in to terrorist extortion or blackmail or paying ransom for the release of hostages. The Government believes that firmness and punishment of terrorists tends to discourage future violence.

Other nations have responded variously. Israel follows a hard-line policy to the extent of employing counter-violence. However, many nations have given in to terrorist demands notably West Germany, Mexico, and Haiti. In general foreign airport security measures do not meet U.S. standards. Arab states, while formally disapproving of terrorism, have only recently begun refusing sanctuary to Palestinian hijackers. No hijacker has ever been executed.

The United States has encouraged multilateral action against terrorism, particularly in the United Nations and in its specialized agency, the International Civil Aviation Organization (ICAO). Three treaties dealing with the protection of international civil aviation negotiated under the auspices of ICAO are now in force:

(1) The 1963 Tokyo Convention on Offenses and Certain Other Acts Committed on Board Aircraft;

(2) The 1970 Hague Convention for the Suppression of Unlawful Seizure of Aircraft; and

(3) The 1971 Montreal Convention for the Suppression of Unlawful Acts against the Safety of Civil Aircraft.

Amplifying the Tokyo Convention, the Hague and Montreal Conventions classify air piracy as an international crime and provide for the extradition or prosecution of hijackers. The Montreal Convention expands the offenses covered to include sabotage. Attempts to make these agreements more effective by providing for sanctions against nations that harbor hijackers have failed. The most recent example was an extraordinary ICAO session and an International Conference on Air Law, which met simultaneously in Rome, August 23–September 21, 1973.

Legislation implementing the Hague Convention has been considered in both the 92nd and 93rd Congresses. It was signed into law on August 5, 1974 (P.L. 93-366). In December 1972, the FAA issued regulations requiring baggage and passenger screening and the provision of airport security officers by local airports. In January 1974, the FAA proposed additional regulations requiring the use of security programs by foreign airlines operating in the United States (39 FR 3293–3294, 6619). The FAA is now analyzing comments from foreign air carriers and Governments.

Two treaties concerning the protection of diplomats from terrorism have been signed but are not in force. In 1971, the Organization of American States adopted a Convention to Prevent and Punish the Acts of Terrorism Taking the Form of Crimes Against Persons and Related Extortion That Are of International Significance. In September 1972, the killing of 11 Israeli athletes at the Olympic Games

255

in Munich prompted U.N. action on other forms of terrorist attack. Secretary-General Kurt Waldheim requested that terrorism be placed on the agenda of the General Assembly. The United States also proposed a draft convention to prevent acts of terrorism.

However, the opposition of third world states led by Algeria deferred action to an Ad Hoc Committee on International Terrorism, which met in the summer of 1973, but failed to agree on recommendations. Nevertheless, a more limited Convention on the Prevention and Punishment of Crimes against Internationally Protected Persons, including Diplomatic Agents, worked out in the Legal Committee and the International Law Commission, was approved by the General Assembly December 14, 1973. The Convention establishes legal mechanisms requiring prosecution or extradition of persons alleged to have committed serious crimes against diplomats, including murder, kidnaping, violent attacks, threat of attack, or attempts to attack.

The Convention was open for signature until December 31, 1974. Twenty-two ratifications are needed before the treaty goes into effect. The United States, Denmark, Finland, Iceland, Norway, and Sweden have signed the convention. On November 18, 1974, the President sent the Convention to the Senate for its advice and consent. The U.S. State and Justice Departments are in the process of drafting implementing legislation, which would amend Title 18 of the U.S. Code. Adoption of this legislation would also result in U.S. ratification of the OAS Convention.

During its 1974 session the United Nations General Assembly again failed to act on international terrorism as the Legal Committee recommended on December 10 that the debate on international terrorism be deferred until next year.

### LEGISLATION

#### [P.L. 93–366]

S. 39 was signed into law by the President on August 5. This legislation amends the Federal Aviation Act of 1958. Title I, The Antihijacking Act of 1974, implements the 1970 Hague Convention for the Suppression of Unlawful Seizure of Aircraft. It expands the definition of the term "special aircraft jurisdiction of the United States" as used in the Federal Aviation Act; provides for the imposition of life imprisonment or the death penalty in cases where the death of another person results from the commission of an offense under the Act (the death penalty may be imposed only if specific procedural requirements set out in the Act have been complied with); authorizes the President to suspend civil air traffic with any foreign nations that does not abide by the Hague Convention, or that aids and abets terrorist groups, or with any other nation that continues to provide air service to nations encouraging hijacking; and authorizes the Secretary of the Treasury with the approval of the Secretary of State, to restrict the operations of foreign carriers when their governments do not maintain adequate security standards. Title II, the Air Transportation Security Act of 1974, requires the Administrator of the Federal Aviation Administration to prescribe or maintain in force reasonable regulations governing air carriers in their screening of passengers and baggage with weapons-detecting devices, and requires the operators of airports to maintain air transportation security programs in being with adequate enforcement personnel. The Act authorizes the use of Federal Aviation Administration or other Federal employees in certain circumstances; and gives exclusive authority to the Administrator over law enforcement activity directed toward ensuring the safety of passengers and property in flight.

#### HEARINGS

U.S. Congress. House. Committee on Foreign Affairs. Subcommittee on International Organizations and Movements. Problems of protecting civilians under international law in the Middle East conflict. Hearings, 93d Congress, 2d session. Apr. 4, 1974. Washington, U.S. Govt. Print. Off., 1974. 108 p.

U.S. Congress. House. Committee on Foreign Affairs. Subcommittee on the Near East and South Asia. International Terrorism. Hearings, 93d Congress, 2d session. Washington, U.S. Govt. Print. Off., 1974. 219 p.

Hearings held June 11, 18, 19 [and] 24, 1974.

U.S. Congress. House. Committee on Internal Security. Terrorism. Hearings, 93d Congress, 2d session. Washington, U.S. Govt. Print. Off., 1974. Part 1, 2951–3083 p; Part 2, 3085–3321 p; Part 3, 3915–4130 p.

Hearings held Feb. 27 . . . Aug. 13, 1974.

