# EXHIBIT 19

Section 1.  International Terrorism

1.   Japanese Ambassador's Residence Seized in Peru

(1)   Outbreak of the Incident<BR>

At around 8:30 p.m. on December 17, 1996 (around 10:30 a.m. on December 18, Japan Time), members of a left-wing terrorist organization called Tupac Amaru Revolutionary Movement (to be hereinafter called MRTA) used explosives and seized the official residence of the Japanese Ambassador to Peru. At the residence, the Japanese Ambassador was hosting a reception to celebrate Japanese Emperor Akihito's birthday inviting hundreds of people. The guests included Peruvian government officials, ambassadors and other diplomatic mission members as well as Japanese nationals residing in Peru. The group of 14 left-wing terrorists, led by Nestor Cerpa Cartolini, armed themselves with hand grenades and automatic rifles and took a record number of people as hostages    \ about 700 persons. For more than four months, the group occupied the residence.

Upon seizing the building, the criminal group made a four-point demand to the Peruvian government in a statement issued via local mass media. It demanded that the government "release all MRTA members now in prison," "provide escort and guarantee the safe exit route to the Central Amazon region for them," "change the government's economic policy" and "pay the ransom which they called 'war tax'".

(2)   Brief Outline of MRTA Organization<BR>

MRTA was formed in or about 1982 in Peru to champion Marx-Leninist revolution. The organization embraced 1,000-2,000 members at the peak time, and has been funded by contributions from narcotics dealers, and money raised through abduction, robberies and intimidation of business corporations. MRTA had attacked European and the U.S. diplomatic establishments and Peruvian government agencies and abducted diplomatic mission members and Peruvian government officials. The number of MRTA activists decreased sharply as a result of thoroughgoing crackdown on terrorists by the government which had reinforced terrorists control laws and arrested leaders of terrorist organizations one after another. The members of MRTA were considered to number less than 100 when this incident happened. <BR>

(3)   Developments of the Incident<BR>

<BR>

A.   MRTA's Seizure Prolonged<BR>

The group of MRTA members set free a large number of women and the aged among the hostages about two hours after the outbreak of this incident. The group set free nine persons including The Canadian Ambassador to Peru; On the following day, or December 18, four Peruvians of Japanese ancestry on December 19; 39 people including ambassadors and other members of the diplomatic corps of various countries on December 20; 225 people including ambassadors from various countries on December 22. In the meantime, the group demanded the "release of imprisoned MRTA members" and others.<BR>

President Alberto Fujimori of Peru rejected all of their demands and demonstrated a resolute stance indicating that he might resort to force if the MRTA members harmed the hostages.  Because the Peruvian Government refused to negotiate with the MRTA group at first, Michel Minning, the Peruvian delegate of the International Committee of the Red Cross (ICRC) and Canadian Ambassador Anthony Vincent who was set free on the second day of the incident went

to the Japanese Ambassador's official residence for talks with the MRTA group.<BR>

On December 28, Peruvian Education Minister Domingo Palermo became the first Peruvian government official to enter the Japanese residence after the hostage incident broke out. He conducted negotiations with the MRTA members for about three hours and a half, and on the same day 20 people including the Dominican Republic ambassador were freed.<BR>

The talks with the MRTA members had been virtually stalled when helicopters of the Peruvian Government menacingly circled low over the embassy building, while armored vehicles were deployed around the building. In addition, loud speakers positioned nearby blared military marches and other music numbers. The MRTA members replied with repeated warning shots from rifles. For a time, a very noisy and highly tensive atmosphere prevailed in the neighborhood of the ambassador's residence.<BR>

Under such circumstances, the safety of the hostages was a matter of serious concern. The terrorists refused to release any more hostages after freeing one Peruvian police officer on December 27. A total of 72 hostages were held in the ambassador's official residence until the incident was brought to an end. <BR>

<BR>

B.    Japan-Peru Summit Talk and Start of "Preliminary Dialogue"<BR>

In search of a breakthrough for settling the incident, Japan and Peru held a summit meeting in Toronto, Canada, on February 1. The top leaders of Japan and Peru strongly criticized the whole incident as unacceptable to the international community and confirmed each other's will to make stepped-up efforts to settle the incident in a peaceful manner and release all hostages at the earliest date possible. They agreed that the Peruvian government would start "preliminary dialogue" with MRTA prior to the full start of direct talks between them.<BR>

The negotiations between the Peruvian Government and MRTA representatives were conducted, in the form of "preliminary talks" since February 11. They were joined by a third party "Guarantors Committee" consisting of Roman Catholic Archbishop Juan Luis Cipriani who is the leader of religious circles in Peru, ICRC representative Minning and Canadian Ambassador Vincent. Japanese Ambassador to Mexico Terada joined the committee as an observer. The negotiations which were focused on terms under which the incident could be ended made a rough sledding with the MRTA representatives refusing to compromise their demands, which included  "the release of imprisoned MRTA members." <BR>

<BR>

(4)   Rescue Operation<BR>

<BR>

Under such circumstances, the Peruvian Government had a special squad of about 140 soldiers raid the residence at 3:23 p.m. on April 22, 1997 (at 5:23 a.m. on April 23, Japan Time). As a result, all but one    \ a Peruvian supreme court justice    \ of the 72 hostages, including 24 Japanese, were brought to safety on the 127th day of their captivity. As a result of the exchange of gun fire, besides the justice, two members of the Peruvian special unit died, and all the 14 MRTA terrorists were shot to death. <BR>

<BR>

(5)   International Community's Reaction<BR>

<BR>

From the beginning to the end, the international community vehemently denounced the conducts of MRTA terrorists and supported the Peruvian Government which firmly adhered to its stance of never yielding to terrorism, threatening to

use force if the MRTA terrorists should inflict damage to the hostages.<BR>

On December 27, 1996, Chairman's Statement of the G7/P8 Countries was issued. The statement pledged the countries' determination to never to yield to terrorists, to seek immediate release of the hostages, to make the rescue of people's life the top priority objective and support the Peruvian Government's endeavor to settle this incident by peaceful means. <BR>

<BR>

(6)   Japan's Response<BR>

<BR>

On December 18, 1996 (Japan Time), when the incident broke out, the Japanese Government set up an office of countermeasures in the Prime Minister's official residence to collect relevant information. On the next day, or December 19, the government established the "Headquarters to Cope with the Seizure of Japanese Ambassador's Residence in Lima" headed by the Prime Minister.<BR>

The National Police Agency, on the day of the outbreak of the incident, established a liaison office headed by the director general of the Security Bureau to be responsible round the clock for interdepartmental liaison within the government and gathering information. On the following day, the agency sent police officers to Peru and had them stay there till the end for reporting back the situation around the Japanese Embassy and gathering information as staffers of the local liaison office in Peru. The police also had them engage in consultations with the Peruvian authorities on steps to be taken to solve the incident as well as had them exchange information with foreign concerned.<BR>

After the hostages were released, the National Police Agency sent more police officers to Peru in order to support the local liaison office and cooperate with the Peruvian authorities in conducting investigation. They aided the Peruvian authorities in the examination of the ambassador's residence and criminal identification activities by making available supplies and equipment and sorting out and analyzing materials collected at the scene. In Japan, the Metropolitan Police Department interviewed released Japanese hostages about the circumstances at the time of the incident in detail and analyzed materials supplied by the Peruvian authorities. Thus, it conducted investigations to determine violations of the "Law to Punish Compulsory Acts by Hostage Taking." <BR>

<BR>

(7)   "Lima Syndrome" Observed<BR>

A psychoanalyst sent to Peru as a member of the police team reported having observed the same psychological condition as have been identified as the "Stockholm Syndrome" (note), a syndrome seen in many cases of hijacking and hostage taking. The specialist said the conditions which might be named "Lima Syndrome" developed during the incident.<BR>

The Lima Syndrome was explained as follows: "influenced by hostages, criminals eventually wished to identify themselves with their hostages. Thus, they assimilated and studied the cultures of hostages, with the result that their hostility toward hostages was softened."  The psychoanalyst theorized that this phenomenon, as it does not take place evenly among all the criminals, can delicately change the internal structure of the group of criminals and cause a crisis of their unity.<BR>

<BR>

(Note) The Stockholm Syndrome is the development of affinity between the hostages and criminals in a hold-out incident. <BR>

<BR>

(8)   Lessons Learned from the Incident<BR>

<BR>

This incident was brought to an end by a raid of the ambassador's residence by the Peruvian special unit. It offered many lessons in terms of how to cope with terrorists in the future. The National Police Agency will promote various steps to cope with terrorism in the future by learning lessons from the incident in Peru. See 3 of Section 2 in this chapter "Japan's Future Measures against Terrorism."<BR>

<BR>

2.   Japanese Red Army and "Yodogo" Hijacker Group<BR>

<BR>

(1)   Japanese Red Army<BR>

<BR>

The Japanese Red Army was organized by Fusako Okudaira (Shigenobu), Tsuyoshi Okudaira and other former members of its predecessor, the Sekigunha faction of Kyosando (Communist League), who fled to Lebanon. Since its organization, the Japanese Red Army has been engaged in terrorist activities in various parts of the world either in cooperation with Palestine guerrillas or single-handedly. The Japanese Red Army is among the most active of the international terrorist organizations.<BR>

Some of the members of the Japanese Red Army remain in Lebanon, a long-time base of their activities, while others have dispersed to various parts of the world and gone underground in order to build new bases of their activities.  It was dealt a heavy blow as members of the Japanese Red Army were arrested one after another after 1995. It, no doubt, was hit even harder by the arrest of five members in Lebanon in February 1997. <BR>

<BR>

A.   History of Japanese Red Army<BR>

(a)   Inauguration<BR>

The Sekigunha faction of Kyosando (Communist League) which was the predecessor of the Japanese Red Army, was dealt a devastating blow by the so-called "Daibosatsu-toge Incident" in which many members were rounded up while they were engaged in military training. However, in 1971, members of the Sekigunha faction, namely, Fusako Okudaira (Shigenobu) and Tsuyoshi Okudaira, left Japan for Beirut, established contact with the Popular Front for the Liberation of Palestine (PFLP) and started activities to organize the Japanese Red Army. They reinforced the organization by inviting to Lebanon Japanese Red Army sympathizers, such as Yasuyuki Yasuda, Kozo Okamoto, Kazue Yoshimura and Osamu Maruoka, who later became nucleus members of the group. <BR>

<BR>

(b)   Activities in the 1970s<BR>

In 1972, the year following the organization of the Japanese Red Army, three members, namely, Tsuyoshi Okudaira, Yasuyuki Yasuda, and Kozo Okamoto fired automatic rifles at random under the command of the PFLP at the Tel Aviv Lod Airport in Israel, injuring about 100 people, mostly tourists. Twenty-four of them were killed. Beginning with this Tel Aviv Airport incident, the Japanese Red Army perpetrated terrorist incidents one after another, occupying diplomatic establishments or hijacking in the "Dubai Incident" (1973), "the Hague Incident" (1974), "Kuala Lumpur Incident" (1975), and the "Dacca Incident" (1977). In the "Kuala Lumpur Incident" and "Dacca Incident," the Japanese Red Army demanded that their comrades who were detained in Japan be set free. It increased its strength by adding 11

members released by the Japanese Government.<BR>

<BR>

(c)  Activities in the 1980s<BR>

After Dacca Incident, the Japanese Red Army stopped visible armed struggle and conducted publicity activities from its base in Beirut.  In 1985, Kozo Okamoto who had been serving a prison term in Israel for perpetrating the "Tel Aviv Lod Airport Incident" was released in exchange for captives of the PFLP-GC (the General Command faction of the Popular Front for the Liberation of Palestine). He then joined the Japanese Red Army again.<BR>

In the meantime, terrorists incidents using bombs, such as "Jakarta Incident" (1986), "Rome Incident" (1987) and "Naples Incident (1988)," broke out at many places around the world, and the involvement of the Japanese Red Army in these incidents became clear from fingerprints of its members lifted from the scenes of these incidents.<BR>

In November 1987, Osamu Maruoka, who involved himself in the "Dacca Incident" and "Dubai Incident" and smuggled himself into Japan was arrested. In April 1988, Yu Kikumura was arrested in the United States on suspicion of carrying pipe bombs with him, while in June 1988, Hiroshi Izumi, a suspect of the "Dacca Incident" was arrested by coordinated efforts of the Japanese and Philippine authorities. In this manner, members of the Japanese Red Army were arrested one after another. <BR>

<BR>

B.  Recent Activities<BR>

(a)  Activities Outside the Middle-East<BR>

It is believed that the Japanese Red Army is composed of about two dozen members led by Fusako Okudaira (Shigenobu).<BR>

The Japanese Red Army was engaged in militant activities with its base established in Lebanon for more than 25 years, except for a period when Israel invaded Beirut. However, it had to close its camp on the Bekaa Valley by the autumn of 1993 as a peaceful mood prevailed in the Middle East following the termination of the Gulf War.<BR>

In recent years, some of the members of the Japanese Red Army remained in Lebanon trying to maintain the organization. However, other members launched activities in places other than the Middle East in order to build new footholds. This became known from the "statements" issued by the Japanese Red Army and a series of arrests of Japanese Red Army members.<BR>

In March, 1995, the police located Yukiko Ekita in Romania and arrested her. In May 1996, the police found Kazue Yoshimura, who was then hiding in Peru, and arrested her on June 8, 1996. In September the same year, Tsutomu Shirosaki was discovered in Nepal and was arrested. <BR>

(b)  Wholesale Roundup in Lebanon<BR>

Five members of the Japanese Red Army (Haruo Wako, Masao Adachi, Mariko Yamamoto, Kazuo Tohira and Kozo Okamoto) who had been hiding in Lebanon by concealing their true identity were discovered in the middle of February, 1997, and they were apprehended by Lebanese authorities. Subsequently, they were indicted on charges of forgery of passports and illegal entry into Lebanon. The Japanese government has asked the Lebanese authorities to extradite the five captives to the Japanese Government as soon as legal proceedings are completed in Lebanon.<BR>

The Japanese Red Army which has lost its principal base and lost several members by arrests, is expected to concentrate on rehabilitation of its organizational setup and build new bases for their activities as the top priority matter. However, the countries which used to support international terrorist organizations have changed their pro-terrorist policies. Moreover, at this time when anti-terrorist measures are being taken extensively on a global scale, it is difficult for the

Japanese Red  Army to build new bases for their activities. It seems that the subsistence of the organization itself is being threatened.<BR>

Under such circumstances, it is considered difficult for the Japanese Red Army to engage in aggressive terrorist activities. However, there is no denying the danger of the organization perpetrating a violent terrorist incident in retaliation for the arrest of its members as well as instigating their sympathizers by showing both at home and abroad that their organization is still sound and strong.<BR>

Accordingly, it is necessary for the police to fortify tie-up with the organizations and countries concerned in order to contain the activities of the Japanese Red Army and disband the organization. Police must locate at the earliest date the internationally wanted eight members of the group and promote various measures vigorously in order to apprehend them. <BR>

<BR>

(2)   "Yodogo" Hijacker Group<BR>

<BR>

A.   "Yodogo" Hijacking Case<BR>

On March 31, 1970, JAL plane Flight No. 351 "Yodogo" was flying over Mt. Fuji en route to Fukuoka, Kyushu, from Tokyo, when nine members of the Sekigunha faction of Kyosando (Communist League) including Takamaro Tamiya, armed with Japanese swords, daggers and steel pipe bombs, hijacked the plane. The hijackers, by holding 129 passengers and crew of "Yodogo" as hostages, demanded that the plane fly to North Korea. After releasing some of the passengers and the crew members at Fukuoka Airport in Kyushu and Kimpo Airport in the Republic of Korea, they entered North Korea aboard the plane.<BR>

The Japanese police sought cooperation through ICPO-Interpol and threw a dragnet for the arrest of these Yodogo hijackers. The police are still hunting for them. In connection with this Yodogo hijacking case, the top leader and other leaders of the Sekigunha faction of Kyosando (Communist League) were apprehended as conspirators in Japan and brought to justice. <BR>

<BR>

B.   Activities in North Korea<BR>

In 1988, the Japanese police arrested one of the Yodogo hijackers who had secretly entered Japan on a passport which he had obtained illegally. It became known in the course of his investigation that the group of Yodogo hijackers often left North Korea to engage in activities in various countries.<BR>

At present, the group of Yodogo hijackers, using North Korea as their base and under the leadership of Takehiro Konishi, write articles and contribute them to publications or engage in commercial activities by running a trading company known by the name of "Project 21."  They are known to be working, as their priorities, to acquire citizenships for their children and for their own return to Japan.<BR>

The group of Yodogo hijackers had long insisted that they be allowed to return to Japan by obtaining pardon of the Japanese government. However, they gave up this attempt recently. Now they insist that they be allowed to return to Japan from the standpoint of humanity. <BR>

<BR>

C.   Pinched Yodogo Hijackers<BR>

On November 30, 1995, Yodogo hijackers' leader Takamaro Tamiya died. Takahiro Konishi took over as the leader.

However, because Tamiya demonstrated his leadership in everything within the group since the 1970 hijack of Yodogo plane, his death inflicted a devastating damage to the group.<BR>

Under such circumstances, Yoshizo Tanaka, one of the members of the group of Yodogo hijackers who had been hiding in Cambodia under the cloak of economic activities was caught in the country and was transferred to Thailand. He was arrested by Thai authorities on charges of possessing forged U.S. dollar notes for the purpose of using them.<BR>

The members of the group of Yodogo hijackers announced the death of a group member Takeshi Okamoto and his "wife," though their deaths were not confirmed yet.  As a result of a series of deaths and arrests, it is estimated that only five Yodogo hijackers remain in North Korea.      <BR>

<BR>

<BR>

3.    State-Sponsored Terrorism by North Korea<BR>

<BR>

(1)   Major Terrorist Incidents Sponsored by North Korea in the Past<BR>

<BR>

As part of its subversive activities against the Republic of Korea, North Korea has so far perpetrated such international terrorist incidents as the "Attempted Attack on the Presidential Blue House" in 1968, "Rangoon Incident in Burma" in 1983, and the "Korean Air Plane Bombing Case" in 1987.<BR>

In view of this, the State Department of the United States still regards North Korea as one of State Sponsors of Terrorism together with Libya, Iran, etc. <BR>

<BR>

A.    Attempted Attack on Presidential Blue House<BR>

On January 21, 1968, 31 armed North Korean guerrillas who had attempted to assassinate the then South Korean President Park Chung Hee and other South Korean leaders shot to death five civilians and one police officer in the neighborhood of the Presidential Blue House.  Thirty of the 31 armed guerrillas were shot to death and one was arrested by the South Korean authorities. This unsuccessful attack on the Presidential Blue House is believed to have been perpetrated by North Korea's People's Army Reconnaissance Bureau. <BR>

<BR>

B.    Rangoon Incident in Burma<BR>

On October 9, 1983, three armed North Korean guerrillas who had smuggled themselves into Burma (present Myanmar) under the guise of North Korean cargo ship crew plotted to assassinate the then South Korean President Chun Doo Hwan and South Korean government leaders who were then on a goodwill visit to Burma and bombed Aung San Mausoleum on their itinerary, killing 21 persons including South Korean Director General of Foreign Affairs Department and injuring 47 others.  One of the  armed guerrillas was shot to death and two others were rounded up by the Burmese authorities. This bomb blast incident is believed to have been perpetrated by the Reconnaissance Bureau of North Korea. <BR>

<BR>

<BR>

C.    Korean Air Plane Bombing Incident<BR>

On November 29, 1987, North Korean agents Kim Sungil and Kim Hyon Hui carrying bogus passports in the name of Japanese nationals blasted a bomb on a Seoul-bound Korean Air flight No. 858 which departed from Bagdahd, killing all the 115 passengers and crewmembers.  The two took poison in suicide attempt when taken into custody by Bahrain authorities. The man died but Kim Hyon Hui survived and was later handed over to South Korean authorities. She was sentenced to death in South Korea in April 1989 but was granted a special presidential pardon in April 1990 and released.<BR>

From her testimony, it became known that she and Kim Sungil were members of the External Intelligence Department of the Korean Labor Party and that they were given by the North Korean authorities an order to blast a Korean Air plane in order to obstruct the Seoul Olympics of September 1988. <BR>

<BR>

<BR>

(2)    Recent Trend<BR>

<BR>

After the Korean Air plane bombing incident of 1987, there has been no terrorist incident in which North Korea was apparently involved. However, North Korea still retains the group of "Yodogo" hijackers. As described earlier, Yoshizo Tanaka, a member of the group of Yodogo hijackers, was seen in Cambodia together with three North Koreans carrying the North Korean diplomats' passports.<BR>

The Japanese police are continuing to pay attention to North Korean moves on the national security of Japan. <BR>

<BR>

(3)    Suspected Abduction of Japanese Nationals<BR>

<BR>

Kim Hyon Hui, one of the perpetrators of the "Korean Air plane bombing incident" testified that she had received lessons on how to pass as a Japanese from a Japanese woman who was alleged to have been abducted from Japan and who called herself as "Lee Un Hae." Subsequent investigation conducted in Japan revealed that it is highly possible that she is a Japanese woman from Saitama Prefecture.<BR>

There are at least seven cases involving 10 Japanese suspected of having been abducted by North Koreans and taken to North Korea. One of them is a school girl apparently abducted in Niigata Prefecture in November 1977, and others are several couples who became missing from the beaches of Fukui, Niigata and Kagoshima prefectures from July through August of 1978.<BR>

The Japanese police are continuing their investigation into these cases through exchanging information with South Korean authorities and other agencies concerned both in and out of Japan.<BR>

<BR>

4.    Terrorism in the World<BR>

<BR>

(1)    Terrorism in 1996<BR>

<BR>

A.    Outbreak of Terrorist Incidents<BR>

In 1996, a number of terrorist incidents broke out indicating a turn to intensified terrorism throughout the world. In the Middle East, suicidal bombers from the Islamic Resistance Movement (HAMAS), which constitutes a radical faction of Islamic Fundamentalists, launched attacks in close succession in Israel. In Britain, the Provisional Irish Republican Army (PIRA) resumed terrorist activities by using bombs. In Saudi Arabia, terrorists' bombings of the U.S. military's facility continued for two successive years. While the Atlanta Olympics were held in the United States, the Centennial Olympic Park was bombed.<BR>

According to the U.S. State Department statistics on outbreak of international terrorist incidents in 1996, the number of outbreaks decreased to 296 from 440 in 1995. Yet, the number of fatalities from these incidents increased to 311 from 163 in 1995.  There is a tendency that the means of perpetrating terrorism become increasingly violent and the scale of damage become larger in scale (see Chart 1-1, Chart 1-2 and Table 1-1).<BR>

Under such situation of global terrorism, the Japanese Ambassador's Residence in Peru was seized by terrorists in December, sending shock waves throughout the world. <BR>

<BR>

<BR>

B.    Unique Tendency Observed in Recent Years<BR>

Recent years have witnessed a frequent outbreak of large-scale terrorist incidents in which many people were killed or injured. "Oklahoma Federal Building bombing" killed 168 people and injured about 500 people. Equally conspicuous are suicidal terrorism which affects innocent citizens, and indiscriminate attacks aimed at killing and injuring large numbers of bystanders.<BR>

The "sarin poisoning of subway passengers" in Japan has awakened many countries to the need of guarding against the use of biological and chemical substances not as a remote possibility but as a real threat.<BR>

The emerging forms of terrorism can inflict extremely serious damage not only on individual lives but also on society and nation. All countries around the world are pressed to work out effective countermeasures immediately. <BR>

<BR>

(2)   Background of Terrorist Incidents<BR>

Domestic problems, such as poverty, religious and racial problems may be cited as motives of terrorism.<BR>

Among terrorist organizations upholding religious faith as guiding principles today, most radical are HAMAS, Hezbollah and GIA, all of which are called "Islam Fundamentalist radicals".<BR>

In Japan, the religious cult Aum Shinrikyo resorted to indiscriminate terrorism. For years, the danger of fanatic anti-social religious organizations resorting to terrorism has been pointed out in European countries and in the United States. Groups which are resorting to terrorism against the State for the purpose of winning separation and independence from their country mainly for reasons of ethnic issues are known as  "separatist, independent radicals." Falling under this category are the Provisional Irish Republican Army (PIRA), Basque Fatherland and Liberty (ETA) and Kurdistan Workers' Party (PKK).  Moreover, it has been pointed out that terrorism motivated by minority issues may erupt in China's Xinjiang Uygur Autonomous Region and Tibet Autonomous Region.<BR>

Moreover, the developing countries in Latin America are rocked by terrorist incidents apparently given rise by the social situation pregnant with such domestic problems as social inequality, poverty and unemployment as well as by advanced countries' increasing presence overseas. The seizure of the Japanese Ambassador's Residence in Peru, which was targeted at Japan, was perpetrated by MRTA which had caused many terrorist incidents aimed primarily at U.S.

government organizations.<BR>

<BR>

5.    International Terrorism's Threat to Japan<BR>

<BR>

(1)    Threat of Terrorism Spreading to Japan<BR>

<BR>

As Japan's presence in the international society becomes pronounced, threat of terrorism to Japan's interests as well as to Japanese nationals abroad has become increasingly intense in recent years. The "seizure of the Japanese Ambassador's Residence in Peru" has made the presence of such threat all the more clear. It also shows a stern reality that Japanese people residing at many places around the world as well as Japanese facilities may become targets of global terrorism any time in future.<BR>

Many foreign nationals whose home country situation is unstable are staying in Japan. Accordingly, it is feared that disputes in foreign countries might have ripple effects on Japan in the form of terrorist incidents. Moreover, because there are in Japan many U.S. facilities which have repeatedly become targets of attack by Islam Fundamentalist radicals, many serious terrorist incidents by those radicals are posing real threat also to Japan.<BR>

Though dealt a lethal blow as a result of the apprehension of its members one after another in recent years, the Japanese Red Army which had perpetrated many terrorist incidents in the past and which is engaged in terrorist activities at many places in the world today, still remains as a major source of threat to Japan.<BR>

As for North Korea, which is not linked to any terrorist incidents occurring after 1988, its movement arising from unpredictable situation on the Korean Peninsula needs close watching, particularly in the case of Japan, its neighbor, in light of the fact that North Korea had caused many terrorist incidents in the past. <BR>

<BR>

(2)    Terrorist Incidents Which Have Victimized Japanese Residents Overseas<BR>

<BR>

Apart from the "seizure of the Japanese Ambassador's Residence in Peru," Japanese business corporations and Japanese residents overseas were targets of terrorism. Some of the recent incidents are: Japan International Cooperation Agency (JICA) experts of agricultural technology in Peru were shot to death in July 1991; an attempt was made to kidnap a Japanese company employee in Algeria in September 1993; a Japanese ranch owner was kidnapped in Colombia in September 1994.<BR>

In addition, terrorist incidents in which Japanese nationals were not targeted but happened to be involved include the Sri Lanka Central Bank bombing case perpetrated in Sri Lanka in January 1996, the Egypt Air plane hijacking case which occurred in Egypt in March 1996, and the bombing incident at Port Royal Station in France in December 1996.  Many Japanese were injured in these incidents. In December 1994, one Japanese passenger was killed on board the Philippine Air plane which was bomb-blasted.<BR>

<BR>

1.    International Cooperation in Combating Terrorism<BR>

<BR>

(1)    Promotion of Cooperation Among Countries<BR>

<BR>

Against the background of international terrorism which is assuming increasing severity, one country's efforts to combat terrorism have limits. In view of this, terrorism is often debated actively at the summit meetings of industrialized countries or at the United Nations conferences in recent years. At the same time, cooperation among countries is being pushed vigorously.<BR>

The 1978 Bonn Summit adopted a Statement on Air-Hijacking upon a proposal from Japan. This was the first statement concerning terrorism ever issued in the history of the summit meetings of industrialized countries. Japan made this proposal in view of the mounting threat of terrorism in the world posed by the Japanese Red Army's "Dacca Incident" in 1977 and other incidents. Since then, almost every summit meeting has taken up terrorism as one of the important issues on the agenda, and issued a statement concerning terrorism.<BR>

As for the United Nations, in view of frequent occurrence of terrorist incidents, the 27th General Assembly in 1972 took up and debated the measures to prevent international terrorism and its root causes. Since then, the problem of terrorism has been discussed mainly by the Sixth Committee of the U.N. General Assembly. At the 49th General Assembly held in 1994, the "Declaration on Measures to Eliminate International Terrorism" was adopted.<BR>

As is evident from the above, in the field of measures to combat global terrorism, an international consensus was formed "to condemn terrorism in all its forms and manifestations, regardless of its perpetrators or motives," and extensive and concrete measures are being taken to prevent terrorism with cooperation of all countries, including developing countries. <BR>

<BR>

(2)   Summit Ministerial Conference on Terrorism (Ottawa)<BR>

<BR>

Following the Halifax Summit in 1995, the Summit Ministerial Conference on Terrorism was held in Ottawa, the capital city of Canada, in December 1995, with interior, justice and foreign ministers of the Summit member countries attending. On the basis of recognition that measures to prevent terrorism constitute an urgent problem to be grappled with on a global scale, the "Ottawa Ministerial Declaration on Terrorism" was adopted. <BR>

(3)   Sharm-el-Sheikh (Peace Makers') Summit<BR>

In view of the mounting tension in the Middle East, the Middle East countries, the Summit member countries, and other countries together with international organizations, totaling 29,  held a "Sharm-el-Sheikh Summit" (Peace Makers' Summit) at the initiative of Egyptian President Mubarak and U.S. President Clinton.   At this summit, each country's determination to make efforts to combat terrorist activities and exterminate support to terrorists as well as all countries' determination to make stepped-up efforts to promote peace in the Middle East were manifested in the Co-Chairmen's Statement.<BR>

<BR>

(4)   G7/P8 Ministerial Conference on Terrorism (Paris)<BR>

<BR>

In view of the fact that "Dhahran U.S. military facility bombing" occurred in Saudi Arabia just before the Lyon Summit was opened in June 1996, the Lyon Summit adopted the "Declaration on Terrorism." The declaration reaffirmed "absolute condemnation of terrorism in all its forms and manifestations."<BR>

Based on this declaration, the G7/P8 Ministerial Conference on Terrorism was convened in Paris in July 1996, and it

adopted a 25 practical measures centering on "adopting internal measures to prevent terrorism" and "strengthening international cooperation to fight terrorism" in order to speed up conclusion of conventions to combat terrorism and to control the fund raising of terrorists. <BR>

<BR>

(5)   Denver Summit<BR>

<BR>

The Denver Summit was held June 20-22, 1997, in Colorado, the U.S. Japanese Prime Minister Ryutaro Hashimoto manifested anew a strong determination to fight terrorism jointly with the international society, saying that "we will never give way to terrorists." Hashimoto strongly called attention to the need to strengthen cooperation among P8 member countries of the summit meeting as well as to the importance of regional cooperation in taking measures on terrorism.  With the seizure of the Japanese Ambassador's Residence in Peru in mind, Prime Minister Hashimoto proposed to hold an expert meeting on terrorism mainly against hostage taking incidents.<BR>

<BR>

On June 22, the Denver Summit issued a communique which reconfirmed the resolve to combat terrorism of all forms and requested all countries to join the international counterterrorism conventions by the year 2000.  Incorporated in the communique were measures to deter terrorists' use of mass destruction materials and their attack on electronic and computer infrastructure as measures to be taken by all countries to prevent terrorism.<BR>

On the basis of proposals from Japan, the communique also refers to the efforts to strengthen the capability of hotage negotiation experts and counterterrorism response units.<BR>

<BR>

2.   Measures To Prevent Terrorism Currently Taken in Japan<BR>

<BR>

(1)   Round-up of Terrorists and Grappling with Measures To Forestall Terrorism<BR>

<BR>

In order to enforce measures to combat various forms of terrorism, the Japanese police have sent, since early on, officers overseas to exchange information with relevant authorities of various countries and vigorously engage in information gathering activities in an attempt to gain a true picture of movements of international terrorist groups, such as the Japanese Red Army.<BR>

In addition to measures to prevent entry of international terrorists into Japan, the Japanese police are vigorously promoting measures to prevent the smuggling of arms and chemicals, that could be used as means of terrorism at seaports and airports, through cooperation with authorities concerned. <BR>

<BR>

(2)   Establishment of Special Assault Team (SAT)<BR>

<BR>

On the occasion of the "Dacca Incident" perpetrated by the Japanese Red Army on September 28, 1977, the Japanese police established special units at the Metropolitan Police Department (MPD) and the Osaka Prefectural Police. However, in order to properly cope with the situation which is increasingly serious in recent years, the Special Assault Team (SAT) was established at MPD, Osaka and five more prefectural police headquarters in April 1996.<BR>

The principal duty of SAT, established to properly deal with serious emergencies such as hijacking cases and holdout cases involving hostages, is to arrest the terrorists while ensuring safety of the victims of such grave incidents. SAT is a team of highly trained specialists, and the SAT throughout the country have about 200 highly trained members in total. <BR>

<BR>

(3)   International Support to Measures to Combat Terrorism<BR>

<BR>

The National Police Agency, since 1993, has invited officers in charge of terrorism mainly from   developing countries as part of Japan's ODA program to acquaint them with antiterrorism measures as well as use of equipment and materials. Moreover, the agency is active in transferring the knowhow of filing and analyzing information and reference materials, and the technique of discovering bogus passports. <BR>

