# EXHIBIT 22

Reproduced at the National Archives

filed: 10/15/70

SECRET

JL3-2
CO

### Economic Sanctions against Countries Harboring
### Hijackers or Refusing to Return Airplanes or Passengers

The following are countries which have been uncooperative in punishing hijackers or in releasing planes or passengers:

Jordan. The most notorious case of hijacking recently was in Jordan; here the question was not the intention of the Government, but its ability to control the guerrillas.

Syria in September 1969 held for several days all passengers on a hijacked TWA aircraft. They then released non-Israeli passengers and Israeli women and held the handful of Israeli men until they were finally included in a broader UAR-Israel prisoner exchange arranged by the Red Cross. The Syrian government released the hijackers.

Lebanon. The Lebanese have been involved in several hijacking cases, either as a transit point or, in one instance, as the final destination. In almost every case there have been indications of official-inspired laxity in accepting the hijacked aircraft and/or attempting to capture and prosecute the hijackers. Pan American Airways, after the recent hijackings threatened to stop landing in Beirut, and the Lebanese Government has instituted new security procedures.

The UAR should not be placed fully in this category. The UAR Government immediately released all passengers from the Pan Am 747 blown up in Cairo in September.          They apprehended the hijackers and still have them in prison. They may falter when it actually comes to sentencing the hijackers, but it is too soon the make that judgment. Cairo for a time closed its airport to hijacked aircraft.

Algeria. Algeria has been less active recently in the hijacking business; but sometime ago it held Moshe Tschombe until his death and also some Israeli victims of hijacking.

North Korea. North Korea has not been involved in many cases, but it did hold the hijacker of a Japanese plane while allowing the plane and passengers to return to Japan. (Somewhat the same is the treatment given hijackers from Communist countries in Germany and Austria; though both states often prosecute the hijackers, they give very light sentences. )

DECLASSIFIED
E.O. 12958, Sect. 3.6

SECRET

By ____ NARA, Date 3/2/98

DECLASSIFIED
Authority EO 12958
By ___ NARA Date 10/02

Reproduced at the National Archives

SECRET                                2

**Cuba.** Cuba has now become one the best behaved of the hijacking states, since it immediately allows the planes and passengers to return, and often jails the hijackers. It recently returned its first hijacker, and offered to return all hijackers provided we would do the same (a commitment we cannot make because of the political asylum aspect).

Appropriate Sanctions

In deciding which economic weapons to use in hijacking cases, we need to decide first whether we are acting only in cases involving U.S. citizens and aircraft, or whether we are speaking of more general action.

The cases of both Lebanon and Jordan raise the question of whether pressure on governments is an answer. Here the governments are ineffective because of civil strife, and foreign pressure is easily likely to make it harder for these governments to cooperate.

In the case of Lebanon, the Pan American Airways threat to stop landing at Beirut had some effect, and there is no reason why similar sanctions should not be applied provided there is broad international support so that US carriers will not be exploited by those of other flags.

As far as other sanctions are concerned against Lebanon, the U.S. faces a dilemma. On the one hand, everything that can be done to prevent hijacking should be done. On the other, the U.S. has a major interest in buttressing the responsible government of Lebanon against Syrian-backed radical guerrilla groups that operate in Lebanon -- as much to undercut the government as to operate against Israel. In the broad political context, the U.S. is providing military and economic assistance to Lebanon in order to help the government contain the radical Palestinians. It is these Palestinians who perpetrate the hijackings. So cutting off aid or trade would run directly counter to the U.S. assistance to the government in controlling these radical groups.

The way to deal with the problem in Lebanon is to apply pressure through the international groups and the carriers in ways directly related to air travel and then to work with the government in providing the capacity to restrict guerrilla activity.

In Syria, the 1969 TWA hijacking experience showed that the U.S. -- without even diplomatic relations -- has no leverage to use against Syria except for those pressures that can be generated through the international forums associated with air travel (ICAO, IATA, pilots). Boycotting Damascus airport was seriously considered in the 1969 hijacking case, but the idea was dropped because U.S. carriers would have other governments and non-US carriers refused to go along

DECLASSIFIED
Authority EO 12958
By NF    NARA Date 10/6

SECRET

Reproduced at the National Archives

SECRET                                    3

The choice of sanctions also depends upon whether they are unilateral sanctions or whether there is wide international cooperation. Multilateral sanctions are the only effective economic means of pressure, since the United States is not sufficiently important as an external trading or financial partner of the above countries to give us decisive influence through multilateral economic measures.

We have proposed in the ICAO a resolution which calls upon member states to take joint action suspending all air connections with states detaining passengers, crew or aircraft for international blackmail purposes, or which fail to extradite or prosecute hijackers. We are also calling for rapid completion of a treaty to accomplish the same ends. These proposals amount to a joint boycott using civil air weapons.