256

U.S. Congress. House. Committee on Interstate and Foreign Commerce. Sub-committee on Transportation and Aeronautics. Anti-hijacking Act of 1973. Hearings 93d Congress, 1st session, on H.R. 3858, H.R. 670, H.R. 3853, and H.R. 4287. Washington U.S. Govt. Print. Off., 1973. Part 1. 425 p. Part 2. 470 p.
  Hearings held Feb. 27, 28; Mar. 1, 6, 7, 8 [and] 9, 1973. "Serial No. 93-10"
U.S. Congress. Senate. Committee on Commerce. Subcommittee on Aviation. The Administration's emergency anti-hijacking regulations. Hearings, 93d Congress, 1st session. Jan. 9 [and] 10, 1973. Washington, U.S. Govt. Print. Off., 1973. 95 p.
  "Serial No. 93-1"
  ——— Anti-hijacking Act of 1971. Hearings, 93d Congress, 1st session, on S. 2280, S. 2299, S. 3815, and S. 3871. Washington, U.S. Govt. Print. Off., 1973. 144 p.
  Hearings held Mar. 6, June 29, [and] Aug. 13, 1972. "Serial No. 92-97"
U.S. Congress. Senate. Committee on Foreign Relations. Aircraft hijacking convention. Hearings, 93d Congress, 1st session, on Executive A., June 7 [and] July 20, 1971. Washington, U.S. Govt. Print. Off., 1971. 99 p.

### REPORTS AND CONGRESSIONAL DOCUMENTS

Aircraft Piracy Amendments of 1973. [Debate and vote in the Senate] Congressional record [daily ed.] v. 120, Mar. 12, 1974: S3502-3506.
Antihijacking Act of 1974. [Debate and vote in the House] Congressional record [daily ed.] v. 120, Mar. 13, 1974: H1728-58.
Cannon, Howard W. The Antihijacking and the Air Transportation Security Acts of 1973. Remarks in the Senate. Congressional record [daily ed.] v. 119, Jan. 4, 1973: S116-S121.
Hartke, Vance. Skyjacking. Remarks in the Senate. Congressional record [daily ed.] v. 119, Feb. 7, 1973: S2337-S2340.
Hruska, Roman L. Aircraft Piracy Amendments of 1973. Remarks in the Senate. Congressional record [daily ed.] v. 119, Feb. 15, 1973: S2539-S2541.
Javits, Jacob K. The International effort to deal with air hijacking and terrorism. Congressional record [daily ed.] v. 119, Jan. 23, 1973: S1183-S1186.
U.S. Congress. House. Committee on Internal Security. Staff study of political kidnapings 1968-1973. 93d Congress, 1st session. Washington, U.S. Govt. Print. Off., 1973. 54 p. Index. At head of title, Committee print.
  ——— Terrorism. Washington, U.S. Govt. Print. Off., 1974. 246 p. At head of title: 93d Congress, 2d session, Committee print.
U.S. Congress. House. Committee on Interstate and Foreign Commerce. Anti-hijacking Act of 1974; report to accompany H.R. 3858. Washington, U.S. Govt. Print. Off., 1974. 53 p. (93d Congress, 2d session. House. Report No. 93-885)
U.S. Congress. Senate. Committee on Commerce. Amending the Federal Aviation Act of 1958 to provide a more effective program to prevent air piracy; report to accompany S. 39. Washington, U.S. Govt. Print. Off., 1973. 76 p. (93d Congress, 1st session. Senate. Report No. 93-13)
U.S. Congress. Senate. Committee on the Judiciary. Aircraft Piracy Amendments of 1973; report to accompany S. 872. Washington, U.S. Govt. Print. Off., 1974. 12 p. (93d Congress, 2nd session. Senate. Report no. 93-722)

### OTHER CONGRESSIONAL ACTION

N/A

### CHRONOLOGY OF EVENTS

03/12/75—In Damascus, Zouheir Mohsen, the PLO military chief, threatened to launch terrorist attacks on Israeli targets in the United States.
03/05/75—At least 18 persons died in a shoot-out at a Tel Aviv hotel: eight civilian hostages (seven of them tourists from Europe and Africa), seven of the eight Palestinian terrorists, and three Israeli soldiers. The Palestinian commandos landed a boat in Tel Aviv and shot their way to the small four-story hotel, grabbing 10 hostages along the way. After several hours of shooting the guerrillas asked for release of 10 Palestinian prisoners and the Greek Catholic Archbishop of Jerusalem. The Israelis responded by attacking the hotel.
02/29/75—Honorary U.S. Consul John P. Egan was shot to death by leftist Montenero guerrillas in Cordoba, Argentina, when Argentine authorities did not comply with the guerrillas' demand to supply proof that four missing guerrillas were alive and well.

257

01/22/75—The Soviet Government strongly protested to the United States Government over extremist gun attacks January 19 on the building of the Soviet mission to the United Nations.
01/20/75—Three Arab terrorists who held 10 hostages for 18 hours in a washroom at Orly Airport Paris, released them and flew to Baghdad, Iraq. The incident began with an attempt to attack a departing Israeli airliner with a rocket launcher. A gun battle with police left eight persons wounded.
01/07/75—British authorities thwarted the attempt of an Iranian citizen demanding $230,000 ransom to hijack a British airliner on a Manchester to London flight to Paris.
12/30/74—A band of Nicaraguan guerrillas today freed 13 hostages and flew to Cuba with ransom of at least $1 million and 14 sympathizers released from Nicaraguan jails. The Spanish and Mexican Ambassadors, the Archbishop of Managua, and the Vatican representative in Nicaragua flew with the guerrillas to guarantee their safety.
12/25/74—A Czechoslovak-born Canadian armed with a pocket knife commandeered a New York-bound Air India jumbo jet for more than two hours and threatened to make it crash in Rome. Crewmen finally subdued him and the plane landed safely.
12/12/74—Israeli planes bombed Palestinian refugee camps inside Beirut to retaliate for the previous day's PLO attack in Tel Aviv.
12/11/74—Two persons were killed and 54 injured by a grenade explosion in a Tel Aviv theatre; a Palestinian organization claimed responsibility for the act, carried out to retaliate for attacks against PLO facilities in Beirut on the previous day.
11/27/74—PLO spokesmen in Beirut said that 26 persons suspected of involvement in the Tunis airline hijacking had been arrested by PLO police forces.
11/21/74—Four Palestinians hijacked a British airliner at Dubai with 43 passengers. A stewardess was wounded and a West German passenger killed at Tunis where the plane landed after no Arab country would grant the hijackers asylum. Four days later the other passengers were released and the 4 Palestinians along with seven others released under duress, five from Cairo and two from Amsterdam were turned over to the PLO by the Tunisian governemnt. (The Palestinians belong to a group hostile to the PLO.)
  Bombs exploded in two bars in Birmingham, England killing 17 and injuring 120 people. The terrorist attack was attributed to the militant Provisional wing of the Irsh Republican Army.
11/19/74—In Beit Shean, Israel, three Arab terrorists seized an apartment house and killed four civilians before being shot to death by Israeli troops.
11/12/74—In New York City, the Militant Jewish Defense League publicly vowed to assassinate Yasir Arafat, leader of the Palestine Liberation Organization delegation to the United Nations.
11/09/74—In Washington, D.C. a bomb exploded in the Pan American Union building, headquarters of the Organization of American States. Shortly after the blast, an unidentified caller told the Associated Press that a group called the "Cuba Movement 4" was responsible and that the purpose of the explosion was to protest the anticipated lifting of the OAS embargo on Cuba.
09/27/74—Seven members of the 12th of January Movement, a faction of the Popular Dominican Movement seized seven hostages, including U.S. Diplomat Barbara A. Hutchinson, and held them in the Venezuelan consulate in Santo Domingo. The terrorists demanded $1 million ransom, release of 37 political prisoners, and safe passage abroad. Demands were not met; hostages released on October 10, and terrorists given safe conduct to Panama.
09/13/74—Three Japanese Red Army terrorists seized the French Embassy at the Hague and 11 hostages including the French Ambassador, Jacques Senard; hostages were released 5 days later in return for release of a Japanese Red Army member in French custody, $300,000 ransom, and a plane to take the terrorists out of the Netherlands.
09/08/74—A TWA flight from Tel Aviv to NY exploded just after take off from Athens killing all 88 persons on board; a Palestinian guerrilla group claimed responsibility for the explosion.
08/19/74—The American Ambassador to Cyprus, Roger Davies, was shot and killed by Greek Cypriots demonstrating in Nicosia against the United States' alleged pro-Turkish policy in the Greek-Turkish crisis over Cyprus.
08/07/74—Israel continued its counterterrorist campaign in southern Lebanon with air attacks in two areas. The attacks followed the reported abduction of a Druze villager from the Israeli-occupied Golan Heights.