<BR>

(4)   Measures to Ensure Safety of Japanese Residents Overseas<BR>

<BR>

Because overseas operational bases of Japanese business corporations and their staffers stationed abroad very often fall victims to terrorist incidents in recent years, various organizations' interest in measures to ensure safety of Japanese overseas is mounting. In such circumstances, the Council for Public Policy, with the cooperation of various organizations concerned, has sponsored since 1993 the Seminar on Security Measures for Overseas Japanese Companies in Bangkok (1993), Manila (1994), and Hong Kong (1995). In July 1996, Seminars in  Jakarta and Kuala Lumpur were held, and the National Police Agency cooperated with the sponsoring organizations of these seminars by sending lecturers to them. <BR>

(5)   Active Participation in International Conferences<BR>

<BR>

As for measures to combat global terrorism, concrete and broad in-depth measures, which have gone beyond the contents of international cooperation thus far discussed, have come to be studied in the United Nations fora and the summit meetings. Japanese police, as a member of the Japanese Government, are grappling with the promotion of international cooperation enthusiastically and powerfully. <BR>

<BR>

(6)   Legislative Measures<BR>

<BR>

A.   Law Concerning the Prevention of Bodily Injuries by Sarin, etc.<BR>

A series of incidents perpetrated by Aum Shinrikyo cult prompted the enactment and promulgation in April 1995 of a law which prohibits the manufacture and possession of sarin, etc. and stipulates punishments to be meted out on conducts to disseminate sarin and measures to be taken when damage is caused by the dissemination of sarin. <BR>

<BR>

B.   Partial Amendment of Police Law<BR>

In June 1996, the Police Law was partially revised to enable prefectural police to exercise their authority in areas outside their borders on its own judgment and responsibility.  The partially amended police law has made it possible for the Comissioner-General of the National Police Agency to issue instructions as regards the work-sharing among the prefectural police forces, so that the Japanese police as a whole can deal with wide-area organized crimes speedily and properly.<BR>

<BR>

3.    Japan's Future Measures Against Terrorism<BR>

<BR>

(1)    Strengthening of Information Gathering and Analysis<BR>

<BR>

Japanese police will make stepped-up efforts to quickly uncover groups which are likely to resort to terrorism in the future, and to promote gathering and analysis of more specialized and comprehensive information.<BR>

Diplomatic missions overseas are urged to enhance their information gathering and security systems, while the police are required to contribute to the enhancement through security officers from the police at diplomatic legations overseas by intensifying coordination with local authorities  and reinforcing security arrangements. <BR>

<BR>

(2)    Reinforcement of Special Assault Team (SAT)<BR>

<BR>

In view of the lessons from the "seizure of the Japanese Ambassador's Residence in Peru," it is urgently necessary for the police to reinforce the Special Assault Teams (SAT) so that cases similar to the Peru incident may be properly dealt with. Particularly, the police are urgently required to give thoroughgoing training to SAT members to upgrade their ability to cope with terrorism. Moreover, the police are urgently required to bolster the contingency preparedness of SATs stationed in seven prefectures around the country. <BR>

<BR>

(3)    Bolstering of Setup to Prevent Terrorism and Investigate Terrorists<BR>

<BR>

To provide against outbreaks of terrorist incidents outside Japan, an arrangement has to be worked out to dispatch a team consisting of experts on measures to combat terrorism more speedily than now in case of emergency so that the dispatched team will operate effectively as the core of Japan's local liaison office in the country of incident. The team is required to establish cooperation with local authorities, gather information speedily and accurately, and engage in activities to provide support to investigation agencies of various countries. It is necessary for the expert team to exchange information with relevant authorities even during peace times, and study methods of investigation, hostage negotiation and prevention in order to provide against the outbreak of terrorist incidents.<BR>

Because the danger of new forms of terrorism, using biological and chemical substances, or hacking (cracking) computer systems, is mounting in recent years, it is urgently necessary to study measures to prevent terrorism of this kind and the method of investigating such cases. <BR>

<BR>

(4)  Making Efforts to Promote International Cooperation<BR>

<BR>

International cooperation through international conferences and coordinative actions with authorities concerned is extremely important in combating terrorism. The Japanese police, as a member of the Japanese Government, are stepping up their efforts to promote international cooperation. At the Denver Summit of industrialized countries, Japan proposed to convene an expert meeting on counterterrorism measures mainly against hostage taking incidents. This conference was held in December 1997. Japan has resolved to take part in such international conferences positively also in the future.<BR>

In order to step up coordination with relevant authorities of various countries, in Asian-Pacific region in particular, Japan has resolved to promote exchange of information with officials of the United States, the Republic of Korea etc. to strengthen cooperation with ASEAN countries, and to build up closer relations with countries of Latin America, Europe and the Middle East through exchange of information and sharing of experiences. <BR>

<BR>

(5)   Study of Legal System to Promote Counterterrorism Measures<BR>

<BR>

As measures to combat organized crimes perpetrated by terrorist organizations, it is effective to control the fund raising by these organizations.   The 25 practical measures adopted at the G7/P8 Ministerial Conference on Terrorism convened in Paris in July 1996, urges every country to take measures to deter flows of funds to terrorists and terrorist organizations and step up exchange of information on international transfer of funds to finance terrorist activities. They also urge to consider adoption of regulatory measures against flows of funds to terrorists. With these points in mind, the police, as part of measures to combat organized crimes, will further promote research and study on legal system to deprive terrorists of illegal proceeds and to restrict their conducts to evade the authorities' deprival of their illegal proceeds by taking into consideration systems put in force in other countries.<BR>

# HISTORICAL DICTIONARY OF TERRORISM

## by Sean Anderson and Stephen Sloan

---

**The Scarecrow Press, Inc.**

**Metuchen, N.J., & London**

Copyright © 1995 by Sean Anderson and Stephen Sloan

---

**JAPANESE RED ARMY.** The JRA is a group of Japanese anarchistic leftists intent on igniting a worldwide revolution through terrorist actions enjoying foreign state sponsorship The JRA has maintained cooperative ties since 1971 with the North Korean regime and the Libyan regime as well a having a long-term relationship with the Popular Front for the Liberation of Palestine (PFLP, q.v.). Since the JRA maintains its center and training camp in the Syria controlled part of the Bekaa valley in Lebanon, Syria ma also be considered one of its state sponsors. The Japanese name for this "Red Army" is Sekigun, "Japanese Red Army" being Nippon Sekigun. Since May 1986, the JRA has been using the name "Anti-Imperialist International Brigades" as either a new cover or as a nom de guerre.

Similar in many ways to the German Red Army Faction (q.v.), the JRA has rationalized its terrorism in revolutionary leftist terms but appears to pursue terrorist violence as an end in itself rather than as a strategy to achieve revolution. The JRA can be considered "leftist" insofar as it seeks to smash capitalism, professes the superiority of a socialist state, and often uses Marxist jargon. Yet they must also be considered anarchistic insofar as they have limited their program to destroying the existing capitalist states rather than building the foundations of some successor socialist state. Often the JRA has claimed to seek the role of serving as a rallying point for similar anarchistic leftists in Japan, opposing Japanese and Western "imperialism," and establishing a People's Republic in Japan. The venue of most of its actions are outside of Japan, however, and even when the JRA has used hostage taking or hijacking to force the Japanese government to release comrades imprisoned within Japan, such compliance tends to be a relatively low-visibility event. Therefore, it is unclear how the JRA terrorist program can expect to influence public opinion within Japan.

The JRA emerged from an internal purge of the Japanese Red Army Faction in 1970-1971, leading to the murders of several members. These murders led to a police crackdown in Japan, forcing many members of the JRA Faction to flee abroad. A JRA Faction liaison with the PFLP in Lebanon, Fusako Shigenobu, invited other fugitive members to join her there where the JRA was formed. Shigenobu remains the leader of the JRA.

From 1971 to 1991, the JRA accomplished 17 noteworthy actions and planned, or attempted, at least 9 major actions that were aborted. Of the 16 successful actions, 12 percent (=2) were armed attacks using knives, samurai swords, small-arms or automatic weapons; 17 percent (=3) were hijackings; 24 percent (=4) were bombings; 12 percent (=2) were hostage seizures; and 35 percent (=6) were rocket attacks. It should be noted that hijackings and hostage seizures occurred from 1971 to 1977 involving hand-held weapons and direct contact with victims. Such tactics seemed legitimated in Japanese culture by the martial Bushido tradition emphasizing personal valor in direct confrontation and actually helped boost the prestige of the group within Japan. Then there was a hiatus in JRA activity from late 1977 to mid-1986 after which the JRA began relying instead on bombings and rocket firings in which the JRA members would be quite remote from the target and could escape more easily. The change in tactics helps preserve in working order an organization that, given its own remoteness from Japan, has had difficulties recruiting new members. Also the JRA has been, and remains, a rather small group, numbering at most perhaps 25 members, whose identities have become fairly

well known among police organizations throughout the world, making it more imperative for them to avoid capture.

The most notorious of the JRA actions was the massacre of 26 people at Israel' s Lod Airport in 30 May 1972, carried out by three JRA gunmen on behalf of the PFLP. The sole surviving gunman, Kozo Okamoto, was imprisoned in Israel until 1985 when he was released in exchange for Israeli prisoners and allowed to fly to Libya where he was accorded a hero's welcome. On 4 August 1975, 10 JRA gunmen seized the U.S. Consulate in Kuala Lumpur and held 52 hostages, threatening to kill them if 7 imprisoned JRA members in Japan were not released. Only five of those JRA members released opted to leave, flying to Libya via Kuala Lumpur. On 14 May 1986, they detonated a car bomb outside of the Canadian embassy and launched rockets against the U.S. and Japanese embassies in Djakarta from a nearby hotel. Fingerprints found in the room with the launcher matched those of a known JRA member, although credit was taken in the name of the "Anti-Imperialist International Brigade." This resumption of JRA activity occurred within a month following the U.S. retaliatory raid on Libya, a circumstance that along with JRA members' choice of Libya as a sanctuary tends to suggest Libyan state-sponsorship of this group. On 9 June 1987, a similar rocket attack coupled with a car bombing was made against the U.S. and British embassies in Rome, causing but minor damage. On 14 April 1988, the second anniversary of the Libya raid, the "Jihad Brigades" claimed credit for bombing a U.S. servicemen's club in Naples in which five people were killed, but the suspects seized in connection with this bombing were also JRA members. Two days earlier Yu Kikumura, a JRA member, was arrested in New Jersey in possession of three powerful bombs. It is believed that he was supposed to bomb some U.S. military facility at the same time as the Naples bombing to mark the second anniversary of the U.S. raid. On 8 January 1990, the JRA attacked the Imperial palaces in Kyoto and Tokyo simultaneously using homemade rockets.

The change in tactics from direct personal combat to the use of remotely triggered rockets and bombs has made future JRA attacks potentially much more lethal. Evidence gathered from arrests of JRA members has shown that the group has an extensive support network, generous finances, and an ability to move members freely throughout the world. Despite the recent collapse of world communism there is little to suggest that members of the JRA have renounced their terrorist program.

**JEWISH DEFENSE LEAGUE.**The JDL was a Jewish self-defense movement that began with the limited goals of protecting orthodox Jewish neighborhoods in New York City from depredations by young black and Puerto Rican hoodlums and to protest local instances of anti-Semitism. Eventually the JDL embraced a universal program of fighting for Jewish interests worldwide. The group was self-sustaining and lacked any support from mainstream Jewish organizations in the United States or from the State of Israel. The JDL was founded in 1968 by Rabbi Meir Kahane, who began to organize young Jewish men as vigilantes to protect Jews and Jewish businesses in the Williamsburg and Crown Heights areas of Brooklyn and elsewhere in the New York City area. Within a year the group had graduated from vigilantism and demonstrations against alleged anti-Semites to burglarizing the files of the PLO U.N. Mission and launching attacks on Soviet diplomatic, trade, and tourism offices and personnel. According to the FBI, the JDL was responsible for at least 37 terrorist acts in the United States in the period from 1968-1983, while the International Terrorism: Attributes of Terrorist Events (ITERATE) database developed on behalf of the United States Central Intelligence Agency by Edward F. Mickolus recorded 50 such incidents from 1968-1987, making the JDL second only to the Puerto Rican FALN (q.v.) as the major domestic terrorist group. Nonetheless the JDL is a legally incorporated political action group and has officially disavowed responsibility for any violent actions carried out by its members. Bombings accounted for 78 percent of all JDL terrorist activities; shootings accounted for 16 percent; while arson attacks, vandalism, kidnapping, threats, and verbal harassment accounted for the rest.

From 1969 to 1985 the JDL targeted mainly the representatives of governments perceived to be anti-Israeli or anti-Semitic, most of which were directed against Soviet targets. Thus the JDL bombed the San Francisco branch of the Iranian Bank Melli on 26 January 1981 and bombed the Iraqi U.N. Mission on 28 April 1982 to protest the mistreatment of Jews in those two countries. The JDL once bombed the office of impresario Sol Hurok, who helped arrange performances of Soviet ballet troupes in the United States, which caused the death of one employee. For the most part, these attacks seemed intended to intimidate but not to kill their victims. Beginning late in 1985, however, the targeting shifted to individuals suspected of being anti-Israeli or anti-Semitic, and the attack mode became much more lethal. On 11 October 1985, the Los Angeles offices of the Arab-American Anti-Discrimination Committee (ADC) was bombed,

killing the ADC director Alex Odeh, who had sought to rationalize the actions of the hijackers of the Achille Lauro on a local newscast the previous evening. On 15 August 1985, a sixty-one-year-old Waffen-SS veteran, Tsherim Soobzokov, was bombed at his Paterson, N.J., home and later died of his wounds. In such attacks an anonymous caller would claim the action in the name of the JDL, and afterward an official JDL spokesman would disavow the group's responsibility. In 1987 several JDL members were convicted on a variety of criminal charges, and since then there has been no record of JDL terrorist activity.

As the JDL was very much the personal creation of Rabbi Kahane, following his emigration to Israel in 1971 the group began to experience factionalism. The day immediately following the bombing murder of Alex Odeh, Kahane announced his resignation as JDL leader. Despite the national prominence of the JDL, this group had poor to acrimonious relations with more conventional Jewish political and social organizations, such as B'nai B'rith's Anti-Defamation League, which regarded the JDL as a marginal group and an embarrassment to the American Jewish community. Without the leadership of Rabbi Kahane, who was shot dead by an Egyptian fundamentalist on 5 November 1990 in New York, the prospects for a revival of the JDL appear dim.

While living in Israel, Kahane founded the Kach Party, an ultranationalist group favoring expulsion of the Arabs from both Israel and the occupied territories. Following his death another group, Kahane Chai (Kahane Lives), split off from the Kach group. Many former JDL members who followed Kahane's example in emigrating to Israel joined these groups, often living in settlements within the Occupied Territories. On 25 February 1994, a Kach Party member and former JDL activist, Dr. Baruch Goldstein, opened fire on Palestinian Arabs in the mosque built over the Tomb of the Patriarchs in Hebron, killing at least 29 and wounding scores more before he himself was killed. This incident led to anti-Israeli rioting throughout the occupied territories and stymied the peace negotiations underway between the PLO and Israel. On 13 March 1994, the Israeli government banned both the Kach and Kahane Chai groups in an effort to stem the furor caused by the massacre in Hebron.

**JIHAD.** The term jihad is an Arabic verbal noun derived from jahada, meaning "to struggle," that is, to struggle with something that is disagreeable or else against something that is wrong. While "holy war" is not a literal translation, it does summarize the essential idea of jihad. The Muslim jurists give the most general definition of jihad as the Muslim believers' exerting their abilities, talents, and power in struggling in the path of God using their resources of life, property, speech, and all available instruments to make the Word of God prevail in this world. Muslim jurists distinguish between a "greater jihad," which is the struggle against the world, the flesh, and the devil in the spiritual realm, and a "lesser jihad" consisting of open physical warfare with the enemies of Islam or of the Muslims. In the course of the revival of Islamic fundamentalism (q.v.) the doctrine of jihad has been invoked to justify resistance, including terrorist actions, to combat "un-Islamic" regimes, or purported external enemies of Islam, such as Israel and the United States.

The classical doctrine of jihad did not necessarily exclude its use to spread the Islamic religion by force of arms since the classical Muslim thinkers ibn Rushd and ibn Khaldun both accepted this interpretation. Most modern jurists, however, have preferred an interpretation of jihad comparable to that of purely defensive warfare. Islamic fundamentalists, such as Sayyid Qutb, other members of the Muslim Brotherhood (q.v.), and members of the Munazzamat al Jihad (q.v.) group that murdered Anwar Sadat, have maintained that the object of jihad was the full enactment of the sacred law of Islam, rather than defense or conquest as such, and that there was no reason to limit the role of jihad merely to defensive warfare.

The Muslim jurists make two other distinctions regarding jihad important to understanding its possible connection with terrorism. Ordinarily jihad is a collective, rather than a personal, obligation. If a Muslim nation undertakes jihad lawfully, the duty of waging jihad is discharged by the Muslim army and its commander on behalf of the entire Muslim community. The conditions under which this form of jihad may be lawfully initiated and exercised are remarkably similar to those governing the Judeo-Christian Just War doctrine: Jihad can be declared only by the competent religious-cum-secular authorities. Recourse to jihad is permissible only after all other diplomatic channels for redress of grievances have been exhausted. During jihad, noncombatant enemy civilians may not be attacked, killed, or taken prisoner nor may the Muslim army engage in random destruction of enemy property. Muslim soldiers and officers must

observe proportionality in their defensive and retaliatory attacks. Such a definition of jihad quite rules out most of what might be considered terrorist actions.

In the case of an invasion of a Muslim land by non-Muslim forces, however, jihad ceases to be a collective obligation, becoming instead the personal obligation of every Muslim man, woman, and child, whether old or young, infirm or well. Given the disproportionate force enjoyed by the invading army over that possessed by the individual believer, upon whom waging jihad becomes religiously obligatory, a greater allowance may be extended to the individual, in effect exempting him or her from the usual limits placed on lawful warfare. Islamic fundamentalist groups like Hezbollah (q.v.) in Lebanon, Hamas (q.v.) in the occupied territories of the West Bank and Gaza Strip, or Munazzamat al Jihad (q.v.) in Egypt tend to view their nation as being occupied by an invading un-Islamic power, even in the case of a nominally Muslim government such as that of Sadat's Egypt. This in turn allows them to claim the right to wage jihad without the authorization of competent religious authorities and by means that may be described as terroristic.

Despite the religious technicalities that limit the correct application of the term jihad to only a few situations, the tendency of secular Pan-Arab nationalism to exploit Islamic religious symbols and sentiments whenever expedient has led Arab nationalists to misuse the term "jihad" to designate what actually have been wars on behalf of Arab nationalism rather than Islam proper. During the 1990-1991 Persian Gulf conflict, Iraqi President Saddam Hussein tried to rally Arab support for himself by describing his war as a "jihad" against the West and Israel. Saddam Hussein, however, lacked the moral and religious credentials of an authority competent to declare jihad nor could he invoke it credibly to defend kaq's usurpation of another Muslim land. Interestingly during the entire course of the Iran-Iraq war, the Islamic Republic of Iran never described its war with Iraq in terms of jihad but only as a jang-i difai al muqaddis, that is, a "war of holy defense against aggression." Shiite fundamentalist Muslims have been less inclined to use the term jihad than their Sunni counterparts due to their belief that jihad proper can be declared only by one of their apostolic Imams.

**JUNE SECOND MOVEMENT.** This group was an anarchistic leftist group formed in West Berlin in 1971 that sought to resist the liberal democratic establishment in West Berlin through bombings, bank robberies, kidnappings, and murders. The group is named after the anniversary of Benno Ohnejorg's death, who was killed in a demonstration against the visiting Shah of Iran in Berlin on 2 June 1967. The group bombed the British Yacht Club in Berlin on 2 February 1972, killing a German attendant. On 10 November 1974, members of this group shot and killed West Berlin Chief Justice Gunter von Drenkmann in reprisal for the death by suicide of a June Second member in jail. On 27 February 1975, the group kidnapped the leader of the Berlin Christian Democrats, Peter Lorenz, who was released in exchange for the freeing of five anarchistic leftist terrorists who were allowed to leave for South Yemen.

The group was closely associated with the Red Army Faction (q.v.) and after the majority of its members had been arrested by the end of the 1 970s, the remainder were absorbed into the RAF group.

**JUSTICE COMMANDOS OF THE ARMENIAN GENOCIDE.** The JCAG is an Armenian nationalist revolutionary organization founded in 1975 seeking to reestablish an independent Armenian state within the territory occupied by the former Republic of Armenia during World War I within eastern Turkey. It has pursued this goal through attacks on Turkish diplomats and economic interests outside Turkey in the belief that Turkey bears responsibility for the slaughter of Armenians and the destruction of the Armenian Republic that occurred in 1915.

JCAG differs from the other major Armenian terrorist group, the Armenian Secret Army for the Liberation of Armenia (ASALA, q.v.) in two important respects: First, JCAG is primarily nationalistic rather than Marxist-Leninist. Therefore it has relied almost exclusively on private support from Armenian communities rather than state-sponsorship from countries hostile to Turkey. Second, the members of JCAG, being very Westernized nationalists, value Western and world public opinion highly and therefore take pains to avoid harming non-Turkish nationals mindful of the potential harm such actions could render the Armenian cause. Nonetheless JCAG has conducted attacks on Turkish targets within the United States, making themselves felt there as a very serious terrorist threat to law and order.

An analysis of 29 noteworthy actions by JCAG in the period from 1975-1983 showed that 52 percent (=15) involved

assassination of Turkish diplomats, 2 of them in the United States and another in Canada; 45 percent (=13) involved bombings and arsons of Turkish diplomatic, tourism, and commercial offices; while 3 percent (=1) represented an unfulfilled threat against Turkish targets. JCAG terrorism within the United States took place entirely from January 1982 to May 1982: On 29 January 1982, Kemal Arikan, consul general of Turkey in Los Angeles, was shot and killed as he was driving home. On 22 March 1982, the offices of Orhan Gunduz, honorary Turkish consul general in Boston, were firebombed and he himself was shot and killed on 4 May 1982. A conspiracy to bomb the home of the honorary consul general of Turkey in Philadelphia was foiled in October 1982. Since then nothing further has been heard of JCAG either in the United States or abroad, a curious fact that requires some explanation.

On 15 July 1983, the ASALA bombed Orly Airport near Paris, killing 7 and wounding over 60 bystanders. This event led to a crisis within ASALA as many members protested what they believed to be counterproductive violence against non-Turkish nationals. The dissenting faction became known as ASALA-Revolutionary Movement, to be distinguished from the mainline ASALA-Militant. Beginning also in July 1983, the name "Justice Commandos of the Armenian Genocide" dropped from use while actions similar to those of JCAG began to be claimed in the name of the "Armenian Revolutionary Army" (ARA). Many analysts believe that the JCAG merely changed its name to ARA and that it is essentially the same organization. It is also possible that members of ASALA-RM and JCAG may have amalgamated themselves into the new ARA. An analysis of 7 actions by ARA in 1983-1985 show that 43 percent (=3) of these involved assassinations; 14 percent (=2) involved hostage and siege situations; while one car bombing and an unfilled threat each accounted for 14 percent of ARA activities. While ARA made the same disclaimers as had JCAG that it intended no harm to non-Turkish bystanders in contrast to earlier JCAG operations, at least six non-Turkish nationals were killed as a result of these operations.

In fact, very little is known about the memberships of these groups, their internal structures, or their relations with possible sponsor states or with other terrorist groups. What little is known about the Armenian groups indicates that they have been involved in factional disputes and internecine fighting that has reduced their effective presence as terrorist groups since the mid-1980s.

**Historical Dictionary of Terrorism.**> By Sean Anderson and Stephen Sloan; published by Scarecrow Press, 4720 Boston Way, Lanham, MD 20706, 800/462-6420 (phone), 800/338-4550 (fax); 452 pages; $57.50. Orders can also be placed by email at orders@scarecrowpress.com. Scarecrow Press's WWW site is at www.scarecrowpress.com.

ÿ



# Chapter 16: THE ARAB-ISRAELI CONFLICT, 1948-1993, Part II

Due to its large size, this chapter is divided into three parts. It covers the following topics:

## Part I

- Israel's War of Independence
- An Exchange of Arabs for Jews
- The Syrian Dictators and Jordan's King Hussein
- The Rise of Nasser
- The Suez Crisis of 1956
- The United Arab Republic
- The 1958 Lebanese Crisis
- More Years of Armed Truce
- The Six Day War
- The War of Attrition
- The Palestinian Wild Card
- Black September

## Part II

- The 1973 War
- Terrorism: the Clandestine War
- The First Phase of the Lebanese Civil War
- How the US Bicentennial Became Entebbe Day
- Sadat's Peace mission
- Israel Gets Involved in Lebanon
- Terrorism: The Next Generation
- The Intifada Begins

Part III

- Lebanon: A National Victim
- The Oslo Peace (Piece?)

---

# The 1973 War

Anwar Sadat had been a quiet partner of Nasser for most of his adult life. An army captain during World War II, he flirted with Nazism (the British arrested him once on a charge of spying for the Axis) and Islamic fundamentalism before deciding that Nasser had the most practical plan for the future. More recently he was president of the Egyptian National Assembly, but since this was merely a rubber stamp to approve decisions Nasser had already made, the job hardly taxed his abilities. Early in 1970 Nasser made him vice-president, apparently because he was the least controversial candidate. The rest of Nasser's inner circle went along with this choice, since they thought they could easily manipulate the man they called Nasser's "black donkey." However, the "black donkey" had some tricks up his sleeve, and soon showed, in his own way, that he could be just as dramatic and flamboyant as Nasser had been.

Sadat began by dismissing his rivals from government, including the highest-ranking leftist, Ali Sabry. This alerted the Soviet Union, and the USSR promptly sent its number three man, President Nikolai Podgorny, to negotiate a 15-year treaty promising economic and military cooperation. Moscow thought all was safe when Sadat signed the treaty; Nasser had never been willing to put Soviet-Egyptian relations in writing. One year later (1972), however, Sadat declared that the USSR was taking too long to ship promised military equipment, and ordered all Soviet military advisors out of his country. The United States stepped into the vacuum left behind by the Soviets, and Egypt has been pro-Western ever since. Sadat also found it easy to improve relations with many countries that disliked Nasser, like Iran, Saudi Arabia and Britain.

The real reason for Sadat's policy switch was his realization that the United States was the only major power that could bring Israel to the conference table. The US did not respond right away, though, since the current deadlock worked to Israel's benefit (the Sinai peninsula gave Israel a very large buffer zone to protect the country with, and contained the only oilfield in both countries). It also seemed that the US and the USSR were too preoccupied with ending their own rivalry to pay much attention to the Middle East. Sadat then decided that he would use force to break the deadlock. In June 1973 he invited King Hussein and Syria's Hafez al-Assad to a summit meeting in Cairo. Nobody thought much of this--Arab leaders are meeting somewhere at any given time--and since Sadat had been threatening a new war against Israel since he took office, he wasn't taken seriously when he talked about it this time. What was kept secret from everybody, including even Hussein, was that Sadat and Assad agreed on a battle plan and a date to launch a two-pronged invasion of Israel.

The date they chose for the attack was Saturday, October 6, 1973. For Israel it could not have been a worse date; this was Yom Kippur, the holiest day on the Jewish calendar. It was also a holy day for Moslems--the 10th of Ramadan--so nowadays we call this conflict either the Yom Kippur War or the Ramadan War, depending on whose side you are on. Anyway, it began with a combined Egyptian-Syrian attack that caught the Israelis totally by surprise. 80,000 Egyptians crossed the canal, overwhelmed 2,600 Israeli defenders, and shattered the Bar-Lev line. The Syrians retook half the Golan Heights on the first day, while shelling and rocket attacks from Syria and Lebanon killed one Israeli and twelve Druze. Israel's advantage in air power and armor was also nearly neutralized, thanks to new Soviet-made SAM missiles and the Sagger antitank "suitcase missile," which a single infantryman can carry. Most of the Arab world was also surprised when the war began, but before it ended nine other Arab nations committed troops, tanks, and planes to support either Egypt or Syria.

For three days it looked like the Six Day War in reverse, with the Arabs making the surprise attacks and winning. Then they stopped advancing on both fronts. Why? The answer was never totally clear. The Egyptians dug in along a new

front line ten miles east of the Suez Canal, while the Syrians did not cross the Jordan River into Israel proper. It appears that they did not want to advance beyond the covering range of their missiles, and they suspected that there were more Israelis behind the units they had just smashed. Actually there were almost no defenders left, and that pause was the miracle Moshe Dayan needed to mobilize the rest of the IDF. It took him 72 hours, because the war had started on a holiday, but once it was complete he effectively threw back the Arabs on both fronts. By October 12 the Golan Heights & Mt. Hermon were cleared of Syrians, and the Israelis began to advance on the suburbs of Damascus. On October 15 a maverick Israeli general, Ariel Sharon, broke through a gap between the Egyptian Second and Third Armies, crossed the Suez Canal, swung south to isolate the Third Army, and began a charge toward Cairo.



Moshe Dayan peeks out of a bunker on the Golan Heights, 1973.

By this time both the United States and the Soviet Union were involved. The USSR acted first, by shipping military equipment to Egypt and Syria, and that prompted the US to do the same for Israel. When the tide of battle turned in Israel's favor both superpowers became extremely concerned. The Soviets wanted a truce before Egypt lost all of its initial gains; the Americans feared that Israel's capture of Cairo or Damascus would provoke a full-scale Soviet intervention. US forces around the world went on full military alert, and both the US and USSR put pressure on their client states to stop fighting. The combatants agreed to a cease-fire on October 22, but a new round of fighting broke it right away. When the second cease-fire went into effect (October 24), Israeli forces halted about sixty miles from Cairo and twenty-five miles from Damascus.

The 1973 war cost Israel 2,378 men, one third of her air force (102 planes), and more than 800 tanks, a shockingly high figure for a country the size of Delaware, with about the same number of people as Alabama. To comprehend such a loss, a comparatively high casualty count on the US armed forces would have resulted in 140,000 dead. As in previous conflicts, no official record of the Arab losses was ever released, but again we estimate that they were higher: about 19,000 dead, more than 350 fighter planes, 1,300 tanks, and 11 ships. Israel won on the battlefield, but in world opinion it was the first three days that counted, because it showed that superior equipment and surprise were not Israeli monopolies. Sadat could claim a great political victory, because he had succeeded in breaking the stalemate over peace in the Middle East. Now the United States worked overtime to arrange a comprehensive series of peace talks, no longer letting domestic concerns (Watergate, the 1974 recession, etc.) get in the way. The Arabs also recovered the self-respect they had lost in 1967, and they also discovered a devastating new weapon to use against the West: oil. We will cover the use of the oil weapon more fully in the section on Saudi Arabia in the final chapter of this work.

# Terrorism: the Clandestine War

While the Middle East went through cycles of war and uneasy peace, Palestinian terrorists continued to make headlines of their own. In May 1972 four al-Fatah gunmen hijacked a Belgian Sabena 707 while it was on the ground at Lod Airport, only to be overpowered 23 hours later by a team of IDF soldiers disguised as mechanics.[5] Later in the same month the PFLP sent three Japanese "freedom fighters" they had trained at Baalbek, Lebanon. The three men flew to Europe, boarded an Air France jet bound for Lod, and cut loose with machine-gun fire and hand grenades in the airport's customs hall. One assailant, Kozo Okamoto, was captured, another committed suicide, while the third escaped. The final score was 26 dead, 72 wounded. Among the dead were sixteen Puerto Ricans on a pilgrimage to see the birthplace of Jesus.

The next attack earned the revulsion of the world, because it took place where one expects only peaceful competition: the 1972 Summer Olympic games in Munich, West Germany. On September 5, 1972, eight members of a group that called itself Black September broke into the Olympic village, killed two Israeli athletes, and seized nine more. They announced that unless Israel released two hundred imprisoned guerrillas, they would kill the hostages at regular intervals. Israel refused to negotiate, leaving West Germany with the responsibility of making a deal with the Black Septemberists. They thought they succeeded when the terrorists accepted an offer of a helicopter to take them and the hostages to the nearest airport, where a Lufthansa 747 was waiting. At the airport, however, a firefight broke out between the Arabs and the German troops that tried to overpower them and free the Israelis. All nine of the Israelis were killed; four of them were incinerated when a hand grenade was tossed into the helicopter. Five Arabs and one German policeman were also killed. Three of the Arabs surrendered and were held for a month, when another Lufthansa jet was hijacked and threatened with the destruction of plane, crew, and seventeen passengers. The Arabs went to a hero's welcome in Tripoli, Libya.