However, even these proposals have been resisted by a number of states, and it is by no means certain that our proposals will prevail. There is much less chance of a multilateral agreement using boycott weapons beyond the civil air field. (Several nations have told us that they would support our proposals at some other time, but that they are unwilling to join an effort which, in view of recent happenings, would be interpreted as anti-Arab.)

There are a number of unilateral actions we could take. However, our importance to these countries is so small that U.S. action alone could not be decisive, though it could be highly annoying to the countries involved. By using instruments outside the civil air field, we would be declaring ineffectual economic war; costing ourselves business to no end other than the marginal gains of a moral stance on the issue; and thus subordinating our entire foreign policy to the hijacking incident.

Of the countries listed above, Jordan and Lebanon are recipients of U.S. aid or arms sales, and we are engaged in an effort to reschedule Egyptian debt.

Another possibility of action would be to cut off loans from the Export-Import Bank, but these are not large for the countries concerned, and the damage in lost export sales would be heavier to us than to the purchasing country.

The main instrument of economic boycott available to the U.S. Government is the Trading with the Enemy Act. This Act has allowed us to sever all financial and trade relations with China, North Vietnam, North Korea, Cuba and Rhodesia. Somewhat similar authority under the Export Administration Act allows us to embargo all exports to those destinations. (Restriction of passports for travel accomplishes the same thing in a more limited field.)

SECRET

DECLASSIFIED
Authority EO 12958
By MF    NARA Date 10/0:

Use of either of these instruments is the equivalent of economic war. No major industrial power uses any instrument of this intensity with the exception of those countries adhering to the Rhodesian boycott. However, though there would be a great symbolic significance in use of these two Acts, the practical effect on the countries concerned would be relatively small and we would be leaving as hostage whatever American investment exists in these countries.

Where American investment in these countries is larger than their holding of assets in the United States, as it is in most, we would lose more than we would take, in a reciprocal confiscation of assets maneuver.

The chances of effective action are better if we continue to pursue the multilateral civil air boycott possibilities, at least until we have thoroughly exhausted them.

SECRET

DECLASSIFIED
Authority EO 12958
By NF    NARA Date 10/02

Reproduced at the National Archives

...RITY COUNCIL CORRESPONDENCE ROUTING AND CONTROL PROFILE

FROM: ELIOT _____
ROGERS _____
Haig x
LAIRD _____
Flanigan
DOC DATE: received 10/12

CLASSIF:    U _____ _____ EXDIS
            C _____ _____ NODIS
            LOU _____ _____ EYES ONLY
            S  X  _____ RES DATA'
            TS _____ _____ CODEWORD
                   _____ SENSITIVE
                   _____ PARIS MTG
                   _____ NO FORN

DOCUMENT SOURCE

SUBJECT: Blind memo, Flanigan to Haig re: sanction against countries harboring hijackers.

ENCLOSURES: ( _____ )    ( _____ ) NOT XEROXED FOR SUSPENSE FILE _____

| INTERNAL ROUTING AND DISTRIBUTION NAME: | ACTION | INFO | RCD CY FOR: |
|---|---|---|---|
| ADVANCE CYS TO HAK/HAIG | ███ | | |
| STAFF SECRETARY | | | |
| DIR, SECRETARIAT | | | |
| SUB-SAHARAN AFRICA | | | |
| NR EAST/NORTH AFRICA | | | |
| EUROPE/CANADA | | | |
| LATIN AMERICA | | | |
| UNITED NATIONS | | | |
| ECONOMIC | | | |
| SCIENTIFIC | # X | | |
| PLANNING GROUP | | | |
| PROGRAM ANALYSIS | | | |

ACTION REQUIRED
MEMO FOR HAK ........................ ( _____ )
MEMO TO PRESIDENT ................... ( _____ )
REPLY FOR HAK SIGNATURE ............. ( _____ )
REPLY FOR PRES SIGNATURE ........... ( _____ )
MEMO _____ TO _____ ... ( _____ )
RECOMMENDATIONS .................... ( _____ )
JOINT MEMO ......................... ( _____ )
APPROPRIATE ACTION ................ ( _____ )
ANY ACTION NECESSARY .............. ( _____ )
CONCURRENCE ....................... ( _____ )
DUE DATE: _____

COMMENTS: (Including Special Instructions)

SECRETARIAT DISTRIBUTION/ACTION

| DATE | FROM | TO | ACTION REQUIRED |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

INTERNAL ROUTING

MICROFILM DATA
DO
INIT _____
DATE _____
ORIG) NSC
TO ) PAF
WHC
SUBF

DISPOSITION

DISPATCH: LETTER/MEMO _____

NOTIFY: _____

COPIES: (AS MARKED ABOVE)

NSC _____ _____ STAFF APPROVAL
PAF _____ _____ HAK APP'L
WHC  X  _____ HAK MARGINALIA
SUBF _____ _____ NS3 FORM REQUIRED

DECLASSIFIED
Authority EO 12958
By MF    NARA Date 10/02