08/04/74—Twelve persons were killed and 48 injured by a bomb blast on an Italian express train bound from Rome to Munich. The right-wing organization Ordine Nero claimed responsibility for the bomb attack.

08/03/74—Three car bombs, supposed to have been planted by Arab nationalists, exploded outside the offices of two right-wing publications and a Jewish welfare organization in Paris.

07/24/74—The hijacker of a Colombian airliner was shot to death by police in Coli. The slain man was suspected of having taken part in an earlier successful hijacking of a Colombian aircraft to Cuba in 1969.

07/23/74—Israeli warplanes attacked Palestinian "terrorist targets" in southern Lebanon, the first such raid with aircraft since the multiple strikes of June 18–20.

07/18/74—A newspaper executive, David Kraiselburd, was kidnaped and later shot to death in Argentina by persons reputed to have associations with one of the organized guerrilla groups operating in the country.

07/17/74—A bomb exploded in the Tower of London killing and injuring 42 persons, the third major terrorist bombing in London in the last sixteen months. Police speculated privately that the incident was the work of terrorist supporters of a united Ireland.

07/15/74—A Japan Air Lines DC-8 was hijacked en route from Osaka to Tokyo by a man who demanded that the Japanese government release an imprisoned leftwing terrorist and allow the terrorist and himself to fly to asylum in North Korea. The government refused these demands and the man was overpowered in Nagoya.

07/11/74—The U.S. Embassy in Mexico announced that the skeleton found in a creekbed near Hermosillo on July 7 was that of vice consul John S. Patterson, kidnaped on March 22.

07/09/74—Israeli commandos raided three Lebanese port towns in an attempt to thwart anticipated terrorist raids on the Israeli coast similar to that which took place at Nahariyya.

06/25/74—Four Israeli hostages and three Arab terrorists were killed in the course of an Arab terrorist raid on Nahariyya in Israel.

06/24/74—Sudanese President Nimeiry turned over eight Palestinian terrorists convicted of the 1973 slaying of three Western diplomats in Khartoum to the Palestinian Liberation Organization.

06/18/74—Israeli warplanes began three consecutive days of air strikes against Palestinian positions in southern Lebanon in retaliation for the Palestinian terrorist attack on Shamir kibbutz on June 13.

06/17/74—A bomb exploded and damaged 900-year-old Westminster Hall, the oldest and most historic part of the Houses of Parliament, in London. Eleven persons were injured, none seriously. The London police reportedly said that the bomb had been planted by the Provisional wing of the Irish Republican Army.

06/13/74—Three women were killed and three men wounded in a Palestinian terrorist attack on a kibbutz in northern Israel. All four terrorists were themselves slain in the attack which presumably was carried out to coincide with President Nixon's Mideast tour.

05/18/74—At least 28 were killed by car-bombs exploded in the center of Dublin, Ireland. Extremist Protestant groups from Northern Ireland were suspected.

05/15/74—Three terrorists reportedly representing the Popular Democratic Front for the Liberation of Palestine attacked the Israeli village of Maalot and seized the high school. At least 25 Israelis were killed and 70 wounded, almost all schoolchildren.

04/12/74—USIS Official in Cordoba, Argentina, kidnaped by ERP; seriously wounded in attack and released immediately.

04/11/74—Popular Front for the Liberation of Palestine (PFLP) attacked village of Kiriyat Shmoneh and killed 18 Israelis, including 16 civilians; Israelis retaliated with raid in Lebanon.

02/04/74—In England, time-bomb exploded in bus filled with British servicemen and families, killing 11 and wounding 14.

12/28/73—United States signed Convention on the Prevention and Punishment of Crimes against Internationally Protected Persons, including Diplomatic Agents.

12/20/73—Premier Luis Carrero Blanco of Spain assassinated in Madrid; Basque separatist movement (ETA) blamed.

12/18/73—Irish Republican Army (IRA) bomb attacks injured 60 people in London.

12/06/73—Victor E. Samuelson, Exxon oil executive, kidnaped by "People's Revolutionary Army" of Argentina (the ERP, or "Ejercito Revolucionario des Pueblo"). He was finally released the end of April and returned to the United States after payment by his company of a record $14.2 million ranson.

11/22/73—John A. Swint, General Manager of a Ford subsidiary in Argentina, assassinated; Ford removed 22 U.S. executives from Argentina.

09/28/73—Black September terrorists kidnaped three Soviet Jews and Austrian customs official in Austria; released hostages after Austrian government agreed to close facilities for Soviet Jews emigrating to Israel.

08/05/73—Black September commandos attacked Athens airport, killing 5 and wounding 55.

7/20/73—Palestinians hijacked Japan Air Lines Boeing 747 from Amsterdam; exploded in Libya four days later; one hijacker killed (first hijacking of 1973).

06/02/73—U.S. army adviser in Iran assassinated by terrorists.

05/04/73—U.S. Consul General in Guadalajara, Mexico, kidnaped; freed after Mexican government released 30 prisoners and paid $80,000 ransom.