1973 saw the murder of one Belgian and two American diplomats, including the US ambassador, in Khartoum, Sudan, by eight al-Fatah terrorists. In May 1974, Naif Hawatmeh's DFLP tried to achieve a military victory of its own. But "military" is hardly the word for what happened. At Maalot, a village in northern Israel, three DFLP gunmen took over an elementary school and demanded the release of 23 prisoners. The Israeli authorities never negotiated with terrorists before, and this time, instead of talking, sent in the army. Hawatmeh's men were killed, along with 22 children. Previously Hawatmeh had claimed he favored a political solution to the Palestinian problem, rather than a military one; now he lost whatever following he might have had from sympathetic Israelis. After this came a week of Israeli air raids on Palestinian bases in Lebanon, followed by a bloody but fruitless raid by the DFLP on an apartment in the village of Beth-Shan (November 1974).

1974 and 1975 were the PLO's best years. Offers of Arab aid persuaded several African nations break relations with Israel and call for a Palestinian state, although rising oil prices hurt them as badly as they hurt the West. In October 1974 the Arab League convened in Rabat, Morocco, made the PLO a full-fledged member, and declared that the PLO is "the sole legitimate representative of the Palestinian people." (Previously King Hussein had claimed to be the leader of the Palestinian Arabs; now promises of additional subsidies from Saudi Arabia persuaded him to drop that claim.) Before the month was over the French president told a press conference that the Palestinians constitute "an entity, a reality, a people," and thus deserved a homeland. Other European leaders were less outspoken, but German and British politicians met with PLO leaders that year.

A year of activity in the United Nations followed. Since the UN General Assembly follows a rule of "one nation, one vote," dozens of newly independent Third World nations dominated it; most of them were pro-PLO and anti-Western, so they voted the same way as the Soviet bloc states did. In November 1974 the PLO was given permanent observer status--the first non-nation to be treated like one. Given the honors of a head of state, Yasir Arafat walked into the General Assembly with a pistol in his hip pocket, and said, "I have come bearing an olive branch and a freedom fighter's gun. Do not let the olive branch fall from my hand." Several UN organizations, especially the International Labor Organization (ILO) and UNESCO, began to publish blatant anti-Israel propaganda. A vote to expel Israel from the UN

was narrowly averted when the Western nations protested. On November 10, 1975, the General Assembly voted 72-35 to condemn Zionism as "a form of racism and racial discrimination." US delegate Daniel P. Moynihan denounced the resolution bitterly: "The abomination of anti-Semitism has been given the appearance of international sanction." Now the Palestinians were no longer seen as part of the Middle East problem, but the heart of the problem.

For the rest of the 1970s and 80s the PLO used the UN as a forum to address the world, and anything it said was listened to seriously by most of the members present. In February 1980, for example, it brought forth an absurd grievance that Israel was trying to steal the cultural heritage of the Palestinian people by claiming the recipe for falafel (a hamburger substitute made from ground chick peas) as its own. The "falafel controversy" only lasted a few days, until somebody did a little research and pointed out that neither Jews nor Palestinians invented falafel--Egypt had it first!

By the late 1970s the PLO had become the best-financed revolutionary organization in history, receiving more than $20 million a year from oil-rich Arab countries, arms and training from the Soviet bloc, and training from China. Palestinians working in the oil states had 5% of their pay withheld by the host governments to support the PLO, which worked out to an additional $50 million per year. It was estimated at the time that the PLO had an investment portfolio of $60-$100 million, which not only financed terrorist activities but provided some 2,300 jobs for disabled Fedayeen and Palestinian women.

The PLO also provided training, money, intelligence, and weapons to various terrorist groups that had nothing to do with the Middle East. In fact, if the PLO did not support a leftist organization, it was probably through sheer oversight. A partial list of groups that received PLO aid includes the following:

Red Brigades (Italy)
Baader-Meinhoff (West Germany)
Irish Republican Army
Basque ETA (Spain)
South Moluccans (Netherlands)
Turkish People's Liberation Front
Tupamaros (Uruguay)
Monotoneros (Argentina)
ELN (Bolivia)
MIR (Chile)
FALN (Puerto Rico)
Weather Underground (USA)
Sandanistas (Nicaragua)
Eritrean Liberation Front
Japanese Red Army
Moro National Liberation Front (Philippines)

# The First Phase of the Lebanese Civil War

After the PLO was expelled from Jordan, many Palestinians came to view Lebanon as their last refuge. Gradually they moved in from elsewhere, and by 1973 Lebanon's population was about 10% Palestinian. The southernmost part of Lebanon, between Mt. Hermon, the Litani river, and the Israeli border, became the PLO's main base for attacks on Israel, and got the nickname of "Fatahland." Still, the Palestinians remained second-class citizens; landless and mostly poor, others exploited them as a source of cheap labor. Increasingly they turned to radical politics, and found friends among those Lebanese who were poor, rural, and mainly Moslem. When the Palestinians got arms, training, and organization, they disrupted the political compromise that had been so carefully worked out between Lebanon's religious groups.

Unlike Egypt, Jordan, and Syria, the Lebanese government was not strong enough to control Palestinian activity.

Lebanese opinion on the matter varied considerably. Some, like former president Chamoun and Pierre Gemayel (the leader of the Phalangists, an armed Maronite Christian militia) saw the Palestinians as a threat, and wanted them expelled; the leftists, led by Kamal Jumblatt, a Druze socialist, felt that it was Lebanon's duty to lend the Palestinians all possible assistance. All saw that Lebanon was helpless in the face of Israeli counterattacks against PLO targets, and feared that Israel might use the PLO presence as an excuse to annex southern Lebanon.

As the Palestinians grew in numbers and strength, so did the leftists, and the Christians frantically armed themselves to avoid losing political power to both. Often there were violent incidents between the PLO and either the Lebanese army or the Phalangists. Each time a hasty agreement saved the country from disaster, by postponing a final solution to the problem. Then in April 1975 a busload of Palestinians was murdered in a Christian quarter of Beirut. Fighting quickly spread to Zahle in the Bekaa valley, Tripoli in the north, and back to Beirut. As in 1958, the army did not intervene, instead dissolving into factions supporting either the Phalangists or the Moslem-Druze coalition. The government also nearly ceased to exist--after 1975 the president had no firm control of anything outside the presidential palace. In the rest of the country the combatants, supported by various foreign groups, turned upon one another with a ferocity--and firepower--that was remarkable in such a small part of the world.

Gradually the left began to win the war. By early 1976 the PLO was fully supporting the Moslems, and together they controlled about 80% of the country, leaving only an enclave around Jounieh to the Christians. It looked like the Christians would be defeated (so either that Lebanon would become a leftist, pro-PLO state), or that Lebanon would be partitioned into Christian and Moslem states. Either case looked to the Syrians like it would trigger Israeli intervention, so Hafez al-Assad reversed Syrian policy. The result was an odd alliance where both Israel and Syria, so bitterly opposed on everything else, took up the cause of the Lebanese Christians. Israel blockaded the coast, trained a Lebanese military unit in Israel, and opened up the border to Lebanese seeking medical treatment and employment (the so-called "Good Fence" policy). In April 1976 Syria invaded Lebanon with 20,000 troops, and that turned the tide. The Palestinians were put on the defensive, and in August they suffered a major defeat when the refugee camp of Tel Zaatar, on the east side of Beirut, fell to rightist forces after a bloody 52-day siege.

President Franjieh was so unpopular that his successor, Elias Sarkis, was elected in May 1976, but Franjieh refused to step down until his term expired in September. By this time the other Arab nations were extremely concerned; the conflict made a mockery of pan-Arabism, and raised fears that it could spread to other countries like Syria and Iraq (Iraqi troops were fighting on the side of the Lebanese Moslems because Syria helped the Christians). In October Saudi Arabia invited the leaders of Egypt, Syria, Lebanon, and the PLO to a summit meeting in Riyadh; Kuwait also attended. The result was a cease-fire and a 30,000-man (mostly Syrian) Arab peacekeeping force. They effectively partitioned Lebanon along what was called the "Green Line," which divided east & west Beirut and followed the Beirut-Damascus highway. East Beirut and the northern coast of the country were ruled by the Christians (a cooperative effort by the Phalangists and the Sarkis government); the southern coast had a leftist (Druze-Moslem-Palestinian) government, led by Kamal Jumblatt until he was assassinated in March 1977. The Syrians effectively became the strongest force in Lebanon, controlling about two thirds of the country, including the Bekaa valley. The southernmost part of Lebanon, below the Litani river, became a special case: here the Syrians would not go, since the Israelis made it clear they would not tolerate a Syrian there. In this area the PLO was free to carry on the way it did before. Also in the south was a Christian officer, Major Saad Haddad (1936-84), who organized a mixed Christian-Shiite militia with Israeli help, and worked toward the eventual goal of expelling both the Syrians and the PLO from his country.

At this point it looked like the Lebanese civil war was over. More than 50,000 had been killed in a year and a half of fighting, and more than a million lost their homes. There were no obvious winners: the Christians had to rely on the Syrians to keep their independence, and lost most of the country in the process. The Palestinians were in danger of losing their "last refuge," and only the peacekeeping force saved them from the fanatical hatred of the rightists. The Syrians looked like an unwilling participant, drawn into a Middle Eastern-style Vietnam from which they could not easily leave; only years later did it become clear that they had no plans for leaving. As hostilities wound down, curfews ended, roadblocks were removed, and the Lebanese reopened their shops in an attempt to return to the carefree capitalism of earlier years. Little did they know that the cease-fire they were enjoying was only a reprieve.

# How the US Bicentennial Became Entebbe Day

While the civil war raged in Lebanon, the Palestinian cause suffered an equally embarrassing fiasco on the terrorist front. On June 27, 1976, an Air France Airbus was hijacked after it took off from Athens. The plane was making a stopover on a flight from Lod to Paris, and thus had nearly a hundred Jewish passengers aboard. The hijackers (eight PFLP and two Baader-Meinhoff gunmen) took the plane first to Benghazi, Libya, then to Entebbe Airport in Uganda. At Entebbe Uganda's mad dictator, Idi Amin, came out on the side of the terrorists; he drove to the airport, embraced the hijackers, put the jet under the guard of his soldiers, and moved the hostages to an abandoned terminal building. On June 29 the hijackers broadcast their demand (the release of 53 jailed terrorists in Israel, Kenya, and Europe by July 1), and released 47 non-Jewish captives.

The next few days were miraculous, from Israel's point of view. Though Israel still would not talk with terrorists, it could negotiate with Amin, and a former friend of Amin, Colonel Baruch Bar-Lev, kept the Ugandan president-for-life busy by talking to him for hours on the phone. Time ran out, and Amin had to fly to the Indian Ocean island of Mauritius, to attend that year's meeting of the Organization of African Unity (OAU); he postponed the deadline set by the hijackers until the date of his return, July 4.

Meanwhile, the Israelis continued talking with the Ugandans, while secretly planning one of the most daring rescue operations ever attempted. The rescue allowed almost no margin for error, and depended on surprise, speed, and precise timing to work; it would only take one small slip to jeopardize the mission and hundreds of lives. Realistically, it was expected to cost thirty lives and fifty wounded if everything else went right. Because time was running out, "Operation Thunderbolt" actually took off 15 minutes before the Israeli Cabinet approved it (2:00 P.M. on July 3); they reasoned that if the plan was approved, the extra minutes could be useful, and if the plan was rejected, the planes could still return to Israel.

The planes (two 707s, four C-130 transports, and eight F4-E fighters) had to fly a difficult path over the middle of the Red Sea most of the way, to avoid violating Arab airspace, and they observed radio silence, to avoid detection. Then they flew over Ethiopia and Kenya; one 707, a hospital ship, landed at Nairobi while the other planes continued to Uganda. In friendlier times Israel had helped the Ugandans build Entebbe, so now the Israelis knew exactly how the airport was set up, including the location of the terminal where the prisoners were held. They brought a black limousine and two land-rovers, and when the Ugandans saw them, they thought Amin was making a surprise midnight visit. As the Ugandans came to attention to salute their leader, they were gunned down. Teams of commandos went out to disable communications and blow up the Soviet-made MIGs guarding the airport, while the main force rushed the building holding the hostages. After a final firefight, they escorted more than a hundred hostages to the waiting planes. At Nairobi they treated the wounded, and returned the whole convoy to Israel in time for the United States Bicentennial. The final casualty count was far better than the Israelis expected: seven hijackers and between 20 and 45 Ugandans were killed. Only three hostages and one Israeli soldier (Col. Yehonatan Netanyahu, the commander of the mission) died in the battle.

There was one other fatality at Entebbe. Dora Bloch, a seventy-five-year-old hostage, was recovering from a choking episode in a Kampala hospital when the Israelis struck. The rescue mission never found her, and left her behind. Idi Amin did not know the hostages had been rescued until several hours afterwards, and then he had his revenge: no one saw Dora Bloch alive again. Not until after Amin fell from power in 1979 did her fate become known, when her remains and personal possessions were returned to Israel.

Entebbe was an amazing feat, for its daring and because it was nearly bloodless. Danny Bloch, a son of the late Dora Bloch, said this about the episode: "After the Yom Kippur War, in 1973, people felt we had lost our secret weapon, the special spirit of Israel. Entebbe gave it back."

# Sadat's Peace Mission

Golda Meir and Moshe Dayan resigned in disgrace after the 1973 war ended; Yitzhak Rabin, a native-born "Sabra" and the army Chief of Staff during the 1967 war, became the next prime minister. As Rabin organized a new Israeli government, diplomats began working to create peace. Just as Anwar Sadat had expected, the war and subsequent oil embargo had moved the United States to become an active participant in the peace process. Now the US portrayed itself as more evenhanded, offering American money and technology to Egypt, Saudi Arabia, and any other Arab country that was willing to be friendly. The new US Secretary of State, Henry Kissinger, made regular trips between Jerusalem and the Arab capitals, keeping the peace talks going with rounds of "shuttle diplomacy." In January 1974 Kissinger scored his first success; Israel agreed to pull back to a line 10 miles east of the Suez Canal, allowing Egypt to begin clearing the canal of shipwrecks (they finally reopened the canal to shipping in June 1975). In May 1974 Israel and Syria signed a disengagement accord, and part of the Golan Heights returned to Syrian rule. Nevertheless, most of the time the peace process hardly seemed to move at all. Often Mr. Kissinger would hear nothing but predictable rhetoric from the heads of state he was meeting with. Other times violent confrontations (acts of terrorism, the Lebanese civil war, etc.) threatened to undo the small gains they had made. Sometimes it seemed that the only thing Israel and the Arabs could agree on was that they all wanted more US-made arms!

The next diplomatic breakthrough came on September 1, 1975. After some more shuttle diplomacy, Israel and Egypt agreed to a full disengagement in the Sinai. Israel pulled out of the western third of the peninsula, including the Abu Rudeis oilfield, and Egypt allowed ships carrying nonmilitary cargoes to and from Israel to use the Suez Canal. A team of U.S. civilian observers, stationed between the Egyptian and Israeli armies, monitored the peace. Predictably, other Arab leaders denounced the agreement (chiefly Libya, Syria, Iraq and the PLO), while Sadat gained many admirers in the West.

There were reasons for the intransigence of most Arabs. Egypt had the largest population of any Arab country and without it, no future attack against Israel could hope to succeed. Consequently, Sadat was accused of betraying the Arab cause and Islam. The Syrians were loudest of all, but since they were now heavily involved in Lebanon, all they could do was shout. The Egyptians, on the other hand, supported Sadat wholeheartedly at this point, since they had suffered most of the casualties in the four previous wars (five, if you count the 1968-70 "war of attrition") and were tired of laying down their lives when it suited somebody else. As one Egyptian writer put it, "richer Arabs want Egypt to starve alone, die alone, fight alone and go bankrupt alone."

A series of minor scandals and a general pessimistic mood in Israel led to a major surprise in the May 1977 elections. For the first time Israel's Labor Party was defeated, and after 29 years of leading the right-wing opposition, Menachem Begin rose to become prime minister. Simultaneously, the new American president, Jimmy Carter, continued the shuttle diplomacy of his predecessors. The Carter administration believed that it could solve the Middle Eastern conflict with a grand peace conference, in which the lions and lambs, eagles and bears of the world would all lie down together. Washington wanted the conference to be held in Geneva, Switzerland; here the heads of the US, the Soviet Union, and all other interested nations were expected to come together and resolve their differences.

Israel did not care for an everybody-get-in-the-act conference, since someone would call for PLO participation in it. And the thought of a meeting jointly chaired by the Russians--that Sadat had booted out of his country in 1972--was distasteful to Sadat and the more conservative Arab leaders. That may have prompted Sadat to come up with a better idea, and resulted in the boldest action of his career.

Sadat offered to go to Israel.

On November 9, 1977, Sadat astonished the world by announcing in a speech that he was willing to go to Israel if that would achieve peace. Menachem Begin immediately invited him, and ten days later Sadat became the first Arab leader to visit the Jewish state. Many stunned Israelis waited to greet him when he stepped off the plane, including all of Sadat's former enemies like Golda Meir, Moshe Dayan, and Ariel Sharon. To Ms. Meir, the Israeli leader he respected the most, Sadat announced he had been waiting a long time to meet her, and she asked why he had taken so long. For Sharon he dug up memories of the 1973 war by joking, "If you attempt to cross to the west bank [of the Suez Canal] again, I'll put you in jail!" "Oh, no," Sharon responded, "I'm minister of agriculture now!"

The rest of the year was full of events that would have been unthinkable just a few days earlier. Sadat addressed the Knesset, where he announced that Arabs and Jews could and would be friends. Egypt became the first Arab state to recognize Israel's right to exist; the "jihad" was over. In return for this, he asked that Israel return to her pre-1967 borders and create a Palestinian state in the West Bank and Gaza territories. Then he went to pray in the al-Aqsa Mosque, a move with much symbolism in it because Jordan's King Abdullah had been killed there for suggesting that peace with Israel was possible. In December Menachem Begin came to Egypt and met with Sadat in Ismailia, one of the newly rebuilt cities along the Suez Canal. All these activities made Begin and Sadat joint winners of the 1978 Nobel Peace Prize.

However, it was a short honeymoon. Begin and Sadat had a reputation for being hawks on military matters, and both were devoutly religious men, with strong convictions that could not be put aside easily. That made for meetings where they could reach no agreement, and a few times talks broke down. Whenever that happened Carter stepped in to jump-start the peace process again; each time he made a pitch for the original US plan of a multinational conference, followed by a comprehensive settlement. However, only a separate peace was possible if Egypt and Israel were the only participants. Before 1977 was over, Syria, Jordan, Libya, Algeria, Morocco, Iraq, and the PLO took part in an anti-Sadat, anti-Israel, anti-peace conference in Damascus. Yet while the participants in this "sorehead summit" could agree on what they were against, they could offer no positive alternative, and thus the political initiative remained with Sadat.

When it looked like nothing else would work, Carter invited Begin and Sadat to a special meeting at Camp David, Maryland. There for twelve days in September 1978, they talked, away from the microphones and cameras of the media, and finally smoothed out the last disagreements they still had. There was rejoicing in Cairo, Jerusalem, and Washington at the success of this meeting, but it took another round of shuttle diplomacy before they could sign a final treaty (March 26, 1979). In it, Israel agreed to return all of the Sinai in a phased withdrawal, which was completed in April 1982. Both sides also agreed to meet again and discuss the future of the other territories Israel has held since 1967. They exchanged ambassadors, and opened the border to trade and tourism. Israel's security was assured by a promise to keep the Gulf of Aqaba and the Straits of Tiran open to the shipping of all nations (remember that the closing of those waterways touched off the 1956 & 1967 wars). In April 1979, for the first time in history, an Israeli freighter passed through the Suez Canal.

Now that Sadat had peace with Israel, he had to make peace with the Arabs! When the Camp David accord was first announced in 1978, Libya, Syria, Algeria, South Yemen and the PLO severed all political and economic relations with Egypt. By the end of April 1979 every Arab country except Sudan and Oman had broken diplomatic relations. Most of the Arab world in its fury denounced Sadat as a traitor; Yasir Arafat vowed revenge and called for Sadat's assassination. Egypt was expelled from the Arab League, and since the League's headquarters had been in Cairo, it moved its meetings to Tunis for the time being. Later moves to punish Sadat included expulsion or suspension of Egypt from the Organization of Petroleum Exporting Countries (OPEC), the Arab Monetary Fund, and the foreign ministers' meeting of the Conference of Islamic States. Saudi Arabia and Kuwait cut off their large financial subsidies of Egypt's economy. To punish the United States, OPEC jacked up the price of its oil to more than $30 a barrel (that, along with the Iranian Revolution, caused a second energy crisis in the West). The PLO increased its list of targets to include Arabs favoring peace.[6] Sadat responded by calling his critics "dwarfs" and "paralytics" who were sunk in Medieval backwardness. He had promised to win concessions from Israel on matters that did not directly concern Egypt, like the Palestinians, and now found himself negotiating on behalf of Arabs who did not want him to negotiate for them.

Once the ink was dry on the treaty, Begin, Sadat and Carter began discussing what to do about the Palestinians. Here they were far less successful. Sadat moderated his original demand, allowing "Palestinian autonomy" instead of a fully independent Palestinian state, but nobody could agree on what form the autonomy would take. Israel would talk to certain Palestinians, like the mayors of West Bank cities, but it wanted nothing to do with the PLO; the Palestinians and most Arab leaders found a Palestinian government unacceptable if it did not include some form of PLO representation. Meanwhile, the PLO continued its campaign of terrorism against Israeli and Lebanese civilians. And under no circumstances would Israel divide its capital again--the Arab-populated eastern part of Jerusalem included the holy places where so many events from the Bible took place--but the Arabs viewed a Palestinian state as meaningless without *El Kuds* (the Arab name for Jerusalem) as its capital. Menachem Begin explained Israel's point of view with claims that dated to the Old Testament and constantly referred to the West Bank by its Biblical name of "Judaea and Samaria"; that left most of his listeners cold. Both Jimmy Carter and the next US president, Ronald Reagan, tried to bring other Arabs

into the talks, particularly Jordan and Saudi Arabia, but all played it safe and said no. The Camp David Treaty gave the talks a five-year deadline to solve the problems of the West Bank and the Palestinians, but the deadline came and went without any new agreement. At any rate, after Sadat's death there was far less willingness from Egypt to keep the talks going.

Sadat paid for his audacity with his life. His popularity in Egypt steadily dropped after 1979, because of lack of progress on both the peace talks and Egypt's chronic economic problems. Early in his presidency he had released those members of the Moslem Brotherhood who had been jailed by Nasser, paid compensation to the families of Brotherhood members who had been executed, and allowed the movement to relaunch its publications. This had been done because he saw the fundamentalists as an effective counterweight to the leftists, but when they and various other Egyptians announced their opposition to the treaty, he attempted to suppress the discontent by force. Soon the Brotherhood had his name at the top of their death lists.

In September 1981 Sadat jailed or exiled 1,500 political opponents, including the leader of the Coptic Church, Pope Shenouda III. On October 6, while he watched a parade commemorating the eighth anniversary of the Yom Kippur War, a group of dissident Egyptian soldiers attacked Sadat. They leaped from their truck when it passed the presidential reviewing stand, threw hand grenades, and fired automatic weapons at point-blank range, mortally wounding Sadat and eight others. Sadat's death sent shock waves through the Middle East and the rest of the world; he was genuinely mourned by most of the Western nations, and three former US presidents (Nixon, Ford and Carter) were among those who came to the funeral. So did Menachem Begin, prompting a cruel joke about Sadat from the Libyan press: "He lived like a Jew and died like a Jew. He was buried [on] Saturday." Ominously, most of the Arab world rejoiced at the news, showing how fragile the peace was.

Sadat's vice-president, Hosni Mubarak, assumed the presidency immediately. He promised to continue the work Sadat had started, but did so only halfheartedly. Following the letter, but not the spirit, of the treaty, he froze progress on improving relations; for much of the early 1980s he even closed Egypt's embassy in Tel Aviv to protest Israel's involvement in Lebanon. But glacial progress is still progress, and the Camp David treaty stands at the time of this writing as the most successful step toward ending the Arab-Israeli conflict. The rest of the Arab world grew fearful of the Islamic fundamentalist menace spreading out of Iran, and gradually swung back to normal relations with Cairo; by 1989 Egypt was forgiven and back in the Arab League.

# Israel Gets Involved in Lebanon

The 1975-76 civil war was a disaster for Lebanon. The country lay in ruins; no compromise proposed was acceptable to both the Moslems (who now made up a majority of the population) and the Christians (who were determined to keep control of the official government in their hands). Foreign intervention reduced, but failed to completely stop the fighting. Not only were the issues that started the war left unresolved, but the thousands of deaths and hatreds created by the war promised that the Lebanese would never again live as one nation indivisible.

In the aftermath of active fighting came a political realignment. The disintegration of the central government allowed private militias to multiply; by the end of 1981 there were 43 armed factions. Of these the two most powerful were the PLO (about 20,000 men) and the Phalangists (between 10,000 and 15,000). In the Christian zone the Phalangists held more power than the Sarkis government, and they used it to crush rival militias (those of former presidents Chamoun and Franjieh). There the aging Pierre Gemayel let his ambitious and talented son, Bashir Gemayel, assume many of his positions in leadership. On the southern coast, from Tyre to west Beirut, the PLO was the most powerful group. Wherever the PLO went, they helped themselves at gunpoint to whatever they wanted. They moved into Lebanese homes, forcing the owners to live in a small corner or kicking them out altogether. They used the electricity, water, roads and schools without paying any taxes. Often they confiscated cars in the streets, making sudden pedestrians of the stranded owners.

PLO oppression and the Iranian revolution woke up Lebanon's Shiites politically. By the early 1980s there were anti-

PLO Shiite militias; most prominent among them were the fanatical pro-Iranian Hezbollah ("Party of God"), and the pro-Syrian Amal ("Hope").

The Christian right soon came to resent the Syrian presence. Syria's entry into the war had saved them, but they did not want to replace leftist oppression with Syrian oppression. Syria had not given Lebanon diplomatic recognition (they didn't until 1991), and many Lebanese feared that the Syrians still held to their dream of a "Greater Syria," and would use the war as an excuse to annex the whole country. Relations between Israel and the Christians improved, and cooled between the Christians and Syrians. Since both Syria and the PLO opposed the peace talks between Egypt and Israel, they came to agree on other issues. By February 1978 the Syrians had switched sides, fighting the Christian militias and supporting the Moslem-leftist-Palestinian groups.

The PLO's worst terrorist attack to date led to Israel's active involvement in Lebanon. On March 11, 1978, eleven al-Fatah terrorists landed in rubber boats on a beach between Tel Aviv and Haifa. They commandeered first a Mercedes, then a bus full of passengers, and went on a shooting spree, firing at any civilians who came too close. Before the bus got to Tel Aviv, the local police stopped it with a roadblock and overpowered the terrorists in a firefight. The final score: nine terrorists killed, two terrorists captured, 37 Israeli civilians killed, and more than 70 Israelis wounded.

Israel responded with a major invasion to clear southern Lebanon of terrorists. 25,000 IDF troops, backed by artillery and air support, advanced to the Litani River, occupying everything south of that line except the city of Tyre. There the Israelis stopped, to avoid a confrontation with the Syrians. The fighting was all over in less than a week; the PLO abandoned most of their camps before the Israelis arrived. International condemnation of Israel's reaction came immediately, and Israel agreed to withdraw from south Lebanon so that a UN peacekeeping force could take its place.

The new UN presence did little, if anything, to solve the problem. The PLO managed to infiltrate the south again, and the UN force failed to keep them from shelling Israel and the 270-square-mile area controlled by Major Haddad's militia. Both Israel and the Christians accused the UN force of favoring the Palestinians as a result. In reprisal for the worst PLO attacks, Israel raided southern Lebanon twice in 1980, withdrawing afterwards under a great deal of international pressure. In northern Israel, life became much like it was along the Syrian and Jordanian borders before 1967; the shelling disrupted farming, closed factories and schools, and destroyed property. Since the Soviet-made Katyusha rockets could not be guided to targets, casualties were light, but Israel considered the situation intolerable.

In April 1981 a major battle began over the town of Zahle, a Christian stronghold about 30 miles east of Beirut. Syrian forces put the town under siege and attacked Christian troops in Beirut. When Israeli planes shot down two Syrian helicopters near Zahle, Syria brought in batteries of Soviet-made surface-to-air missiles. Menachem Begin warned at that point that unless the missiles were withdrawn, Israel would attack them. That prompted the United States to send a special envoy, Philip Habib, to defuse the crisis. Shuttling between Israel, Lebanon, Syria, and Saudi Arabia, Habib worked out a cease-fire agreement by the end of June. The Phalangist forces abandoned Zahle and the Syrians pulled back to let them out. In return it was expected that Syria would remove the missiles, but months later the missiles were still there.

In July 1981 Israeli warplanes bombed PLO offices in crowded west Beirut, killing an estimated 300 people and injuring 800. Begin regretted the loss of life, but said that while Israel had tried in the past to avoid hitting population centers, it would now "attack terrorist bases and headquarters even if they are purposefully located within civilian populations"--which was precisely why the PLO was in west Beirut in the first place.

And so the exchange continued. It became difficult to figure out which came first: the terrorism or the counter-terrorist response. On June 3, 1982, Palestinian gunmen wounded the Israeli ambassador to Britain, Shlomo Argov, shooting him in the head and putting him into a coma. For Israel this was enough. Three days later 60,000 IDF troops swept into Lebanon, backed by tanks, artillery, and the Israeli Air Force and Navy. Begin called the invasion "Operation Peace for Galilee," and soon it became apparent that this was a much more ambitious incursion than the previous ones had been. On the second day the IDF was only 15 miles from Beirut, well beyond the Litani River. The nearest PLO strongholds--Hasbeya, Nabatiyeh, and Beaufort Castle (a former Crusader fortress)--were overrun and given to Major Haddad. On the coast, Tyre, Sidon and Damour were taken. Now the objective was not just clearing the PLO from the south, but the PLO's ejection from all Lebanon.

IDF forces also entered the southern Bekaa valley, leading to a confrontation with the Syrians. There the greatest air battles since World War II took place. Israeli pilots, flying American-made F-15 & F-16 fighters, downed more than sixty Syrian MIGs and destroyed all 19 antiaircraft missile batteries, without losing a single plane. A cease-fire ended the fighting between Israel and Syria on June 11, giving Israel a free hand to deal with the PLO.

One week after "Operation Peace for Galilee" began, the military outcome was obvious, but the political future was murky. Much of the Western media, ill-informed about the causes of the conflict, saw it as aggression rather than a defensive action, and compared it to a Nazi blitzkrieg. Criticism of Begin, Ariel Sharon (now Israel's defense minister) and the state of Israel came from all directions, even from some who normally sympathize with Israel, like American Jews. In the United States, advertisements of uncertain origin appeared in newspapers protesting the fate of Lebanese and Palestinian civilians caught in the onslaught. Many of these ads reported casualty figures like 10,000 dead and 600,000 refugees; Israeli sources asserted that these figures exceeded the entire population of south Lebanon.

Damour, a Christian town just ten miles south of Beirut, provided much evidence to justify Israel's actions. The PLO had driven most of the residents out in early 1976, and the churches became objects of desecration. One church had been converted into a garage; they littered its grease-stained floor with spare parts. Another had been used as an indoor volleyball court, while crosses and altars in others showed the scars of target practice. The returning residents told stories of senseless killings, and of Lebanese children raped by PLO men. Most horrible was the discovery of the PLOhospitals, where civilians had been kidnaped and forced to give blood to wounded terrorists; the IDF found their bodies on the floor with the syringes still attached, drained of all the blood they had. Similar stories from other communities told of the PLO brutalizing Christian and Moslem alike; even the Shiites welcomed the Israelis as liberators.

Moderate Lebanese Moslems also fell victim to the PLO's reign of terror. Ali Bader al-Din, the imam of the Lebanese village of Arouf, refused to inject Palestinian nationalist messages into his sermons. Shortly before "Operation Peace for Galilee," he disappeared. His body was found a few days later by a shepherd under a bridge. To stop possible protests, the PLO ordered his funeral held at night, though this is contrary to Islamic practice.

After the funeral, about 5,000 people gathered for a memorial service at the imam's home, and this so alarmed the local PLO strongman that he asked Yasir Arafat to come to the village immediately. Arafat came to Arouf, made a speech, and turned to the murdered imam's ten-year-old son, Mohammed. He told the boy, "It was the Zionists who killed your father. He is a martyr to the Palestinian revolution." Then he pulled out his Czech-made automatic pistol, gave it to the boy, and said, "When you grow up you will avenge your father's death." Arafat also offered money to the imam's family, which they refused. The imam's brother later handed the gun over to the IDF.[7]

Sidon held a secret that astonished even Israeli intelligence: it was the world's largest secret Soviet military base in a noncommunist country. Miles and miles of tunnels concealed bunkers, Soviet-made arms, thousands of tons of ammunition, tanks, helicopters, and all the supplies that go with such equipment. Storerooms held stacks of Russian-language documents, and when translated, they talked about a major invasion scheduled to take place in August 1982. This huge stockpile took months to remove, with 700 trucks working constantly, and they estimated that there was enough materiel to equip an army of half a million men. In view of the actual size of the PLO force, some wondered who the enormous cache was really for (the USSR?), and if its capture had prevented World War III.