03/01/73—In Khartoum, Black September terrorists seized as hostages and later killed U.S. Envoy to the Sudan, Cleo A. Noel, Jr., Deputy Chief of Mission George C. Moore, and a Belgian diplomat.

02/05/73—United States and Cuba signed anti-hijacking agreement.

01/23/73—U.S. Ambassador to Haiti, Clinton E. Knox, kidnaped; freed in return for release of 12 political prisoners, safe conduct to Mexico for kidnapers, and $70,000 ransom.

09/25/72—United States presented draft convention on prevention of international terrorism to U.N. General Assembly; President Nixon established Cabinet Committee to Combat Terrorism.

09/19/72—Letter-bomb killed Israeli diplomat in London.

09/05/72—During Olympic games in Munich, Black September attack on Israeli athletes and subsequent German police ambush resulted in death of 11 Israelis, 5 terrorists, and 1 policeman.

07/22/72—Bomb attacks by Provisional Irish Republican Army in Belfast; 11 killed, 130 injured.

05/30/72—Japanese "Red Army" guerrillas, supporting PFLP, opened fire on passengers at Lod airport in Israel, killing 26 and injuring over 70.

03/24/72—British Government suspended Northern Ireland parliament and imposed direct rule from March 30.

03/22/72—Director of Fiat Plant in Argentina kidnaped by ERP, found dead April 10. Followed by series of kidnapings of foreign businessmen in Argentina.

02/22/72—IRA bomb attack on British Army barracks at Aldershot killed 7 and injured 19; first IRA bombing in Britain since World War II.

11/28/71—Jordanian Prime Minister Wasfi Tal assassinated in Cairo by Black September terrorists.

09/23/71—Aircraft Sabotage Convention signed at Montreal (approved by Senate 10/03/72, entered into force 10/26/73).

05/17/71—Guerrillas of Turkish People's Liberation Army kidnaped Israeli Consul General in Istanbul; found dead May 23.

02/02/71—OAS Convention to Prevent and Punish Acts of Terrorism signed at Washington (approved by Senate 06/12/72).

01/08/71—Tupamaro guerrillas kidnaped British Ambassador to Uruguay; released 09/09/71.

12/16/70—Hague Convention for the Suppression of Unlawful Seizure of Aircraft signed (approved by Senate 09/08/71, entered into force 10/14/71).

10/00/70—British Trade Commissioner in Montreal, J.R. Cross, and Quebec Minister of Labour and Immigration, Pierre Laporte, kidnaped by Quebec separatist movement; latter found murdered, former released in return for kidnapers' safe passage to Cuba.

09/00/70—PFLP hijacked four airliners (2 American, 1 Swiss, 1 British); Pan Am plane blown up in Cairo, others at Dawson's Field in Jordan. All passengers released. This precipitated Jordanian civil war.

07/31/70—Tupamaro guerrillas in Uruguay kidnaped Brazilian Consul and U.S. adviser Daniel A. Mitrione, who was found dead 08/10/70.

06/11/70—West German Ambassador to Brazil kidnaped, released in return for 40 political prisoners.

03/31/70—West German Ambassador to Guatemala kidnaped; found dead 04/04/70.

260

02/21/70—Swiss airliner en route from Zurich to Tel Aviv exploded in midair by time-bomb; 38 passengers, 9 crew killed; Palestinians suspected but denied responsibility.

12/04/69—United States ratified 1963 Tokyo Convention on Offenses and Certain Other Acts Committed on Board Aircraft, which then came into force.

08/29/69—TWA Boeing 707 hijacked to Damascus and destroyed.

09/04/69—U.S. Ambassador to Brazil kidnaped; released after Brazilian Government agreed to kidnapers' demands.

08/29/69—U.S. Ambassador to Guatemala, John Gordon Mein, assassinated by "Armed Forces of the Revolution" (FAR). 1st U.S. Ambassador ever assassinated.

### ADDITIONAL REFERENCE SOURCES

U.S. Dept. of State. Bureau of Public Affairs. Office of Media Services. U.S. action to combat terrorism. 21 p. (News release, n.d., includes documents from Sept. 25–Oct. 3, 1972)

———The Role of international law in combating terrorism. (Dept. of State publication 8689, General foreign policy series 270). Washington, U.S. Govt. Print. Off., 1973. 7 p.

Dugard, John. International terrorism: problems of definition. International affairs (London), v. 50, Jan. 1974: 67–81.

Evans, Alona E. Aircraft hijacking: What is being done. American journal of international law, v. 67, Oct. 1973: 641–71.

Gross, Leo. International terrorism and international criminal jurisdiction. American journal of international law, v. 67, July 1973: 508–511.

Hamer, John. Protection of Diplomats. Editorial research reports, v. II, Oct. 3, 1973: 759–776.

Hannay, William A. International terrorism: the need for a fresh perspective. International lawyer, v. 8 Apr. 1974: 268–284.

Hoffacker, Lewis. The U.S. Government response to terrorism: a global approach. Dept. of State bulletin, v. 70, Mar. 18, 1974: 274–278.

Kutner, Luis. Constructive notice: a proposal to end international terrorism. New York law forum, v. 19, fall 1973: 325–350.

Laquer, Walter. Guerrillas and terrorists. Commentary, v. 58, Oct. 1974: 40–48.

McWhinney, Edward. Aerial Piracy and International Law. Dobbs Ferry, New York, Oceana Publications, Inc., 1971. 213 p.

Moss, Robert. International terrorism and Western societies. International journal, v. 28, summer 1973: 418–430.

Rosenfield, Stanley B. Air piracy: is it time to relax our security? New England Law Review, v. 9, Fall 1973: 81–117.

Bozakis, Christos L. Terrorism and the internationally protected persons in the light of the ILC's draft articles. International and comparative law quarterly, v. 23, Jan. 1974: 32–72.

Shaffer, Helen B. Control of skyjacking. Editorial research reports, v. I, January 1973: 67–84.

Shurber, Sami. Aircraft hijacking under the Hague Convention—a new regime? International and comparative law quarterly, v. 22, Oct. 1973: 687–726.

Terrorism: the proposed United States draft convention. Georgia journal of international law, v. 3, 1973: 430–447.

The Antiskyjack system: A Matter of search—or seizure. Notre Dame lawyer. v. 48, June 1973: 1261–1280.

## INDEX

(NOTE.—The Senate Internal Security Subcommittee attaches no significance to the mere fact of the appearance of the name of an individual or organization in this index.)