In mid-June the Israelis linked with their Christian allies in east Beirut, trapping the PLO in west Beirut. A siege of the Moslem half of Lebanon's capital began, with the Israelis pounding relentlessly at PLO forces and preventing food, medicine, water, and electricity from crossing the "green line" separating the city's Christian and Moslem sectors. Little aid came from the PLO's backers; the only soldiers who fought alongside Arafat were the handful of Syrians who got trapped in Beirut by the rapid Israeli advance. Most Arab states simply protested; none was willing to welcome many PLO fighters onto its territory; the Syrians suggested that Arafat was no longer competent and should hand over PLO leadership to another (presumably pro-Syrian) faction; Libya's mercurial strongman, Muammar el-Gaddafi, told Arafat to commit suicide and become a martyr to the cause, rather than let the Israelis drive him from Beirut.

US intervention saved the PLO from this bleak situation. Philip Habib returned to the region, shuttled between Beirut and Jerusalem, and negotiated a settlement where the PLO would leave Beirut and disperse among several Arab

countries. A multinational force of French, Italian, and American troops would guard their withdrawal. In late August an estimated 14,000 Palestinian and Syrian soldiers left the city, brandishing assault rifles and flashing victory signs.

Meanwhile, it was election time for the Lebanese. The Phalangists nominated 34-year-old Bashir Gemayel as their candidate for president, and since a special session of parliament, boycotted by nearly every Moslem member, did the voting, Gemayel won easily. Before he could become president, however, Gemayel was killed in an explosion that flattened the Phalangist party headquarters in Beirut. Bashir's elder and more moderate brother, Amin Gemayel, was then elected almost unanimously to succeed him.

Israel responded to the younger Gemayel's assassination by occupying west Beirut. The Phalangists went with them, and entered the Sabra and Shatilla refugee camps, supposedly to look for PLO guerrillas hiding in there. Instead, the Phalangists took their revenge, killing hundreds of Palestinian men, women, and children. Whole families were lined up and shot; others were buried in the rubble of their dynamited homes. Rescue workers later found 328 bodies in the camps, but Israeli intelligence estimated that between 700 and 800 Palestinians died in the bloodbath.

The Sabra-Shatilla massacre caused a political crisis in Israel. The Israelis pulled out of Beirut immediately, and the multinational force stepped in to take their place. Worldwide condemnation fell on Israel for its perceived part in the massacre. Although Israel was not involved in the incident, many felt that anybody with any sense would have kept the Phalangists out of the refugee camps, knowing they were angry at their leader's death. Ariel Sharon lost his job because many saw him as indirectly responsible for the killings. Menachem Begin resigned a few months later, in October 1983. He did so because of failing health and grief over his wife, who died while he was visiting the United States in November 1982; the bad news from Lebanon probably speeded up his downfall as well. Begin spent the rest of his life in seclusion; his successor was foreign minister Yitzhak Shamir, a former Sterngang member who was just as tough a negotiator as Begin had been.

# Terrorism: the Next Generation

Terrorists continued to grab headlines in the early 1980s, and 1985 was a particularly busy year for them. Early in the year Israel made a very controversial move, freeing 1,150 terrorists held in Israeli prisons in exchange for three Israeli soldiers captured by Syria during the Lebanese war. Then on June 14 came history's most televised hijacking; two Lebanese Shiite gunmen took control of a TWA flight en route from Athens to Rome. After several trips across the Mediterranean between Algiers and Beirut, during which time a US Navy diver was killed and most of the passengers released, the plane landed in Beirut, and the remaining hostages were moved to several hidden locations around the city. The gunmen demanded the release of more than 700 prisoners (mostly Shiites) captured by Israel during its occupation of southern Lebanon. Nabih Berri, leader of the Amal militia, stepped in at this point, said he backed the hijacker's demands, and became a mediator. On June 24, Israel released 31 Shiite detainees, but both Israel and the United States insisted that it had nothing to do with the hijacking; they were planning to let them go anyway. Then Hafez al-Assad put pressure on the hijackers, and the rest of the hostages were released on June 30. Israel released the prisoners it held in large groups between July and September.

Israel retaliated by bombing the PLO headquarters in Tunisia on October 1, killing about 70 Palestinians and Tunisians. The PLO response was quick, and a great embarrassment to Arafat. One week later a small PLO faction, the Palestine Liberation Front (PLF), captured an Italian cruise ship, the *Achille Lauro.* The four gunmen and their leader, Muhammad Abbas, took the liner to Egypt and surrendered in return for a promise of safe passage. However, after they flew out of Egypt, US jet fighters intercepted and forced their Egyptian airliner to land in Sicily, where Italian authorities arrested the hijackers. Italy later permitted Abbas to leave for political reasons; the others were put on trial for the hijacking and for the murder of Leon Klinghoffer, an elderly American Jewish passenger who had been shot and thrown overboard.

The lack of authority not only attracted hijackers to Beirut; it also became the world's kidnaping capital. Several foreigners--mostly Americans but also British, French and Germans--were kidnaped off the streets of Beirut. An

otherwise unknown pro-Iranian group that called itself Islamic Jihad claimed responsibility for this, and called for the release of 17 Shiites imprisoned in Kuwait for 1983 car-bomb attacks. Two Americans died in captivity; Terry Waite, the British envoy sent by the Anglican Church to negotiate for the hostages, became a hostage himself; most were held until 1991, long after the issue which prompted the kidnapings became irrelevant.

One kidnaping was a definite "no-brainer," meaning that a remarkable lack of intelligence went into its planning. In September 1985 four Soviet diplomats were abducted in Beirut to protest fighting between fundamentalists and Syrian-backed militias in Tripoli. Islamic fundamentalists disliked the Soviet Union's policy of official atheism, but since both them and the Soviets disliked the United States even more, the act made no sense from a political standpoint. One hostage was shot and killed while in captivity; the kidnappers apologized and released the others a month later.

In November 1985 an Egyptian airliner was hijacked after takeoff from Athens and forced to land in Malta. There the Arab gunmen shot eight passengers, killing two (an American and an Israeli). Hours later an Egyptian commando team stormed the plane and killed or fatally wounded 58 people. Egyptian president Mubarak was criticized for this botched attempt to reenact the Entebbe rescue. The hijackers, one of whom survived, turned out to be anti-Arafat Palestinians from Abu Nidal's faction, which opposed even talking about making peace with Israel. The group was believed to have received support from Libya.

Several other incidents in 1985 and 1986 also had a Libyan signature on them, prompting the US to bomb Tripoli in 1986; after that the number of terrorist acts declined markedly. One of the few that took place, however, was the bloodiest of all. On December 21, 1988, a PanAm 747 exploded over Lockerbie, Scotland, killing all 259 aboard and 11 on the ground. The two terrorists accused of that bombing escaped to Libya, and are still there at the time of this writing (March 1995), despite international condemnation and sanctions.

# The Intifada Begins

The 1980s were a difficult time for Israel. For a start, the cost of defending the Jewish state was a heavy burden on its people; it caused triple-digit inflation and required life-interrupting terms of military service by nearly every able-bodied citizen. The pitfalls of parliamentary democracy also surfaced with every election. Israeli voters cast ballots for a political party, not for a specific candidate, and afterwards the number of votes going to each party determines how many seats it will occupy in the Knesset; party leadership--not the voters--decides which individuals will serve as Knesset members. And since more than two dozen parties participate, no one can win a majority of the votes. What that means is that after every election Labor and Likud scurry to put together a coalition, promising anything that will make the minor parties join them; victory goes to the party that assembles a 61+ member coalition first (the Knesset has 120 members). Thus the minor parties, which include communists, ultra-Orthodox Jewish groups, Israeli Arabs, and just about everything in between, have more influence than their numbers would suggest; the defection of one party from a coalition can bring down the government and force new elections.

One such defection forced an election in 1984. This time nobody won; Labor captured 44 seats, Likud held onto 41, and neither could form a majority coalition. The result was a compromise called "the Unity Government"; Labor leader Shimon Peres became Prime Minister and Yitzhak Shamir served as Foreign Minister for 25 months; at the end of that time they switched places. Many observers predicted that this unstable arrangement would collapse before the second 25-month term ended, but remarkably, it lasted without either of the two major blocs quitting, and it succeeded in tackling the inflation problem, reducing inflation from a staggering rate of 400% per year to less than 20%.

The next election (December 1988) also ended in an unbreakable tie, so they established a second Unity Government, with Shamir as Prime Minister. This time it only lasted 15 months, and was succeeded by another election and a right-wing government led by Shamir. It lasted until June 1992.

Meanwhile, a second generation of Palestinians grew up under Israeli rule. They resented the lack of progress the PLO had made in liberating them, despite decades of effort, and felt the Arab states were using them as pawns to further their

own political games. The last straw, perhaps, was the Arab League meeting of November 1987, which was almost totally concerned with the Iran-Iraq war; discussion of the Palestinian issue was brief, and only occurred because Syria insisted on it. Consequently, many young Palestinians decided to take the revolution into their own hands. In December 1987 riots broke out in Gaza, and they quickly turned into a civil disobedience campaign known as the *Intifada*, meaning "uprising." Now rock-throwing youths replaced hooded gunmen in the Western press as the symbol of the Palestinian struggle. Sometimes more deadly weapons accompanied the rocks: knives, Molotov cocktails, and even hand grenades.

A deadly pattern followed, with Palestinians attacking Israelis who drove through their neighborhoods, evoking a response from Israeli troops attempting to maintain order. The Intifada continued for six years, though it accomplished little. Casualties have also been extremely one-sided: by the end of 1991 some 700 Arabs had been killed by Israelis, while Israeli deaths, both civilian and military, numbered only 25. The IDF tried standard riot suppression tactics, like tear gas and rubber bullets, but eventually had to resort to using live ammunition when all else failed. Thousands of Arabs ended up in Israeli jails, far more than the courts could handle quickly.

The whole relationship between Jews and Arabs in Israel changed for the worse. The Palestinians called for boycotts and general strikes. They used violence and intimidation against those who attempted to cooperate with the Israelis (500 Arabs were killed by Arabs in the Intifada's first four years). About half the Palestinians serving in the police force were pressured into resigning. Palestinian civilians tried to keep Israeli soldiers from searching their communities for suspected troublemakers, and encouraged their children to commit criminal acts that would have landed them in a juvenile detention center, had they done them in the United States. Arson was committed in forests planted by Jews.

The Israeli government imposed several sanctions. They put restrictions on the transfer of funds into the West Bank; schools were closed for extended periods; Palestinians accused of excessive violence were deported and their houses were bulldozed. Frequently the border was closed to civilian traffic between pre-1967 Israel and the West Bank & Gaza, causing many Palestinians to lose their jobs. None of these moves was completely effective in stopping the turbulence, though.

If the PLO had anything to do with starting the uprising, it quickly lost control of it. The Palestinians ignored PLO orders, for reasons that we will cover later. Instead, they turned to a radical fundamentalist group called the Islamic Resistance Movement--"Hamas" in Arabic. Like older Palestinian movements, Hamas gained support by utterly rejecting the state of Israel and by generating vicious anti-Semitism.[8] And it showed even less hesitation than the PLO when it came to killing Palestinians who spoke out in favor of moderation. Unlike the PLO, the Hamas leadership avoids the political limelight, and shuns the mixture of Islam and left-wing politics promoted by Nasser, Gaddafi, and many other 20th-century Arab politicians. In the early 1990s most of the oil-rich Islamic nations, particularly Iran and Saudi Arabia, quit financing the PLO and switched their backing to Hamas. That, combined with the rising tide of Islamic fundamentalism, suggests that western-style nationalism is ending in the Middle East, and politics is returning to the Islamic basis of earlier eras. One continuity remains the same, though: Palestinians always prefer the position on Israel that most completely rejects the Jewish state's right to exist.

## This is the end of Part II.

## [Click here to go on to Part III.](#)

---

# FOOTNOTES

5. The leader of the "mechanics" was a future prime minister, Benjamin Netanyahu.

6. In May 1979 the PLO assassinated the Islamic religious leader of Gaza for endorsing the treaty.

7. This story came from the *New York Times*, July 25, 1982.

8. A 1993 Hamas leaflet put it this way: "We are announcing a war against the sons of apes and pigs [the Jews] which will not end until the flag of Islam is raised in Jerusalem."

© Copyright 2000 *Charles Kimball*





## INCIDENT DESCRIPTIONS

The terrorist incidents and operations described in this chapter are not the only ones with which the antiterrorism instructor should be familiar. They are intended to serve as a ready reference for the major incidents which are used frequently as examples during instruction. The accompanying accounts of these events are by no means complete or overly detailed. Discussion is centered around the aspects that can be used to demonstrate valid teaching points.

When conducting research on the topic of terrorism and presenting the material, it is important to understand that accounts of the same incident may vary significantly in their content and description of details. An attempt has been made to present the information in as general a fashion as possible so as to minimize these discrepancies.

**Terrorism-Related Deaths Since 1975**

"We pray for permanent peace. And yet we know, even as we pray, that the time given us on this earth has been, at its most optimistic, one of volatility and frequent violence."--James H. Webb Jr., Secretary of the Navy, at Arlington National Cemetery, Memorial Day, 1987. (P.J. Budham, Navy Times, 1987.)

Washington--Since the last U.S. Marines were lifted off the roof of the U.S. Embassy in Saigon on April 30, 1975, the nation has technically been at peace. But with the death toll from the attack on the frigate Stark, the number of U.S. military killed under fire since the end of the Vietnam War now stands at 374. About two-thirds of that grim tally came from the single, momentous blast that demolished the Marine barracks in Beirut in October 1983.

But 133 other service people have died in the 12 years and three days between the attack on the Stark and the time 41 Marines and airmen were killed trying to rescue 39 U.S. merchant seamen taken by Cambodian forces from the container ship Mayaguez.

In 15 countries, U.S. soldiers, sailors, airmen, and Marines have died under fire. That includes Cambodia, Iran, North Korea, Pakistan, Puerto Rico, Turkey, France, El Salvador, Grenada, Greece, Honduras, Namibia, East Germany, West Berlin, and Libya. Terrorists account for much of the death toll, but U.S. military members have died at the hands of uniformed personnel from North Korea, the Soviet Union, Cuba, Libya, and now Iraq.

Below is a Navy Times compilation of the 33 incidents that have led to the deaths of U.S. service members under fire.

Cambodia, May 14, 1975--Eighteen service men killed and 50 wounded in rescue attempt on the U.S. merchant ship Mayaguez. Twenty-three airmen killed in a Thailand crash while flying to take part in the mission.

Tehran, Iran, May 21, 1975--Air Force COL Paul R. Shaffer and LTC Jack H. Turner were gunned down by two Iranian extremists as the officers were driving to work at the headquarters of the Iranian Air Force.

North Korea, Aug 18, 1976--Army MAJ Arthur G. Bonifas and LT Mark T. Barrett were hacked to death by North Korean soldiers. Bonifas and Barrett were supervising a tree-pruning operation in a DMZ on the border. They were clearing a view of a U.S. military outpost.

Islamabad, Pakistan, Nov 21, 1979--Army CW3 Bryan L. Ellis and Marine CPL Steven J. Crowley were killed in an assault on the U.S. Embassy during riots.

San Juan, PR, Dec 3, 1979--Puerto Rican nationalist gunmen killed two sailors, Communications Technician First John R. Ball and Radioman Third Emil E. White, in an ambush on a U.S. Navy bus. Ten others were killed. The killing was said to be in retaliation for deaths of three Puerto Rican nationalists.

Desert One, Iran, Apr 24, 1980--Eight were killed and five injured when an RH-53 helicopter collided with a C-130 transport in a failed rescue attempt to free U.S. Embassy hostages in Tehran.

Istanbul, Turkey, Apr 16, 1980--Navy CPO Sam A. Novello was killed when three terrorist gunmen opened fire on him in a residential district.

Adana, Turkey, Nov 15, 1980--AF SGT William C. Herrington was shot and killed by members of a radical leftist group at an air base at Incirlik.

Paris, Jan 18, 1982--Army LTC Charles Robert Ray, a military aide in the U.S. Embassy, was shot and killed outside his home.

Lebanon, Sep 25, 1982--Air Force MAJ Harley S. Warren and Army Major Randall A. Carlson, members of the UN observer force, were

killed with two others when their vehicle hit a landmine on the Damascus-Beirut highway.

Beirut, Lebanon, Sep 30, 1982--Marine CPL David L. Reagan was killed and three Lebanese officials were wounded while trying to defuse an unexploded bomb at Beirut airport.

Beirut, Apr 18, 1983--Four U.S. service members were among 63 people killed in a car bomb explosion at the U.S. Embassy.  They were Marine CPL Robert V. McMaugh and three Army members:  SFC Richard Twine, SSG Ben H. Maxwell, and SSG Mark C. Salazau.

El Salvado, May 25, 1983--Lt Cmdr Albert A. Schaufelberger was killed in his car outside the American University by leftist guerrillas.

Beirut, Aug 29, 1983--Two Marines, 2LT Donald G. Losey, Jr and SSG Alexander M. Ortega, were killed by mortar fire.  Fourteen others were wounded.

Beirut, Sep 4 - 6, 1983--Two Marines, CPL Pedro J. Valle and Lance CPL Randy W. Clark, were killed in shelling.  Ten others were wounded.

Beirut, Oct 16, 1984--Marine CPT Michael J. Ohler was killed by a sniper.

Beirut, Oct 23, 1983--In one of the U.S. military's worst "peacetime" disasters, 219 Marines, 18 sailors, and four soldiers--241 service members in all--were killed by a single explosives-laden truck driven into the ground floor of the Marine barracks.

Grenada, Oct 25, 1983--Nineteen service members were killed and 115 wounded in an assault on the Caribbean island.  Of those killed, 12 were Army, three Marines, and four Navy.

Athens, Nov 15, 1983--U.S. Navy CPT George Tsantes, military attache, was shot and killed by two gunmen on a motor scooter.  The terrorist group "November 17" claimed responsibility.

Beirut, Dec 4, 1983--Eight Marines in an observation bunker near Beirut airport were killed under heavy artillery fire.

Lebanon, Dec 4, 1983--While retaliating for the guerrilla bombardment that killed eight Marines earlier in the day, Navy pilot LT Mark A. Lange died after trying to parachute from his A-6 Intruder, which was downed by Syrian gunfire.

Beirut, Jan 8, 1984--Marine CPL Edward J. Gargano was killed in an ambush.

Honduras, Jan 11, 1984--Army CWO Jeffrey C. Schwab was killed when his helicopter was shot down on the Nicaragua border during joint U.S.-Honduras military maneuvers.

Beirut, Jan 30, 1984--LCPL George Dramis was killed during shelling of the U.S. facility.

Namibia, Apr 15, 1984--Army LTC Ken Crabtree and a diplomatic companion were killed by a bomb at a gas station in Northern Namibia.

Aukar, Lebanon, Sep 20, 1984--Army CWO2 Kenneth V. Welch and Navy Intelligence Specialist Michael G. Wagner were killed in a car bomb blast at the U.S. Embassy annex.  Four others were wounded.

Ludwigslust, East Germany, Mar 24, 1985--Army MAJ Arthur D. Nicholson Jr., a member of a special liaison force in East Germany, was shot and killed by a Soviet sentry at a restricted zone near the border.

Beirut, Jun 15, 1985--Robert D. Stethem, a Navy steelworker and diver, was executed by hijackers of TWA Flight 847 at Beirut airport.

San Salvador, Jun 19, 1985--Four Marines assigned to the U.S. Embassy were killed while off duty at an outdoor cafe.  They were SGT Bobby J. Dickson, SGT Thomas T. Handwork, CPL Patrick R. Kwiatkowski and CPL Gregory H. Weber.  Thirteen other people were also killed.  The Central American Revolutionary Workers Party (PRTC) and the Mardogueo Cruiz Urban Commando (CMC) claimed responsibility.

West Berlin, Apr 5, 1986--Army SGT Kenneth T. Ford was killed immediately and SGT James Goins died of injuries June 8, when a bomb exploded in a disco frequented by U.S. service members.  More than 60 other Americans were injured in the incident, which was blamed on Libyan terrorists.

Libya, Apr 14, 1986--Two Air Force crewmembers, CPT Fernando L. Ribas-Dominici and CPT Paul F. Lorence, were killed when their F-111 crashed into the Mediterranean Sea during a reprisal raid for the Berlin bombings.

El Salvador, Mar 31, 1987--Army SFC Gregory Allen Fronius, a Green Beret acting as military advisor, was killed at a Salvadoran Army base during a massive attack by leftist insurgents.  Sixty-nine others were killed in the attack and 100 wounded.

Persian Gulf, May 17, 1987--37 sailors were killed when an Iraqi jet fired by mistake on the U.S. frigate Stark.

Barcelona, Spain, Dec 1987 USO Bombing--One U.S. sailor was killed and nine injured when an unknown terrorist threw two hand grenades into a USO club crowded with servicemen from two U.S. Navy ships in port for the holidays.  The dead sailor is identified as GSM-3 Ronald Strong.

Clark Air Base, Philippines, Dec 1987--Three active duty and one retired U.S. service members were shot as they walked and drove past an exposed portion of the perimeter of Clark Air Base.  It was a gang-land style killing carried out from vehicles by hit squad members of the leftist factions in the Philippines.

Athens, Greece, Jun 28, 1988--U.S. Navy Captain William Nordeen murdered by car bomb located down the street from his home as he drove to work.  November 17th Org claimed responsibility.

Lockerbie, Scotland, 21 December 1988--Bombing of Pan Am Flight 103--259 passengers and crew, as well as 11 people on the ground, were killed when a bomb exploded in the 747 jumbo jet as it reached cruising altitude headed for New York from London.  The majority of the passengers were Americans traveling home from the holidays.

## 1970 Kidnapping of Dr. Claude Fly, Uruguay

Dr. Claude Fly was an American agronomist working for the USAID (United States Agency for International Development) office at the American Embassy in Uruguay.  He was abducted from his office in Montevideo in 1970 by the Tupamoros (National Liberation Movement, MLN) and immediately accused of being a CIA spy.

Even after months of hardship, Dr. Fly lived each day in accordance with the guidelines of his Catholic faith, even in his dealings with his captors.  During the seven months of his captivity, he found inner strength in his deep religious convictions.  Dr. Fly's efforts to endure and his constant demonstration of faith made him a human being worth saving in the eyes of his captors.

Toward the end of his captivity Dr. Fly suffered a heart attack.  Before losing consciousness Dr. Fly told his captors what was happening to him and that he needed medical attention.  The Tupamoros, who had earlier threatened to kill him, then went out and kidnapped a heart specialist and stole some equipment to treat Dr. Fly.  The heart specialist managed to convince the captors that Dr. Fly would live only if he could be taken to a hospital to receive adequate treatment.  Risking capture, the Tupamoros delivered Dr. Fly to the front steps of the best hospital in the area, along with the heart specialist and the equipment, and alerted the staff by telephone.  The respect and admiration that Dr. Fly had gained from his captors can be credited with saving his life.

## 1971 Kidnapping of Sir Geoffrey Jackson, Uruguay

Sir Geoffrey Jackson, British Ambassador to Uruguay, was kidnapped on 8 January 1971 by the Tupamoros (National Liberation Movement-- MLN).  This kidnapping, carried out in Montevideo, demonstrates the planning and military precision used in operations conducted by well- organized, well-trained, and highly dedicated terrorist groups.

Jackson realized early that he was the object of an on-going surveillance effort.  He had, as a result, made plans for his family in the event that he should become a victim.  These plans would prove invaluable during his captivity.  He also curtailed his activities and attempted to upgrade his security posture.

Shortly before 1000 hours on 8 January, the ambassador departed his residence en route to the embassy.  He traveled in a two-car motorcade which consisted of Jackson's chauffeured car in the lead and a security follow car in trail.  The motorcade left a major avenue and turned onto a narrow and congested side street when a large red van pulled out from the curb, ramming Jackson's vehicle in the left front fender.  At the same time, another car moved in behind the follow car, immobilizing the two diplomatic vehicles.  A third car moved into the intersection, thereby isolating the attack site.  Jackson's driver got out of the car to inspect the damage and was hit on the head by one of the terrorists.  Gunshots were fired into the air from an automatic weapon which was concealed in a basket of fruit carried by a disguised terrorist.  Four terrorists ran to the car; one drove and the other three controlled Jackson.  The two unarmed guards in the follow car were removed to the sidewalk and beaten by terrorist support personnel.  The ambassador was then transported from the scene in his own car.

Ambassador Jackson was held for 244 days under unsanitary and humiliating conditions.  He was repeatedly moved from basement to basement and held in cramped cages, which were inappropriately named "people's prisons" by his captors.  He was deprived of food and kept isolated from other people except his guards.  He was given communist reading material in an attempt to indoctrinate him; however, his captors soon learned that he was already much better read on the subject than they were.  In fact, he began indoctrinating them.  He practiced many

resistance techniques to counter the efforts being made by the Tupamoros to dehumanize him.  One of the most successful of these was the constant practice of total recall or memory exercises.  He refused to allow the captors to humiliate him and make him anything less than what he was.  He refused to be addressed by anything but "Ambassador."  He let his captors know that, although he was being held in meager surroundings, by virtue of the fact that he was the ambassador from Great Britain, the Queen's own representative, these surroundings were none the less the British Embassy and were to be treated as such.  Through the use of rapport building and the ambassador's deportment, he was able to request and receive such things as bathing facilities, books, and other items to ease the strain and boredom of captivity.

Throughout his period of captivity, Ambassador Jackson retained his dignity as an English gentleman and remained very much the British ambassador conducting the Queen's business.  He managed to present an image to his captors of something more than a caged animal awaiting the slaughter.  He imparted a sense of decency and devotion upon his captors unmatched by anything they had previously experienced.  Despite efforts to break his will, he persevered and became something which the Tupamoros deeply respected rather than despised.  This bridge of respect built through hardship was what finally motivated the Tupamoros to release Ambassador Jackson unharmed and without receiving anything in return.

## 1972 Murder of Israeli Athletes at Munich Olympics

On 5 September 1972, eight Arab terrorists, disguised as athletes, slipped into the Olympic village complex in Munich, West German, killing two members of the Israeli Olympic team and taking nine others as hostages.  A short time later the nine hostages and five of the terrorists were killed in a shoot-out between the terrorists and West German police at a military airport.  The Arabs and their hostages had been taken by helicopter to the airport 15 miles west of Munich where a jet had been made ready to fly them all to Cairo.  Three Arabs were arrested after the shoot-out and a German helicopter pilot was critically wounded.  The Black September Organization (BSO) claimed responsibility for the attack and issued a four-page statement calling for the release of Arab guerrillas being held by Israel.

The 23-hour ordeal unfolded at 0430 hours on 5 September when the terrorists scaled an eight-foot wire fence that surrounded the Olympic village compound.  The raiders then made their way to building 31 which housed the Hong Kong, Uruguayan, and Israeli teams.

At about 0530 hours the raiders burst into the quarters where the Israelis were staying.  As they rushed in they were intercepted by Moshe Weinberg, the Israeli wrestling coach who held the door against the terrorists while shouting for the athletes to flee.  Seconds later the raiders broke in, killing Weinberg and weight lifter Joseph Romano.  Six of the 15 Israelis managed to escape from the building.  The nine who were held inside the building reportedly fought the terrorists for a time with knives.

The Arabs, however, overpowered the Israelis and took them as hostages.  Once in control of the quarters, the Arabs issued their demand for the release of the 200 Arab guerrillas in Israel.  Throughout the morning and afternoon, West German officials negotiated with the Arabs on the patio of the building.  Offers for the release of the hostages made by the Germans and by members of the Arab league were repeatedly turned down by the terrorists.

The stalemate was finally broken around 2100 hours when the West German succeeded in convincing the terrorists to move out of building 31 with the hostages.  As part of the bargain the Germans agreed to have three helicopters transport the nine hostages and captors to the military airport at Furstenfeldbruck.  Munich authorities then cleared a path around the building from which the Arabs and Israelis emerged at around 2200 hours.  Using underground passages, the group was moved out of the Olympic village by bus to the awaiting helicopters.

When the convoy arrived at the airport, two of the terrorists walked from the helicopters to inspect the 707 jet that was to take them to Cairo.  As they walked back to the helicopters, German riflemen reportedly opened fire.  The Arabs, armed with automatic weapons, returned the fire.  As a result of the ensuing gun battle, all nine hostages were slain along with a German policeman and five of the terrorists.

German police defended the action, saying that although the hostages had agreed to the terrorists' demand to be flown to Cairo, it was felt by the authorities that it would have meant certain death had they been allowed to leave.  After the incident there were several disclosures by various sources.  Some of these revelations are as follows:  German officials believed that at least two of the slain hostages were Israeli security agents in cover; reports indicated that some of the hostages who were killed at the airport may have been killed by police who mistook them for fleeing terrorists; at least three of the eight-man commando force that perpetrated the act had been employed on a permanent basis at the Olympic village.

The three terrorists who were taken alive were all wounded during the gun battle.  They were identified as Ibrahim Badran, 20; Abd es Kadir el Dnawy, 21; and Samer Mohammad Abdullah, 22.  All identified themselves as being students who had come from Jordan.  Although the three were indicted on murder charges for which they would have served life sentences had they been convicted, they were released by the Bonn government approximately 30 days after the incident in connection with another terrorist operation carried out to gain their release.  That incident was the hijacking of a Lufthansa airliner over Turkey on 29 October 1972.

## 1972 Hijacking of a Lufthansa Airliner

Two Arab terrorists of the Black September Organization (BSO) hijacked a West German airliner over Turkey on 29 October 1972, forcing the Bonn government to release the three Arab terrorists held for the 5 September 1972 murder of 11 Israeli athletes at the Munich Olympics.  The

freed killers were later flown to Tripoli, Libya.  The released Arab murderers who faced trial for the killings were Mahmud el-Safadi, 21; Samer Mohammad Abdullah, 22; and Ibrahim Badran, 20.  Safadi was identified at his arrest as Abd es Kadir el Dnawy.

The aircraft, a Boeing 727 carrying 13 passengers and seven crew members, was commandeered by the two guerrillas after it left Beirut, Lebanon, en route to Ankara, Turkey.  The hostages included one each from the United States, West Germany, Jordan, Spain, Turkey, Oman, and South Yemen; and six from Lebanon.

Threatening to blow up the plane and its occupants unless their demands were met, the terrorists forced the pilot to fly to Munich, with fuel stopovers at Nicosia, Cyprus; and Zagreb, Yugoslavia.  As the plane circled the heavily guarded Munich airport, the hijackers ordered it flown back to Zagreb.  It circled the airport there for an hour and did not land until a smaller jet carrying the three murderers released by the West German government arrived at the Yugoslav airport.  The three freed prisoners then boarded the hijacked Lufthansa jetliner which flew to Tripoli.  The plane, with all occupants, was released and flew back to West Germany on 30 October.

The Croatian interior minister said that Yugoslav negotiators had tried to stall the hijackers when they landed in Zagreb the second time by refusing to refuel the plane in hope of freeing the hostages.  The minister said that after the hijackers threatened to destroy the plane, he consulted with the West German consul in the control tower and received written permission for refueling.

## 1972 Killing of Mahmoud Hamshari, Paris

On 8 December 1972, Dr. Mahmoud Hamshari was killed by a bomb in his apartment in Paris, France.  Hamshari was the Black September Organization (BSO) chief in Paris and was constantly surrounded by bodyguards.

Hamshari had been implicated in the planning and organizing of the 1972 Munich Olympic massacre of 11 Israeli athletes by members of the BSO.  The Israeli secret service operational arm, "The Mossad," had been tracking and eliminating participants in that action.  They knew that Hamshari's death would require much more careful planning than any they had carried out previously.

Mossad agents staked out his apartment and noted Hamshari's routines, such as the times that he came and went, when he was alone in the apartment, and when his French wife took his daughter to school.  An Israeli engineer posing as a plumber worked on the telephone cables beneath Hamshari's apartment building.  Hamshari soon began having trouble with his telephone and called the company to effect repairs.  The engineer had been situated close by and was cutting in and out of Hamshari's calls until the one for the repairs came through.  The engineer, in full sight of the unsuspecting Hamshari, then placed a command-detonated explosive device in the base of the telephone while pretending to fix it.

While this was going on, another Mossad agent posing as an Italian journalist made contact with Hamshari with the intention of interviewing him.  The Mossad agent waited patiently outside Hamshari's residence for his wife and daughter to leave and then placed a call to the apartment.  Hamshari answered the phone.  A voice on the other end said, "This is the Italian journalist who has a rendezvous with you today.  Is that really you, Mr. Hamshari?"  The Palestinian replied that it was.  When he said that, the phone blew up in his face.

## 1972 Lod Airport Massacre, Israel

On 30 May 1972, a three-man hit squad from the Japanese Red Army arrived at the Lod Airport in Tel Aviv, Israel, via Air France Flight 132.  They were dressed in business suits and carried what appeared to be violin cases.  The operation was planned and supported by the General Command of the Popular Front for the Liberation of Palestine (PFLP-GC).  The events of this fateful day would thrust the Japanese Red Army (JRA) into the forefront of notoriety among the violent militant groups of the decade.

As the three men passed the ticket counter area, they suddenly pulled automatic weapons from their cases and began to spray the crowd indiscriminately.  As they changed magazines in their weapons, the men threw hand grenades into the mass of sprawling bodies.  One of the terrorists, Yasuyuki Yasuda, ran out of ammunition and was cut down by his companions.  A second terrorist, Tsuyoshi Okudaira, committed suicide by pulling the pin on a grenade and detonating it against his body.  The third terrorist, Kozo Okamoto, was captured while attempting to flee from the terminal.