### A

| | Page |
|---|---|
| Ação Libertadora Nacional (ALN) (Action for National Liberation) | 209 |
| Acção Revolucionaria Armada (ARA) | 182, 185, 187, 203 |
| Action Organization for the Liberation of Palistine (AOLP) | 211 |
| Addis Ababa Radio | 195 |
| Africa | 184, 186, 203, 249 |
| African National Congress (ANC) | 195 |
| Afro-Asian-Latin American People's Solidarity Organization (AALAPSO) | 190 |
| Air Transportation Security Act (1974) | 255 |
| Al Fatah | 182, 193, 195, 210, 211 |
| Al Saiqa | 210, 211 |
| Ala (Red Wing) | 209 |
| Albany | 244 |
| Algeria | 179, 186, 191, 210, 244, 255 |
| Allende | 194–106, 203 |
| ALP | 210 |
| Amsterdam | 249 |
| Analysis of Terrorism by Function, fiscal years 1974 and 1975 (table) | 234 |
| Anarchists | 182, 193 |
| Angola | 187, 197 |
| Angry Brigade | 183, 193, 198 |
| Annual of Power and Conflict, 1971 (publication) | 191 |
| Annual of Power and Conflict, 1972 and 1973 (publication) | 190, 194 |
| Annual of Power and Conflict, 1973 and 1974 (publication) | 208 |
| Arab Information Agency | 195 |
| Arab-Israeli war | 196, 238, 245 |
| Arab League | 245 |
| Arab Liberation Front (ALF) | 211, 245 |
| Arab States | 196, 208, 237–239, 246, 254 |
| Arab terrorists | 178, 191, 205, 245 |
| Arafat, Yasser | 195 |
| Ardoyne | 206 |
| Argentina | 181, 196, 208, 217, 246 |
| Asia | 210, 211 |
| Athens Airport | 249 |
| Atomic Energy Commission | 253 |
| Attorney General | 231 |
| Australia | 184, 210 |
| Austria | 249 |
| Avanguardia Nazionale | 198 |
| Avanguardia Operaia | 199 |

### B

| | Page |
|---|---|
| Baader, Andreas | 210 |
| Baader-Meinhof gang (Red Army group) | 178, 181, 182, 191, 193, 197, 198, 210, 217, 244 |
| Baath Party (Syria) | 211 |
| Baku | 184, 18. |
| Bakunin | 182 |
| Bangkok | 211 |
| Bangladesh | 196 |

II

Banguarda Armada Revolutionaria-Palmares (VAR-Palmares) (Armed Revolutionary Vanguard-Palmares) ... Page 209
Bank of America ... 248
Beirut ... 248, 253
Belfast ... 201, 206
Belgium ... 200
Bern ... 194
Berner Tagblatt (publication) ... 194
Birmingham, England ... 202
Bombings ... 202
Bite, Vita ... 253
Black Liberation Army ... 210
Black Panthers ... 210
Black power ... 198
Black September Organization (BSO) ... 182, 191, 192, 211
Blanco, Admiral Carrero ... 196, 200
Bogota Radio ... 195
Bolivia ... 195, 209
Borghese, Prince Valerio ... 199
Brazil ... 183, 195, 196, 209, 235
Brezhnev, Leonid ... 186
British Security Forces ... 200, 201
Brittany ... 198
Brussels ... 180, 190, 198
Buenos Aires ... 248
Bulgaria ... 184, 185, 191
Burrell, R. M. ... 196

C

Cabora Bassa Dam ... 197
Caetano, Prime Minister ... 197, 204
Cambodia ... 184, 197, 244
Canada ... 210, 244
Ministry of Transport ... 243
Carabinieri ... 199
Carlos, Prince Juan ... 200
Carrillo, Santiago ... 200
Castro, Fidel ... 184, 190, 195, 196, 236, 245
Castroites ... 182
Catalonia ... 182, 200
Central Intelligence Agency (CIA) ... 228, 253
Chad ... 185
Chernikov, G. P. ... 194
Chile ... 184, 187, 194, 196, 209
China ... 180, 182, 185
China, Republic of ... 244
Chinese People's Republic (CPR) ... 182, 184, 192, 196, 244
Christian Democrats ... 199
Chronologies of hijackings—1968 through 1975 (list) ... 222–227
Chronology of events (list) ... 256–260
Chronology of significant terrorist incidents involving U.S. diplomatic Official personnel (list) ... 220–222
Clary, Gary ... 177
Colombia ... 185, 187, 195
Columbia Broadcasting System (CBS) ... 189
Comando da Libertação Nacional (COLINA) (National Liberation Commando) ... 209
Comintern ... 184, 204
Communist ... 178, 182, 186, 191, 194, 196, 199, 238
Communist Party ... 212
Brazil ... 200
Chile ... 195
Colombia ... 195
Cuba ... 193
Great Britain ... 202
Guatemala ... 209
Italy ... 199

III

Communist Party—Continued
North Korea ... Page 193
North Vietnam ... 193
Portugal ... 182, 185–187, 203
Soviet Union ... 203
Central Committee ... 184, 187, 194
International Department ... 184
20th Congress ... 184
Spain ... 200
Turkey ... 211
Congo, Republic of (Brazzaville) ... 179, 186, 191
Congressional hearings (list of) ... 255, 256
Congressional reports and documents (list of) ... 256
Cosmos Travel Agency ... 195
Costello, Seamus ... 200
Crozier, Brian ... 236, 238
Testimony of ... 179–212
Cuba ... 184, 195, 208, 212, 248
Cuban terrorists ... 245
Cunhal, Alvaro ... 185, 186
Cymdeithas yr Iaith Cymraeg (Welsh Language Society) ... 202
Cypriot terrorists ... 178
Cyprus ... 178, 179, 202
Czechoslovakia ... 184, 185, 187

D

Davis, Ambassador ... 178
Death Squad (Escuatrão da Morte) ... 183
de Gaulle, General ... 187
Denmark ... 187, 244, 255
Department of Defense (DOD) ... 194, 241
Advanced Projects Agency ... 240
Department of Transportation Safety Institute ... 243
Der Bund (publication) ... 194
Dev-Gene (Devrimci Gençler) (Revolutionary Youth) ... 211
Dien Bien Phu ... 183
Directorio General De Inteligencia (DGI) ... 185, 195, 236
Distribution of terrorism security funds appropriated to the Department of State fiscal years 1974 and 1975 (table) ... 233
Douglas Aircraft ... 248
Dubai ... 253
Dublin ... 201