Twenty-six people were killed in the cross fire and 78 were injured.  Sixteen of the dead were not even Jews.  They were Puerto Ricans in Israel on a pilgrimage.  Okamoto is the younger brother of Takedia Okamoto, one of the JRA terrorists who hijacked a Japan Airlines flight to North Korea in 1970.  As the sole survivor of the Lod assassin team, Okamoto was sentenced to life imprisonment in Israel.  He was released, however, as part of a 1983 prisoner exchange with Palestinian militant factions.  He reportedly dropped from sight in Beirut supposedly to reunite with his former comrades in the JRA.

After his capture, Okamoto addressed accusations that they had been drugged during the incident by saying, "The only drugs for us are Marxism-Leninism.  The world of Che Guevara is the only stimulus we need."  The leader of the JRA, Fusako Shigenobu, made the following statement about the incident:  "It is time to show the imperialists that armed struggle is the only humanistic way to advance the cause of oppressed people."

**1973 Kidnapping of Victor Samuelson, Argentina**

Victor Samuelson was a native of Cleveland, Ohio, and was the director of Esso-Argentina, a subsidiary of the Exxon Corporation.  He was also the general manager of an oil refinery located in Campana, Argentina.  Samuelson was kidnapped by the Montoneros on 6 December 1973 as he was eating lunch at the cafeteria in the refinery.

This kidnapping was one of a series of abductions directed at foreign businesses and diplomatic personnel in Argentina.  He was held for 4 1/2 months before being released.  His release was paid for by the Exxon Corporation whose shareholders paid $14.2 million to ensure his freedom.  This ransom was a record payment for the release of a single individual, which stands yet today.  Shareholders of Exxon filed a civil suit against the board of directors and trustees of the corporation for paying the ransom without the consent of all interested parties.

**1973 Assassination of Carrero Blanco, Spain**

In December 1973 the Prime Minister of Spain, Admiral Luis Carrero Blanco, was assassinated by an explosive ambush while driving to work from church services.  The group which committed the act was the ETA (Euskadi Ta Askata-Suna-Basque Home Land and Freedom), a Basque separatist group, active in Spain and France.

Prime Minister Blanco was driven by routines and habits.  The particular routine which was his undoing was his observance of Catholic mass every morning before continuing on to his office.  The terrorist leaders initially had set out to kidnap Blanco but for some reason decided partway through the surveillance phase to assassinate him instead.  Operatives of the ETA began a concerted surveillance effort on the Prime Minister approximately one year before committing the act.

The terrorists rented a basement apartment on Claudio Coello Street, telling the landlord that they were sculptors and needed the basement so that they would not disturb other residents with the noise they made while they worked.  They dug a tunnel from the apartment to the center of the street where they planted approximately 75 kilograms of "East bloc" explosives.  They ran the firing wire through a street-level window, down the street to the corner, and up to the top of a veranda.  This was done so that it would appear as though they were fixing the lighting, while placing them a safe distance from the explosion as well as affording them a quick escape route.  The terrorists also painted small marks on the curb adjacent to the detonation point so that they could accurately judge Blanco's arrival at that position.

On the morning of the assassination, Blanco followed his normal routine.  His motorcade consisted of his car and a security follow car.  In his car were only a driver and Blanco himself.  He left the church, drove about one block, turned left and drove to the next corner.  He then turned left onto Claudio Coello Street.  When Blanco's car was directly over the detonation point, the terrorists, dressed as electricians, set off the explosives, blowing Blanco's car up and over a six-story building.  It landed, with the motor still running, on the inner second-story balcony.  The car wasn't found by security and rescue forces for two hours.  Reportedly, Blanco lived until just before the arrival of rescue personnel, and the driver remained alive until arrival at the hospital and died from injuries a short time later.  As soon as the explosion occurred, the terrorists shouted "gas" so as to make bystanders think that it was a gas explosion and to further confuse security forces.  They then made their escape.  The momentum of the follow car carried it forward; it came to rest inside the large crater left by the explosion.

In order to exploit the act and generate funds, the group wrote a book about the incident, outlining in detail the entire process.  The book is called Operation Ogro--How and Why We Killed Carrero Blanco.  It was translated into many languages and distributed worldwide (except in Spain, where it is banned).

**1973 Rome Airport Massacre**

On 17 December 1973, five armed Arab gunmen attacked a US jetliner at Rome's international airport.  Twenty-nine people were killed aboard the plane.  Two others were slain in the terminal during the subsequent hijacking of a Lufthansa airliner.

The Palestinians began shooting as they pulled weapons from their luggage in the airport terminal lounge.  The men made their way to an American Airlines 707 that was preparing to take off for Beirut and Teheran.  They hurled incendiary bombs inside the aircraft, killing all aboard and destroying the plane.  The terrorists then herded five Italian hostages into a Lufthansa jetliner and killed a sixth person, an Italian customs policeman, as he tried to escape.  The plane, carrying the hostages, crew, and terrorists, took off and the pilot was ordered to head for Beirut.  Lebanese officials refused to allow the plane to land, however, and it flew on to Athens and landed.

In negotiations with Greek authorities, the group demanded the release of two Arab terrorists held since August 1973 for an attack on the Athens airport.  Some reports say that the Greek government refused to release the terrorists.  Other sources say the government complied, but, when released, the two Arabs refused to join the terrorists since they were from a rival Palestinian group.

In an effort to gain compliance with their demands, the terrorists killed one of the hostages and threw his body onto the tarmac before leaving Athens.  The pilot had urged Greek authorities to meet the terrorists' demands, reporting that four other hostages had been killed.  He was unaware that it was a hoax used to place more pressure on the Greek authorities.  The plane then flew to Damascus where it took on fuel and food during a

two-hour stop.  Later that day, after landing in Kuwait, the terrorists released their hostages in return for free passage to an unknown destination.

## 1973 Takeover of the Saudi Arabian Embassy, Khartoum

On the evening of 1 March 1973, members of the Black September Organization (BSO) rushed into the Saudi Arabian Embassy in Khartoum, Sudan.  The BSO had selected a diplomatic reception being held in honor of an American, U.S. Charge d'Affaires Curtis Moore, a highly popular envoy who was being replaced by U.S.  Ambassador Cleo Noel.

The attack itself was a study in simplicity employing both speed and surprise.  During the assault, some guests were able to escape over the garden wall, but all others were taken hostage along with Moore, Noel, Belgian Charge Guy Eid, and the ambassadors of Jordan and Saudi Arabia.

The BSO demanded that the Jordanians release 17 of its members jailed in Jordan, including Abu Daoud, the terrorist suspected of organizing the 1972 Munich Olympic operation.  The group also wanted the Americans to free Sirhan Sirhan, convicted killer of Robert Kennedy, and to have the Israelis free Arab female fedayeen prisoners.  The BSO also wanted the Germans to release the Baader-Meinhof prisoners on trial at that time.  Soon after taking over the embassy, the negotiations began with shifting demands but no concessions, as the Jordanians would not give in.  In Washington, President Nixon announced that the United States would not be blackmailed.

The BSO could hardly lose.  Either the governments concerned would be coerced into making concessions and the hostages would be released, or they would refuse and the hostages would be killed.  Outside the embassy, the security forces and the media waited, and it became clear that no concessions would be granted by either Washington or Aman.  Shortly after 9 p.m., they heard a muffled burst of gunfire; Moore, Noel, and Eid had been murdered.  A few hours later the terrorists surrendered.  They were tried, convicted, and sentenced to death, but the sentence was commuted and they were released into the custody of the PLO and flown to Cairo.

## 1974 Siege of SLA Safe House, Los Angeles

On 17 May 1974, the Los Angeles Police and the FBI discovered the hideout of six members of the Symbionese Liberation Army in the Watts section of Los Angeles.  After the group refused to give themselves up and began to shoot, police returned fire to the besieged house.  Bullets and tear gas canisters must have hit cans of gasoline inside the house which erupted in flames.  The terrorists sought refuge in the basement, where they continued to shoot back, aiming through ground-level air vents.  The house was soon a torch, sending smoke and debris some 150 feet into the air.

For a time the cement walls of the basement and the floor boards of the house protected the terrorists.  After a 70-minute firefight, the shooting stopped and the Symbionese were silent, killed by police bullets and the subsequent fire.  The charred remains of the figurehead leader of the organization, Donald Defreeze, were found in the basement where he had apparently shot himself in the head with a pistol.  Along with the bodies of the six terrorists were found an arsenal of weapons and ammunition, the remains of a terrorist handbook, and a piece of paper with the words inscribed "We will never surrender."

## 1974 Maalot School Massacre, Israel

The Marxist-oriented Palestinian group, the Popular Democratic Front, led by Nayef Hawatmeh, took boastful responsibility for the massacre which occurred at a school in Maalot, Israel, on 15 May 1974.  Three Arab guerrillas crossed the border from Lebanon and seized the school with some 90 teenagers inside.  Their demands were the release of Palestinian guerrillas being held in Israeli jails.  This included the only surviving Japanese Red Army terrorist from the group which conducted the Lod Airport massacre of 1972, Kozo Okamoto.  In return, they offered the lives of their innocent hostages.

Ordinarily the Israeli government refuses to bend in such matters, but the youthfulness of so many captives in guerrilla hands compelled them to agree.  The Arab prisoners had been taken from their cells in preparation for the exchange when the negotiations broke down.  Israeli troops opened fire in a desperate attempt to free the children.  The terrorists began to shoot the young hostages.  Altogether, scores were wounded and 26 perished.  Most were killed by fedayeen bullets on the spot while the rest died later of wounds received.  Among the dead were an Israeli soldier and several other adults who had been killed by the group while en route to the school.  All three of the murderers were killed in the Israeli onslaught.  In Beirut, eloquent demonstrations honoring the fallen fedayeen as noble martyrs of the cause were ordered by Hawatmeh.

## 1974 Kidnapping of the Borne Brothers, Argentina

Juan and Jorge Borne were sons of a wealthy German-born industrialist who headed the Bunge-Borne Group in Argentina.  They were two of the richest and best protected men in all of Argentina.  The two were kidnapped in September 1974 by the Montonero-Peronist Movement in an attempt to gain operating funds and to discourage outside industry from staying in Argentina.

Throughout their period of captivity, the Argentine government refused to negotiate for the men's release.  In the eyes of the military junta, which held power in a tumultuous political and social atmosphere, to negotiate for the release of any victims would have been inconsistent with the

on-going counterinsurgency program in effect throughout the country.  The father of the two men negotiated in secret for their release, much to the displeasure of the government that rightfully claimed that this would invite further such actions.

After months of extensive and secretive negotiations, the two brothers were released a few weeks apart for a record ransom of $60 million.  This is the highest amount ever paid for a group of hostages, a record that still stands.  It has been reported that a significant portion of the money was transferred to the Sandinista National Liberation Front to support its efforts to topple the Samoza regime in Nicaragua.

## 1975 Takeover of OPEC Headquarters, Austria

At about 1100 hours on 21 December 1975, six terrorists, led by Carlos (Ilyich Ramirez Sanchez), operating under the group name "The Arm of the Arab Revolution," attacked the headquarters of the Organization of Petroleum Exporting Countries (OPEC) in Vienna, Austria.

The team planned and rehearsed for the operation in the Middle East.  From there they went to Rome individually where they were picked up and driven to Vienna by car.  In Vienna they met an Arab diplomat at his residence where they were provided with weapons and explosives that had been smuggled in via the Arab's diplomatic pouch.  From the residence the team took a streetcar to OPEC Headquarters and entered the building.

The OPEC Headquarters was located in a seven-storied building at Dr. Darl Lueger Ring 10, one of the busiest boulevards in the city.  Known as the Texaco Building because of the large sign above the door, it was also occupied by a branch of the Vienna Municipality Administration, the Canadian Embassy, offices of two private firms, and a private apartment.  Access to all floors was provided by three self-service elevators and two stairways equipped with heavy steel doors.  The building was guarded at the main entrance by a uniformed policeman and by two plainclothes policemen on the second floor where the OPEC conference was being held.  Both policemen, Inspector Anton Tichler and Inspector Josef Janda, were middle-aged.  Tichler was working his last day before his retirement.

The attack team took the stairs to the second floor and burst into the anteroom.  Tichler was standing by the elevators when the armed terrorists came into the room.  He grabbed Carlos' weapon, attempting to disarm him.  In the struggle for control, Carlos jerked his weapon away, causing Tichler to stumble backward into one of the elevators.  The female terrorist then approached Tichler and asked him if he was a policeman.  When he said yes, she shot him in the head.  She then sent Tichler's body down the elevator to the first floor.  As she turned around, the bodyguard of Iraqi Oil Minister Joseph Janda grabbed her right arm in an attempt to disarm her.  Even though she was undoubtedly weaker, she somehow managed to pull a second pistol out of a pocket and shot the bodyguard in the face.

In the meantime, Carlos grabbed the Iraqi oil minister by the arm and ran him down the hall leading to the conference room, firing into the ceiling as he went along.  Bullets hit the wires and extinguished the lights.  Carlos pushed Janda into a staff office and closed the door.  Then he went back toward the conference room, checking offices as he went.  In one office he came face-to-face with Yousef Ismirl, a member of the Libyan delegation.  Ismirl's first impulse was to grab Carlos' Uzi submachine gun and attempt to fire at the terrorist.  However, Ismirl, not being familiar with the weapon, could not place it into operation.  Carlos produced a handgun from his belt and shot Ismirl five times.  By this time the remaining terrorists had gained control of the personnel in the conference room.  When all the other people in the building were rounded up, there were over 70 hostages.  In the initial assault one of the terrorists was wounded and later taken to a hospital.

The negotiator was Riyafh Al-Azzawi, the Iraqi Charge d'Affaires.  Carlos gave him an eight-point communique to be read at two-hour intervals over the radio in Austria and in all OPEC nations.  The terrorists also demanded that a DC-9 aircraft, equipped with full tanks and a crew, be ready to fly at 0700 the next morning to take the terrorists and the hostages out of the country.

The Austrian Cabinet met that night in an emergency meeting under Chancellor Otto Kreisky, who got in touch with certain Arab countries to see if they would accept the terrorists.  Algeria agreed to do so under the condition that all the hostages would be released upon arrival.  The Austrian Cabinet's decision was that all consideration must be given to saving the lives of the hostages and agreed to give them the aircraft on two conditions:  a written declaration be provided stating that all hostages were leaving of their own free will, and that all Austrian hostages not be taken from Austrian soil.

A bargain was struck, and on 22 December five terrorists with 33 hostages were taken by bus to the airport, where they were joined by the wounded terrorist.  It had been a condition imposed by Carlos that the departure be televised.  After Carlos inspected the plane and announced that it was suitable, they boarded and were off to Algeria.  The plane landed at 1700 hours at the Dar el Beida Airport, Algiers.

This was not the end of the story.  Carlos did release some of the hostages, but not all as he had agreed.  He released the neutrals, mostly non-Arabs, and kept the others.  The wounded terrorist was taken to a hospital in Algiers and later turned himself in to the German government; much information has been learned from him.

At 1900 hours the aircraft, with hostages still aboard, took off.  Two hours later it landed in Tripoli, Libya.  Here the command of the operation was taken over by a terrorist known as Khalid.  He and the oil ministers of Algeria and Libya went to the control tower while the others, including Carlos, remained in the plane.  It seems that the plan, at this point, was to take the ministers on a tour of the "Rejection State" capitals to show them off and to show the latent power of the Rejection Front.  Khalid negotiated with the governments of Saudi Arabia and Iran for the lives

of their ministers through the president of Algeria.  The governments of Iran and Saudi Arabia even agreed to pay ransom to the terrorists amounting to 25 million dollars each.  The terrorists then released the Algerian and Libyan ministers but retained nine hostages including the ministers of Saudi Arabia and Iran.  The plane took off again at 0400 hours on 23 December and flew to Algiers.

In Algiers the terrorists released all of the hostages and turned themselves in to the Algerian authorities.  Khalid had dropped into the background and Carlos resumed his leadership role.  The following day the terrorists were flown to Libya where they were personally welcomed by Colonel Qaddhafi.  For Carlos, this was his biggest exploit so far, and the world press was billing him as "Carlos the Jackal."

## 1975 South Moluccan Train Hijacking, Holland

On 2 December 1975, seven armed South Moluccan terrorists seized a train bound for Amsterdam near the small town of Beilin.  Two people were killed in the takeover and 50 others were taken hostage.

The radicals were Dutch-born children of natives of the Moluccas.  The number of these people living in Holland is estimated at 35,000 to 40,000.  They claim that the Dutch had forgotten their promise of Moluccan independence by allowing Indonesia to take over the territory in 1950.  The two people killed were the first terrorist-related deaths in the Netherlands.

The Dutch government dispatched a special tactical force of Marines to the Beilin area.  The 30-man unit had previous experience with handling a group of terrorists who had staged an attack in The Hague in 1974.  The South Moluccans aboard the train threatened further violence to the passengers if they were not provided with transportation out of the country to an unspecified location.  One hostage who had attempted to flee on 3 December was killed.  In a note released shortly after the killing, the gunmen, who called themselves, "Free South Moluccan Youths," called upon the Dutch government to release from prison all South Moluccans held on charges of terrorism.  The note also demanded that The Hague government recognize their government in exile.

Moderate leaders of the South Moluccan movement failed in repeated attempts to get the hijackers to release their hostages and to surrender to authorities.  On 5 December, an unexplained explosion ripped through the train, injuring one of the hijackers.  Along with two other hostages, he was lowered from the train and taken to a hospital.

Throughout the incident, The Hague government remained fervent in its refusal to recognize South Moluccans' asserted right to independence from Indonesia.  On 14 December, the six remaining hijackers surrendered to police.  According to the Dutch authorities, the government had granted no concessions to the terrorists in order to win the release of the hostages.

This incident was one of two simultaneous incidents perpetrated by South Moluccan groups in support of one another.  At the time the terrorists were taking hostages in Beilin, another group was assaulting the Indonesian consulate in Amsterdam, taking 30 hostages.  One hostage was injured while trying to escape.

## 1977 Kidnapping of Hanns-Martin Schleyer, West Germany

Hanns-Martin Schleyer was chairman of the board at Mercedes Benz, head of the German Association of Industry, and a close personal friend and advisor to then Chancellor Helmut Schmidt.  As early as 1975 the German police knew that he was a likely target for terrorist attack.  After German banker Robert Jurgen Ponto was shot in 1977, investigations showed that Schleyer was the alternate target.  From then on he was given maximum police protection including 24-hour guard on his residence as well as personal bodyguards when traveling.

On 5 September Schleyer was returning home from work in Cologne.  Schleyer and his driver were in the lead Mercedes, with Schleyer riding in the right rear seat.  Three bodyguards followed in another Mercedes.  As the motorcade, traveling along a well-established route, turned right onto a one-way street, a car heading in the wrong direction forced the lead car to swerve to one side where a terrorist was waiting with a baby carriage.  The baby carriage was pushed in front of the lead car which caused the driver to swerve back and collide with the blocking car.  To one side of the street was parked a Volkswagen (VW) microbus with several terrorists inside.

As many as six terrorists exited the blocking car and the VW microbus, killing all three of the bodyguards in the follow car and Schleyer's driver in less than 90 seconds.  The terrorists used shotguns, machine pistols, and a Mac-10 submachine gun.  Schleyer, unharmed during the attack, was taken from the vehicle by the terrorists, members of the Red Army Faction (RAF), who then sped from the scene in the VW microbus.

Schleyer was held for 43 days.  The RAF members demanded the release of jailed RAF terrorists in exchange for his safety.  Two of the main members in captivity were Andreas Baader and Ulrike Meinhof.  The German authorities would not capitulate to the RAF demands.

As an act to demonstrate international solidarity among terrorist groups, four members of the Popular Front for the Liberation of Palestine (PFLP) hijacked a Lufthansa 737 jet to increase pressure on the Germans to give in to the RAF demands.  However, the German police launched a successful assault on the plane as it sat in Mogadishu, Somalia.

When the RAF members in jail heard of this, they became despondent and committed suicide. In retaliation, Hanns-Martin Schleyer was murdered on 18 October 1977.

Schleyer and his bodyguards made serious mistakes which the terrorists capitalized on. Most importantly, the motorcade route to and from work was never varied. In addition, the follow car followed too closely, allowing no room for maneuvering. Schleyer's driver elected to stop the car instead of ramming the blocking vehicle and running over the lady with the baby carriage, who, in fact, was Frederike Krabbe, a well-known RAF terrorist.

**1977 Hijacking of a Lufthansa Airliner**

On 13 October 1977, four terrorists, two of whom spoke Arabic and one of whom was a woman, seized a Lufthansa jetliner as it left the Spanish island of Majorca for Frankfurt, West Germany. The passengers consisted of mostly tourists who had been to the island on vacation. The terrorists forced the pilot to make refueling stops at Rome; Cyprus; Bahrain; and Dubai, United Arab Emirates (UAE).

The hijackers demanded payment of $15 million in ransom money and the release of 13 prisoners--11 of them in West Germany and 2 in Turkey. The German prisoners demanded by the terrorists included the leaders of the Baader-Meinhof Gang (now Red Army Faction), whose release also had been demanded by the kidnappers of the German industrialist Hanns-Martin Schleyer. Schleyer had been abducted on 5 September of that year. In a statement reported on 13 October in Beirut, a group calling itself the "Struggle Against World Imperialism" took credit for the hijacking and indicated that it was connected with Schleyer's abductors. After the successful rescue of the plane and passengers by German security forces, Andreas Baader, Jan-Carl Raspe, and Gudrun Ensslin, the leaders whose release had been demanded by the hijackers, all committed suicide in a German prison where they had been held. West German officials said that Baader and Raspe had shot themselves in the head with pistols; Ensslin had hanged herself with a cord; and a fourth terrorist, Irmgard Moeller, had tried to kill herself with a bread knife, but was found alive. Schleyer was executed on 18 October immediately after the suicides of the terrorist leaders.

The West German government pressured the Italian and Cypriot governments to stall the plane so that a rescue could be attempted. However, the terrorists threatened to immediately blow up the plane if delays were experienced. A representative from the Palestine Liberation Organization (PLO) attempted to negotiate the release of the women and children aboard the plane while it was in Cyprus. The effort failed, and the PLO claimed that it had nothing to do with the hijacking. After leaving Cyprus, the jet was refused permission to land at Beirut, Damascus, and Kuwait before finally landing in Bahrain. After departing from Bahrain, the plane landed at Dubai, UAE. It had initially been refused landing rights, but the need for fuel forced the Dubai authorities to allow a landing. Negotiations continued in Dubai throughout 15 October.

The airliner took off for Aden where it landed despite the South Yemen government's attempts to block the field. Captain Jurgen Schumann, the pilot, landed the plane on a sand strip next to Aden's concrete runway, reportedly with the intention of ruining the plane's landing gear to prevent another takeoff.

The hijackers later shot CPT Schumann in the head (16 October) in Aden in full view of the rest of the passengers. His body reportedly was left lying on the floor of the cabin for hours. They told the passengers that they had killed him because he had tried to escape. Lufthansa officials stated that he was killed because he had refused to ready the plane for another departure. It was also reported that the foreign minister of the UAE had praised the pilot for secretly revealing the number of hijackers and their weaponry to the authorities over the radio. This was immediately publicized by the media, and it has been speculated that the hijackers had received word through the news of what the pilot had done and killed him in retaliation. At that time Schumann was one of the few hijacked hostages to ever die during an incident by anything not related to a rescue effort or other drastic action by security forces.

The aircraft lifted off from Aden on 17 October and landed in Mogadishu, Somalia, the same day. The terrorists pushed the body of the dead pilot onto the runway shortly after landing. West Germany's minister of state arrived in Somalia shortly after the plane arrived. He immediately began negotiations with the Somali government to allow a rescue attempt by German forces. As before, he contacted the hijackers and attempted to negotiate the release of the hostages.

The first deadline put forth by the terrorists passed without incident on the morning of the 16th, before their arrival in Mogadishu. Diplomatic efforts to resolve the situation were presented by England, France, the United States, and Saudi Arabia, to no avail. Pope Paul VI offered to become a hostage on the airplane if the passengers and crew were released. The Soviet Union pressured its surrogate, South Yemen, to refuse landing rights to the hijackers.

With the hijackers' new deadline in effect for the destruction of the plane, the West Germans, with the consent of the Somali government, prepared to attack the plane. About 60 West German commandos were flown to Mogadishu via Crete for the operation. About half of the assault force slipped under the jet 90 minutes before the hijacker's ultimatum had expired at 0330 hours, Mogadishu time.

Within the aircraft, the hijackers had spilled alcohol over the interior to ensure it would burn after the explosion, and they tied the passengers to their seats. The leader of the hijackers, who called himself Captain Mahmoud and said he was Palestinian, was in the cockpit, while his three associates were in the main cabin. They were apparently unaware that an assault was imminent, having warned the authorities against trying an

"Entebbe"-type action.

The commandos distracted the hijackers with flare grenades near the front of the plane, blew open the middle and rear doors, and overwhelmed the terrorists with concentrated gunfire.


## 1978 Assassination of Aldo Moro, Rome

Aldo Moro was the leader of the Christian Democratic Party of Italy and was attempting to form a coalition government with the Italian Communist Party. The Red Brigades terrorist group felt that any compromise of their goal of a purely communist state in Italy was to be prevented and decided that the leader of the moderate Communist Party must die. However, upon initiating an intelligence-gathering effort against him, it was discovered that he was an extremely hard target. The group elected to take out the next best thing, Aldo Moro.

Moro was a man of simple and methodical habits. For 15 years, he more or less traveled the same route from his home to his office. Every morning he would stop for a few minutes at the Church of San Francisco d' Assisi or at the Chapel of Santa Chiara.

On Thursday, 16 March 1978, at about 0820 hours, Moro was picked up at his residence in Rome by his official car and a police escort vehicle. The security personnel assigned to him included an armed driver and bodyguard riding in Moro's car (Moro rode in the right rear seat) and an armed driver and two armed police bodyguards in the follow car. These personnel were carrying handguns and were assigned submachine guns which were kept in the trunks of the cars.

Moro's intended destination on the day of his abduction was the Italian Parliament. By 0830 hours, he was at the Church of San Francisco d' Assisi. At 0900 hours the motorcade left the church and continued to the parliament. At some point along the route a white Fiat station wagon with diplomatic plates pulled in front of the motorcade. Additionally, two other cars, a blue Fiat sedan and a white Fiat sedan, took positions to the rear. At about 0904 hours, as the motorcade approached a stop sign, the white station wagon slammed on the brakes. Moro's car, traveling too closely to the wagon and too fast for the traffic, collided with the other car. During the surveillance, the terrorists had ascertained that Moro's driver had developed the habit of tailgating and decided to use that habit to their benefit. The follow security car, in turn, rammed Moro's car, lifting the rear end off the ground and blocking it. During mission preparation, the terrorists had pre-positioned a parked car along the curb next to the attack site to ensure Moro's car would be blocked from possible escape.

When all cars had stopped, two men in the white attack car got out. Carrying athletic bags, they appeared to begin to inspect the damages. Instead, they pulled pistols from the bags and began firing through the windows of Moro's car, killing both the driver and the bodyguard. At the same time a second and third attack element went into action. The second attack element, consisting of four men dressed in Alitalia Airlines uniforms, was positioned in front of a closed bar across the street from the attack site as if waiting for a bus to the airport. Since airline personnel frequent that area, these men did not seem out of place. However, at the exact instant of the collision, these men brandished weapons from their flight bags and ran toward Moro's follow car. Inside the follow car, the driver and the bodyguard in the front seat were killed before they could draw their weapons.

A third bodyguard, who had been riding in the right rear seat, was able to draw his weapon, dismount the vehicle, and engage two of the terrorists, wounding both, before being killed as well. This was the group's only miscalculation. Surveillance had indicated that this guard always sat in the left rear seat where fire was initially concentrated. However, it was this guard's first day on the job, and he happened to choose to sit on the right side. By changing something as insignificant as seating in the routine (even if by accident), the guard was able to use his weapon and nearly killed two of the assailants.

The third attack element, consisting of two terrorists, was positioned in a concealed location behind a row of bushes in front of the bar. Shortly after the assault was initiated, these two ran to Moro's car, pulled him from it unharmed, and put him in the waiting blue Fiat sedan. Just after the collision, this car, along with the white sedan, had moved into the attack site. The terrorists also had another car positioned around the corner, and when the assault was completed, this car made a U-turn and acted as the lead car. It was followed by the blue car carrying Moro and the white car carrying the remaining terrorists.

It had been speculated that there was perhaps a fourth element involved in the operation acting as either command and control or as an observer. The two men comprising this element were observed running from the scene when the operation was completed. The entire operation lasted less than 30 seconds and involved no fewer than 12 terrorists who fired between 80 and 90 rounds of ammunition. Five security personnel were killed in the action. It was a military-like operation which employed in-depth planning and coordination as well as skilled surveillance. Sound operational concepts such as surprise, violence of action, superior fire and manpower, as well as planned escape routes, made this one of the most successful and studied terrorist incidents of our time.

After a period of captivity lasting 55 days, Aldo Moro was shot and put into the rear of a Fiat wagon. This car was left in the midpoint of a street along which the headquarters for both the Christian Democratic Party and the Communist Party are located. The symbolic nature of this act

was clear.

## 1979 Takeover of U.S. Embassy/Holding of Hostages, Tehran

The Iran Hostage Crisis was precipitated by the seizure of the U.S. Embassy in Tehran by militant students on 4 November 1979.  The students took hostage 66 U.S. Embassy employees, including the Marine Security Guard Detachment, and demanded the return of the Shah of Iran (Muhammad Reza Shah Pahlavi) who had fled the country and sought safety in the United States.  The religious and political leader of revolutionary Iran, Ayatollah Khomeini, who had taken power in February 1979 after the overthrow of the Shah, warmly supported the students.  On 14 November 1979, President Jimmy Carter ordered frozen all Iranian assets in U.S. banks.

The release on 19 and 20 November of 13 hostages who were either black or female did little to alleviate the crisis.  Although the Shah had left the United States for Panama in early December, the militants refused to release the remaining hostages which numbered 53.

An unsuccessful attempt on 24 April 1980 by U.S. special operations forces to rescue the hostages resulted in the deaths of eight U.S. servicemen and aggravated the hostility between the two countries.  The subsequent death of the Shah in July had no effect on the status of the hostages.  In November, however, the Iranian revolutionary parliament set four conditions for their release; no U.S. interference in Iran; the unfreezing of Iranian assets inside and outside the United States; the cancellation of all trade sanctions against Iran; and the return of the Shah's property.  Algeria was named as the mediator, and an agreement was signed in January 1981.  On 20 January, minutes after the inauguration of the new U.S. President Ronald Reagan, the hostages were released after having spent 444 days in captivity.  Jimmy Carter went to West Germany to greet them as President Reagan's special envoy.

## 1979 Attack on General Alexander Haig, Belgium

On 25 June 1979 at about 0825 hours, an attempt was made to kill General Alexander Haig using the explosive ambush tactic.  The terrorists who conducted the act were members of the Red Army Faction (RAF) based in West Germany.  The RAF had the general placed under surveillance about 30 days prior to the incident.  Through this surveillance they learned that General Haig traveled in a three-car motorcade and varied the three possible routes to and from his office at Supreme Headquarters Allied Powers Europe (SHAPE) in Belgium.

On the morning of the explosion, one of the three possible routes was closed due to construction, which limited the choices of the general and enhanced the probability of a successful mission for the terrorists.  The route used that morning was the one most often used.  It was less congested and was also the preferred route of General Haig.

The terrorists set the scenario for the attack as follows:  one terrorist on a motorcycle was positioned at a major intersection along the route.  At this intersection the motorcade could pass through the intersection and continue along the target route or turn left onto an alternate route.  The terrorist located at this intersection could determine early on which of the two routes the motorcade would take and radio to the other terrorist, who was located on a knoll overlooking a small bridge containing the explosive device.  An electrical wire led from the device to a small grassy knoll 150 meters away, where it was attached to a small, plastic battery pack, housing four 6-volt batteries connected in series and activated by a plastic toggle switch.

On the day of the attack the general left his residence and proceeded along the preferred route to SHAPE.  The motorcade consisted of a lead car carrying U.S. Army Criminal Investigation Division (CID) personnel, the general's armored Mercedes, and an unarmored follow car with more security personnel.  After traveling about 3 miles along the route, the lead car was about 200 meters in front of the general's car, maintaining a speed of approximately 30 miles per hour.  The motorcade passed the Oburg cement factory and was approaching the 50-foot bridge with the explosives.  Just as the general's car was passing over the bridge, the terrorist on the knoll activated the device, setting off the explosives.  At the time of the explosion the follow car was about four car lengths behind the general's car.   The blast caught only the very rear portion of Haig's car, causing only minor damage.  The momentum of the follow car, however, carried it into the blast which lifted it up and blew it laterally.  It came to rest 50 feet to the rear of the detonation point.  As soon as the explosion took place, the general's driver accelerated in an attempt to clear the area.  He was ordered to stop by Haig.  The general, concerned for the welfare of the security personnel in the follow car, started to exit the vehicle with the intention of assessing the situation.  He was persuaded by his aid to get back into the car and to leave as fast as possible, since the aid was sure that Haig was the primary target.  Although the follow car sustained considerable damage, the personnel riding in it received only minor injuries.