E

East Asia ... 184
East Berlin ... 191, 194, 195
East Germany ... 185, 195
Eastern Europe ... 184
Economic Commission for Europe (ECE) ... 208
Ecuador ... 244
Egypt ... 210, 244, 245
Ejército de Liberacíon Nacional (ELN) (National Liberation Army) ... 209
Ejército Revolucionario del Pueblo (ERP) (People's Revolutionary Army) ... 181, 200, 208, 209, 246
Elbrick, Burke ... 178
Eldorado ... 195
El Poder Cubano (Cuban Power) ... 210
El Siglo (publication) ... 195
Energy Research and Development Administration (ERDA) ... 241
England ... 201, 205
Eoka-B ... 202
ERDA–DOD Physical Security Review Board ... 241
Eritrea ... 211
Eritrean Liberation Front (ELF) ... 211
Ethiopia ... 196, 211
Europe ... 195, 197, 208, 210, 211

IV

| | Page |
|---|---|
| Euzkadi Ta Azkatasuna (ETA) (Basque Nation and Liberty) | 200, 210 |
| V Assembly | 198, 200 |
| VI Assembly | 182, 198 |
| Executive Protection Service | 228, 240 |
| Eye for an Eye (Ojo por Ojo) | 183 |

F

| | |
|---|---|
| Far East | 213 |
| Fatah | 245 |
| Fearey, Robert A | 179, 190 |
| Testimony of | 212, 251 |
| Federal Aviation Act | 255 |
| Federal Aviation Administration (FAA) | 242–244, 254, 255 |
| Air Security School | 244 |
| Federal Bureau of Investigation (FBI) | 214, 228, 229, 231, 240, 245–248 |
| Federal Republic of Germany | 181 |
| Feltrinelli, Giangiacomo | 191 |
| Fields, Louis | 212, 232 |
| Finland | 186, 187, 255 |
| FLNC | 236 |
| Foreign Relations Association | 247 |
| Foreign Service | 216, 228, 249 |
| Fort Bragg | 179 |
| Fourth International (Trotskyist) | 189, 190, 198 |
| France | 196, 197, 199, 200, 203, 210, 243 |
| Franco, General | 200 |
| Frankfurt | 191, 206, 207 |
| Freedom for the Basque Homeland (Basque Euzkadi to Azkatasuns) | 198 |
| Front d'Alliberament Catalá (FAC) | 198, 200 |
| Frente Argentino de Liberacion (FAL) (Argentine Liberation Front) | 208 |
| Front de Liberation de la Bretagne | 198 |
| Front for the Liberation of Mozambique (FRELIMO) | 186, 187 |
| Front de Liberation du Québec (FLQ) (Quebec Liberation Front) | 182, 192, 210 |
| Fuerzas Armadas Reveldes (FAR) (Rebel Armed Forces) | 209 |
| Fuerzas Armadas Revolucionarias (FAR) (Revolutionary Armed Forces) | 209 |
| Fuerzas Armasas Peronists (FAP) (Peronist Armed Forces) | 208 |

G

| | |
|---|---|
| Gatch, John N | 212, 213, 230, 236 |
| Germany | 178, 183, 210, 217, 248 |
| Embassy of (Stockholm) | 217 |
| Ghadaffi | 186 |
| Ghana | 196 |
| Great Britain | 193, 201, 202, 205, 206, 208 |
| Embassy of | 248 |
| Greece | 198, 202 |
| Grupos de Acción Revolucionaria Internacionalista (GARI) | 200 |
| Guadalajara | 249 |
| Guam | 244 |
| Guardia di Finanza | 199 |
| Guardian of Liberty (publication) | 194 |
| Guatamala | 183, 192 |
| Guevara, Che | 193 |
| Guevarists | 182, 193 |
| Guinea-Bissau (Portuguese Guinea) | 186, 195 |

H

| | |
|---|---|
| Hague Convention (1970) | 215, 242, 249, 254, 255 |
| Haiti | 249, 254 |
| Halperin, Ernst | 196 |
| Hanoi | 197 |
| Havana | 178, 185, 190, 196 |
| Hearst, Patricia | 253 |
| Hermosillo, Mexico | 178 |
| Hoffacker, Ambassador Lewis | 213, 247 |
| Holland | 185, 189, 200 |

V

| | Page |
|---|---|
| House Committee on Internal Security | 254 |
| Human Kindness Day | 178 |
| Hungary | 186, 187 |

I

| | |
|---|---|
| IAEA | 241 |
| Iceland | 255 |
| Indochina | 179, 197 |
| Indonesia | 179 |
| Institute for the Study of Conflict (ISC) | 179, 182, 190, 192, 194–197, 208 |
| International Civil Aviation Organization (ICAO) | 231, 254 |
| Council | 215 |
| International Labor Organization (ILO) | 246 |
| International Marxist Group (IMG) | 202 |
| International Socialists (IS) | 202 |
| International Terrorism: A Chronology, 1968–74 (publication) | 194 |
| Interpol | 208, 215, 229, 249 |
| Iraq | 186, 245 |
| Ireland | 189, 201 |
| Ireland, Republic of | 188, 200, 201, 208, 210, 244 |
| Irish Republican Army (IRA) | 182, 189, 193, 195, 198, 200–203, 206–208, 210, 217, 245 |
| Provisional Wing | 182, 185, 187, 193, 197, 198, 200–203, 210, 245, 246 |
| Irish Republican Socialist Party (IRSP) | 200 |
| Israel | 191, 193, 210, 211, 253, 254 |
| Italicus express | 198, 199 |
| Italy | 182, 183, 196–199, 203, 204, 212 |
| ITU | 246 |

J

| | |
|---|---|
| Jackson, Ambassador | 178 |
| Japan | 211 |
| Japanese Red Army (See United Red Army.) | |
| Jenkins, Brian | 218 |
| Jewish Defense League (JDL) | 210 |
| Johnson, Lyndon | 187 |
| Jordan | 245 |
| Justice Department | 255 |

K

| | |
|---|---|
| Karachi | 249 |
| KGB | 184, 185, 194, 195 |
| Khadaffi, Colonel | 191, 196 |
| Khartoum | 211, 216, 232, 235 |
| Khrushchev, Nikita | 203 |
| Kissinger, Henry | 253 |
| Komsomol | 194 |
| Kuwait | 213, 249 |

L

| | |
|---|---|
| Labour Party | 202 |
| Lao Dong | 182 |
| Laos | 184 |
| Latin America | 179, 184, 188, 183, 190, 194, 195, 200, 208, 209, 214, 235, 244, 247 |
| Law Enforcement Assistance Administration (LEAA) | 244 |
| Lebanon | 183, 186, 191, 253, 211 |
| Lenin | 184, 238 |
| Lenin Institute (a.k.a. Institute of Social Sciences, Institute of Social Studies, International School of Marxism-Leninism) | 184, 187, 194, 203 |
| Leone, President | 199 |
| Letter-bombs | 191 |
| Liberia | 244 |
| Libya | 186, 191, 196, 210, 245 |
| Literaturnaya Gazeta (publication) | 195 |
| Lod Airport massacre | 183, 207, 211, 212 |
| London | 179, 188, 191 |