It is speculated that the attack failed for any of several reasons:  the battery pack was located too far away from the device and was too slow to set off the charge.  There were bushes partially obstructing the view of the bridge from where the terrorist was located, thereby throwing off his timing.  The general's driver was traveling at a higher rate of speed than normal, causing the timing to be off.  There was considerable amount of terrain obstructing the full view of the route from where the terrorist was located, allowing him only a few seconds to visually acquire the target, judge the timing, and detonate the device.

An important side note to this incident was that the terrorists did not have the target area covered by small arms fire.  Had they done so, they could have shot the general when he exited the car.  Terrorist groups learn from their mistakes very quickly.  Two years later the RAF attempted to assassinate another U.S. general, Frederick Kroesen, using similar circumstances but did have the target covered by small arms fire in the event the

general attempted to exit the vehicle.

## 1979 Murder of Ambassador Adolph Dubbs, Afghanistan

In February 1979 the situation in Afghan society could have been described as volatile, but since no local terrorist groups had expressed violent anti-U.S. sentiments, normal security measures at the U.S. diplomatic mission were in effect. An evening curfew of 2300 hours had been in effect since the April 1978 coup d'etat in Afghanistan. Ambassador Dubbs had instructed all U.S. personnel to be home by 2230 hours just to be safe. Roadblocks were common during this period, and the ambassador had instructed personnel to cooperate despite their diplomatic immunity.

Ambassador Dubbs' vehicle was a chauffeur-driven 1976 four-door Oldsmobile sedan with distinctive red diplomatic license plates. In addition to this, the American flag was attached to the left front fender to show that the ambassador was riding in the car. The vehicle was partially armored and equipped with the standard radio communications as well as a protective mobile radio (PMR), which did not work. Ambassador Dubbs always sat in the right rear seat, and his normal time of departure for work was between 0830 and 0840. During the debriefing the ambassador's chauffeur testified that he varied his routes to and from work, did not establish routines, and that he had at least six different routes available from the residence to the embassy. The chauffeur had been trained in defensive driving techniques by the regional security officer (RSO), but he took his immediate commands from the ambassador.

Ambassador Dubbs made the mistake of allowing searches of his vehicle at roadblocks by people in Afghan police uniforms. These incidents may have been tests to see if the ambassador would regularly agree to have his vehicle searched, even though he was exempt from such action due to his diplomatic immunity.

On the morning of 14 February 1979 as the ambassador was en route from his residence to the embassy, the chauffeur noticed a police sergeant approximately 15 yards ahead motioning them to stop. The chauffeur slowed the vehicle and asked the ambassador what he wanted to do. The ambassador instructed the chauffeur to stop and see what the policeman wanted. The driver stopped the car, rolled the window down three inches, and asked in local Afghan what the policeman wanted. The policeman said he had government orders to search the car.

When told it was the U.S. ambassador's car, the policeman insisted that he still must conduct a search. The chauffeur told the ambassador in English what was happening, and the ambassador gave permission for the search. The chauffeur unlocked the front door but remained in his seat. While the policeman was searching beneath the front seat, he reached back and unlocked the left rear door. He then pulled out a pistol, placed it in the driver's stomach and instructed him not to move. At the same time, three other Afghans entered the vehicle through the left rear door. One climbed into the front passenger seat and pointed a second pistol at the chauffeur. The policeman then climbed into the rear seat with the ambassador and the other two Afghans. During this time the ambassador did not move or speak.

The chauffeur was instructed to drive to the Kabul Hotel. Upon arrival the Afghans opened the right rear door of the car, pushed the ambassador out, and spirited him up the steps and through the front door of the hotel. The man who had been riding in the right front seat told the driver to go the embassy and tell them what had taken place. This man then entered the hotel, and the driver did as he was told and reported the abduction of the ambassador.

The ambassador had been taken to room number 117 on the second floor of the hotel. Soon the hotel was full of American Embassy officials, Afghan police, military, and fire-fighting equipment. Four Soviet personnel also were on hand, three of which claimed to be acting as Afghan police advisors. The Afghan authorities were extremely uncooperative with the Americans. They would not provide any information at all about the situation. The U.S. officials tried to stress patient negotiations with the kidnappers and appealed to them to ensure the safety of the ambassador. The Afghans remained uncooperative.

At 1250 hours, Afghan authorities initiated an assault on room number 117. No prior notification, consultation, or authorization from the American officials present had been requested. There was concentrative fire from both inside and outside the room for about 40 seconds. Police sniper fire from across the street lasted several more seconds. When the firing stopped, American officials, including a physician, started toward the room. At that time, more shots were heard from inside the room. The Americans stopped momentarily and then proceeded forward.

When they reached the room the Americans found that Ambassador Dubbs had been mortally wounded with several bullet wounds to the head and the chest. Autopsy reports indicated that the ambassador died as a result of at least 10 wounds inflicted by small-caliber weapons, including four point-blank head wounds from a .22-caliber weapon. According to the Afghan authorities themselves, the abductors had no .22-caliber weapons. This information raises serious questions.

The most important lesson learned from this incident is that Americans serving overseas in diplomatic posts should always insist on exercising all their rights under diplomatic immunity. Ambassador Dubbs should never have set a pattern of allowing his car to be searched. Also, the PMR could not be used since it did not work. All such emergency equipment should be checked at least biweekly. The ambassador committed another avoidable mistake by maintaining a highly visible vehicle.

## 1980 Attack on Ambassador John Dean, Beirut

On 27 August 1980, the motorcade of the ambassador to Lebanon, John Gunther Dean, was attacked by unknown assailants on a highway in Beirut, Lebanon.  Standard security measures were in effect at the time of the attack.  "The Front for the Liberation of Lebanon From Foreigners" claimed responsibility.

Ambassador Dean's residence was located on the Christian side of Beirut in the suburb of Yarzi near the Presidential Palace, approximately six miles from the American Embassy, which was located in West Beirut.  There were six possible routes between the embassy and the ambassador's residence with many checkpoints along the way.  The Lebanese Armed Forces were incapable of dealing with the increasing activity of the various factions and militias using Beirut as a battleground.  They could not be depended on to provide adequate protection for foreign diplomats against the threat of terrorism.  For transportation, the ambassador used a fully armored Cadillac with ballistic protection in the doors and seats in addition to the protective glass in the windows.

On the day of the attack, the ambassador's motorcade consisted of three vehicles.  Dean was en route from his residence to a dinner at the American University.  There was no planned route to the university.

On the evening of the attack, the motorcade was traveling down a four-lane highway divided by a median strip.  As the motorcade was making a U-turn crossing the Damascus highway, it passed an apparently unoccupied maroon Mercedes Benz sedan parked with its emergency lights blinking.  As the motorcade passed the Mercedes, there occurred a loud explosion and bursts of automatic rifle fire .  The ambassador's protective detail returned fire.  Firing continued until they had proceeded 100 meters down the road.  All three cars were hit, but only one agent in the ambassador's protective detail was slightly wounded.  The motorcade headed for the American Embassy and arrived there approximately 14 minutes later.

The explosion had been caused by an American light antitank weapon (LAW), the round of which impacted on the road to the left rear of the follow car, leaving a crater in the highway.  An investigation of the attack site afterward indicated a lengthy occupancy and preparation of the ambush area.  It is estimated that four to seven men participated in the attack.  Two AK47 assault rifles had been abandoned in the area along with the launcher for the LAW.  A check on the license of the Mercedes revealed that the car had recently been stolen.

## 1980 Takeover of the Dominican Republic Embassy, Bogota, Colombia

On 27 February 1980, 16 terrorists from the 19th of April Movement (M-19) assaulted the Dominican Republic Embassy in Bogata, Colombia.  The M-19 took advantage of the lax security measures in effect at the embassy during a celebration of a Dominican national holiday.  In attendance were several diplomats from other missions including a number of East block ambassadors as well as American Ambassador Diego Asencio.

On the morning of the assault there were 12 men dressed in athletic suits playing soccer in a courtyard directly in front of the embassy at a distance of no more than 120 feet.  This did not seem out of place due to the close proximity of a university to the embassy and the great number of students in the area playing soccer.  When the guests arrived at the party, they were asked to have their protective details remain outside with their cars.  Most of the dignitaries complied with this.  The American charge, however, was accompanied inside by his two personal bodyguards.

As the party wore on, two members of the terrorist group mingled unnoticed with the guests, further demonstrating the poor security practices being used.  At one point in the affair, as if on cue, the East bloc ambassadors began preparing for departure and saying their good-byes.  This seemed odd to the American charge and he decided to depart as well.  As Diego Asencio appeared at the door with his two bodyguards and was about to leave, the two terrorists inside the embassy produced weapons and shot the ambassador's two guards.  This served as the signal to the terrorists playing soccer to pull their weapons (shotguns, pistols, and submachine guns) and to begin eliminating the security personnel and drivers waiting by their cars next to the building.  They did this as they stormed the building and gained entry.  No police were in the area, and there was only one guard present, located at the front entrance.  Shortly after the terrorists took control of the building, a man on a motorcycle drove by and dropped a duffel bag containing clothes and supplies for the hostage takers.

One terrorist was killed during the assault and five people, including security personnel, were injured.  The departure of the Socialist ambassadors just prior to the incident raises serious questions.  The M-19 held 60 diplomats, Colombian officials, and local employees hostage for two months.  After extensive negotiations, the terrorists and the Colombian government reached a compromise.  The terrorists released a number of hostages and were provided safe passage to Havana, Cuba, with the rest.  In Havana the remainder of the hostages were released and the terrorists remained there.

## 1981 Kidnapping of Brigadier General James Dozier, Italy

Brigadier General James L. Dozier was kidnapped from his residence in Verona, Italy, on 17 December 1981 by the Red Brigades.  He was held in a static location for 42 days until rescued by the Italian police.  It has been speculated that the general was a secondary target of the assailants, chosen because he was a softer target than their primary target, believed to have been an Air Force general.

BG Dozier's residence was located in an upper floor apartment in a building that had been used for seven years to house senior grade officers. The only viable security system in the building, other than door locks on the apartments, was a buzzer/intercom system at the main entrance. The only security personnel assigned to the general was an armed driver.

The terrorists had been surveilling the residence for approximately 30 days from various positions including a bus stop on the street corner near the building, a static location across the street and adjacent to the apartment (reportedly the terrorists had used binoculars from this position to watch the residence), and a small park located on the riverbank below the apartment. Some of the techniques used were young couples picnicking in the park (this might have seemed odd in that these couples were never accompanied by children, abnormal for Italian couples of that age), young people standing at the bus stop, often looking up at the apartment and letting buses go by or taking a bus and returning to the same stop a short time later. Reportedly, one of the suspected surveillants approached Mrs. Dozier on one occasion at the bus stop.

The terrorists used the technique of penetration to gather intelligence about the Doziers and the layout of their apartment. A pair posing as utility meter readers made two visits to the residence. This was strange, since it takes only one person to read a meter, and the norm in that country is one meter reader.

On the day of the kidnapping, four terrorists (three men and a woman) in a rented blue van parked behind the building. Two men wearing white coveralls and carrying what appeared to be tool bags gained access to the building, approached the Dozier apartment, and rang the buzzer. BG Dozier went to the door and asked who was there. The answer was plumbers. He asked why they were there and was told that there was a leak in the apartment below and that they wanted to see if it was coming from the Dozier apartment. Although he thought it strange that they had not buzzed his apartment from downstairs to gain access to the building, he knew that the building was 20 years old and that leaks were commonplace. General Dozier let the two men in and led them down the hallway to a utility room which housed the bathroom and the washer and dryer. The plumbers looked beneath the sink in the bathroom and discovered no leak. In the process, they used an Italian word which the general was unfamiliar with. The general left the room and went to the kitchen to look up the word in a dictionary which was kept on the kitchen table. As he paged through the book, he kept his back toward the terrorists. BG Dozier was suddenly and forcefully spun around, and he found himself looking down the barrel of a silenced weapon. At that moment one of the terrorists slapped him on both ears with cupped hands and jumped on his back, driving him to the floor. At the same time, the other terrorist grabbed Mrs. Dozier, flung her to the floor as well, and held the pistol to her head. General Dozier was struggling with his assailant until he became aware of the danger to his wife; he then ceased struggling and became passive. The terrorists stated they were from the Red Brigades and demanded money. The general told them that he had no money, and for that he received a blow above the eye with the pistol. He was hit several more times in the abdomen. The terrorists then turned him over, handcuffed him, bound his feet, applied a gag and a blindfold, dragged him down the hallway, and placed him in a padded trunk which had been brought up by a third terrorist.

Mrs. Dozier was gagged and blindfolded, chained at her hands and feet, and then gently placed in the utility room where she was chained to a fixture. The terrorists apparently went out of their way to make her comfortable, even putting a pillow beneath her head and adjusting the blindfold so that she could breathe easier. She estimates that the terrorists searched the apartment for approximately two hours. They found the general's holster for his pistol and asked Mrs. Dozier where the weapon was. She replied that she didn't know. In fact the general had left it at his office. The kidnappers went through all the papers in the apartment looking for sensitive documents but found none.

General Dozier, still in the trunk (which was devoid of air holes), was taken to the van and transported to an apartment in Padua, Italy. The terrorists evidently intended for Mrs. Dozier to escape quickly because the keys to the chains were left in the locks. Unfortunately one of the keys they had placed there did not operate the lock, and she was only able to remove one set of chains. Unable to free herself, she banged her knees on the dryer and screamed for help in Italian until the Italian family downstairs called the police. The largest manhunt in Italian history, up to that date, was initiated using all resources available. The taking of a high-ranking officer was an extreme embarrassment to the Italian government.

BG Dozier was held in a second-floor apartment above a supermarket in Padua. This apartment was a multiroom complex, with the center room housing the makeshift tent used to detain the general. This tent was 6 feet by 6 feet with an exterior room for a guard to sit. Dozier was kept chained to his cot with enough slack in the restraints to enable him to use the chemical toilet provided. The terrorists attempted to disorient the general by keeping a 40-watt bulb burning at all times, forcing him to lose sense of time. Additionally, the captors taped a set of headphones over his ears and played loud "acid rock" music. He was later able to talk them into lowering the volume and then changing the music to something more to his liking. While he was not beaten during his captivity, the general reports having been interrogated no less than seven times. The questions used during these interrogation sessions seemed to have been prepared by an outside source and were centered around the missile installations in Europe, something that the general knew little or nothing about.

General Dozier states that the individual tasked to provide the majority of his security was given a contingency that in the event a rescue was attempted or if the general tried to escape, he was to be shot immediately. It was this same individual that was on guard when the general was rescued.

On the day of the assault by Italian police, 42 days after the general's abduction, the terrorists looked out the window which overlooked the parking lot to the supermarket. They observed several individuals getting out of vans carrying weapons. Their impression was that these gunmen were other terrorists carrying out a robbery of the store below. Several seconds later the door flew open and after a short-lived struggle, during

which no one was killed, the terrorists were apprehended and the general was released.  As the fight for control waged on, the guard pointed his weapon at the general, with the apparent intention of carrying out his contingency orders.  At the last second he changed his mind and the direction in which he was pointing the weapon and was detained by the police.

## 1981 Ramstein Air Base Bombing, West Germany

On the morning of 31 August 1981 at 0720 hours, a bomb exploded in the parking lot in front of Headquarters US Air Force, Europe, and the North Atlantic Treaty Organization (NATO) Air Command located at Ramstein Air Base, West Germany.  The explosion hurled passersby to the ground, shattered windows as far away as 100 meters, and left other cars in the parking lot in flames.  The detonation injured 18 U.S. servicemen, including an American general, and two German civilians.

Three bombs were used in the attack.  Two exploded in or beneath a 10-year-old Volkswagen with US Air Force license plates, and another was flung into the building by the blast of the first device but didn't explode.

The car, of which the biggest piece after the explosion measured about 12 inches across, was stolen in late July of that year in Karlsruhe.  The plates were stolen from a U.S. serviceman's car in Darmstadt in February.

The bombs were exploded electrically, but explosives experts would not disclose whether they were command detonated or if there was a timing device used.  The car was parked in front of the building shortly before the detonation.

In November 1980, police found plans for an attack against Ramstein Air Base in the apartment of gang member Julianne Palmbeck, who was killed in a traffic accident near Heidelberg.  The Red Army Faction (RAF) said that the attack was carried out by the Sigurd Debus Commando, a reference to a supporter of the RAF who died in a Hamburg jail after a 10-week hunger strike to protest prison conditions.

## 1981 Attack on Muniz Air Base, Puerto Rico

On the night of 11 January 1981, members of a pro-Puerto Rican independence group called the Macheteros (Boricuan Popular Army) destroyed nine jet fighter aircraft and damaged two others at the Muniz Air National Guard Base near the international airport in San Juan, Puerto Rico.  FBI officials stated that 26 bombs were planted, two in each of the 13 planes, but that the bombs in two of the planes were dismantled by Navy explosives experts before they could explode.

An estimated 45 million dollars' worth of damage was done to government equipment.  The 198th Tactical Squadron, to which the destroyed A-7D Corsair II jets belonged, was left completely ineffective.

Security measures at the air base were lax at the time of the attack.  They consisted of one guard seated at the entrance to the field and one roving guard driving the perimeter of the 45-acre facility in a car.  The perimeter barrier consisted of nothing more than cyclone fence through which the attackers reportedly cut their entrance.  One side of the field is completely open to a swamp, and one report stated that the attackers had entered and escaped by that route.  There were other reports that the terrorists had received inside information and even assistance to perform the attack since the field's floodlights, normally on at night to illuminate the planes, were not on prior to the attack.  The explosives were placed in the air intakes of the jets as well as in the landing gear wells.  They were constructed similarly to pipe bombs except that they were designed as incendiary devices.  Additional damage was done by exploding ammunition from the planes.

The act was an effective symbolically as it was tactically.  To capitalize on the symbolism, the group left a machete in the ground, around which was tied a ribbon bearing the initials of the organization.  There were reports that a green beret was also left on the runway surface near the planes to symbolize the far-reaching character of the resistance movement.  A two-page communique was issued later by the group, and reports circulated that the action on the target was actually videotaped.  The stated reasons for the attack were to demonstrate defiance of the military draft registration and to lash out against Yankee imperialism that is attempting to subjugate and annex the Puerto Rican people.  The action coincided with the anniversary of the birth of 19th-century patriot Eugenio Maria de Hostos, who was instrumental in securing Puerto Rican independence from Spain.  It was also believed that the bombing was designed to disrupt the 13 January first convening of the newly elected legislature.

## 1981 Attack on General Frederick Kroesen, West Germany

On 15 December 1981, an attempt was made on the life of General Frederick Kroesen, Commander in Chief of US Army, Europe.  The assassination attempt was carried out by the Gudrun Ensslin Commando of the Red Army Faction.  The terrorists chose as the attack site a traffic light at an intersection located next to a canal in Heidelberg, West Germany.  They had prepared a firing point on the side of a steep hill below the Heidelberg University International Students Center.  This point was approximately 138 yards from the target site.  The terrorists arrived at the location by following a path with handrails for about 50 yards.  They then left the path and descended an additional 54 yards where they established a tie point for a rope and used this rope to descend another 100 yards.  It was at this location that they erected a pop-up tent and established the living area for the week they were to survey the general and the attack site.  Eleven yards below the sleeping area they established the actual firing point from which they would engage the target.  To enhance visibility of the target site, the terrorists cleared brush and tree limbs from in front of

the position.  They also erected an antenna for a CB radio with which they communicated with the other terrorists who were detailed to follow the general's car.

General Kroesen was limited in his choices of routes to and from work, and he had played down terrorist threats to hit high-ranking targets in Europe.  The Mercedes, which was detailed to him by the German government, was only partially armored and his driver was untrained in evasive or defensive driving techniques.  On the day of the attack, the general's wife was riding with him in the back seat; his aid, Major Bodine, was in the front.

At 0722 hours, General Kroesen's Mercedes and his unarmored follow car with security personnel arrived at the traffic light and stopped.  For some unknown reason the driver of the general's car turned off the motor when the car came to rest.  The two cars were in the far right lane.  As the cars came to a halt, two rounds from a Soviet RPG-7, as well as four rounds from a .223 caliber rifle, were fired from the terrorist position on the hill.  The first RPG-7 round missed and detonated on the wall on the far side of the vehicle.  The second round penetrated the trunk and exited the other side, detonating upon exit.  One round of .223 hit the driver's side window and lodged in the protective glass.  A second round of .223 lodged in a similar fashion in the left rear window, and one hit the top of the roof immediately above the general's head.

The general sustained minor lacerations on the back of the neck, and his wife suffered minor hearing loss resulting from the detonation of the RPG-7 round.  When the initial explosion was felt, the driver froze with fear.  The general's aide had to strike the man to get him to start the car and leave the scene.  The general was reported to have said that his first impulse was to open the door and get out of the car.  He recalls that the only reason he did not do this was because his wife was riding with him and appeared to be hurt.

This case presents us with several good teaching points.  It displays the importance of having protective glass and armor on cars.  The terrorists had certainly learned from the failed assassination attempt on General Haig in Belgium in 1979.  They had expected General Krosen to exit the vehicle and were waiting with small arms fire.  The general's driver should have been trained in defensive/protective service driving techniques.  Proper training would have precluded his shutting off the motor and would have enabled him to recognize the dangerous situation, making escape from the scene all the faster.

This case also displays the sophistication and expertise of this group in that they were able to establish and occupy a survey/firing point of that type for an entire week without being detected in a city the size of Heidelberg.  The significance of this comes to light when one realizes the large police effort that was being launched against terrorism at that time, in addition to the large military presence in and around that area.

## 1981 Assassination of President Anwar al-Sadat, Egypt

On 6 October 1981 Muhammed Anwar al-Sadat, President of the Arab Republic of Egypt, was killed while viewing a military parade held on the eighth anniversary of "The Crossing," the beginning of the 1973 war.  The two-hour parade was nearing its conclusion when, just as a flyover of Mirage jets roared past at low level, an Army truck left the line of parade and stopped in front of the reviewing stand.  As a lieutenant dismounted and approached the stand, President Sadat rose, evidently expecting a salute, but the officer threw a grenade at the President as three other gunmen leaped from the truck firing submachine guns and throwing grenades.  President Sadat and 7 of his companions were killed and 28 were wounded.

The lieutenant who led the attack and the members of the attack team were members of an Islamic group called the Muslim Brotherhood, some of whom had been released from prison by Sadat in 1979.  They had remained inactive until Sadat signed a treaty with Israel in 1981 which the brotherhood considered a violation of Islamic law.  The assassination of an un-Islamic leader was an act sanctioned by Islamic law and practice.  Six months later Lieutenant Khalid Al-Islambuli and four other gunmen were convicted, sentenced to death, and executed.

## 1982 Murder of Lieutenant Colonel Charles Ray, Paris

On the morning of 18 January 1982, LTC Charles Ray was assassinated in front of his residence in Paris, France.  Ray was entering an embassy-provided vehicle when a lone gunman approached him from behind and shot him several times in the back of the head with a small caliber pistol.  During the investigation it was learned that LTC Ray had established a routine which was noted and used by the terrorists.  He waited on the curb in front of his residence between 0805 and 0810 every morning for a driver to pick him up, and he never deviated from this pattern.

The terrorist group which carried out the act was the Lebanese Armed Revolutionary Faction (LARF).  They had placed surveillance on the target approximately 30 days prior to the action.  A surveillant posed as a flower vendor with a cart and took up a position adjacent to the Ray residence.  This should have seemed odd in that it was a relatively slow-paced residential area which offered little traffic for business.  Witnesses reported that the flower vendor did not arrive at his normal location on the morning of the attack and never returned to the area.

The most obvious error made by LTC Ray was the establishment of a routine easily picked out by terrorist intelligence personnel.  He failed to note the sensitive indicator of the out-of-place flower vendor, and he did not take the appropriate action necessary to heighten his protective posture in the presence of an elevated terrorist threat to Americans throughout Europe.

**1983 U.S. Embassy Bombing, Beirut**

On 18 April 1983, the U.S. Embassy building in Beirut, Lebanon, was demolished by a suicide car bomb blast that killed dozens of people and wounded over 100.  The bomb collapsed the entire facade of the horseshoe-shaped building, leaving the wreckage of offices and balconies in heaped tiers of rubble.  The explosion was heard throughout the city and broke windows as far away as a mile.

Rescue workers labored for days to unearth the dead and wounded from the wreckage.  U.S. officials said on 19 April that the death toll was 46 people.  Included were 16 Americans (U.S. staff personnel and Marine guards), Lebanese clerical employees, Lebanese civilians applying for visas at the consular section, and passing motorists and pedestrians.

The circumstances surrounding the attack remain clouded in speculation and accusations.  Lebanese police speculate that a large van, similar to those used by the embassy staff, was laden with explosives by the sponsors of the bombing.  The driver then forced his way passed the checkpoint at the end of the embassy driveway, drove up to the front of the building, and detonated the device.

The embassy was deficient in proper security devices to protect against such an attack; however, the security program was in the process of being overhauled.

The pro-Iranian group Islamic Jihad took responsibility for the attack in a telephone call to a news agency just moments after the blast.  The anonymous caller said that the act was part of the Iranian revolution's campaign against imperialist targets throughout the world.  Iran denied any involvement with the incident, but this was later proven to be false through intelligence sources.

**1983 Marine Battalion Landing Team Headquarters Bombing, Beirut**

U.S. military forces were inserted into Lebanon on 29 September 1982 as part of a multinational force composed of U.S., French, Italian, and, later, British troops.  The mission of the U.S. contingent of the multinational force (USMNF) was to establish an environment that would facilitate the withdrawal of foreign military forces from Lebanon and to assist the Lebanese government and the Lebanese Armed Forces (LAF) in establishing control and authority over the Beirut area.  Initially the USMNF was warmly welcomed by the local populace.  The environment was essentially benign and continued that way into the spring of 1983.  The operation was intended to be of short duration.

The destruction of the U.S. Embassy on 18 April 1983 was indicative of the extent to which the political/military situation had deteriorated in Lebanon since the arrival of U.S. forces.  By August 1983, the LAF were engaged in direct conflict with factional militias and the USMNF positions at the Beirut International Airport were receiving hostile fire.  Attacks against the multinational force in the form of car bombs and sniper fire increased in frequency.  By September the LAF were locked in combat for control of the highlands overlooking the airport, and U.S. Naval gunfire was being used in support of the LAF at Suq-Al-Gharb after determination by the National Security Council that the LAF retention of that area was essential to the security of USMNF positions at the airport.

Intelligence support of the USMNF provided a broad spectrum of threats.  Between May and November 1983, over 100 intelligence reports warning of terrorist car bomb attacks were received by the USMNF.  The reports contained little specific information as to how and when those attacks might be carried out.  From August to October the USMNF was virtually flooded with terrorist attack warnings.

On 23 October 1983, a large truck laden with explosives equivalent to 12,000 pounds of TNT crashed through the barricade of the U.S. compound at the Beirut International Airport, penetrated the front entrance to the Marine Battalion Landing Team Headquarters (HQBLT) building and detonated.  The force of the explosion destroyed the building, killing over 250 U.S. military personnel.

Witnesses reported seeing a large yellow Mercedes Benz truck traveling at a speed reportedly in excess of 35 miles per hour moving from the parking lot south of the HQBLT building through the barbed wire and concertina fencing, into the main entrance of the building where it detonated approximately 0622 hours.  The truck penetrated the perimeter barbed wire and concertina obstacle, passed between guard positions six and seven without being engaged, entered an open gate, passed around one sewer pipe obstacle and between two others, flattened the sergeant-of-the guard booth, entered the interior of the lobby by passing through the main entrance, and exploded.

The sentry at post seven heard the truck as it ran over the wire, then observed it and recognized that it was probably a vehicle bomb.  He inserted a magazine into his M16, chambered a round, and took aim.  He did not fire since by that time the truck had already penetrated the building.

Both sentries realized that the truck was, in fact, a car bomb and therefore sought cover within their respective bunkers.  One sentry placed himself in the corner of his bunker and did not observe the detonation.  The other sentry partially observed the detonation from behind the blast wall to the rear of the bunker.  He reported seeing the top of the building explode vertically in a V-shape.  He then took cover inside his bunker for protection from the falling debris.  The sergeant of the guard was at his position which was located at the main entrance (south) of the building.  He

was alone at his post and was facing inward (north) toward the lobby when he heard noises to his rear, including a rapidly revving engine. He turned in time to see the truck closing rapidly on his post as it passed through the open gate of the permanent fence. He realized the driver's intentions and ran from his post toward the rear entrance (north) yelling repeatedly "Hit the Deck." He glanced over his shoulder as the truck continued toward the front entrance. He saw the truck breach the entrance (the cab was apparently too tall for the entrance archway) and, without hesitation, run over his post and come to halt in the center of the lobby. As the sergeant of the guard continued to run, there was an interval of one or two seconds between the truck's halt and the detonation. He was then blown through the air, struck the ground, and was seriously injured.

When the truck exploded it created an oblong crater measuring 39 feet by 29 feet six inches and 8 feet in depth. Because of the structure of the building (it had a large, covered courtyard extending from the ground floor to the roof), the explosive force of the bomb was greatly magnified. This was caused by the confinement of the explosive force and the convergence of force vectors. This "tamping effect" multiplied the blast effect to the point that the bottom portion apparently was blown out while the upper portion collapsed on top of it.

The FBI forensic laboratory investigators described the blast as the largest conventional blast ever seen by the explosives expert community. Based on FBI analysis of the blast that destroyed the U.S. Embassy in April 1983 and the findings on the bomb used 23 October 1983, the investigating commission believes the explosive equivalent of the latter device was of such magnitude that major damage to the BLTHQ and significant casualties would have resulted even if the terrorist had detonated the device on the roadway, some 330 feet from the building itself.

It has been shown that this act was carried out by the Islamic Jihad Organization under the direction of the Iranians. There was also sponsorship and authorization by the Syrians. The personnel known to have been directly involved include a Lebanese financial emissary, the Iranian ambassador to Syria (an established kingpin in Middle East terrorism), a Syrian intelligence colonel, a former Palestine Liberation Organization (PLO) security officer, Syrian members of the Syrian-controlled Sai-qua terrorist group, a relative of the Shiite Muslim leader in the Bekaa Valley of Lebanon, an Islamic fundamentalist clergyman, and several other men unremarkable except for their willingness to become involved with such acts.

In addition to the bombing of the Marine Headquarters at the airport, the French contingent to the multinational force was also bombed in a similar fashion on the same day. The suicide commandos who perpetrated those actions initially had two other targets as well. One was the Lebanese Parliament and the other has not been determined. For unknown reasons, the latter of the two operations did not take place.

There were a number of motives behind the attacks. Probably the most important was the removal of the multinational force, in particular the U.S. contingent, from Lebanon. This clearly was the strongest motivation behind Syria's involvement. The Iranians, however, were probably motivated by the French arms shipments to Iraq and the continuing French support for the Iraqi cause in their war with Iran.

Shortly after the attack, the terrorist group Islamic Jihad Organization (IJO) published in a Beirut newspaper a statement about their aims and indicated a high degree of fanaticism and a willingness, even a desire, to sacrifice their lives in pursuit of their goals. This act caught worldwide attention for the IJO and catapulted them to the center stage of the terrorist spotlight.

**1983 Murder of Lieutenant Commander Albert Schaufelberger, El Salvador**

Approximately 1830 hours on 25 May 1983, the senior Naval representative at the U.S. Military Group, El Salvador, Lieutenant Commander Albert Schaufelberger, was assassinated on the grounds of the Central American University in San Salvador. No group immediately claimed credit for the killing, but a few days later a report from the Popular Liberation Forces (FPL) claimed that a subelement, the Clara Elizabeth Ramirez Commando (CERF), carried out the operation as a warning against U.S. intervention in El Salvador's civil war. Later, another group under the umbrella of the Farabundo Marti National Liberation Front (FMLN), the Central American Revolutionary Worker's Party (PRTC), was thought to have actually carried out the act.

Schaufelberger had been dating an employee of the university, Ms. Consuelo Escalante Aguilera, for several months. Unfortunately he had established a pattern of driving to the university in civilian clothes to pick up Ms. Escalante after work. While he varied the days of the week, the time was always the same, between 1830 and 1840 hours. On the 25th he arrived at the normal time and honked the horn of his armored, embassy-provided Ford Maverick. This was the usual signal to inform his date that he had arrived to pick her up. Ms. Escalante exited her office and observed what she believed to be a Volkswagen microbus pull up and stop adjacent to Schaufelberger's car. Three men got out of the bus while a fourth stayed with the vehicle. One gunman, carrying a revolver, went around behind the victim's car and intercepted Ms. Escalante. He ordered her to wait where she was. A second gunman took up a security position, while a third ran to the open window of Schaufelberger's car and fired four rounds of .22 magnum from a handgun into the left side of the victim's head. The assassins then jumped into their vehicle and escaped. Lieutenant Commander Schaufelberger made a number of tragic mistakes:

- He established an easily discernible routine.