VI

Page

London Economist (publication)_____ 179
London Times (Sunday) (newspaper)_____ 179
Londonderry_____ 201
Lorenz kidnaping_____ 217
Lufthansa Airlines_____ 191
Lydda Airport massacre_____ 191, 192

M

Maalot_____ 253
Manson killings_____ 183, 198
Mao Tse-tung_____ 180, 193
Maoist Brigate Rosse_____ 182, 198
Maoist groups_____ 182
Maoist Reorganization Movement of the Party of the Proletariat (MRPP)_ 182, 198
MAR_____ 185
Marighela, Carlos_____ 209
Martin, David_____ 177, 179, 211, 212
Mayors Advisory Committee on International Relations and Trade_____ 247
Meinhof, Ulrike_____ 210
Mexico_____ 184, 185, 187, 249, 254
Meyer, Ambassador Armin_____ 213
Middle East_____ 184, 186, 196, 210, 211, 213, 219, 238, 250, 253
Middle East War_____ 196
Milan_____ 198, 199
Miristas_____ 196
Mitrione, Daniel_____ 178
MLN (Movimiento de Liberación Nacional) (National Liberation Movement), (better known as Tupamaros)_____ 209
Mogadishu (Somalia)_____ 195
Montevedeo_____ 209
Montoneros_____ 181, 209
Montreal Convention (1971)_____ 215, 242, 249, 254
Morning Star (publication)_____ 195
Moscow_____ 178, 182, 185-187, 194, 195, 202, 204
Movimento Revolucionario-8 (MR-8) (Revolutionary Movement of the Eighth)_____ 209
Movimento Sociale Italiano (MSI)_____ 199
Movimiento Ibérico Libertario (MIL)_____ 182, 198
Movimiento Izquierdista Revolucionario (MIR) (Revolutionary Leftist Movement)_____ 195, 209
Movimiento Revolucionario-13 (MR-13) (Revolutionary Movement of the Thirteenth)_____ 209
Mozambique_____ 183, 186, 197
Munich_____ 191, 194, 255
Airport_____ 211
Munich Massacre_____ 191

N

National Front_____ 202
National Liberation Directorate (DLN)_____ 195
National Security Agency (NSA)_____ 228
National War College_____ 213
Navarro, Arias_____ 196
Nazi-Soviet Pact_____ 186, 187
Netherlands_____ 205, 206, 244
New Dimensions of Security in Europe (Report of ISC)____ 193, 197
New Left_____ 187, 198, 199
New Orleans_____ 247
New Peoples' Army_____ 245
New York City_____ 178, 191, 210, 239
New York Times (newspaper)_____ 179
Nicaragua_____ 217
Nigeria_____ 196
Nixon, Richard_____ 247
North America_____ 184, 210, 217, 250
North Atlantic Treaty Organization (NATO)_____ 193, 196, 197, 199, 202

VII

Page

North Korea_____ 183, 185, 191, 194
Defense Ministry_____ 194
North Vietnam_____ 184
Northeast Regional Conference on Possible Terrorist Activity_____ 244
Northern Ireland_____ 186, 188, 195, 200-202, 206, 207, 210, 217, 256
Norway_____ 187, 255

O

Odessa_____ 184, 188, 194, 203
Okinawa_____ 218
Oman_____ 196, 244
Omnipol_____ 185, 203
Operation Motorman_____ 201
Order of the October Revolution_____ 186
Ordine Nero_____ 183
Ordine Nuovo_____ 198, 199
Organization of African Unity (OAU)_____ 195
Organization of American States (OAS)_____ 198, 215, 249, 254
Convention_____ 255
Organization of the Popular Revolution-33 (OPR-33)_____ 209

P

PAIGC_____ 195
Palestine_____ 193
Palestine Liberation Army (PLA)_____ 210, 245
Palestine Liberation Organization (PLO)_____ 196, 210, 211, 217, 235, 237, 245, 246, 253
Palestinian Arabs_____ 210
Palestinian terrorists_____ 178, 191, 195, 211, 244, 245
Palestinians_____ 195
Pan American Airlines (Pan Am)_____ 178, 253
Panama_____ 244
Paris_____ 187, 191, 195, 211
Partido Guatemalteco de Trabajo (PGT) (Guatemalan Workers Party)__ 209
Patrice Lumumba University (Moscow)_____ 184, 188, 238
Patterson, John_____ 178
PCI_____ 203
Peacetime strategy of the Soviet Union (ISC report)_____ 192
Peel, Sir Robert_____ 205
Peking_____ 178
Pentagon_____ 249
Perón, President Juan_____ 196, 208
PFLOAG_____ 196
Philippine terrorists_____ 245, 246, 253
Philippines_____ 186, 244, 245
Piazza Fontana_____ 199
Plaid Cymru (Welsh Nationalist Party)_____ 202
Ponomarev, Boris_____ 184, 203
Popular Democratic Front for the Liberation of Palestine (PDLP)__ 210, 211, 253
Popular Democratic Republic of Yemen (PDRY)_____ 186
Popular Front for the Liberation of Palestine (PFLP)___ 183, 191, 207, 210, 211, 217, 244, 245
Popular Front for the Liberation of Palestine-General Command (PFLP-General Command)_____ 210, 211, 245, 253
Popular Liberation Forces (PLF)_____ 120
Popular Unity coalition_____ 195
Portugal_____ 185, 186, 187, 197, 198, 203, 204, 244
Prague_____ 178, 185
Prague Spring_____ 187
Pribytkov, V. G_____ 194
Pubblica Sicurezza_____ 199
Puerto Rican terrorists_____ 245
Punishment Squad_____ 211
Pyongyang_____ 194
Pyrenees_____ 200

VIII

### Q

| | Page |
|---|---|
| Quebec | 210 |
| Quijano, Cecilia | 195 |
| Qiryat Shemona | 211 |