- He went to a location, after dark, frequented by known leftist sympathizers.

- He removed the protective glass from the front window of the driver's side and rolled down the regular windows because of a faulty air

conditioner.

     - Even though he was armed, he overestimated his ability to defend himself.

## 1983 Murder of Captain George Tsantes, Athens

As he did every weekday at 0700 hours, 53-year-old U.S. Navy Captain George Tsantes stepped into the rear seat of an embassy-provided black Plymouth sedan outside his home in Kifissia, Greece, a northern suburb of Athens, for the 30-minute ride to his office in downtown Athens. This time, however, two men on a light-blue Vespa motor scooter were shadowing him. When the car stopped for a traffic light, the scooter sped up alongside and a gunman riding on the rear of the cycle fired seven shots from a .45-caliber pistol. Tsantes was killed instantly and his driver, 62-year-old Nikos Veloustsos, died later in the hospital. The coroner's report later stated that Captain Tsantes died from a bullet directly below the heart as well as one in the shoulder and a third bullet in the abdomen.

Captain Tsantes was the first American to be killed as a result of the political violence in Greece since 23 December 1975 when Central Intelligence Agency (CIA) Station Chief Richard Welch was shot down outside his home also by a .45-caliber pistol. Several hours after the murder of Tsantes, a man called a local Greek newspaper and claimed responsibility for the act on behalf of the November 17th Organization, the same group which took responsibility for Welch's assassination. Subsequent ballistic tests showed that Tsantes was killed with the same handgun that killed Welch.

Tsantes was born in New York City of Greek immigrant parents. He was a highly decorated Vietnam War veteran who was eager to be posted in Athens. After his arrival he served as chief of the Naval section of the Joint U.S. Military Aid Group, Greece (JUSMAGG), which administers American military aid programs. JUSMAGG has acquired a reputation among Greeks for working with the CIA to influence domestic politics, though in recent years its activities have been sharply curtailed. A week prior to the killing, left-wing newspapers stated that Tsantes was a CIA agent, and further speculated that he may have been the agency's Athens station chief. The embassy denied the report, but the damage had already been done.

The November 17th Organization said after the action that Tsantes was chosen because, "He was one of the highest ranking tools of American Imperialism in Greece." The group also said that the JUSMAGG, through its tools inside and outside the state bureaucracy, is responsible for numerous crimes against the people.

## 1983 Bombing of Harrods Department Store, London

On 17 December 1983, a car bomb exploded on a street crowded with holiday shoppers and traffic in central London. The bomb was placed directly in front of the world-famous Harrods Department Store. A man had telephoned a warning to the Samaritans, a charity group, at about 1240 hours saying, "This is the IRA (Irish Republican Army). Car bomb outside Harrods. Two bombs in Harrods. One in Oxford Street. One in Little Wood's (a department store), Oxford Street." The other areas he mentioned were searched, but no bombs were found. Two police officers responding to the bomb at Harrods were among the people killed.

On 18 December, the IRA issued a statement that the attack was unauthorized and that it regretted the civilian casualties. Of particular note was the death of an American tourist in the bombing. It was thought that the 18 December statement was motivated by the IRA's desire to maintain good relations with support groups in the United States and to avoid any negative publicity in this country.

The police had diffused a suspected IRA bomb on 13 December just a short distance from Harrods. There had been no warning about that bomb. Several bomb warnings after the Harrods attack proved to be erroneous. Security in London was greatly increased to guard against further bomb attacks, and police conducted an intensive search for the terrorists who had planted the Harrods device.

## 1984 Attack on U.S. Army Master Sergeant James Judd, Athens

On 3 April 1984, U.S. Army Master Sergeant Judd, a postal officer for the Joint U.S. Military Aid Group (JUSMAG) in Athens, Greece, was transporting mail from the advisory group's office in Athens to the U.S. Air Force base in Hellenikon. MSG Judd was at a traffic light on Vouliagmeni Avenue in Athens approximately 1630 hours when two gunmen on a red Honda motorcycle approached the jeep he was driving from the left rear. Judd observed them stopping to the rear of his vehicle rather than continuing on to the front of the line of traffic as they would normally have done. He then observed the passenger of the motorcycle drawing a pistol from his jacket. Judd recognized the danger immediately and took action. Since he was stopped in the far left lane of traffic, he was afforded maneuvering room with his vehicle. He proceeded to swerve left into the oncoming traffic as the gunman fired five shots through the rear window of the jeep. Two of the five bullets found their mark and seriously wounded MSG Judd. Despite his wounds, he was able to drive the vehicle two miles to the Air Force base gate before collapsing.

The November 17th Organization group claimed responsibility for the shooting, even though it wasn't totally successful, to demonstrate protest of the U.S. operation of four military bases in Greece. Ballistic tests later concluded that the weapon used to shoot MSG Judd was the same .45-caliber pistol that was used to kill Central Intelligence Agency Station Chief Richard Welch in 1975, as well as Navy Captain George Tsantes in 1983.

**1985 Siege of the Palace of Justice, Bogota, Colombia**

On 6 November 1985, a reported 35 terrorists from the April 19th Movement (M-19) stormed the Palace of Justice in Bogota, Colombia. They held more than 300 hostages in the building and immediately began to burn all court records, especially those dealing with extradition of drug traffickers to the United States. Most of the 300 hostages were judges, including the majority of the justices from the nation's two highest courts. Many of the hostages escaped during the initial confusion.

The M-19 had recently broken a year long truce with the government, charging that the military had continued to engage in violence and that promised reforms had not been carried out. One of the rebel's demands during the incident was that an M-19 prepared statement on the peace process be published in every Colombian newspaper and be broadcast on free radio time. They also wanted the reports and actions published of a committee appointed to monitor the peace process. This committee had been critical of the government.

After the terrorists had seized the palace, hundreds of troops backed by armored personnel carriers began surrounding the building. They began their attack three hours later. An armored vehicle led the attack by ramming down the doors to the main entrance of the building. Amidst a hail of gunfire, they recaptured the first three floors of the building and freed more than 100 hostages.

The rebels demanded that President Belisario Bentacur come to the palace to negotiate with them. Chief Justice Alfonso Reyes, who was a hostage, pleaded with the government over the telephone to halt the attack and avoid tragedy; however, the troops continued throughout the day to exchange fire with the guerrillas, throwing tear gas grenades up the stairwells leading to the fourth floor.

The troops began their final assault on the building around 1400 hours on 7 November by blasting down walls with explosives. As many as 48 hostages were rescued. Reports indicated that a total of 111 hostages were killed including 11 supreme court judges. None of the M-19 terrorists survived the military's onslaught.

**1985 Hijacking of the Cruise Ship Achille Lauro, Egypt**

The hijacking began on the night of 7 October 1985 off the Egyptian port of Alexandria, when four armed gunmen from the PLF took over the Achille Lauro, a luxury liner flying the Italian flag. The ship normally held more than 1,000 people, but the majority of the passengers had disembarked to take a land tour and were to rejoin the ship the next day. Reports indicted there were 80 passengers of European and American nationalities as well as 320 Italian crew members who remained aboard. Italian officials indicated that the terrorists had most likely joined the ship in Genoa, where it had departed on 3 October for a 10-day Mediterranean cruise. Police speculated that they had used stolen passports and had hidden their weapons and explosives in their luggage. There were also reports that the leader of the group had traveled on the ship before, posing as a Greek shipowner, befriending crew members and learning details about the ship.

The hijackers demanded that Israel release 50 jailed Palestinians. They said that unless the demand was met they would start killing their hostages, beginning with the Americans and the British. They also claimed they were prepared to blow up the ship if a rescue was attempted. Throughout the incident, the ship was shadowed by ships from the Italian, US, and Egyptian navies. All three governments were reported to have mobilized counterterrorist military units in case a rescue attempt became necessary. The three governments said they would make no concessions to the terrorists.

Since the ship was of Italian registry and the majority of the hostages were Italian, Italy took the lead role in the negotiations. Italy, which enjoys good relations with Yasser Arafat, prevailed the Palestine Liberation Organization to convince the hijackers to surrender.

After being commandeered, the ship sailed to Tartus, Syria, and then to Cyprus. Officials in both countries refused to grant port rights, and the ship was forced to return to Egypt.

It was apparently off Tartus on 8 October that the terrorists shot and killed 69-year-old New York City resident Leon Klinghoffer, a wheelchair-ridden Jew, and dumped his body overboard while his wife watched. The action came after the killers had stated to the negotiators that they could wait no longer and would begin killing the hostages. One of the passengers later stated the terrorists had segregated the mostly elderly American passengers from the rest of the hostages and kept threatening them.

On 9 October, the ship finally sailed back to Port Said where the hijackers surrendered after negotiations with two PLO officials, one of whom was Abul Abbas, leader of the pro-Arafat faction of the PLF. The negotiators said they had not been aware of the killing when they promised the hijackers safe passage to an undisclosed location.

Early on 10 October, Egyptian President Hosni Mubarak indicated that the hijackers had left Egypt under the control of the PLO and had headed for an undisclosed location. In fact, however, they were still waiting at an Egyptian military base. Mubarak said they were under the control of the PLO, but Arafat said that Egypt still controlled them. President Ronald Reagan announced that he wanted the PLO to turn the hijackers over to a sovereign state for trial. Later that day an Egyptian 737 jet took off carrying the four hijackers, two unidentified Palestinians,

and several Egyptian security men.  The plane tried to land in Tunis where the PLO had its headquarters, but the Tunisian government refused it permission to land.  On order of the president, several F-14 Tomcat fighters were dispatched from the carrier Saratoga, which was sailing in the Aegean Sea.  The fighters intercepted the plane in international airspace near the island of Crete.  The fighters then directed the pilot of the jet to accompany them to a North Atlantic Treaty Organization (NATO) base in Sicily where they were immediately surrounded by Italian and U.S. troops.  The hijackers were then turned over to the Italians for prosecution.

After the incident it was reported that the original plan of the hijackers was to disembark at the Israeli port of Ashdod and carry out an attack.  They were forced to take the ship, however, when a crew member discovered their weapons.  This was later confirmed by the leader of the PLF, Abul Abbas.

## 1985 Hijacking of Trans World Airlines Flight 847, Beirut

On 14 June 1985, Trans World Airlines Flight 847 was skyjacked less than 20 minutes after departing Athens, Greece, enroute to Rome, Italy.  On board were 153 passengers, of which 120 were Americans and the crew.  The group behind the act was the Islamic Jihad Organization (IJO) from Lebanon.

Three well-dressed Lebanese men arrived from Cairo the day prior and spent the night in the airport terminal.  On the morning of the hijacking, the plane arrived at the Athens airport more than an hour late.  All continuing passengers had to deplane and pass through a TWA screening point before boarding with the rest of the passengers.  Witnesses stated later that the young girl operating the X-ray screening machine was not paying close attention to her job and also that one of the hijackers had to go through the metal detector three times before finally being waved through by the operator without any further physical search.

Only two of the hijackers were able to board the flight because the plane was full.  After creating a scene, the third hijacker, Ali Atwa, was detained by security officers, and it was discovered that he possessed two forged Moroccan passports.  Atweh later identified the other two hijackers as Ahmed Ghorbieh and Ali Youness.  All were from Lebanon.  They managed to smuggle aboard two hand grenades and a 9-mm pistol by wrapping them in fiberglass and carrying them in nylon traveling bags.  Once on the plane, they took seats in the rear of the aircraft.

Approximately 20 minutes into the flight, the two hijackers ran down the aisle, shouting and waving their weapons.  Unable to get the cockpit door open, they moved all passengers out of the first-class compartment.  Once the door was opened, they ordered the pilot, Captain John Testrake, to fly the plane to Beirut.  They then began to position all the male passengers in the window seats, apparently to remove them from possible threatening positions.  They also began to beat and threaten all the passengers.  People were ordered to put their heads down with their hands covering their faces.  The head stewardess, a German named Uli Derickson, was then ordered to collect all the passports from the passengers as one of the hijackers followed close behind.  This hijacker spoke fluent German and spoke almost solely in German to Derickson.  Both hijackers had some ability to speak broken English.

Among the passengers were five US Navy divers who carried no passports and who were traveling on their military identification cards only.  When Derickson was told to translate between the divers and the hijackers, she did so literally.  Due to the manner in which the word "diver" translates into German, the hijackers mistakenly concluded that the five sailors were Marines.  They came around a second time in order to match faces with passports and then robbed the passengers of money and jewelry.  It was at this point that Testrake reported that the hijackers had begun to beat and threaten to kill the passengers.

Flight 847 was twice denied permission to land at the Beirut International Airport.  To demonstrate their determination to gain access to the airport, the hijackers moved one of the Navy divers, Robert Stetham, to the first-class compartment and began beating him with an armrest taken from one of the seats.  To add to that, one of the hijackers had removed the pin from a hand grenade and threatened to drop it if they were not allowed to land.

The authorities on the ground finally gave into the pleas of the captain and allowed the plane to land at 0400 hours on Friday.  The passengers were ordered to close all the window blinds, and the plane was refueled in exchange for the release of 17 women and 2 children.

After taking on fuel, the plane departed for Algiers.  Stetham was returned to his seat but was seriously injured.  U.S. Army Reserve Major Kurt Carlson was then taken to the cockpit in Stetham's place.  The plane arrived in Algiers at 1030 hours on Friday, but was initially denied landing permission.  President Ronald Reagan sent a personal telex message to Algerian President Chadli, requesting that he allow the plane to land in the hopes that more of the passengers could be released.  The plane sat on the runway in the heat for five hours waiting to be refueled.  Carlson was beaten and made to scream into the microphone in order to emphasize their demands.  Finally, 22 more passengers, mostly women and children, were released in exchange for food, water, and fuel.  Ms. Derickson had to give the Algerians her Shell Oil Company credit card before they would refuel the plane.  Carlson was severely beaten during the terrorists' attempts to get fuel.  They threatened to kill him twice, and the second time they had actually placed the gun to his head preparing to prove their sincerity when Testrake saw a fuel truck approaching.  Carlson lost consciousness for more than an hour as a result of the beatings.  The hijackers and the stewardess thought he was dead and left him alone until he regained consciousness.

At 1915 hours the plane departed for Beirut a second time and arrived at 0300 hours on Saturday, 15 June.  The hijackers had taken another diver, Clinton Suggs, to the front to be beaten.  He was hit by the assailant, but the beating was stopped by the head stewardess.  Upon arrival at the Beirut airport, they discovered that officials had blocked the runway, and they were again refused permission to land despite more threats to kill all the passengers.  After threats to fly the plane into the control tower and the presidential palace, and after more beatings doled out to Robert Stetham, the tower officials turned on the runway lights and allowed the plane to land.

Immediately upon landing a quarrel broke out among the hijackers and the Lebanese officials over a demand to bring Shiite leaders to the plane.  As a result, Robert Stetham was dragged from his seat nearly unconscious, and the hijackers again threatened to kill him.  "You don't believe us," one of them screamed.  "We'll take this Marine; he is one of those who shelled Beirut."  Captain Testrake intervened to warn that they were going to kill one the passengers.  As the shot rang out, he reported over the radio that they had made good their promise and had shot the young man.  His body was then dumped onto the tarmac.

The hijackers then pressed for the demands which had been made in Algiers.  They wanted the release of all Shiite prisoners captured in Lebanon and then taken to Israel, the cutting off of oil sales by Arab states to the West, and the release of all Shiite prisoners held in Kuwait.  In addition they threatened to kill all eight Greek passengers if Atwa was not released.  They also wanted the airport lights to be turned off.  Under the cover of darkness, about 12 Amal militia men boarded the aircraft.  Shortly after, the hijackers notified the tower to let the Red Cross remove the body of Robert Stetham.

To distance themselves from the rapidly building US military strength in the area in response to this incident, the hijackers once again departed for Algiers, arriving there at 0745 hours.  Here they maintained the initiative and made further demands for fuel and subsistence, which were met with the release of 61 hostages, 2 of whom had collapsed from heat injury.  Well versed in the art of negotiations and hijackings, these particular terrorists made good use of their human bargaining chips.  They released all the hostages who would have provided them with bad publicity if they had been harmed and also those who had specific ailments.  By this time, they had released all by 37 male passengers and crew.

The Greek government, anxious to win the release of its citizens, one of which was Greek pop music singing star, Demis Roussos, quickly gave in to the demand for the release of Atwa.  So anxiously conciliatory were the Greeks that they not only released him but also flew him to Algiers to be reunited with his cohorts.  This served to boost the morale of the terrorists and encouraged them to make further demands.  In return, the hijackers released some of the Greek passengers but decided that a singing star was too valuable a publicity tool to be thrown away and retained him and his secretary, Pamela Smith.  Now, with a new man in their ranks, and with renewed strength and resolve which that brought about, and having to secure only a comparative handful of hostages, the terrorists had even tighter control of the plane, making rescue prospects even more remote.

Early on the morning of Sunday, 16 June, the three hijackers ordered the plane to depart once again for Beirut.  Immediately after landing, seven passengers were taken from the plane.  These included the four remaining divers, Kurt Carlson, and Demis Roussos and his secretary.  The seven were transported to an apartment complex in Beirut, away from the airport, where they met with Amal leaders.  After the meeting the singer and his secretary were moved to an upstairs apartment, and Carlson and the divers were taken to jail cells which had been constructed on the ground floor.  Some attempt was made at clandestine communication between them, but one of the divers could not recall the system that he had been taught in training.

It was at this point that Nabibh Berri, the lawyer-leader of the Amal militia in Lebanon, entered the picture as a negotiator or middleman to interface between the Jihad religious fanatics and Washington.  Officials in Washington recognized him and allowed him to play this part but also called on President Assad of Syria to apply pressure.

After midnight the remaining passengers were taken from the plane, dispersed throughout the city, and held in apartments by members of Nabibh Berri's Amal militia.  The crew of seven remained with the plane.

One of the passengers, oil company executive Allyn Conwell, became the unofficial spokesman for the hostages.  Due to his experience in dealing with Arabs and other mideasterners, he felt that he best knew how to address the situation.  He was allowed to visit the other groups of hostages and issue his reports to the media.  He made several press appearances to make known the wishes of the hostages and those of the captors.  Although these conferences were carefully staged by the captors, Mr. Conwell has been sharply criticized for his apparent willingness to be critical of the US government during the negotiations on behalf of the rest of the hostages.

Now being held in small groups in jail cells, Carlson and the divers decided to concentrate on keeping the guards' minds off of them since they knew these Arabs hated Americans.  They told the guards they wanted to learn Arabic.  To their surprise, the guards actually enjoyed teaching them.  For the first couple of days the Americans underwent repeated harassment and physical abuse by the guards.  Threats were made with weapons and they were made to repeat Arabic nursery rhymes.  After managing to build a small amount of rapport and by timing their naps to coincide with the arrival of the new guard shifts, they were able to avoid these hazings.  The guards even gave them Arabic names.

The guards securing Carlson and the divers captured an armed Palestinian who was reportedly approaching the jail over an adjacent building.  The guards wanted the divers to kill him.  They even tried to shove the rifle into the hands of one of them (Ken Bowens), but he steadfastly refused

to kill the man.  The guards then severely beat the Palestinian.  The group holding these military men took their captives (two at a time) to the roof to view the war-torn city, perhaps to offer justification for their actions.  The information gathered by these men while on top of the building was later used to identify the area by satellite photographs, and it also helped them to plan an escape and evasion route.

The Amal allowed an ABC news crew (one of which was Charles Glass, who became a hostage himself in 1987 but escaped from the apartment in which he was held and fled to safety) from France to approach the plane and talk with Captain Testrake and two other crew members.  This interview had the effect of stirring up the press corps present at the airport.  These media men pressed continually harder for information, both verbally and photographically.  They constantly challenged the rifles of angry gunmen.  In one incident, an Arab cameraman approached the plane and posed as the relative of one of the Amal gunmen who was holding the plane.  When his plan was compromised, he ran and was shot at by the terrorists.  This action was photographed by other newsmen, but the Amal leader on site demanded that this footage be delivered to him and that all media people be removed from the area.

On Tuesday of the second week of captivity, all hostages were consolidated at a schoolhouse to meet with the Red Cross.  A festive atmosphere prevailed as the hostages greeted each other as long-lost comrades and exchanged information.  One of the hostages was seen riding a motorbike which belonged to one of the Amal captors.  After being examined by doctors, they were sent back to their holding areas.

The original hijackers were members of the Islamic Jihad Organization (IJO), a group beneath the Hizbollah movement in Lebanon.  They were taken from the plane shortly after the hostages were removed and allowed to make a press statement.  They were then taken by their own people and disappeared into the turmoil that is revolutionary Beirut.  Members of the Amal militia under Nabibh Berri (a more moderate group rivaling the religious factions for power in Lebanon) took control of the plane and of the majority of the passengers.  The military men were being held separately, which caused considerable concern during the negotiations.

Berri was using his elevated role as mediator to raise his position of power in the country while the whole time holding the very bargaining chip central to the entire incident.  When it appeared that dealings with Berri were as ineffectual as his leadership in gaining the release of the hostages, US officials persuaded the President to open discussions with the real power in Lebanon at that time, President Assad of Syria.  By gaining the upper hand in the role of negotiator and savior in another American hostage ordeal, Assad hoped to elevate his own prestige in the region and increase his power over the factions who were responsible for taking and holding the hostages.  He wanted to demonstrate that he was all-powerful in Lebanon.

Assad issued a 12-hour ultimatum and by doing so forced the Hizbollah to release the seven hostages who were being held separately.  He told the leadership of the Hizbollah that unless all hostages were released unharmed, he would sever all relations with them and cut off all types of support, specifying communications and supplies.

On day 15 of the ordeal, the hostages were taken to a consolidation area and then to the Summerland Hotel for a farewell dinner, arriving about 2300 hours.  ABC camera crews and correspondents were the only media people permitted to see the hostages at that time and they proceeded to conduct interviews.  Three phone lines were set up so that the hostages could call the United States.  They were also permitted to make a personal video for their families.

On 29 June, day 16, the hostages were taken to a school yard to consolidate for the final convoy to Damascus, arranged by President Assad.  The Hizbollah, which still retained custody of one group of hostages, refused to release them, even though the Amal surrounded the building where they were staying.  The hostages waited at the school until about 2200 hours, at which time they were driven to apartments to spend the night awaiting transportation to Syria.

Hizbollah finally released the captives, and all hostages were returned to the school on 30 June, day 17.  They were loaded into vans and cars for the convoy to Damascus.  The Amal militia guarded the convoy until it reached the Bekaa Valley, at which time the Syrian Army took over.  All of the hostages were accounted for at this hand off, and they were driven the rest of the way out of Lebanon.  They arrived in Damascus and boarded a U.S. Air Force C-141 jet and were flown to Rhein-Main Air Base, West Germany, for medical observation.  They arrived in Washington, DC, on 2 July 1985.

## 1985 Rome/Vienna Airport Massacres

Eighteen people were killed and 111 wounded on 27 December 1985 when Arab gunmen opened fire and hurled grenades at the check-in counters of El Al, the national airlines of Israel, in the international airports of Rome and Vienna.  Blame for the simultaneous and coordinated attacks quickly centered on the Abu Nidal Organization (ANO), a renegade Palestinian faction backed by Libya.

Four gunmen entered the international terminal of Rome's Leonardo da Vinci Airport shortly after 0900 hours.  They approached the El Al counter and pulled out Soviet-made AK47 assault rifles and began firing wildly and throwing grenades.  Plainclothes Israeli security guards, along with Italian police, returned fire and killed three terrorists and wounded the fourth.  The surviving terrorist had to be rescued from an angry mob by the police.  Twelve innocent bystanders were killed:  five Americans, three Greeks, two Mexicans, an Italian, and an Algerian.  There were 74 wounded.  Many of those hit had been standing at the TWA ticket counter which was adjacent to El Al's.

Minutes later, three terrorists entered Vienna's Schwechat Airport and carried out a similar attack. The quick reactions of the Israeli security guards and the Austrian police limited the civilian casualties to two dead, an Austrian and an Israeli, and 37 wounded. The terrorists were forced to retreat down a stairway, after which they commandeered a car and were chased by police. After a running gun battle, their car was disabled by police fire a mile from the airport. One gunman was killed and two were wounded and captured.

A note found on the surviving Rome terrorist said that the gunmen were members of an unknown group called the Martyrs of Palestine and that the attacks were meant to avenge the 1 October Israeli air raid on the Palestine Liberation Organization (PLO) headquarters in Tunis. However, the PLO (who enjoys good relations with both Italy and Austria) condemned the acts and denied any connection. The day after the attacks, the two terrorists captured in Austria admitted to being members of the Fatah Revolutionary Council, a renegade Palestinian group led by Abu Nidal (Sabry al-Banna). They also claimed they had originally planned to hijack an El Al airliner and fly it to Israel.

On 30 December, the Tunisian government claimed that the passports used by the terrorists in Vienna had originally been confiscated from Tunisian workers expelled from Libya earlier that year. The third passport had been lost by a Tunisian in Libya in 1977. Libya's official press agency on 29 December lauded the attacks, calling them "heroic." This prompted an uproar of public criticism in Italy and Austria; consequently, Libya denied any connection to the attacks but condemned U.S. and Israeli "joint threats of aggression." Italian military intelligence claimed that the Rome terrorists had been trained in Iran and made their way to Italy through Syria.

In response to the alleged Libyan support for the two attacks, U.S. President Ronald Reagan announced sweeping trade sanctions against Libya and ordered some 1,500 U.S. citizens working in Libya to come home. He also ordered frozen all Libyan assets in U.S. banks. These actions signaled a starting point for renewed tensions between Libya and the United States. Almost the entire Arab and Muslim world issued statements to show support for the Libyans in their fight against the Americans.

## 1985 La Belle Disco Bombing, West Berlin

On 5 April 1986 a bomb exploded in a West Berlin disco, killing five people including an off-duty American soldier. This attack was attributed through intelligence sources to Libya's Colonel Muammar Qaddafi, who reportedly ordered the blast. The bombing came three days after the bombing of a TWA flight over Greece that killed four Americans. Even though U.S. officials could make no specific link between Qaddafi and the first bombing, they expressed concern for what they believed to be his increasing role in international terrorism. They also made public their growing suspicion of a link to the Berlin bombing. This wave of anti-American terrorism was believed to be in response to U.S. and Libyan tensions centered around U.S. Naval operations in and around the Gulf of Sidra which Libya claims to be within its territory.

The early morning blast ripped through La Belle, a disco popular among U.S. service members stationed in Berlin. Killed were Sergeant Kenneth T. Ford and a Turkish woman, Nermin Haney. About 200 people were injured including 60 Americans, most of them soldiers and their dependents.

Three terrorist groups immediately claimed responsibility: the Red Army Faction (RAF); one of its splinter groups, the Holger Meins Commando; and an unknown Arab group. None of the claims could be confirmed, and no clear connection could be made between any of them and Libya. U.S. officials quickly suggested, however, strong evidence that indicated Libya and planned and supported the attack and that it was part of a master plan of indiscriminate violence by Qaddafi's regime directed at the United States. It was also reported that U.S. intelligence operatives had prior knowledge of the bombing and were on the way to warn U.S. personnel but were about 15 minutes too late.

In response to the West Berlin attack, U.S. officials stepped up their campaign efforts to get allies to impose political and economic sanctions against Libya. In January, the Reagan administration had failed to get allied support to punish Libya for its part in the planning of and supporting of the Rome and Vienna airport massacres of December 1985. In particular, the United States had asked allied governments to expel Libyan diplomats known to have used their diplomatic immunity status to smuggle explosives and weapons into Europe and who otherwise aided in the preparation for attacks directed at American targets. In the past, Libya's unconventional embassies, known as "People's Bureaus," had been accused of involvement in the murders of Libyan exiles hostile to the Qaddafi regime. The sequence of events surrounding the La Belle disco bombing and other terrorist acts of that period prompted U.S. military action against Libya later that year. This came in the form of a raid on selected Libyan targets by U.S. war planes based in England and on U.S. carriers in the Mediterranean.

## 1985 Killing of U.S. Marines at the Zona Rosa, San Salvador

On 19 June 1985 the most serious attack on U.S. personnel in Central America, to date, occurred in San Salvador, El Salvador. Four U.S. Marine security guards and two U.S. businessmen were assassinated at a curbside restaurant by members from a terrorist splinter group of the Farabundo Marti National Liberation Front (FMLN). The groups responsible for carrying out the attack were the Revolutionary Party of Central American Workers (PRTC) and its terrorist arm, the Mardogueo Cruz Urban Commando (CMC).

In the months immediately prior to the attack, a high threat to U.S. personnel working in El Salvador had been identified, naming U.S. military advisors as probable targets. As late as 18 June, U.S. Embassy personnel had been briefed on the terrorist threat and had been made aware of appropriate security precautions which included avoiding outdoor cafes and restaurants with curbside tables, and varying their routines.

The attack took place in the Zona Rosa (Red Zone) area of San Salvador on Boulevard Hipodromo in Colonia San Benito, approximately one block from the U.S. ambassador's residence. This location was a popular restaurant and nightclub district known to be frequented by Americans.

Approximately 2100 hours local time, ten men, wearing camouflage shirts and caps, who were riding in a light-colored pickup truck, arrived in front of a group of four adjacent sidewalk cafes. The patrons of the cafes immediately dismissed the group as a military patrol conducting a search or a document check. The truck parked on the street in front of "Chilis" cafe where the Marines were seated. The attack element jumped from the truck and turned toward the customers while others from their group deployed to adjacent security positions. The attackers moved directly toward the table where the Marines were seated while firing on full automatic with U.S. M16 rifles, German G-3 rifles, and Uzi submachine guns. Fire was initially directed at the Marines but was then turned against other patrons. One Marine was reportedly chased into "Las Pizzas" cafe and killed inside.

When the firing ended, four U.S. Marines, two U.S. businessmen, a Guatemalan businessman, and five Salvadorans were dead. So indiscriminate was the firing that one terrorist was reportedly wounded by a stray round from one of his own men. The gunmen then escaped from the scene in the same pickup truck which had brought them. One witness said the Marines were approached by a young man who chatted with them briefly, then bicycled away. Ten minutes later the gunmen appeared.

Two days later in a communique, the CMC stated that its operation, named "Yankee Aggressors in El Salvador, Another Vietnam Awaits You," was directed against U.S. advisors, CIA agents, and elements of other nations associated with intelligence organizations in the service of the North American imperialists. Captured documents suggest that the rebels were turning to urban terrorism in order to recoup their recent losses in the field.

The slain Marines were identified as Sergeant Thomas Handwork, 24; Sergeant Bobby Dickson, 27; Corporal Patrick R. Kwiatkowski, 20; and Corporal Gregory Webber, 22. They were the first U.S. military personnel to be killed in El Salvador since the 1983 slaying of Navy Lieutenant Commander Albert Schaufelberger at the Central American University in San Salvador. Since this incident, U.S. Army Staff Sergeant Gregory Fronius was killed in 1987 by a guerrilla mortar attack on the Salvadoran Army base where he was working as a Special Forces advisor.

## 1985 Abduction and Murder of Enrique Camarena, Mexico

On 7 February 1985, Drug Enforcement Administration (DEA) agent Enrique Camarena Salazar was abducted in Guadalajara, Mexico. He was subsequently tortured and then murdered by kingpins in the Mexican drug trafficking underworld. He was killed along with his Mexican pilot, Alfredo Zavala Avelar, for his part in the stinging successes that the Mexican government and the DEA were having in stemming the flow of illegal drugs to the United States. Specifically, he had been working on an extensive and highly successful investigation called Operation Padrino (Godfather).

Camarena was a 37-year-old Mexican-born naturalized U.S. citizen who hailed from Calexico, California. He was a 10-year veteran with the DEA, having spent 5 years in Mexico. He was married with three children.

On the day of the abduction, Camarena left his office at the American Consulate in Guadalajara on foot and proceeded down the street to a restaurant where he was to have met his wife for lunch. He never made his appointment and was not seen alive again. Witnesses stated that they saw a car stop next to Camarena and that four men got out. They then forced him into the car and drove off. On the same day, Avelar, the pilot, was taken from a different location. They both were driven to a ranch belonging to an underworld kingpin, Caro-Quintero. They were held overnight, and the next day they were badly beaten and tortured for about eight hours before being killed by blows from a metal rod, probably a tire iron, and then shot in the head. The bodies were stuffed into large plastic bags and buried in a shallow grave for a few days. They were then dug up and moved to a location about 30 feet off a road running through a lemon grove located on a ranch approximately 70 miles from Guadalajara. The bodies were found by a civilian after a police shoot-out with drug dealers who lived on the ranch. Camarena's body was taken to Guadalajara for identification and was then flown to San Diego by an Air Force jet.

The killers were a mix of drug dealers and Jalisco State Police officers. Later, 13 officers were arrested and charged for their parts in the abductions and murders, although 6 of them stated that their confessions were made under torture and that they were being made scapegoats. Mexican officials proved to be a hindrance throughout the investigation of the murders due to implications that the act was directed and ordered by high-placed officials. Mexican police repeatedly destroyed important evidence regarding the case, including some of the clothes found on the bodies. They attempted a massive cover-up to avoid embarrassment and refused, for a time, to hand over to U.S. authorities a tape made by the murderers of the actual torture session. This tape was made by the killers in case Camarena were to divulge any information regarding DEA operations. Also implicated in the murders were two of the most powerful drug overlords in Mexico, Caro-Quintero and Ernesto Carrillo Fonseca. After an extensive manhunt, Quintero was arrested at his hiding place on a Costa Rican ranch and put in prison to await trial. Fonseca has continued to elude police efforts to arrest him.