### R

| | Page |
|---|---|
| Rabe, Deputy Chief | 229 |
| Rand Corp | 194, 218, 240 |
| RASD | 211 |
| Rebels, The (book) | 179 |
| Red Army group (RAG). (See Baader-Meinhof gang.) | |
| Red Weekly (publication) | 202 |
| Rees, David | 196 |
| Reference sources (list of) | 260 |
| Rejection Front | 245 |
| Reuters (news agency) | 179 |
| Revolutionary Armed Forces of Colombia (FARC) | 195 |
| Rhodesia | 195 |
| Ricci, General Ugo | 199 |
| Rio de Janeiro | 209 |
| Rogers, William | 249 |
| Rome | 191, 207, 215, 246, 249 |
| Airport | 178, 249, 253 |
| Rosa Dei Venti | 183, 198 |
| Royal Ulster Constabulary (RUC) | 201 |
| Russia | 177, 186, 195 |
| Ryshenko, F. D | 194 |

### S

| | Page |
|---|---|
| Sahnoun, Mohammed | 195 |
| Saiga | 245 |
| Salazar | 185 |
| Salisbury Radio | 195 |
| Santiago | 195 |
| São Paulo | 209 |
| Saudi Arabia | 210, 244, 245 |
| Embassy of | 211 |
| Scarman, Lord Justice | 202 |
| Schapiro, Leonard | 179 |
| Scheveningen jail | 189 |
| Schiphol Airport | 185, 187, 203 |
| Scotland | 201, 202 |
| Scottish Nationalist Party (SNP) | 202 |
| Scribners | 170 |
| Sechaba (publication) | 195 |
| Schachori, Dr. Ami | 191 |
| Secret Service | 228, 240 |
| Secretary of State | 213, 247 |
| Short, R. J | 177 |
| Simferopol | 184, 188, 203 |
| Singapore | 244, 240 |
| Sirhan Sirhan | 232 |
| Spain | 182, 106–200, 204, 210, 217, 244 |
| Special Cabinet Committee on International Terrorism | 179, 212–214, 220, 227, 228, 247, 254 |
| Working Group | 179, 207, 212, 213, 214, 216, 220, 239, 240, 247, 248 |
| Membership of (list) | 220 |
| Spinola, General | 197 |
| Socialist Party (Chile) | 195 |
| Sourwine, J. G | 177–251 |
| South Africa | 195 |
| South Asia | 184 |
| South Vietnam | 197, 244 |
| Soviet Union | 183, 185, 187, 195, 100, 237, 238, 245 |
| Soviet Armed Forces | 187 |

CONTINUED

1 OF 2

IX

| | Page |
|---|---|
| State Department | 194, 212, 214, 216, 228, 231, 240, 249, 254, 255 |
| Office of Security | 216, 233 |
| Operations Center | 249 |
| Students for a Democratic Society (SDS) | 120 |
| Sudan | 235, 244, 247 |
| Sweden | 183, 187, 255 |
| Swissair | 178 |
| Switzerland | 198, 244 |
| Symbionese Liberation Army (SLA) | 183, 199, 210, 253 |
| Syria | 183, 186, 191, 210, 211, 245 |

T

| | |
|---|---|
| Tanzania | 186, 191 |
| Tarabochia, A. L. | 177 |
| Tartan Army | 202 |
| Tashkent | 184, 188, 194, 203 |
| Tass (Soviet News Agency) | 195 |
| Tel Aviv | 178, 211, 253 |
| Tet offensive | 187 |
| Thailand | 184 |
| Theory of Conflict, A (book) | 179 |
| Third World | 184, 194 |
| Thompson, Sir Robert | 179 |
| Thurmond, Senator Strom | 177–251 |
| Time (magazine) | 179 |
| Tokyo Convention (1963) | 215, 242, 249, 254 |
| Tomas, President | 197 |
| Tricontinental | 190 |
| Tripoli | 191 |
| Trotskyist Party (Argentina) | 208 |
| Trotskyists | 182, 193 |
| Truong Chinh | 180 |
| Tunis | 235 |
| Tupamaros [MLN (Movimiento de Liberación Nacional) (National Liberation Movement)] | 172, 198, 200 |
| Turkey | 193, 211, 244 |
| Turkish People's Liberation Army (TPLA) (a.k.a. Turkiye Halk Kurtulus Ordusu (THKO)) | 187, 191, 211 |
| 20th Olympic Games (Munich) | 191, 211, 213, 247, 254 |

U

| | |
|---|---|
| Ulster | 193, 198, 201, 207 |
| Ulster Defence Association (UDA) | 200, 201 |
| Ulster Freedom Fighters (UFF) | 200 |
| Ulster Volunteer Force (UVF) | 200 |
| UNESCO (United Nations Educational, Scientific and Cultural Organization) | 246 |
| Union of Soviet Socialist Republics (U.S.S.R.) | 1, 4, 188, 192, 238 |
| United Kingdom | 183, 188, 197, 198, 200, 208, 210 |
| United Nations | 208, 210, 231, 237, 246, 247, 249, 254 |
| Ad Hoc Committee on International Terrorism | 255 |
| Declaration of Human Rights | 250 |
| General Assembly | 215, 237, 245, 246, 249, 250, 255 |
| United Red Army (Rengo Segikun) | 183, 191, 199, 211, 217, 244 |
| United States | 177, 184, 189, 190, 194–199, 205–207, 210, 216, 219, 230–232, 236, 240, 241, 243, 245, 246, 248, 249, 253–255 |
| Ambassador | 178, 235 |
| Congress | 216 |
| Embassy (Manama, Bahrain) | 213 |
| Supreme Court | 195 |
| United States-Cuba Accord | 231 |
| UPU | 246 |
| Uruguay | 178, 192, 195, 196, 209, 235 |
| Uruguayan terrorists | 178 |

x

### V

| | Page |
|---|---|
| Vanguarda Popular Revolucionaria (VPR) (Popular Revolutionary Vanguard) | 209 |
| Vieira, Gilberto | 195 |
| Vietcong | 183, 189, 238 |
| Vietnam | 180, 187, 189 |
| Vo Nguyen Giap | 180 |

### W

| | |
|---|---|
| Wales | 201, 205 |
| Walsheim, Kurt | 255 |
| Washington, D.C. | 178, 240 |
| Metropolitan Police Department | 229, 239 |
| Weather Underground | 179 |
| Weathermen | 183, 198, 210 |
| West German Radio | 195 |
| West Germany | 198, 199, 206, 212, 244, 254 |
| Western Europe | 182, 184, 185, 197, 199, 204 |
| White House | 249 |
| Workers' Party of North Vietnam | 203 |
| World Council of Churches | 187 |
| World Health Organization (WHO) | 246 |
| World Marxist Review (publication) | 203 |

### Y

| | |
|---|---|
| Young Citizens' Army (YCA) | 200 |
| Yugoslavia | 210 |

### Z

| | |
|---|---|
| Zagreb | 191 |
| Zaire | 186, 196 |
| Zambia | 186 |
| Zengakuren | 211 |

END