## 1985 Rhein-Main Air Base Bombing, West Germany

At 0716 hours on 8 August 1985, a car containing an explosive device detonated in the parking lot in front of the headquarters of the 435th Tactical Airlift Wing, Rhein-Main Air Base, West Germany, six miles west of Frankfurt.

The bomb blast killed two persons:  Airman First Class Frank Scorton (who was TDY); and a dependent, Becky Jo Bristol.  Eighteen U.S. personnel were injured in the blast as well as two German citizens.  The attack damaged several cars and caused minor structural damage to the 435th headquarters building along with other buildings in the immediate area.

The device was concealed in a Volkswagen Passat that had a false U.S. Forces license plate.  The charge was contained in seven propane gas canisters with railroad lug nuts used as shrapnel.  The resulting crater measured 1 meter in depth and 2 meters in width.

According to witnesses, the vehicle, a green Volkswagen Passat, was placed in position in the parking lot by two males at 0655 hours.  The car was bought at a public auto sale about a week prior by a woman believed to be Sigrid Sternsbeck, a known hard-core Red Army Faction member.

## 1985 Murder of U.S. Army Specialist Four Edward P. Pimental, West Germany

On the night of 7 August 1985, U.S. Army SP4 Edward P. Pimental was killed after leaving a local Wiesbaden bar with a female and an athletically built Hispanic man named Jeff.  His body was discovered at 0600 hours on 8 August in a wooded area approximately six miles north of Wiesbaden in a location known as "Lover's Lane."  Pimental's green military identification card was sent to the British news service Reuters Ltd through the mail on 13 August.  It arrived with a letter signed by the Red Army Faction (RAF), a terrorist group.  The letter was a duplicate of the one sent to other news agencies the week before, claiming responsibility for the Rhein-Main Air Base bombing.  The letter to Reuters did not state that the ID card was stolen to give the terrorists access to the base, but investigators said that was the implication.

The letter from the RAF also bore the symbol of Direct Action (AD), a similar terrorist group based in France.  This was the first time that the groups actually claimed they had worked together, something that was previously known but not confirmed by them.  This incident signaled a shift in RAF tactics from attacking only symbolic targets, such as industrialists or military chiefs, to targeting lower ranking personnel as well.

## 1986 Bombing of Trans World Airlines Flight 940, Greece

On 2 April 1986, a bomb that had been smuggled aboard Trans World Airlines Flight 940 from Rome, Italy to Athens, Greece, exploded, killing four Americans and wounding nine others.  The blast tore a gaping hole in the plane's fuselage, and four of the victims were sucked from the plane.

The bomb exploded beneath the seat of Alberto Ospino, who was sitting by the window in row 10, just forward of the plane's right wing.  Sitting directly behind Ospino and killed along with him were Demetra Stylianopoulos, her daughter Maria Klug, and her infant granddaughter Demetra Klug.  Their bodies, which were sucked through the 9- by 3-foot hole, were later recovered in southern Greece.

The plane was at an altitude of 15,000 feet and descending towards Athens at the time of the explosion.  No major operational systems on the plane were damaged, and the pilot was able to make a safe landing less than 10 minutes later.  Although rapid decompression of the plane's cabin occurred, it was not as severe as it might have been had the device detonated at a higher altitude.

A previously unknown Arab terrorist group claimed responsibility for the act, saying that it was committed in response to the U.S. clashes with Libya in the Gulf of Sidra the week before.  Libyan leader Colonel Muammar Qaddafi, of course, denied any role.  He lightly described the bombing as "an act of terrorism against a civilian target, and I am totally against this."

Hours after the incident, an anonymous caller in Beirut said the Ezzedine Kassam unit of the Arab Revolutionary Cells had planted the bomb in retaliation for U.S. actions against Libya and the "the drunken behavior of American imperialism seeking hegemony and domination over the people of the Arab nation."  A Palestinian source stated that the group was associated with the renegade terrorist faction led by Abu Nidal (Sabri al-Banna), which was also responsible for the December 1985 Rome and Vienna airport massacres.

The Italian interior minister reported a day after the incident that a woman traveling on a Lebanese passport was believed to have planted the bomb while flying on the TWA flight's first leg, from Cairo to Athens.  The woman, identified as May Elias Mansur, then reportedly flew to Beirut aboard a Middle East Airlines flight.  Records show that Mansur sat in the seat that was later assigned to Ospino.  Investigators believe that the bomb was attached to the bottom of the seat, beneath the life preserver.  A TWA spokesman reported that the new crew had boarded the plane in Rome and had conducted a thorough search to make sure there were no hand baggage or parcels left on board.  The search had included a spot check of the life jackets and feeling beneath the seats at random to ensure they were in place.  The crew could not recall whether row 10 had been checked.

Italian police said that Mansur was a known terrorist and an expert in explosives.  TWA officials noted that she had been the last person to board the plane in Cairo, checking in at the last moment.  While her hand baggage was said to have been checked by X-ray machine and by hand, security experts agree that plastic explosives could have escaped detection and any metallic detonating devices could have been disguised to avoid

detection.

Officials later said the bomb had been composed of a small amount of powerful plastic explosive and a detonation device so tiny that it may have easily escaped detection by X-ray devices.  The entire bomb was estimated to have been no bigger than two or three cigarette packs.  Its design was similar to that previously used quite frequently by another renegade Palestinian terrorist group, the May 15th organization.

Following autopsies of the victims, Greek and American forensic experts said that the two American women and the infant who had been sucked out of the hole in the fuselage were killed when they hit the ground after falling approximately 15,000 feet.  Only Albert Ospino was killed directly by the bomb blast itself.

On 4 April, May Elias Mansur issued a statement on Libyan television from Tripoli denying she had anything to do with the blast.  She was described as a boutique owner in Tripoli.  She told reporters that she was a member of Lebanon's National Syrian Social Party and had taken part in military activities against Israel and Christian militia targets inside her own country.  She voiced her support for attacks against selected American targets and interests, but she said she would never strike innocent women and children.  She later refused a request by Greek authorities to return to Greece for questioning, but she was interrogated in Tripoli on 10 April by Lebanese interrogators acting on behalf of the Greek government.

Greek and American authorities still regard Mansur as the prime suspect, but they offer that it is possible the device, with an extended timer, had been placed days prior by someone else.

**1986 Takeover of Pan American World Airways Flight 73, Karachi, Pakistan**

On 5 September 1986, four Arab terrorists posing as airport security guards stormed aboard a Pan Am 747 jumbo jet (flight 73) filled with nearly 400 passengers in Karachi, Pakistan.  After a 16-hour standoff, the terrorists, fearing a rescue attempt by security forces, reacted to an electrical power outage on the plane and began shooting the passengers.  A total of 21 people were killed in the slaughter and over 100 were wounded.  The terrorists were subsequently captured alive as they attempted to escape.

The gunmen were Palestinian; however, several groups immediately claimed responsibility for the action.  None of the claims could be verified with absolute certainty.

The plane was seized after arriving in Karachi from Bombay, India, and almost half of the 389 passengers aboard were Indian citizens.  Among other nationalities were 83 Americans and 15 Britons.  The jet was bound for New York via Frankfurt, West Germany.

Showing the careful planning that went into the operation, the hijackers drove onto the tarmac of the airport in a vehicle which had been painted to resemble an airport security van.  The four attackers wore uniforms and badges like the airport security personnel.  It was the first time that terrorists had gained access to a plane using this ruse.  As the terrorists ran up the stairs, firing their guns in the air and commandeering the plane, the three-man crew immediately exited the cockpit of the Boeing 747 via an escape hatch in the roof and lowered themselves to the ground with a rope.

Pan Am officials supported this action by the crew, stating they had followed the "first rule in the book" regarding aircraft hijacking:  "If possible, keep the plane on the ground by depriving it of a pilot."  It was the first time the rule had been successfully adhered to during an actual hijacking.

Early in the incident, the terrorists identified an Indian-born U.S. citizen of only two months, shot him in the head, and threw his body onto the tarmac.  It was reported that the predominantly Indian contingent of flight attendants tried to hide the passports of the American passengers to avoid having them singled out for murder.  As a result, a British man was selected next for murder and spent the remainder of the incident next to the terrorist leader.  However, he managed to survive the incident.

The hijackers demanded a new crew to fly the plane to Cyprus so that they could free their friends in prison there.  Cypriot officials told Pakistan that under no circumstances would they allow the Pan Am jet to land there.  Pakistani officials, in order to avoid panicking the terrorists, did not tell them of the Cypriot refusal.  They told them that the flight crew was on the way.  The hijackers then set a deadline for 1900 hours, at which time they would begin shooting the passengers.

When the hijackers were informed at 1900 hours that the crew had not yet arrived, they extended the deadline to 2100 hours.  It was later reported that Pakistan had decided to storm the plane with specially trained commandos and that this unit was present at the airport and conducting rehearsals and preparations.  There were also reports that U.S. counterterrorist forces had been deployed.  However, sometime between 2000 and 2200 hours, the auxiliary power unit that supplied the plane with electricity ran out of fuel and cut off.  The lighting faded out, the air-conditioning stopped, and all radio contact with the plane ceased.  The gunmen apparently took the fading lights as a signal that a rescue raid was about to be launched.  In response, they turned to the passengers, all of whom had been gathered into the aisles, and opened fire on them with automatic weapons, as well as hurling at least two hand grenades.  In the ensuing chaos and carnage, several of the passengers managed to open some of the emergency exits and began escaping down chutes and onto the wings.

When the lights went out, the chief Pakistani negotiator ran to the tarmac with a megaphone to warn the hijackers not to panic.  He estimated that it took as long as 15 minutes from the time the slaughter began until the first Pakistani commandos entered the plane, at which point all the passengers had either been shot down or had escaped.

Pakistani military officials, of course, denied this account, stating that commandos were there immediately; however, the initial version was backed up by American passengers when they were interviewed in Frankfurt.  They uniformly reported there had been no sign of soldiers of any kind near the plane during the massacre or afterward during the escape.

The four hijackers were later captured by Pakistani security forces.  Two of them tried to escape by blending in with the escaping passengers but were recognized by some of their victims who reportedly beat them and turned them over to police.  One of the terrorists was seriously wounded; however, it was not clear whether he was shot by Pakistani soldiers or by one of his comrades.  Passengers reported seeing one of the terrorists being beaten and then carried away by Pakistani security forces.  The man was heard to say, "I am a Palestinian Commando."

The exact affiliation of the hijackers remains unclear.  A caller in Cyprus claimed the operation had been carried out by the Libyan Revolutionary Cells.  However, in usual fashion, Libyan leader Colonel Muammar Qaddafi denounced the incident as "a terrible act of terrorism."  Another caller in Beirut claimed responsibility on behalf of the Jundullah Organization (Soldiers of God).  U.S. Secretary of Defense, Caspar Weinberger said there were strong indications from basic intelligence sources that the radical Palestinian terrorist group led by Abu Nidal (Sabri Al-Banna) was behind the Karachi incident.  A number of Middle East analysts linked the hijacking to the terrorist massacre of 21 Jews in an Istanbul synagogue a day later.  This incident is believed to have been carried out by Abu Nidal's terrorists as well.  This would be characteristic of this group, which was responsible for the 1985 simultaneous massacres at the Rome and Vienna airports.

## 1986 Attack on an Istanbul Synagogue

On 6 September 1986, one day after the attempted hijacking of a Pan Am flight in Karachi, Pakistan, two Arab gunmen killed 21 Jewish worshipers and themselves in an attack on an Istanbul synagogue.  Four other Jews were injured, one of them critically.

Posing as photographers, the attackers entered Istanbul's largest synagogue, the Neve Shalom, during the morning Sabbath service (this was the first service held there for some time, since it had been closed for extensive renovations).

The terrorists barred the doors from the inside and opened fire on the assembled congregation with submachine guns.  After shooting for several minutes, the terrorists reportedly poured gasoline on some of the victims and set them on fire.  The terrorists then attempted to flee but were confronted outside the synagogue by arriving police.  The two men ran back inside, and an explosion was heard.  Turkish officials discounted claims by some witnesses that there had been two other terrorists involved but who had successfully escaped.

The attack left the synagogue on fire, with bodies and parts of bodies strewn among the wreckage.  The terrorists themselves were mutilated by the grenade blast that killed them.  There are varying theories as to whether the attack was meant to be a suicide raid or whether the organizers had provided the gunmen with short-fuse grenades to ensure they would be killed rather than captured.  One report said that at least one of the seven unexploded grenades recovered from the synagogue had a zero-time fuse, meaning that it would detonate as soon as the user attempted to arm it.

This attack was the first of its kind to take place in Turkey, where Jews have lived relatively unmolested in an overwhelmingly Muslim society.  Turkey had largely escaped the violence rising from the Arab-Israeli conflict.

A number of rival groups competed for responsibility for the massacre.  One caller in Cyprus said it was the work of the previously unheard of Palestinian Revenge Organization.  However, Palestine Liberation Organization (PLO) leaders in Tunis immediately denied any connections to the attack.  Callers in Beirut claimed responsibility both for the Islamic Jihad Organization and the Islamic Resistance, a southern Lebanon guerrilla group dominated by the pro-Iranian Hezbollah movement.  The next day another caller denied that the Islamic Resistance was responsible.  There is a belief among experts that the Abu Nidal group was responsible for this as well as the Karachi attack of 5 September.

## 1986 Abduction of Victor Cortez, Jr., Mexico

Victor Cortez is an agent with the Drug Enforcement Administration (DEA) who was abducted by the Jalisco State Police in Guadalajara, Mexico, in August 1986.  Cortez, a veteran DEA agent, was stationed in Guadalajara with his wife and was involved with several major investigations into Mexican drug trafficking.  As with all DEA agents, Cortez held no formal jurisdiction or powers of arrest but was supposedly working with the Mexican officials in an official capacity.  He was also investigating the 1985 abduction of his friend and fellow DEA agent, Enrique Camarena Salazar, and was enjoying some success.  Indications are that he was abducted and detained by the same group of corrupt police officers that had kidnapped and delivered Camarena to his torturers and participated in his murder.  Formal charges were finally brought against eight police officers in connection with the case but only after a storm of threats and rhetoric from the U.S. government about corruption and inefficiency within the Mexican legal system.

On the day of the incident, Cortez, accompanied by a Mexican who was working for the DEA as an informant, was waiting outside a bowling

alley in the Juarez section of the city.  He had made a call to some of the other agents working at that time and was to have met them at the bowling alley.  Just prior to the arrival of the other agents, two carloads of police arrived and began to question the two about their identity.  Although they had no weapons on them at the time, there were two rifles in the trunk of the car which belonged to the informant.  Cortez explained to them that he was a DEA agent and that he was properly registered with the state officials.  The police insisted that the two accompany them to the station, but Cortez refused, remembering what had happened to Camarena a year before.  He asked that they call the U.S. Consulate to make a positive identification, but they refused.  He was finally forced at gunpoint to enter the vehicle with the police and was taken to the police station.

When Cortez arrived at the station he was hurried into a 4- by 12-foot cell and told to strip.  He was then handcuffed and blindfolded.  Shortly thereafter, three men entered, carrying wires and water buckets and wearing rubber boots.  For approximately 10 to 12 hours, Cortez was brutally tortured while undergoing an intensive and seemingly pointless interrogation about DEA activities in Mexico.  He was repeatedly beaten with fists and kicked.  Electric shock was applied to his body through wires that had been placed around his left leg.  He was held upside down while water was forced up his nose.  He recalls that the questions were put to him so that they had a reason for the torture and not because of a genuine desire for information.  All the information they asked for, they already had access to from various sources.  Cortez was sure that these were the same individuals who were involved with the Camarena case.  They threatened to take him for a ride in the country from which he wouldn't return, and he had no reason to doubt their sincerity.  At one point in the interrogation, he was taken to a different cell and allowed to rest.  Promises were made that he would receive more of the same treatment in a short time.  While in the new cell he attempted to establish rapport with a man in an adjacent cell.  He pleaded for help from the man, but his cell mate was unable to offer any assistance at that time.  Cortez was desperately searching for a method of communication with the outside.  He knew he had to let someone know where he was.  The method he used was to cut a piece from a newspaper that had the name of the state police section which had abducted him and to place it inside a match book that he kept in his pocket.  In this way, if he were killed, there would be some way of determining who the perpetrators were.

Victor did not know it at the time, but his abduction had been observed by an old lady who was standing nearby.  His fellow agents arrived on the scene just as the police were leaving with Cortez and his Mexican companion.  Cortez recalls watching their van drive around the corner to park, as the car he was in pulled away.  When the agents did not find him at the bowling alley, they immediately sounded the alarm and began searching.  They interviewed the old lady, who was able to give a sketchy but valuable account of what had taken place.  She recalled the last portion of the license number of the car, which the agents recognized as a suffix used by the Jalisco State Police.  They had began making calls to the different stations, asking for Cortez.  Eventually, through good investigative techniques and deductive reasoning, they found the right station and arrived in time to demand the release of their friend.  The man who had occupied the cell adjacent to Cortez was released shortly after he had talked to Victor.  He called the consulate and aided greatly in gaining the release of Cortez.

Mexican officials publicly downplayed the incident as nothing extraordinary and nothing that should be viewed as an international incident.  Initially they refused to acknowledge that Cortez had been treated with anything but courtesy, and established the position that he had merely been asked to come in to prove his identity.  Only because of allegations made by the Reagan administration through Attorney General Edwin Meese and Secretary of State George Shultz, did the Mexican government concede wrongdoing and promise to investigate and prosecute the people connected with the incident.  Eight people were eventually charged in connection with the case.

Upon release, Victor Cortez was flown, with his family, to Tucson, Arizona, where he received medical treatment and was allowed to recuperate.  He recalls that two or three days prior to the incident, his wife had noted a strange car parked down the street from their house.  She said that the man in the car seemed to be watching their residence and was acting suspicious.  Victor decided at the time not to act on the reports given by his wife, saying that it probably wasn't much to worry about.  While it can't be proven that this surveillance was connected with the group that actually conducted the abduction, it can be reasoned that had he used this as a sensitive indicator and reported it, things may have turned out quite differently for Victor Cortez.

## 1987 Bombing of USO Club, Barcelona, Spain

An obscure Catalonian separatist group claimed responsibility for the Christmas bombing of a USO club packed with off-duty sailors from U.S. Navy ships visiting Barcelona.  The attack left nine sailors injured and one dead.  The dead sailor was identified as GSM-3 Ronald Strong from Reeders, Pennsylvania.  He died in a hospital after surgery for shrapnel injuries.

Witnesses told police that a short young man with curly hair threw two grenades into the club and then ran.  Police said the assailant was in the club immediately before the attack and threw the grenades from the safety of a parked car and then fled on foot.

Although the group known as the Red Army of Catalonian Liberation claimed responsibility for the attack, Spanish authorities speculated that it was probably a more militant splinter group of the separatist movement known as Terra Lliure.

U.S. and Spanish officials agreed that it was the same group that had claimed responsibility for the October 1987 bombing of the U.S. Consulate in Barcelona, the June bombing of the Hewlett-Packard Company, and the May bombing of the General Electric Corporation.

## 1987 Attack at Clark Air Base, Angel City, Philippines

On the afternoon of 28 October 1987, unidentified assassins shot to death three Americans, including one retired and two active-duty servicemen, in successive attacks near Clark Air Base, Philippines. A Filipino bystander was also killed in one of the attacks, and another American escaped injury after gunmen fired on his car. The shootings occurred within a period of 15 minutes.

The first incident occurred approximately 1545 hours. While walking to his home in the Dau area of Angeles City, U.S. Air Force Sergeant Randy Davis was approached from the rear by three Filipino males. One of the assailants, who was about five feet behind and to the left of Davis, opened fire first. As Davis lay on the ground, his murderers shot him several more times. Before departing the area, one of the terrorists shot Davis at the base of the throat at close range. The victim was wearing a military uniform.

At about the same time as the attack on Sergeant Davis, Herculano C. Mangente, a retired U.S. Air Force Technical Sergeant and a Philippine-born U.S. citizen, was shot and killed in the Hensonville section of Angeles City. Four terrorists standing under a tree flagged down Mangente's car and opened fire, hitting him with five rounds; his vehicle, a red Chevrolet Blazer, was hit at least seven times. Thirteen .45-caliber shell casing were found at the scene.

After shooting their victim, the terrorists walked past a witness' car, and one of the terrorists stared at him for a short time before deciding not to take any action. The terrorists then walked farther down the road and caught a jeepney and escaped.

Approximately 1545 hours, Airman First Class Steven Faust was fatally shot while driving his car from Carmenville, a subdivision about 1.5 miles south of the base. As Faust slowed down at an intersection, he was hit by three bullets from four to six Filipino males who were waiting for him at the intersection. After being hit, Faust lost control of the car, which slammed into a utility pole. The terrorists approached the car and fired at their victim again. At this time, Joseph Porter, a Filipino businessman, and his wife approached the crime scene, apparently thinking it was an accident. As they slowed down to investigate, one of the terrorists walked up to Porter's car and fatally shot him. Porter lost control of his car, which came to rest against the shoulder of the roadway. After shooting Porter, two of the terrorists escaped on a three-wheeled motorcycle and the others escaped in a jeepney. It is not known whether there were accomplices waiting in these vehicles to facilitate the escape.

As U.S. Air Force Captain Ray Pulsifer (who was driving a 1972 black Porsche) was slowing down to make a left-hand turn onto Porac Road, he noticed a Filipino man standing off to the side of the road. As Pulsifer approached the individual, he saw the man removing a pistol from his belt. Seeing this, Pulsifer accelerated rapidly as the terrorists opened fire on his car. Standing about 15 feet from the first terrorist was an accomplice who also opened fire on Pulsifer's car as he turned the corner. Though Pulsifer did not see him, witnesses say there was a third terrorist involved in the attack. The victim was hit in the right chest area, but the round was deflected by his checkbook, which he kept in the right-hand pocket of his flight jacket.

While the rightist military elements and the Muslim extremists were not totally absolved, suspicion immediately fell on the New People's Army (NPA), the military wing of the Communist Party of the Philippines. NPA assassin squads, known as the "Sparrows" because of the speed in which they carry out their operations, have killed prominent Filipinos and have threatened to kill Americans involved in the counterinsurgency campaign going on in the country.

## 1988 Kidnapping and Murder of LTC William Higgins, Lebanon

USMC LTC William R. Higgins, chief of the UN truce Supervision Organization Observer Group, was kidnapped by an element of the Hezballah while driving along a coastal road in southern Lebanon. Two little-known groups claimed responsibility for the act. One, the Organization of the Oppressed of the World (OOW), released to the media copies of two of Higgins' ID cards as well as a written statement.

A witness stated that LTC Higgins was put into a brown Volvo, which grouped together with several other brown Volvos, and then all the vehicles dispersed in various directions.

Stated demands were: (1) that Israeli troops be withdrawn from southern Lebanon, (2) that Lebanese and Palestinian prisoners be released, and (3) that the United States end interference in Lebanon. In August 1988, a Hizballah official claims to have abducted Higgins in defense of Islam.

On 31 July 1989, pro-Iranian Hizballah terrorists released a video tape of LTC Higgins' apparent execution. This action was supposedly in retaliation for the 28 July 1988 Israeli abduction of Sheik Abdul Karim Obeid, an outspoken Lebanese cleric.

## 1988 Assassination of U.S. Navy Captain William Nordeen, Athens

On 28 June 1988, the U.S. military attache in Greece, Navy Captain William Nordeen, was killed on the street where he lived. A bomb located in a parked vehicle blew his armor-plated car off the road as he drove to work. The blast occurred 100 meters from Nordeen's residence and hurled his car across a small, tree-lined street and lodged it in a steel fence. The victim's decapitated body was found a few yards away in front of an abandoned house.

Although there was no immediate claim of responsibility, Greek authorities believe it was the work of the November 17th Organization. The explosion occurred at 0806 hours in the northern Athens suburb of Kifissia, where many American and other foreign diplomats live.

Approximately 50 pounds of high explosives were placed inside a Toyota parked about 100 yards from Nordeen's residence. Bags of cement were placed inside the vehicle nearest to the curb to direct the blast toward the road. As Captain Nordeen drove by the Toyota, the charge was triggered from a nearby residence. Trees, fences, gates, and walls in the area of the explosion were blackened by smoke as fire engulfed both cars. Nearby residents were injured when the blast hurled pieces of Nordeen's car into neighboring houses. A witness said that shortly after the blast he saw two men on a motorcycle drive off.

The November 17th Organization had attempted a similar attack in January against Drug Enforcement Administration Special Agent, George Carros. However, a radio-controlled device placed in a trash can failed to detonate. Although the November 17th Organization had used a .45-caliber pistol in most of its attacks, in this incident, the bomb was planted outside Carros' home because his car was armor plated and difficult to attack with a pistol.

At the time of Nordeen's death, the November 17th Organization had been responsible for 11 assassinations since 1975, including the shooting of U.S. Navy Captain George Tsantes in 1983 and the murder of Central Intelligence Agency station chief Richard Welch in 1975. Nordeen's killing occurred four days after Greek and American negotiators concluded an unproductive seventh round of talks on a new agreement about the future of U.S. military bases in Greece.

### 1988 Attack on U.S. Soldiers, San Pedro Sula, Honduras

On 17 July 1988, shortly before 0100 hours, a group of nine off-duty U.S. soldiers were attacked with small arms fire and small explosives while leaving the parking lot of an entertainment spot in the Honduran city of San Pedro Sula. The soldiers were on a one-day recreation trip from the U.S. Palmerola Air Base and were exiting the discotheque parking lot in a rental van when the attackers opened fire. The assailants numbered 10 to 12 and used small arms and threw small bombs at the Americans from another car inside the parking area.

The Americans carried no weapons and were in civilian clothes at the time of the attack. When the driver of the American vehicle noticed the shooting, he quickly took evasive action and sped away from the scene. The assailants pursued the fleeing Americans for some distance before breaking off the attack in the parking lot of an industrial area. Six of the group were injured by the attack and were rushed to a hospital where they were treated and later flown to Palmerola Air Base.

The Confetti Disco is a preferred night spot for Americans on pass from the air base. At the time of the attack there were 150 soldiers on a one-day pass from Palmerola, but they were recalled immediately. The terrorist group known as the "Cinchoneros" (Popular Liberation Movement--MPL) claimed responsibility for the attack in a message delivered one day after the incident.

### 1988 Bombing of Pan American Flight 103, Scotland

In what was widely believed to be a revenge attack for the USS Vincenz' downing of an Iranian Airbus in July 1988, Pan Am 103 exploded in flight less than an hour after departing London's Heathrow Airport.

Flight 103 originated in Frankfurt, Germany, with a Boeing 727. Upon arrival in London, all but one continuing passenger transferred to a Boeing 747 for the second leg to New York.

The jet was on its normal flight path after departing Heathrow Airport at 1825 hours. At 1919 hours it disappeared off Scottish radar screens. The main impact sight for the plane's debris was the small Scottish town of Lockerbie. All 259 passengers (189 U.S.) were killed in addition to 11 persons on the ground. Witnesses state that the plane trailed flames as it plummeted 31,000 feet.

Intelligence sources have said the bombing was sponsored by the Iranian Revolutionary Guards and carried out by the Popular Front for the Liberation of Palestine General Command (PFLP-GC).

Debris from the plane was scattered over a 79-mile-long path from Lockerbie to the North Sea. Engineers from Boeing say that the explosive device, believed to be Semtex-H contained within a radio-cassette recorder, was placed in the plane's forward baggage hold. Similar devices and explosives had been found in caches belonging to the PFLP-GC. To further substantiate the PFLP-GC's complicity in this act, barometric switches were found in the residences of group members near Duesseldorf during an October 1988 roundup of the Damascus-based group by German police.

This was only the second 747 to be brought down by a bomb. The first was an Air India jet in June 1985 by a device planted by Sikh extremists.

### 1989 Assassination of U.S. Army COL James N. Rowe, Philippines

During the early morning hours of 21 April 1989, elements of the NPA assassinated COL Rowe while he was enroute to his office. COL Rowe was chief of the ground forces division of the Joint U.S. Military Advisory Group (JUSMAG). The JUSMAG compound was located in Quezon City, just north of Manila. COL Rowe lived openly in a Manila suburb with his family. He was aware of NPA hit lists on which his name appeared, and he had observed terrorist surveillance on his residence. Unfortunately, it appears he became a victim of a fairly predictable routine.

The NPA hit team intercepted the 51-year-old colonel's vehicle in a traffic circle, and two hooded gunmen armed with M16 rifles executed an overrun attack. Although his lightly armored vehicle was hit by 21 rounds of 5.56-mm, only one bullet managed to penetrate the rear compartment, striking the colonel in the back of the head. He died on the way to the hospital. His Filipino driver was also hit but not fatally.

The attack on COL Rowe seems to have been part of a larger NPA "tactical offensive(s), to punish U.S. imperialists for arrogance, insolence, and abuse."

On 19 June 1989, the Philippine military filed charges against Donato Continente, a 27-year old university employee. Donato said he was part of the elite five-man rebel team that had kept COL Rowe under surveillance since late January 1989 but was not involved in the attack.

In a more recent development on 5 November 1990, Reynaldo Bernardo was arrested by Philippine authorities. Bernardo is suspected of being the intelligence chief and deputy commander of the Manila wing of the NPA's Alex Boncayao Brigade.

## 1989 Bombing of UTA Flight 772, Niger

In what proved to be the single most spectacular terrorist event of 1989, UTA Flight 772 was blown out of the sky by a terrorist bomb. At 1408 hours on 19 September 1989, a small explosive charge detonated on the UTA flight enroute from Brazzaville, Congo, to Paris. All 171 passengers aboard the DC-10 were killed when the plane exploded less than an hour after its departure from an intermediate stop in Chad. The wreckage was spread over a 40-mile area of the Sahara Desert in eastern Niger.

A report issued in early 1990 stated that French forensic experts had determined that PETN (an ingredient in several U.S. military explosives), and not Semtex-H, was the explosive on the flight. The bomb was reportedly 5 to 11 ounces of PETN in "paper form" set off by a concealed barometric switch set for 10,000 meters. The device was allegedly hidden in a shipment of farm chemicals. A previously unknown group, the Secret Chadian Resistance, claimed responsibility, saying they wanted a withdrawal of colonial forces from Chad. France still continues to maintain a military presence in Chad in support of Chad's fight against Libya.

Seven Americans, including the U.S. Ambassador's wife, were aboard.

## 1989 Assassination of Dr. Alfred Herrhausen, Germany

Dr. Alfred Herrhausen, director of the powerful Deutsche Bank was assassinated by members of the Red Army Faction on 30 November 1989. An explosive device was attached to a bicycle which detonated as his chauffeur-driven armored Mercedes passed through Spa Park in Bad Homburg.

Dr. Herrhausen traveled in a three-car motorcade, with the car transporting him being the second vehicle. The location in which the explosive ambush occurred was a narrow portion of the road where short poles bordered the sides, precluding vehicles from parking along the shoulders. The bicycle on which the explosive device was concealed, in a saddlebag, was placed against one of those poles.

Although explosives ambushes have been used for several years by the RAF, this operation demonstrated a new level of sophistication. A light sensor was aimed at a reflector across the street from the bike. The sensor was offset from the explosive in the direction of travel of the motorcade so that the shaped charge would detonate nearest to the position of Dr. Herrhausen's seat when the front of his vehicle broke the light beam.

A wire had been run from the bicycle to a firing position about 70 meters away, a set of stairs that led from the spa to a jogging path. The wire had been run across the sidewalk by the terrorists. While disguised as repairmen, they chiseled out a small groove and then after inserting the wire, resurfaced the walkway.

The morning of the attack, the terrorists let the lead vehicle pass and then armed the device prior to Herrhausen's car interdicting the beam. The switch and device worked perfectly, severely wounding the driver and fatally wounding Dr. Herrhausen.

A note found by the remote switch had the RAF symbol and the words, "Wolfgang Beer Commando." As in many cases of terrorist acts, a worker at a pool in the spa said he was curious about some workers (terrorists) along the road but had not been suspicious enough to inquire with the authorities.

**1993 Bombing of the World Trade Center**

On 26 February 1993, approximately 1218 hours an explosion occured beneath the World Trade Center Twin Towers office complex and the Vista International Hotel in New York, New York.  The explosion resulted in the deaths of 6 persons, injuries to 1,040 others, and massive destruction (Estimated $1 Billion) to the garage area beneath the two buildings.

The garage was constructed of reinforced concrete floors and ramps with steel columns and steel beams encased in concrete.  The garage area extended vertically from the top level, B-1, to the bottom level, B-6.  Above level B-1was the Vista ballroom.  Above that was the outside plaza between the World Trade Center and the hotel.  The building next to the hotel where the explosion occurred was the North Tower of the World Trade Center, a 110-story building.